1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9         SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  JAIME HOYOS, | Case No.:  09cv0388 L (NLS) |
| 12                        Petitioner, | *DEATH PENALTY CASE* |
| 13  v. | |
| 14 | **ORDER:** |
| 15 | **(1)  DENYING RESPONDENT'S** |
| 16 | **REQUEST TO DISMISS CLAIMS 14-16 ON THE BASIS OF STATE** |
| 17  RON DAVIS, Warden of San Quentin | **PROCEDURAL BARS** |
| 18  State Prison, | |
| 19                        Respondent. | **(2)  DENYING PETITIONER'S REQUEST FOR AN EVIDENTIARY** |
| 20 | **HEARING ON CLAIMS 13-23 AND 25** |
| 21 | |
| 22 | **(3) DENYING SECOND AMENDED PETITION FOR A WRIT OF** |
| 23 | **HABEAS CORPUS** |

24

25          On August 28, 2014, Petitioner filed a brief regarding procedural issues, including

26   requesting an evidentiary hearing, and addressing the merits of the claims in the Second

27   Amended Petition ["SAP"], the operative petition in this habeas action under 28 U.S.C. §

28   2254.  (ECF No. 104.)  Petitioner asserts that he "is entitled to an evidentiary hearing on

his <u>Brady</u> claims, his IAC [ineffective assistance of counsel] claims, and his Eighth Amendment mental retardation claim," listed as Claims 13-23 and 25 of the SAP. (<u>Id.</u> at 55.) On October 23, 2014, Respondent filed an Opposition/Response, and on March 6, 2015, Petitioner filed a Reply. (ECF Nos. 106, 114.) The Court held oral arguments on January 26, 2017. In response to the Court's subsequent request for information regarding matters discussed at oral arguments (<u>see</u> ECF No. 120), Petitioner filed a Response on May 12, 2017 and a Notice of Lodgment on June 30, 2017. (ECF Nos. 135, 140.) On July 6, 2017, Respondent filed a Response to Petitioner's filings. (ECF No. 141.)

For the following reasons, and based on the arguments presented in the pleadings and at oral argument, the Court **DENIES** Respondent's request to dismiss Claim 14-16 on the basis of state procedural bars, **DENIES** Petitioner's request for an evidentiary hearing on Claims 13-23 and 25, and **DENIES** habeas relief on all claims in the Second Amended Petition.

## I. <u>PROCEDURAL HISTORY</u>

By an Information filed on August 25, 1992, Petitioner Jaime Hoyos and co-defendant Emilio Alvarado were charged with two counts of first degree murder and one count of attempted first degree murder in the deaths of Daniel and Mary Magoon and the wounding of their 3 year old son J., and three special circumstances. (Clerk's Transcript ["CT"] 26-31.) Both Petitioner and Alvarado[1] were also charged with conspiracy to commit robbery, first degree robbery, residential burglary, grand theft of a firearm, and transporting more than 28.5 grams of marijuana. (CT 31-34.) Petitioner and Alvarado were tried together.

After a guilt phase trial, Petitioner and Alvarado were convicted on two counts of first degree murder pursuant to California Penal Code § 187 in the deaths of Daniel and

---

[1] Alvarado alone was charged with three additional crimes, which included possession of a firearm by possessor of controlled substance, possession of a controlled substance, and possession of a firearm by a felon. (CT 34-35.)

Mary Magoon. (CT 3554-55, 3559-60.) They were acquitted of attempted murder but convicted of the lesser included offense of assault with a firearm pursuant to Cal. Penal Code §§ 664, 187, and 245 (a)(2) in the wounding of J. (CT 3556-57, 3561.) Petitioner and Alvarado were also convicted of conspiracy to commit robbery pursuant to Cal. Penal Code §§ 211 and 182.1, first degree robbery pursuant to Cal. Penal Code § 211, burglary pursuant to Cal. Penal Code § 459, grand theft of a firearm pursuant to Cal. Penal Code § 487.3, and transporting more than 28.5 grams of marijuana pursuant to California Health and Safety Code § 11360(a). (CT 3554-64.)

The jury found that Petitioner and Alvarado used a firearm in the commission of the murders pursuant to Cal. Penal Code § 12022.5. (CT 3555, 3559-60.) The jury also found true the three special circumstance allegations- that the murder was committed during the course of a robbery and burglary pursuant to Cal. Penal Code § 190.2(a)(17)(A) and (G), and multiple murder pursuant to Cal. Penal Code § 190.2(a)(3). (CT 3555-56, 3559-60.) Before the start of the penalty phase proceedings, the trial court denied Petitioner's motion for a new trial, but granted Alvarado's.[2] (CT 3574-75.)

After the penalty phase, the jury returned a verdict of life without the possibility of parole in the murder of Daniel Magoon and a verdict of death in the murder of Mary Magoon. (CT 3583-84.) On July 11, 1994, the trial court denied Petitioner's motions for a new trial and for modification of the verdict, and sentenced him to death. (CT 3588-91.)

On automatic appeal ["direct appeal"] of this conviction and judgment to the California Supreme Court, Petitioner filed an opening brief on October 17, 2003, raising sixteen (16) claims for relief, and a reply brief on March 16, 2006. (Lodgment Nos. 100, 102.) The California Supreme Court affirmed Petitioner's conviction and sentence in a decision issued on July 23, 2007. People v. Hoyos, 41 Cal. 4th 872 (2007). On February

---

[2] Alvarado later pled guilty and was sentenced to life in prison without the possibility of parole.

19, 2008, the Supreme Court of the United States denied his petition for a writ of certiorari. Hoyos v. California, 552 U.S. 1201 (2008.)

On September 11, 2006, Petitioner filed a habeas petition and supporting exhibits with the California Supreme Court, raising eighteen (18) claims for relief, and a reply brief on July 11, 2008. (Lodgment Nos. 106-15, 117.) The petition was denied on February 18, 2009, without an evidentiary hearing. (Lodgment No. 118.)

On February 26, 2009, Petitioner filed a motion to appoint counsel in this Court. (ECF No. 1.) On October 2, 2009, the Court appointed counsel. (ECF No. 12.) On January 15, 2010, Petitioner filed a motion for equitable tolling. (ECF No. 30.) After briefing and argument, the Court granted the motion for equitable tolling on February 16, 2010, extending the deadline to file the petition until September 1, 2010. (ECF No. 36.) On February 17, 2010, Petitioner filed a petition for writ of habeas corpus, raising twenty-eight (28) claims for relief, and on September 1, 2010, Petitioner filed an amended petition for a writ of habeas corpus, raising the same 28 claims. (ECF Nos. 37, 54.) After hearing and adjudicating issues of exhaustion and stay and abeyance, the Court stayed the federal petition and held the case in abeyance for purposes of exhaustion. (ECF No. 72.)

On February 3, 2011 and February 9, 2011, Petitioner filed a habeas petition and supporting exhibits with the California Supreme Court, raising two claims for relief, and a reply brief on May 25, 2011. (Lodgment Nos. 120-21, 123.) On October 30, 2013, the California Supreme Court denied Petitioner's state exhaustion petition. (Lodgment No. 124.) On November 29, 2013, Petitioner filed his Second Amended Petition ["SAP"] in this Court, raising the same 28 claims presented in the prior federal petitions. (ECF Nos. 86-88.) On March 25, 2014, Respondent filed an Amended Answer ["Ans."] and an attached Memorandum of Points and Authorities ["Ans. Mem."]. (ECF No. 94.) On May 27, 2014, the Court issued an order setting forth deadlines for briefing procedural default, merits and any motions for evidentiary development. (ECF No. 99.) On August 28, 2014, Petitioner filed an Opening Brief ["Pet. Brief"] regarding the merits, procedural issues and an evidentiary hearing. (ECF No. 104.) On October 23, 2014, Respondent filed an

Opposition/Response ["Resp. Opp."], and on March 6, 2015, Petitioner filed a Reply ["Reply"].  (ECF Nos. 106, 114.)

## II. <u>TRIAL PROCEEDINGS</u>

The Court refers the parties to the statement of evidence issued by the California Supreme Court in <u>Hoyos</u>, 41 Cal. 4th at 879-89.  The California Supreme Court's factual findings are presumptively reasonable and entitled to deference in these proceedings.  <u>See</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47 (1981).

To provide context to the Court's discussion of the claims in the Second Amended Petition, particularly the claims asserting ineffective assistance of counsel, restated below is the California Supreme Court's summary of evidence and testimony presented during the guilt and penalty phase proceedings.

### A. Guilt Phase

*1. The Prosecution's Case*

*a. Evening of May 26, 1992*

On May 26, 1992, Daniel Magoon, his wife Mary, and their children, D. (age seven) and J. (age three), were living on Steele Canyon Road in the Jamul area of San Diego County. Daniel Magoon operated a large-scale marijuana distribution business out of the garage of their house. He also kept weapons and money in the garage. A security gate around the house was usually closed.

Jimmy Johnson was a long-time friend and occasional partner of Daniel Magoon in the marijuana trade. In 1974, both Daniel Magoon and Johnson had pleaded guilty to intent to distribute a controlled substance. Johnson testified that he was not involved in dealing marijuana with Daniel Magoon at the time of Magoon's death.

Around 8:30 p.m., Daniel Magoon visited Johnson at Johnson's residence. Magoon told Johnson that he was expecting some people to come over to the Magoon house that evening, and then left Johnson's residence. That day, Johnson had seen Magoon with a stack of money, possibly as much as $250,000. Johnson never heard from Daniel Magoon again.

Around 7:45 p.m., the Magoons' next-door neighbor, Mary Jane Lange,

5

09cv0388 L (NLS)

entered her bedroom to read. Her bedroom windows were open. About 40 minutes later, Lange heard Daniel Magoon's voice and at least one other male voice. She heard Magoon say something like, "Oh, come on." Sometime between 10:30 p.m. and 11:30 p.m., Mrs. Lange heard what sounded like four firecrackers, in rapid succession, that came from the direction of the Magoon residence. Between five and 15 minutes later, Mrs. Lange heard a series of four to seven more firecracker noises in rapid succession, again coming from the direction of the Magoon house. Mrs. Lange's live-in son-in-law, Kenneth Wall, heard what sounded like four gunshots sometime between 11:00 p.m. and 11:30 p.m.

### b. Auto Stop and Arrest of Defendants

About 12:20 a.m., on May 27, 1992, El Cajon Police Officer William Pettus was on patrol when he noticed the rear license plate light was out on a passing Toyota Corolla. Officer Pettus stopped the Corolla, exited his patrol vehicle, and approached the car. He saw Alvarado in the driver's seat and defendant in the front passenger seat. Alvarado was shaking; he appeared nervous and was sweating, although the evening temperature was cool. Officer Pettus asked Alvarado for his driver's license and vehicle registration. Alvarado handed him a California Identification Card with the name "Ralph Varela." Alvarado told the officer that defendant had a driver's license, and the officer asked both Alvarado and defendant for defendant's license, but defendant did not produce one. After returning to his patrol car and determining that there was no record that either defendant or "Varela" had a valid driver's license, the officer began to write a citation and called for police back-up.

El Cajon Police Officer Christopher Pietrzak arrived at the scene shortly thereafter. Officer Pettus ordered defendant and Alvarado out of the car. Officer Pietrzak watched defendant and Alvarado, while Officer Pettus searched the Corolla. Officer Pettus searched the driver's side and found a nine-millimeter gun magazine (containing 12 rounds), and two large caliber rounds. On the passenger side, under the seat, he found a loaded nine-millimeter, semi-automatic, Egyptian-manufactured Helwan pistol. It had one round in the chamber and eight rounds in its magazine. The Helwan pistol matched a gun box later found in the victims' house for a gun that Daniel Magoon owned.

Officer Pettus then searched the back seat of the car, where he found phone bills, rental agency forms, and a license plate. He searched the trunk

6

09cv0388 L (NLS)

and found approximately 28 pounds of marijuana, some of which was frozen, both in brick form and inside plastic baggies contained in boxes. A latent fingerprint removed from a piece of tape used to wrap the marijuana was later identified as Daniel Magoon's.

Officer Pettus arrested Alvarado and defendant. The officer conducted a pat-down search of Alvarado before placing him in a patrol car. He found an empty nine-millimeter casing in Alvarado's left front pants pocket. After placing Alvarado in a holding cell, the officer checked the back seat of the patrol car and found two nine-millimeter cartridges. A strip search of Alvarado yielded a rock of methamphetamine.

At the police station, Officer Pietrzak searched defendant and found $1,033 in various denominations in his right rear pants pocket, and three $1 dollar bills in a front pocket. He also found defendant's Mexican driver's license.

*c. Discovery of the Murders*

On May 27, 1992, about 7:00 a.m., seven-year-old D. woke up in his home. He saw his three-year-old brother, J., sleeping on a futon in the living room, woke him up, and asked him if he was okay. J. answered "yeah," and fell back to sleep. D., however, saw some blood on J. He then found the body of his mother, Mary Magoon, in the bathroom. He found his father's body in the kitchen by the microwave. D. attempted to use the telephone to call 911 or the police, but was unsuccessful. He left to go to his best friend's house down the street.

At approximately 7:30 a.m., Patricia Bagnell was jogging through a field behind a 7–Eleven store in Jamul. She encountered D., barefoot, walking quickly down the side of a dirt road. D. looked pale and was crying. She said hello, and asked him why he was crying. He said that his parents were dead and there was a lot of blood in his house. She walked with him towards the residence of his best friend, where they encountered Richard Brewer. Brewer asked if they needed help. Bagnell told Brewer that D. had told her that his parents were dead. Brewer asked D. where he lived, and the three of them drove to D.'s house. When they arrived at the Magoon residence, both security gates were open and they pulled into the driveway.

The front door was open, and Brewer entered the residence while the other two stayed in his truck. The house was a shambles; everything was torn

up. Brewer saw a little boy on the living room floor close to two rifles and a gun with a silencer. Brewer shook the little boy but got no response. Brewer got nervous and left to call for help, leaving the little boy where he was. Brewer, D., and Bagnell went to Bagnell's house nearby and called 911.

Firefighters arrived at the Magoon residence about 8:00 a.m. Brewer told Fire Captain Jeffrey Nelson that there was a bleeding child in the living room, and that there might be more people down the hallway. After making sure that police deputies were on their way, Captain Nelson entered the house through the front door. He noticed a "Mac–10" style submachine gun on the carpet just beyond the entry tile, later identified as an Ingram, semiautomatic .45–caliber pistol with a barrel extension. As he walked into the entryway, he saw J. lying on a futon. As he moved toward the child, he saw two rifles that were lying parallel to each other, later identified as a Ruger Mini–14 semi-automatic .223–caliber rifle, and a .177–caliber air rifle.

J.'s hair was matted and wet from blood. The upper part of his T-shirt was covered with blood, which had spilled down onto his diaper. When Captain Nelson attempted to feel for a pulse, J. woke up and looked very scared. Captain Nelson then carried him outside to receive medical attention. J. had a laceration to the back of his head, and a six-to-eight-inch-long bruise in the left shoulder blade area. His head laceration was later determined to be a bullet wound.

Police deputies and other investigators went through the house. Daniel Magoon was found dead, lying on the floor in the kitchen area. Mary Magoon was also found dead, lying on her right side with her shoulder and head at the threshold of the hallway bathroom doorway. There was no evidence of forced entry to the Magoon residence.

*d. Crime Scene Evidence*

On-site investigation and later testing showed that multiple weapons had been fired in various rooms of the house, and that the house had been ransacked. No percipient witnesses testified about what happened in the house when the Magoons were shot. The prosecution relied on detailed crime scene evidence to establish its case.

*(1) Entryway and Living Room*

Investigators found three guns in the entryway and living room: a .45–caliber

semiautomatic pistol, a semiautomatic .233–caliber rifle, and a .177–caliber air rifle. The Ingram, Mac 10–style .45–caliber semiautomatic pistol found at the entryway had a barrel extension (that resembled a silencer) and a magazine, but contained no ammunition. It had been improperly reassembled, and therefore could not fire. The Ruger Mini–14 semiautomatic .223–caliber rifle did not have a magazine, and had no rounds in the chamber. It had been fired before, but the testifying criminologist could not determine how recently. Blood on the trigger guard was tested and found to be consistent with defendant's blood type. The .177–caliber air rifle was operable and had been fired before, but it could not be determined how recently. Its barrel was bent in a downward direction, and had hair and blood on it. Blood on the trigger guard and forearm stock was tested and found to be consistent with defendant's blood. Blood on the barrel was consistent with Mary Magoon's blood.

On the floor was a woman's checkbook and wallet that had been rifled through, but contained a few dollars. There was also loose marijuana on the floor. One unexpended nine-millimeter cartridge was on the living room floor next to the fireplace.

*(2) Kitchen*

On top of the kitchen island, investigators found a full 7–Eleven "Big Gulp" cup with Alvarado's fingerprints.[FN4] Daniel Magoon's face and upper body were covered with a blanket. His right hand held a clump of hair, later identified as J.'s. There were several nine-millimeter and .22–caliber casings on the floor near Daniel Magoon's body, and scattered across the kitchen counter area. A wallet containing Daniel Magoon's driver's license, business and credit cards, but no money, was on the floor.

FN4. Marbell Lopez testified that there was a 7–Eleven store near the Magoon residence, and that she had driven defendant home from that 7–Eleven store at least once two months before the murders.

*(3) Hallway Bathroom*

One expended nine-millimeter bullet was found under Mary Magoon's right forearm. A second nine-millimeter bullet fell from her body as she was lifted onto a gurney. She held a clump of hair in her right hand, later identified as her own. She also held a clump of hair in her left hand, later identified as J.'s, and a baby pacifier. A baby blanket was lying between her legs. She was

wearing pajamas.

There were three nine-millimeter casings in the hallway bathroom. The hallway bathroom door had two bullet holes at the base. The door had another bullet hole, and a blood spatter about five and one-half feet off the ground, which was consistent with either blunt force trauma or a gunshot. The blood on the bathroom door was consistent with that of Mary Magoon's blood.

The hallway carpet contained a bullet hole. A nine-millimeter casing was lying on the same carpet. There was blood on the wall across from the bathroom hallway about two and one-half feet off the ground, which was identified as a swiped application of blood onto the surface. This blood was consistent with the blood of either Daniel Magoon or J. There was fresh vomit on the hallway carpet located between where Mary Magoon's body was found and the kitchen.

*(4) Master Bedroom*

Investigators found a nine-millimeter casing on the carpet at the end of the hallway or entrance to the master bedroom. The master bedroom door was open. The outside of the door had a bullet hole about three feet up from the floor with some black soot around it, indicating a close-range shot. Splinters from the door were lying on the floor in that area. A nine-millimeter casing was on a closet floor. An expended bullet that struck a chair was lying on the floor near a gun safe. The gun safe had a combination lock and keys, both of which had to be activated to open the safe door. Some keys were in the lock, but the safe door was closed and locked.

In the master bedroom bathroom there was a hidden storage compartment behind a slip-out shelf. This storage compartment contained a .30–caliber M–1 rifle. It also contained the gun box for the nine-millimeter Helwan pistol that Daniel Magoon owned.

*(5) Two Bedrooms off the Hallway*

The Magoon residence had two bedrooms off the hallway. The door to one of the bedrooms appeared to have been recently kicked open. The doorjamb was cracked and splintered, and the striker plate and splinters were lying on the hallway carpet.

*(6) Garage*

The garage contained marijuana debris, heat lamps, a fan, a trash compactor with wood blocks to make bricks of marijuana, an electronic scale, a vacuum sealer, and packaging material, such as plastic baggies, large garbage and plastic bags, and rolls of clear tape. A federal drug enforcement agent testifying as an expert witness stated that the equipment indicated that the persons in control of the premises were involved in the sale of marijuana, and that the type of marijuana and its packaging indicated Mexican origin. Also in the garage were two freezers, a chest-type and an upright-type.[FN5] Only the upright-type freezer was working, and it contained two packages with large quantities of marijuana stems and seeds, as well a large amount of marijuana debris at the bottom of the freezer. A roll-away tool chest contained "pay and owe" sheets, which are used to record drug transactions.

> FN5. The federal drug enforcement agent testified that marijuana dealers believe that storing marijuana in a freezer retains its potency.

*e. Autopsy and Medical Evidence*

*(1) Daniel Magoon*

Daniel Magoon died from four gunshot wounds. A bullet hole on his left sleeve was surrounded by tiny marks from burning gunpowder, indicating the shot came from an "intermediate" range of a few inches to a few feet. The four shots probably were fired in rapid succession. It was unlikely he would have been able to walk after being shot because both of his lungs and his aorta had been perforated, and a bullet had penetrated his spinal cord; he probably died within 30 seconds of being shot. The toxicology report on Daniel Magoon showed 0.25 micrograms per milliliter of active cocaine present in his blood.

*(2) Mary Magoon*

Mary Magoon's death was caused by gunshot wounds and blunt force injuries. She suffered four gunshot wounds, including one from a bullet that entered the back of her head, went through her brain, and exited her right forehead. In addition, the medical examiner identified at least seven separate blunt force injuries to her head. The severe injuries to her head alone could

have caused her death. Her skull was severely fractured underneath the bruises and lacerations. The blunt force injuries to her head occurred before she died. These injuries could have been caused by the air rifle found on the living room floor.

Mary Magoon also had injuries to the rest of her body, including four separate injuries to her back. These injuries had imprints that were consistent with the shape of the air rifle. She had multiple injuries to her arms and hands. Her left ring finger was broken, and there were shallow cuts to her right wrist. Some of these injuries were consistent with "defensive wounds," which is a natural inclination to move the arms up to deflect blows. A laceration on the top of her foot contained embedded wood fragments, which the medical examiner opined were from the wood chips the gunshot hole created in the lower part of the hallway bathroom door. The toxicology report on Mary Magoon showed 0.98 micrograms per milliliter of active cocaine present in her blood.

*(3) J.*

J. had two lacerations, an entry wound and an exit wound two inches apart, to the back of his head, indicating a bullet caused the penetrating injury. There was discoloration and burning of the skin which, the treating physician opined, indicated the gun was close to the entry wound. A brain scan indicated the brain had been injured, but J.'s wound was not life-threatening. An impact to the brain can cause nausea and vomiting.

*f. Blood and DNA Testing*

Defendant's and Alvarado's clothing was taken as evidence the night they were arrested and later submitted for DNA testing, which revealed the following. Defendant was the possible source of the bloodstains on his T-shirt and of three separate bloodstains on his jeans. However, there was blood consistent with that of Mary Magoon on the right thigh of defendant's jeans. There was also blood consistent with that of either Daniel Magoon or J. on the left front pocket area of defendant's jeans. No blood was found on Alvarado's clothing.

*g. Ballistic Evidence*

A firearms expert testified that his analysis of the recovered bullets and casings indicated that two nine-millimeter firearms were used at the crime

scene. Daniel Magoon's Helwan pistol, which was found in Alvarado's car, was the only nine-millimeter weapon recovered during the investigation, but none of the recovered nine-millimeter bullets or casings was fired by the Helwan. The Helwan had been fired at some point, but it was not possible to determine when.

Expert testimony also revealed that two expended bullets recovered from Daniel Magoon's body during the autopsy, and the expended bullet found on the master bedroom floor, were fired by one nine-millimeter weapon, but the expert could not determine the particular model. Either of the two nine-millimeter guns listed on the Department of Justice's records as registered to Alvarado (under the name "Ralph Varela") was the type of gun that could have fired the bullets, but there were approximately 75 other models of nine-millimeter firearms available on the market that could have also fired them.

The two expended bullets recovered under Mary Magoon's body were fired from the same gun, which was probably an Uzi-manufactured firearm. The Uzi magazine found in Alvarado's car could have fit into either a pistol or carbine Uzi weapon.

The firearms expert also testified that six of the nine-millimeter casings recovered were fired by one gun; five of the casings were found at the crime scene (including the three casings found near Daniel Magoon's body) and one casing was found in Alvarado's pants pocket when he was arrested. The three nine-millimeter casings found on the floor in the hallway bathroom (where Mary Magoon was killed) were fired from a different gun.

An unexpended cartridge found on the living room floor, and two unexpended cartridges found in the backseat of the patrol car where Alvarado was sitting, had been cycled through the same firearm that fired the three nine-millimeter casings found on the hallway bathroom floor. In addition, five .22–caliber casings were recovered at the crime scene, all of which were fired from the same gun.

### h. Defendant's Dealings With Daniel Magoon

Several times between February and May of 1992, Johnson was present at the Magoon residence, mostly in the garage, where Daniel Magoon, who knew some Spanish, spoke with Spanish-speaking men. Johnson identified defendant at trial as someone he had seen with Daniel Magoon at least once

in the garage. Defendant had been at the garage in the company of one or two other persons. Johnson did not recognize Alvarado. Defendant had also been in the company of a woman named "Maria" Lopez.[FN6] Johnson initially thought Maria Lopez and defendant were married, and assumed defendant's name was "Jaime Lopez." Johnson had identified defendant in a live line-up as "Jamie Lopez."

> FN6. Maria Lopez was apparently a friend of Johnson's wife. Lopez appears to be the same person as "Marbell" Lopez, who testified at trial.

Marbell Lopez met defendant in 1991, and had a close relationship with him. In February 1992, she purchased a Ford Bronco for defendant with money he gave her. She would occasionally drive defendant to the Magoon residence, had been there with him four or five times, and had met Daniel Magoon there once or twice while with defendant. She also met Alvarado through defendant.

*i. Alvarado's Firearms Use*

Thomas Lamb, who knew Alvarado, testified at trial. He stated that once, before the murders, Alvarado had displayed a nine-millimeter handgun to him.

Earlier on the day the murders were committed, about 3:00 p.m., defendant, Alvarado, Thomas Arroyo, and Jose "Chepe" Sanabia drove to a gun shop in San Ysidro, California.[FN7] Alvarado, using the name "Ralph Varela," purchased a Bersa, a .380–caliber gun manufactured in Argentina, which is smaller than a nine-millimeter gun and is called a "nine-millimeter short." Alvarado did not take the gun with him that day, because there was a 15–day waiting period. Sanabia picked up the gun after the waiting period.

> FN7. Sanabia identified defendant in a photographic lineup but could not identify defendant in court.

On May 30, 1992, a detective searched Alvarado's residence in El Cajon. Underneath a drawer, the detective found an empty gun box for a semiautomatic nine-millimeter pistol. The serial number on the gun box matched the serial number of a weapon listed on the Department of Justice's records sold to "Ralph Varela" (Alvarado's alias).

## 2. The Defense Case

Neither codefendant testified.

### a. Defendant's Driver's License

An official from the Mexican consulate testified that defendant had a valid Mexican truck driver's license.

### b. Daniel Magoon's Cocaine Use

As noted, toxicological specimens collected during the autopsy indicated that Daniel Magoon had 0.25 micrograms per milliliter of active cocaine in his blood. Stephen Stahl, M.D., a psychiatrist and psychopharmacologist, testified that this level of cocaine would be consistent with Daniel Magoon's "being anywhere from mildly stimulated to being overtly crazy." Richard Whalley, a forensic scientist and toxicologist, testified that, given this cocaine level, Daniel Magoon could have exhibited a range of behavior, from being a little more than usually alert to paranoia.

### c. Daniel Magoon's Firearms Use

Arthur Coleman testified that on April 25, 1982, he was a deputy sheriff in Imperial County, and he encountered Daniel Magoon driving a van. Magoon appeared to be under the influence of alcohol, and Deputy Coleman arrested him. During an inventory search of the van, Deputy Coleman retrieved three loaded firearms, two unloaded firearms, approximately 1,000 rounds of ammunition, and two bundles of marijuana.

### d. The Shooting of J.

Pathologist Arthur Koehler, M.D., testified that he had reviewed the medical reports, photographs, and other records of J.'s gunshot wounds. Dr. Koehler testified that the bullet entry to J.'s scalp was "tangential," which meant that it was fired somewhat parallel to his scalp rather than at a right angle. Dr. Koehler stated that J.'s wound was consistent with a bullet passing through Mary Magoon's arm.

Forensic pathologist, Irving Root, M.D., also testified about J.'s injuries. Dr. Root stated that, if J. had been injured in the area of the hallway bathroom, one would expect to see a blood trail from that area to the futon

where J. was found, but there appeared to be no such blood trail. Because of this, and because of the large amount of blood on the futon, it was Dr. Root's opinion that J. was on the futon within a few seconds to one minute after he began to bleed. Dr. Root testified that the vomit found on the hallway floor was consistent with J.'s vomiting after he sustained the scalp injury.

## B. Penalty Phase

### 1. Prosecution Evidence

The prosecution gave no opening statement, put on no evidence, and rested on the guilt phase evidence.

### 2. Defense Evidence

James Park, a correctional consultant and retired administrator for the California Department of Corrections, testified about the conditions of defendant's confinement, if he were sentenced to life without the possibility of parole.

Carrie Baker, who lived in Jamul, testified that, in the early morning of May 27, 1992, she heard approximately five muffled gunshots around 2:45 a.m. (which would have been after the time defendants had been arrested). Three or four days later, she read something about the murders, called a number that was listed for information about the case, and left her name and telephone number on an answering machine.

Eight members of defendant's family (his wife, three children, three brothers, and a sister) testified that they loved defendant and would be deeply saddened if he were put to death.

Hoyos, 41 Cal. 4th at 879-89.

# III. PROCEDURAL MATTERS

## A. Procedural Default

When a state court's rejection of a federal claim "rests on a state law ground that is independent of the federal question and adequate to support the judgment," the claim is procedurally defaulted. Coleman v. Thompson, 501 U.S. 722, 729 (1991). "State rules count as 'adequate' if they are 'firmly established and regularly followed.'" Johnson v.

Lee, 578 U.S. ___, 136 S.Ct. 1802, 1804 (2016), quoting Walker v. Martin, 562 U.S. 307, 316 (2011). "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." La Crosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001), citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983) and Harris v. Reed, 489 U.S. 255, 265 (1989). "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

Respondent asserts that the Court should not review the portion of Claim 14 alleging ineffective assistance of counsel with respect to the third party culpability defense because the claim is procedurally barred as untimely. (Ans. at 11-12.) Respondent also asserts that Claims 15 and 16 are procedurally barred under Dixon and Seaton, respectively, and should not be reviewed on the merits. (Ans. at 13-14.)

In denying the first state habeas petition, the California Supreme Court held that "[e]xcept insofar as it asserts ineffective assistance of trial counsel," the state claim now raised as Claim 15 in the SAP "is barred under *In re Dixon* (1953) 41 Cal.2d 756, 759, because it could have been, but was not, raised on appeal." (Lodgment No. 118.) The California Supreme Court held that "[e]xcept insofar as it asserts ineffective assistance of trial counsel," the state claim now raised as Claim 16 in the SAP "is barred under *In re Seaton* (2004) 34 Cal.4th 193, 199-200, because it was not properly preserved in the trial court." (Id.) The California Supreme Court also summarily stated: "All claims are denied on the merits." (Id.) With respect to the second state petition, the California Supreme Court denied the ineffective assistance of counsel portion of the state claim now raised as Claim 14 on the merits and stated that the claim "is also barred as untimely (*In re Robbins* (1998) 18 Cal.4th 770, 780-81) and because it could have been, but was not, raised in petitioner's first petition for writ of habeas corpus. (*In re Clark* (1993) 5 Cal.4th 750, 767-

17

769.)" (Lodgment No. 124.)

Petitioner argues that he can satisfy cause and prejudice with respect to Claim 14, and can also demonstrate that Claim 14 should be heard on the merits under the miscarriage of justice exception. (Pet. Brief at 29-32.) Petitioner points out that the California Supreme Court explicitly exempted the ineffective assistance of counsel allegations in Claims 15 and 16 from procedural bars in ruling on those claims, and alleges that with respect to Claim 15 "[r]egardless of whether a separate claim for prosecutorial misconduct as to the initial making of this statement is viable in this federal proceeding, the IAC component of the claim clearly is," and asserts with respect to Claim 16 that "[t]he crux of petitioner's claim is ineffective assistance of counsel." (Id. at 36, 38.)

The Ninth Circuit has held that: "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.")  In light of the acknowledged complexities involved in a prospective procedural default analysis, coupled with the fact that these three claims each fail on the merits, as discussed in detail below, the Court will address Claims 14, 15 and 16 on the merits and decline to address the issue of procedural default.

**B.  Teague v. Lane**

"Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."  Teague v. Lane, 489 U.S. 288, 310 (1989) (plurality opinion); see also Stringer v. Black, 503 U.S. 222, 227 (1992) ("Subject to two exceptions, a case decided after a petitioner's conviction and sentence became final may not be the predicate for federal habeas corpus relief unless the decision was dictated by precedent existing when the judgment in question became final.")  A new rule is one that "breaks new ground or imposes a new obligation on the States or the Federal Government" or one

whose "result was not dictated by precedent existing at the time defendant's conviction became final." Teague, 489 U.S. at 301. The two exceptions to Teague are if the new rule in question: (1) "places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,'" or (2) "requires the observance of 'those procedures that . . . are implicit in the concept of ordered liberty.'" Id. at 307, quoting Mackey v. United States, 401 U.S. 667, 692, 693 (1971) (internal quotation omitted). "That a new procedural rule is 'fundamental' in some abstract sense is not enough; the rule must be one 'without which the likelihood of an accurate conviction is *seriously* diminished." Schriro v. Summerlin, 542 U.S. 348, 352 (2004), quoting Teague, 489 U.S. at 313. "[I]f the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply Teague v. Lane before considering the merits of the claim." Caspari v. Bohlen, 510 U.S. 383, 389 (1994). Respondent has raised Teague as a defense with respect to Claims 4 and 12. (See Ans. Mem. at 22-24, Resp. Opp. at 33 (Claim 4); Resp. Opp. at 53 (Claim 12).)

For the purposes of the Teague analysis, the Court again notes that the California Supreme Court affirmed Petitioner's conviction and sentence in a decision issued on July 23, 2007. On February 19, 2008, the Supreme Court of the United States denied his petition for a writ of certiorari, at which time Petitioner's conviction became final.

### 1.  Claim 4

In this claim, Petitioner contends that the trial court erred in denying a defense motion to conduct individual, sequestered voir dire, specifically with respect to the prospective jurors' responses concerning the death penalty. (SAP at 32.) Respondent argues that "Hoyos' speculation that the trial court's refusal to conduct individual and sequestered voir dire 'resulted in a significant risk that the resulting *voir dire* was inadequate "to identify unqualified jurors["]' (SAP at 34) indeed 'breaks new ground or imposes a new obligation on the State or the Federal government,'" and does not fit under either Teague exception. (Resp. Opp. at 13-14.) Petitioner maintains that he "seeks only the application of the well-settled rule that a voir dire procedure that 'render(s) the

defendant's trial fundamentally unfair,' violates the United States Constitution, <u>Mu'Min</u> [<u>v. Virginia</u>, 500 U.S. 415 (1991)], supra." (Pet. Brief at 9-10.)

However, upon review, it is clear that in <u>Mu'Min</u>, the very case Petitioner relies upon, the Supreme Court rejected a claim of error arising from a trial court's refusal to conduct individual voir dire to question prospective jurors on the specific content of their exposure to pretrial publicity. <u>See</u> <u>id.</u> at 427 ("[O]ur own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias.")

As such, Petitioner's citation to <u>Mu'Min</u> fails to support his contention that the rule he seeks is compelled by existing Supreme Court precedent. Such a rule would "break[] new ground or impose[] a new obligation on the States or the Federal Government," and Petitioner fails to show that either exception to <u>Teague</u> applies to this "new" rule. <u>Id.</u> at 301, 307. The rule proposed in Claim 4 is <u>Teague</u>-barred. In any event, as an alternate ground for the decision, the Court finds that Claim 4 also fails on the merits for the reasons discussed below.

## 2.    <u>Claim 12</u>

In this Claim, Petitioner contends that he, as a Mexican national, was deprived of due process by the violation of his right to consular access and notification pursuant to Article 36 of the Vienna Convention. (SAP at 56-57.) Respondent asserts that "Hoyos has not presented any case law indicating that reversal of his conviction and sentence because of a violation of Article 36 of the Vienna Convention is compelled by existing Supreme Court precedent," and argues that such a rule would be barred under <u>Teague</u>. (Ans. Mem. at 53; Resp. Opp. at 34.)

In <u>Breard v. Greene</u>, 523 U.S. 371 (1998), the Supreme Court suggested generally that "[a]ny rights that the Consul General might have by virtue of the Vienna Convention exist for the benefit of [the foreign country], not for him as an individual." <u>Id.</u> at 378. In 2008, meanwhile, the Supreme Court acknowledged the lack of resolution on this issue and expressed skepticism that any such individual rights, even if granted, would be enforceable

on federal habeas review.  See Medellin v. Dretke, 544 U.S. 660, 664 (2005) ("[E]ven accepting, *arguendo*, the ICJ's construction of the Vienna Convention's consular access provisions [determining, among other issues, that it guaranteed individually enforceable rights], a violation of those provisions may not be cognizable in a federal habeas proceeding.")  Both parties also acknowledge the Supreme Court's decision in Garcia v. Texas, 564 U.S. 940 (2011) (per curiam), in which the Court reasserted Medellin's holding that "[n]either the Avena decision nor the President's Memorandum purporting to implement that decision constituted directly enforceable federal law."  Garcia, 564 U.S. at 941.

Thus, given the absence of clearly established federal law dictating that the Vienna Convention creates individually enforceable rights, much less ones that are cognizable on federal habeas review, it is clear that the rule Petitioner advances would "break[] new ground or impose[] a new obligation on the States or the Federal Government."  Teague, 489 U.S. at 301.  There is also no indication that such a rule would fall under either exception to Teague.  See id. at 307.  Accordingly, Claim 12 is barred under Teague, and in any event also fails on the merits as discussed below.

## IV. STANDARDS OF REVIEW

### A.   Standard of Merits Review under AEDPA

The provisions of the Anti-Terrorism and Effective Death Penalty Act ["AEDPA"] apply to federal habeas petitions filed after its effective date of April 24, 1996.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Woodford v. Garceau, 538 U.S. 202, 207 (2003).  Because Petitioner filed his federal petition in this Court after that date, AEDPA applies to this case.

Pursuant to AEDPA, a state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits unless that ruling: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or  "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding." <u>Harrington v. Richter</u>, 562 U.S. 86, 97-98 (2011), quoting 28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>; <u>Bruce v. Terhune</u>, 376 F.3d 950, 953 (9th Cir. 2004). "Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions at the time of the relevant state-court decision.'" <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003), quoting <u>Williams</u>, 529 U.S. at 412.

"[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA." <u>Parker v. Matthews</u>, 567 U.S. 37, 48-49 (2012). However, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011), quoting <u>Maxwell v. Roe</u>, 606 F.3d 561, 567 (9th Cir. 2010); <u>see</u> <u>also</u> <u>Marshall v. Rodgers</u>, 569 U.S. 58, __, 133 S.Ct. 1446, 1450-51 (2013) (per curiam) (while a reviewing court may "look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent, . . . it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct.") (internal citations and quotations omitted).

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007), citing

09cv0388 L (NLS)

*Williams*, 529 U.S. at 410. "State-court factual findings, moreover, are presumed correct;

2 the petitioner has the burden of rebutting the presumption by 'clear and convincing

3 evidence.'" *Rice v. Collins*, 546 U.S. 333, 338-39 (2006), quoting 28 U.S.C. § 2254(e)(1).

4 "A state court's determination that a claim lacks merit precludes federal habeas

5 relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

6 decision." *Richter*, 562 U.S. at 101, quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664

7 (2004). "If this standard is difficult to meet, that is because it was meant to be. As amended

8 by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation

9 of claims already rejected in state proceedings. . . . It preserves authority to issue the writ

10 in cases where there is no possibility fairminded jurists could disagree that the state court's

11 decision conflicts with [the Supreme] Court's precedents." *Richter*, 562 U.S. at 102.

12 Claims 12, a portion of Claim 14 (the portion not involving allegations of ineffective

13 assistance of counsel), 15-23,[3] and 25-28 were each denied on the merits by the California

14 Supreme Court in a February 18, 2009, Order which stated in relevant part: "The petition

15 for writ of habeas corpus, filed September 11, 2006, is denied. All claims are denied on

16 the merits." (Lodgment No. 118.)

17 Moreover, the ineffective assistance of counsel aspects of Claim 14[4] were denied on

18 the merits by the California Supreme Court in a October 30, 2013, Order which stated in

19 relevant part: "The petition for writ of habeas corpus, filed February 3, 2011, is denied.

20 All claims (I & II) are denied on the merits." (Lodgment No. 124.)

21 Because these claims were denied on the merits without a statement of reasoning,

22 the Court will conduct an independent review of the record with respect to Claims 12, 14-

23 23 and 25-28 in order "to determine whether the state court clearly erred in its application

---

26 [3] The California Supreme Court alternately held Claims 15 and 16 to be procedurally
27 barred, addressed in section III.A. above.

[4] The California Supreme Court alternately held this aspect of Claim 14 to be
28 procedurally barred, addressed in section III.A. above.

of Supreme Court Law." See Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002); see also Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) ("Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law."); see also Richter, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden must still be met by showing there was no reasonable basis for the state court to deny relief.") "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 102.

## B.  **Standard for Evidentiary Hearing**

For claims previously decided on the merits by a state court, the Supreme Court has held that a federal habeas court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011). "Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." Id. at 186. Section 2254(d)(2), meanwhile, expressly limits a reviewing court to the "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Section 2254(e)(2) of AEDPA further limits the circumstances under which a district court may hold an evidentiary hearing. If the prisoner "has failed to develop the factual basis of a claim in State court proceedings," a district court is precluded from holding an evidentiary hearing unless the prisoner meets certain narrow exceptions.  28 U.S.C. § 2254(e)(2).  The claim in question must either rely upon "(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or "(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence;" and the prisoner must show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence

24

that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." Id. "Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar habeas relief," for instance, "when deciding claims that were not adjudicated on the merits in state court." Pinholster, 563 U.S. at 185.

"Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." Landrigan, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes relief, a district court is not required to hold an evidentiary hearing." Id.; see also Sully v. Ayers, 725 F.3d 1057, 1075 (9th Cir. 2013) ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.")

In light of these limitations, the Court will conduct a section 2254(d) review, provided the claims at issue are subject to section 2254(d), together with the evaluation of Petitioner's request for an evidentiary hearing on Claims 13-23 and 25.

**C.** **Standard for Claims of Ineffective Assistance of Counsel**

Petitioner raises numerous independent claims of ineffective assistance of counsel at both the guilt and penalty phases, including allegations that trial counsel was ineffective for failing to object to instances of prosecutorial misconduct and with respect to asserted Brady violations. Given that these claims appear throughout the SAP, the Court sets forth the relevant standard prior to the outset of the discussion.

Pursuant to the clearly established standard set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984), "a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009), citing Strickland, 466 U.S. at 687. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. "[A] court must indulge a

strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.")

To establish prejudice, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; see also id. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.") "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112.

With respect to the penalty phase, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins v. Smith, 539 U.S. 510, 534 (2003); Williams, 529 U.S. at 397-98 (the court must "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation."); Wong v. Belmontes, 558 U.S. 15, 26 (2009) (per curiam) ("[T]he reviewing court must consider all the evidence-the good and the bad-when evaluating prejudice."), citing Strickland, 466 U.S. at 695-96.

Moreover, when a federal habeas court is reviewing a claim of ineffective assistance of counsel previously adjudicated on the merits by a state court:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams, supra, at 410, 120 S.Ct. 1495. A state

court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

<u>Richter</u>, 562 U.S. at 101. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Id.</u> at 105.

# V. <u>DISCUSSION</u>

## A. <u>Jury Selection Claims</u>

### 1. <u>Claim 1</u>

Petitioner asserts that the "trial court erred in refusing to find a prima facie case of purposeful discrimination" when the prosecutor struck three of four Hispanic individuals from the sitting jury panel, prospective jurors L.H. and M.A. and prospective alternate juror Y.M.,[5] and additionally erred "in failing to require the prosecutor to state reasons for the strikes, and then to evaluate the genuineness of the reasons as required by <u>Batson</u>." (SAP at 10.) Petitioner also asserts that "[t]he California Supreme Court's rejection of this claim was an unreasonable application of <u>Johnson</u> because it failed to acknowledge that the showing supported an inference of discrimination that was sufficient to have required the prosecutor to state his reasons for the strikes. Instead, the Supreme Court engaged in the prohibited exercise of reviewing the trial record regarding the struck jurors and identifying colorable reasons why the prosecutor <u>might</u> have legitimately struck the three jurors." (<u>Id.</u> at 15.)

Petitioner raised this claim on direct appeal, where the California Supreme Court rejected it in a reasoned opinion, as follows:

Defendant contends that the prosecution's striking of Hispanic prospective jurors violated his right to equal protection under the Fourteenth Amendment to the United States Constitution. For the reasons discussed below, we conclude the trial court did not err in denying defendant's motion

---

[5] The Court will refer to each member of the jury venire by their first and last initials only, following the practice of the California Supreme Court in this case.

09cv0388 L (NLS)

under *Batson v. Kentucky* (1986) 476 U.S. 79, 84–89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (*Batson*), and *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277, 148 Cal.Rptr. 890, 583 P.2d 748 (*Wheeler*).

The prosecutor exercised peremptory challenges against three Hispanic jurors: M. A., L. H., and Y. M. Alvarado made an objection to each excusal under *Batson/Wheeler*, in which defendant joined. The prosecution argued that the codefendants had not made a prima facie showing, given that one Hispanic juror, P. G., was on the panel. The trial court found no prima facie showing and denied the motion, basing its ruling on a review of the jurors' voir dire transcripts, which disclosed neutral grounds for the challenges, and on the presence of at least one Hispanic juror on the panel, P. G.

Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias. (*Batson, supra*, 476 U.S. at p. 89, 106 S.Ct. 1712; *Wheeler, supra*, 22 Cal.3d at pp. 276–277, 148 Cal.Rptr. 890, 583 P.2d 748.) Recently, "the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. 'First, the defendant must make out a prima facie case by "showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]'" (*People v. Cornwell* (2005) 37 Cal.4th 50, 66–67, 33 Cal.Rptr.3d 1, 117 P.3d 622 (*Cornwell*), quoting *Johnson v. California* (2005) 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129, fn. omitted (*Johnson*).)

The high court clarified that "a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson, supra*, 545 U.S. at p. 170, 125 S.Ct. 2410, revg. in part *People v. Johnson* (2003) 30 Cal.4th 1302, 1318, 1 Cal.Rptr.3d 1, 71 P.3d 270 [requiring the defendant to "show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias"].) "'When a trial court denies a *Wheeler* motion without finding a prima facie case of group bias, the appellate court reviews the record of voir dire for evidence to support the trial court's ruling. [Citations.] We will affirm the ruling where the record

suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question.'" (*Guerra*, *supra*, 37 Cal.4th at p. 1101, 40 Cal.Rptr.3d 118, 129 P.3d 321, quoting *People v. Farnam* (2002) 28 Cal.4th 107, 135, 121 Cal.Rptr.2d 106, 47 P.3d 988.)

As a preliminary matter, defendant contends that because the trial court did not articulate the standard it used to determine whether he established a prima facie discrimination case, we must presume it used the then current "strong likelihood" standard. Defendant asserts that this standard sets a higher threshold than the *Batson* standard of an "inference" of group bias. Defendant also claims that because the trial court used the incorrect standard, its ruling is entitled to no deference.[FN15] But as we have held in analyzing *Batson/Wheeler* claims, "[r]egardless of the standard employed by the trial court, and even assuming without deciding that the trial court's decision is not entitled to deference, we have reviewed the record and, like the United States Supreme Court in *Johnson* ... [we] are able to apply the high court's standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*Cornwell*, *supra*, 37 Cal.4th at p. 73, 33 Cal.Rptr.3d 1, 117 P.3d 622, italics omitted; *Guerra*, *supra*, 37 Cal.4th at p. 1101, 40 Cal.Rptr.3d 118, 129 P.3d 321.)

> FN15. Defendant also contends that the trial court's ruling deserves no deference because, in the course of discussing the motion, the trial court mentioned that "there were two African–American representatives on the jury." Defendant argues that this demonstrates a misunderstanding of the purpose of *Batson*. We need not reach this issue, because as explained below, our conclusion that defendant did not make a prima facie showing is based on our review of the record, not on deference to the trial court's ruling or reasoning.

As to the three challenged jurors, defense trial counsel sought to establish a prima facie case of discrimination solely on the circumstance that the prosecutor struck three individuals of Hispanic ancestry, and that defendant was of the same ancestry. On appeal, defendant contends that a prima facie case is established because the prosecutor struck three of the only four Hispanics called to serve on the jury. In the alternative, defendant claims that the fact that all three struck jurors were Hispanic women supports a prima facie case of discrimination against Hispanic women as a cognizable class. We will assume, without deciding, that defendant's claim of discrimination as to Hispanic women specifically (as opposed to Hispanics generally) is not

forfeited on appeal because he failed to present it below. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1016, fn. 12, 47 Cal.Rptr.3d 467, 140 P.3d 775 (*Lewis and Oliver*).)

We have held that, although a prosecutor's excusal of all members of a particular group may establish a prima facie discrimination case, especially if the defendant belongs to the same group, this fact alone is not conclusive. (*Guerra supra*, 37 Cal.4th at p. 1101–1102, 40 Cal.Rptr.3d 118, 129 P.3d 321; *People v. Crittenden* (1994) 9 Cal.4th 83, 119, 36 Cal.Rptr.2d 474, 885 P.2d 887 (*Crittenden*); but see *Johnson, supra*, 545 U.S. at pp. 166, 173, 125 S.Ct. 2410 [the removal of all three African–American prospective jurors established a prima facie case].) The prosecution did not excuse all Hispanic jurors, and defendant is a Hispanic man, not a Hispanic woman. In any event, as discussed below, the record discloses race-neutral grounds for the prosecutor's peremptory challenges. (*Guerra, supra*, 37 Cal.4th at p. 1101, 40 Cal.Rptr.3d 118, 129 P.3d 321.)

*1. Prospective Juror M. A.*

During voir dire, Prospective Juror M. A. stated that Spanish was her primary language, and that she did not speak English well or understand many words. She stated she did not have any strong feelings either for or against capital punishment. Defense counsel moved to excuse M. A. for cause because she lacked sufficient skills in both written and spoken English, and because her problems with speaking and understanding English could affect her ability to interact with the other jurors during deliberations. The prosecutor agreed and also requested that she be excused for cause. Trial counsel for Alvarado opposed the for-cause challenge. The trial court denied the challenge, and stated the parties would have to deal with excusing M. A. through a peremptory challenge.

Defendant contends that because the trial court denied the challenge for cause based on M. A.'s limited English language skills, this ground is not a valid basis for a peremptory challenge either. But the circumstance that a juror is not subject to exclusion for cause does not, on its own, support an inference that group bias motivated the peremptory challenge. (*Cornwell, supra*, 37 Cal.4th at p. 70, 33 Cal.Rptr.3d 1, 117 P.3d 622.) The record demonstrates both the prosecutor and defendant's own counsel were reasonably concerned about the prospective juror's English language skills and, on this basis, the prosecutor was entitled to excuse her.

## 2. Prospective Juror L. H.

During voir dire, Prospective Juror L.H. stated she tended to favor life imprisonment, rather than the death penalty, as the appropriate punishment. She observed that she could keep an open mind, but would have to be "really convinced" before returning a death verdict. Although the trial court had explained at some length that neither side bore a burden of proof in the penalty phase, when asked by the prosecutor if she would place a burden of proof on either party regarding the appropriate punishment, she responded, "Prosecution."

At best, L.H. appeared equivocal about the death penalty, and at worst, she appeared biased against it. Defendant claims that although she stated during voir dire that she would lean toward imposing life imprisonment, she also said she could keep an open mind. That a juror is equivocal about his or her ability to impose the death penalty is relevant to a challenge for cause, but does not undercut the race-neutral basis for a prosecutor's decision to excuse a prospective juror peremptorily. (*People v. Catlin* (2001) 26 Cal.4th 81, 118, 109 Cal.Rptr.2d 31, 26 P.3d 357.) The record strongly suggests the prosecutor had grounds for concern about her possible bias against the death penalty, and on this basis was entitled to excuse her.

## 3. Prospective Juror Y. M.

During the court's voir dire, Prospective Juror Y.M. stated she had strong religious beliefs against the death penalty and she could not return a death sentence. During the prosecution's voir dire, she again expressed religious reservations against the death penalty, but asserted she could sit as a juror in this case. The trial court denied the prosecutor's for cause challenge of Y. M., but allowed the prosecutor to exercise a peremptory challenge against Y. M. after finding that Y. M. had strong feelings against the death penalty. The record suggests the prosecutor had reason for concern about Y. M.'s possible bias against the death penalty, and on this basis, he was entitled to excuse her.

## 4. Group Attitude

In addition, defendant claims that, even if Prospective Jurors L. H. and Y. M. exhibited a bias against the death penalty, most Hispanic women actually feel this way, so that any disqualification of a Hispanic woman based on her beliefs about the death penalty would constitute improper bias against

this group. We note that defendant points to no evidence in the record to support his speculation about Hispanic women's beliefs. In any event, we have recently rejected a similar contention. (*Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1016, 47 Cal.Rptr.3d 467, 140 P.3d 775.) A prosecutor may excuse prospective jurors, including members of cognizable groups, based on personal, individual biases those prospective jurors *actually* express, even if the biased view or attitude may be more widely held inside the cognizable group than outside of it. (*Ibid.*)

Hoyos, 41 Cal. 4th at 899-903 (brackets in original).

In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court held that "the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause," and stated that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Id. at 89. The Batson Court outlined a three-step procedure to evaluate such claims, restated in Johnson v. California, 545 U.S. 162 (2005), as follows:

> First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." 476 U.S., at 93-94, 106 S.Ct. 1712 (citing *Washington v. Davis*, 426 U.S. 229, 239-242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. 476 U.S., at 94, 106 S.Ct. 1712; see also *Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem*, 514 U.S. 765, 767, 115 St. 1769, 131 L.Ed.2d 834 (1995) *(per curiam)*.

Id. at 168 (footnote omitted) (bracket in original).

To state a prima facie case under Batson's first step, a defendant "must show that (1) the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor used a peremptory strike to remove the juror and (3) the totality of the circumstances raises an inference that the strike was on account of race." Crittenden v. Ayers, 624 F.3d 943, 955 (9th Cir. 2010), quoting Batson, 476 U.S. at 96. "A pattern of exclusion of minority

venirepersons provides support for an inference of discrimination." Turner v. Marshall, 63 F.3d 807, 812 (9th Cir. 1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999) (en banc); see also Batson, 476 U.S. at 97 ("[A] 'pattern' of strikes against [minority] jurors included in the particular venire might give rise to an inference of discrimination.")  A statistical disparity, such as showing that strikes were disproportionately used against minority jurors, can satisfy this first step.  See e.g. Fernandez v. Roe, 286 F.3d 1073, 1078 (9th Cir. 2002) (prosecutor's use of four of nineteen, or 21 percent, of challenges to strike four of seven Hispanic prospective jurors, where Hispanics comprised only 12 percent of venire, supported an inference of discrimination).

During jury selection, defense counsel raised a challenge to the prosecutor's exercise of peremptory challenges against two female Hispanic prospective jurors; the trial court heard the challenge after all the jurors and alternates had been selected, at which time the defense additionally challenged the prosecutor's decision to exercise a peremptory challenge to excuse a third female Hispanic individual from the panel of prospective alternate jurors.  At the hearing on the challenges, trial counsel asserted the grounds for the defense's Batson/Wheeler motion, stating that three individuals of "Mexican ancestry" had been excused through prosecutor's use of peremptory challenges and that Petitioner "was of the cognizable class."  (Reporter's Transcript ["RT"] 2786-87.)  In response, the trial prosecutor contended that a prima facie showing had not been made and pointed to the presence of a Hispanic juror on the panel; the prosecutor also noted that "[t]here was another, I would argue, Hispanic on the jury as an alternate, but that came after the motion is made.  So I don't believe it would be proper for the court to consider that at this time." (RT 2787.)

///

///

///

///

The trial court considered the challenge, stating "I have to make a determination as to whether, considering everything, whether or not these preemptory [sic] challenges were exercised based upon a discriminatory approach to this jury." (RT 2788.) The judge stated that he was "mindful" that a Hispanic man was on the jury, as well as members of other minority groups, such as two Black jurors. (<u>Id</u>.) The judge referenced the voir dire record and noted reasons why each of the three prospective jurors may have been excused, specifically noting that M.A. expressed difficulty with the English language, Y.M. voiced an objection to the death penalty, and L.H. would tend to side with life in prison rather than the death penalty. (RT 2788-89.) The trial court then stated that:

> Observing the manner which all of these jurors were questioned by the prosecution, the extent of the questioning, the use of these preemptories [sic], the presence of at least one Hispanic on the panel, Mr. P[] G[], it seems to me that there really isn't anything from which I could reasonably find the exercise of preemptories [sic] based on race. Some attempt to exclude Hispanics, that doesn't seem to be the case at all in each of these cases.

> It seems to me that a reasonable individual would be inclined to perhaps exclude these jurors on matters solely independent of race. I just don't see it. And I feel that there isn't really any type of substantial showing at all of the use of preemptories [sic] based upon race. So I find there is not a prima facie showing. The prosecution had the right to excuse these individuals for reasons other than race.

> And it seems to me that even without inquiring of the prosecution as to the specifics, one can pretty well see on the face of the information that was presented by the jurors that race is not an issue that caused them to be excluded.

(RT 2789-90.)

After trial, but prior to the California Supreme Court's adjudication of this issue on direct appeal, the United States Supreme Court issued <u>Johnson</u>, which struck down California's "more likely than not" standard for determining if a defendant has established a prima facie case of discrimination in jury selection, and reaffirmed that "a defendant satisfies the requirements of <u>Batson</u>'s first step by producing evidence sufficient to permit

34

the trial judge to draw an inference that discrimination has occurred." <u>Johnson</u>, 545 U.S. at 170.

The California Supreme Court acknowledged that the trial court's decision was made prior to <u>Johnson</u>, and accordingly did not render a decision on whether the trial court had applied the correct standard, but instead explicitly stated that the adjudication of Petitioner's claim would be based on the state supreme court's own application of <u>Johnson</u>, as follows:

> But as we have held in analyzing *Batson/Wheeler* claims, "[r]egardless of the standard employed by the trial court, and even assuming without deciding that the trial court's decision is not entitled to deference, we have reviewed the record and, like the United States Supreme Court in *Johnson* ... [we] are able to apply the high court's standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*Cornwell*, *supra*, 37 Cal.4th at p. 73, 33 Cal.Rptr.3d 1, 117 P.3d 622, italics omitted; *Guerra*, *supra*, 37 Cal.4th at p. 1101, 40 Cal.Rptr.3d 118, 129 P.3d 321.)

<u>Hoyos</u>, 41 Cal. 4th at 901 (brackets in original); <u>see</u> <u>also</u> <u>id.</u> at 901 n. 15 (declining to address Petitioner's argument that the trial court decision was not entitled to deference due to the trial court's consideration that the jury also contained two Black jurors, again stating "our conclusion that defendant did not make a prima facie showing is based on our review of the record, not on deference to the trial court's ruling or reasoning.")

Petitioner asserts that the California Supreme Court's decision was unreasonable because "[t]he CSC, with the benefit of <u>Johnson</u>- equally ignored petitioner's evidence of statistical disparity, and instead erroneously and unreasonably proceeded 'to affirm the (trial court's) ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in questions,' [sic] <u>Hoyos</u>, 41 Cal. 4th 873, 900." (Reply at 4.) The section of the direct appeal opinion to which Petitioner refers is at the outset of the California Supreme Court's discussion of the <u>Batson</u> claim, where the state supreme court simply recited the general standard *usually* employed when reviewing a trial court's decision. However, in evaluating Petitioner's claim, the California Supreme Court

explicitly stated that it would conduct its *own analysis* as to whether a prima facie case had been made.[6] Thus, contrary to Petitioner's assertion, the state supreme court did not simply review the record for grounds upon which to affirm the trial court's ruling.

Instead, the California Supreme Court correctly recognized and articulated the controlling Supreme Court authority set forth in Johnson, and stated that it would itself review the record and independently determine "whether the record supports an inference that the prosecutor excused a juror on the basis of race." Compare Hoyos, 41 Cal. 4th at 901 with Johnson, 545 U.S. at 170 ("[A] defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.")

The California Supreme Court specifically addressed Petitioner's statistical arguments,[7] recounting that "trial counsel sought to establish a prima facie case of

---

[6] Contrast Hoyos, 41 Cal. 4th at 901 n.15 ("[O]ur conclusion that defendant did not make a prima facie showing is based on our review of the record, not on deference to the trial court's ruling or reasoning."), with Currie v. McDowell, 825 F.3d 603, 608-09 (9th Cir. 2016) ("[T]he state appellate court violated clearly established federal law in its Batson step one analysis by affirming because 'the record suggest[ed] grounds upon which the prosecutor might reasonably have challenged the jurors in question,' whether or not those were the reasons proffered," where the state appellate court held that "[s]ubstantial evidence supports the trial court's stated conclusion that [the juror] was not a desirable panelist for the prosecution because she had two relatives who had been arrested for drug offenses, and that consequently, no prima facie case had been made," and additionally holding that the state court's alternative Batson step three analysis was unreasonable under § 2254(d)(2).))

[7] On direct appeal, Petitioner also raised the following contention: "In the alternative, defendant claims that the fact that all three struck jurors were Hispanic women supports a prima facie case of discrimination against Hispanic women as a cognizable class." Hoyos, 41 Cal. 4th at 901. The California Supreme Court rejected this argument. Id. at 903. To the extent Petitioner renews this assertion in the instant Petition, he fails to demonstrate that the California Supreme Court adjudication was contrary to, or an unreasonable application of, any clearly established federal law, given that "neither the Supreme Court nor the Ninth Circuit has recognized that the combination of race and gender, such as 'black

36

discrimination solely on the circumstance that the prosecutor struck three individuals of Hispanic ancestry, and that defendant was of the same ancestry. On appeal, defendant contends that a prima facie case is established because the prosecutor struck three of the only four Hispanics called to serve on the jury." Hoyos, 41 Cal. 4th at 901. The California Supreme Court then stated that "although a prosecutor's excusal of all members of a particular group may establish a prima facie discrimination case, especially if the defendant belongs to the same group, this fact alone is not conclusive." Id. The state supreme court noted that not all prospective Hispanic jurors had been excused from Petitioner's jury venire,[8] that "the record discloses race-neutral grounds for the prosecutor's peremptory challenges," and proceeded to discuss those reasons. Id. at 901-03.

Thus, Petitioner's argument that the California Supreme Court "ignored petitioner's evidence of statistical disparity" is not supported by the record. The California Supreme Court explicitly acknowledged Petitioner's argument, but was unpersuaded that Petitioner demonstrated a prima facie case. This conclusion was not unreasonable, given the de minimus nature of Petitioner's statistical showing. "Although a pattern of strikes against

males,' may establish a cognizable group for Batson purposes." Turner, 63 F.3d at 812, overruled on other grounds by Tolbert, 182 F.3d 677.

[8] As noted above, the record reflects that five, not four, Hispanic individuals were called to serve on Petitioner's jury and subject to potential peremptory challenges. (RT 2787.) While the trial prosecutor stated that it would not be "proper" to consider the fifth individual, an alternate called to serve after the third peremptory challenge (id.), the record further reflects that juror M.A. was the sole subject of the defense's initial motion; when the trial court stated an intention to hear the motion "at a later time" counsel stated that "I was thinking also of making the same objection for the excusing of [L.H.]." (RT 2752.) It was only after all of the jurors and alternate jurors had been selected and sworn that defense counsel added L.H. and Y.M. to the Batson/Wheeler motion. (See RT 2749, 2758 (jurors and alternates sworn); RT 2762.) As such, if the Court considers Y.M. in this analysis, who was challenged after the initial motion, it appears reasonable to at least note that there was also an additional Hispanic juror seated after the initial motion, particularly in light of the fact that this alternate juror actually ended up serving on Petitioner's jury, replacing a juror who was excused for sleeping during trial. (See RT 3831; CT 3540.)

37

[a minority group] provides support for an inference of discrimination, [Petitioner] must point to more facts than the number of [minority group members] struck to establish such a pattern." Williams v. Woodford, 384 F.3d 567, 584 (9th Cir. 2002) (internal citation omitted). Petitioner offers little aside from the fact that three Hispanic jurors were subject to peremptory challenges; while the Court can count the number of juror questionnaires to ascertain how many prospective jurors were in the venire after hardship excusals (assuming that all juror questionnaires were retained), the record does not disclose how many Hispanic jurors were in the venire as a whole, rendering incomplete any attempt to determine whether there was a statistical disparity. See id. ("[B]ecause [Petitioner] failed to allege, and the record does not disclose, facts like how many [group members] sat on the jury, how many [group members] were in the venire, and how large the venire was, it is impossible to say whether any statistical disparity existed that might support an inference of discrimination.")

Petitioner also argues that the California Supreme Court erred in considering the trial record and the possible reasons for excusing the three prospective jurors at issue, given the existence of authority, including Williams v. Runnels, 432 F.3d 1102 (9th Cir. 2006) and Johnson, criticizing such speculation. (SAP at 15-17.) In Johnson, the Supreme Court indeed stated that: "The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." Johnson, 545 U.S. at 172, citing Paulino v. Castro, 371 F.3d 1083, 1090 (9th Cir. 2004) ("[I]t does not matter that the [prosecutor might have had good reasons . . . [;] [w]hat matters is the real reason they were stricken"); see also Miller-El v. Dretke, 545 U.S. 231, 252 (2005) ("A Batson challenge does not call for a mere exercise in thinking up any rational basis.")

However, the situations presented are distinguishable, as the defendants in those cases had already established an inference of discrimination based on the statistical showing alone, satisfying Batson's first step, while the California Supreme Court, applying Johnson, held that Petitioner had not done so in this case. For instance, in Williams, the

Ninth Circuit conducted a de novo review[9] of Williams' <u>Batson</u> claim, finding a statistical disparity sufficient to satisfy the first <u>Batson</u> step where the prosecutor used three of his first four peremptory challenges to remove Black jurors from the venire and only four of the first forty-nine prospective jurors were Black, and stated that "to rebut an inference of discriminatory purpose based on statistical disparity, the 'other relevant circumstances' must do more than indicate that the record would support race-neutral reasons for the questioned challenges." <u>Id.</u> at 1108. Similarly, in <u>Johnson</u>, despite three peremptory challenges against minority jurors each resulting in a defense objection, which prompted the trial court's comments that "we are very close" under California's "more likely than not" standard, and the California Supreme Court's comment that the excusals "certainly looks suspicious," the United States Supreme Court criticized the procedure where "[t]he trial judge still did not seek an explanation from the prosecutor. Instead, she explained that her own examination of the record had convinced her that the prosecutor's strikes could be justified by race-neutral reasons." <u>Id.</u>, 545 U.S. at 165-66. The <u>Johnson</u> Court explained that "[t]he <u>Batson</u> framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." <u>Id.</u> at 172. In both cases, once the defendant had established a prima facie inference of discrimination, it was incumbent for the court to discern the real reasons for the peremptory challenges, and to not rely on speculation in its stead. But a defendant *must first establish* that an inference of discrimination exists, which is the very standard the California Supreme Court applied.

---

[9] Petitioner's case is further distinguishable on this basis, as the Ninth Circuit conducted a de novo review in <u>Williams</u> because the state court applied the "strong likelihood standard" in reviewing the <u>Batson</u> claim. <u>See</u> <u>Williams</u>, 432 F.3d at 1105; <u>see also</u> <u>Shirley v. Yates</u>, 807 F.3d 1090, 1101 (9th Cir. 2015) (agreeing with district court's finding that state appellate court "acted contrary to clearly established law when it 'based its prima facie analysis on the discredited pre-*Johnson*, standard articulated by the California Supreme Court in *People v. Box.* . .'"); <u>Johnson v. Finn</u>, 665 F.3d 1063, 1068-69 (9th Cir. 2011) (same). Unlike in those cases, the California Supreme Court specifically cited and applied <u>Johnson</u> in deciding Petitioner's claim.

39

In rendering its decision in this case, the California Supreme Court repeatedly cited People v. Cornwell, 37 Cal. 4th 50 (2005), which referenced Johnson in discussing the relevant standard, as follows:

> Once the trial court concludes that the defendant has produced evidence raising an inference of discrimination, the court should not speculate as to the prosecutor's reasons- it should inquire of the prosecutor, as the high court directed. But there is still a first step to be taken by the defendant, namely producing evidence from which the trial court may infer 'that discrimination has occurred.'

Cornwell, 37 Cal. 4th at 73-74, quoting Johnson, 545 U.S. at 170, overruled on other grounds by People v. Doolin, 45 Cal. 4th 390, 421 n. 22 (2009).

The United States Supreme Court has also specifically stated that: "In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances." Batson, 476 U.S. at 96. "For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." Id. at 97; see also United States v. Collins, 551 F.3d 914, 921 (9th Cir. 2009) ("[T]he fact that the prosecutor fails to 'engage in meaningful questioning of any of the minority jurors' might indicate the presence of discrimination."), quoting Fernandez, 286 F.3d at 1079. In light of this authority approving consideration of the record in determining whether a defendant has made a prima facie showing of discrimination, and because the cases Petitioner relies upon are distinguishable from the situation presented here given his failure to establish an inference of discrimination based on the statistical showing alleged, the Court is unable to conclude that the California Supreme Court's consideration of the record was erroneous or unreasonable.

Petitioner also contends that the California Supreme Court's decision was based on an unreasonable determination of the facts. Petitioner argues that the state court, in discussing the jurors' answers in the questionnaires and voir dire responses, misstated or

mischaracterized the challenged jurors' statements or positions. (Reply at 11-12, 15-16, 20-22.) For the reasons discussed below, this argument is similarly unpersuasive.

With respect to prospective juror L.H., Petitioner contends that the state court's "characterization of her as 'at best' somewhat 'equivocal about the death penalty,' and 'at worst' 'biased against it' is contradicted by the record," and the state court also unreasonably failed to acknowledge that the juror's answers during voir dire clarifying her positions "at least on its face negated any inference of bias from her earlier answers." (Id. at 16.) The record reflects that L.H. wrote in her questionnaire that: "I believe in the death penalty (and the justice system) but only in certain instances. Although I am not certain what benefit it does for society by executing someone. Life imprisonment may even be harsher in some aspects. The threat of the death penalty does not seem to effect [sic] people." (CT 5579.) L.H. wrote that she had "softened" in her views on capital punishment, and "used to believe any/every murderer deserved the death penalty (except self-defense). I no longer hold this thought." (RT 5580.) During voir dire, the trial court asked about her feelings on capital punishment, to which she stated: "Well, I tend to side with the life in prison as opposed to the death penalty," but stated that she could keep an open mind. (RT 2376.) When the court asked if she could return a death penalty verdict "if in that hypothetical case you were of a mind that the aggravating evidence so substantially outweighed the mitigating evidence that death was in fact warranted" she replied: "I'd have to be really convinced." (RT 2376-77.) When asked again if she could render a death penalty verdict, she answered: "I think I can, but I would have to be real convinced that it outweighed it heavily." (RT 2377.) When the prosecutor asked if she would place a burden on the defense or prosecution to convince her of the appropriate punishment, she stated: "Prosecution." (RT 2413.) When the prosecutor stated that the court instructed the prosecution did not have a burden in the penalty phase, she replied: "Well, I guess I answered that incorrectly. I would have to be convinced of the evidence, of everything all together. That's what I mean." (RT 2413.) L.H. then agreed she could vote for either penalty, depending on which she felt was appropriate, and stated: "If it meets

41

all the aggravating items that are necessary, I would make that decision then." (RT 2414.) Based on a review of the record, the California Supreme Court's conclusions did not constitute an unreasonable determination of the facts, as L.H. stated at various times that she would have to be "convinced," "real convinced" or "really convinced" to vote for the death penalty and that she leaned towards life in prison as a potential punishment, demonstrating at a minimum her equivocal feelings about capital punishment.

With respect to Y.M., Petitioner asserts that the state court's characterization "is repudiated by the record," and that the state court "exaggerated" and "substantially overstates" her voir dire answers in reporting that she stated "she could not return a death sentence," given that the trial court had denied the prosecution's challenge for cause and found that she could follow the court's instructions. (Reply at 20-22.) Petitioner argues that "the CSC's failure to acknowledge and address the trial court's factual finding renders its ruling 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" (Id. at 22.)

A review of Y.M.'s questionnaire and voir dire responses and the trial court's statements during the Batson hearing do not support Petitioner's argument. In the questionnaire, Y.M. wrote that the death penalty is a "scary thought, but I believe in each individual case, given certain facts it is a punishment that should be done." (CT 5465.) However, she also indicated that she did not want to be a juror in the case, and wrote: "I don't feel I could be part of a jury, if they impose the death penalty." (CT 5468.) Y.M. continued to voice her reservations during jury selection as, during voir dire questioning by the trial court, Y.M. stated that: "I just have strong religious beliefs deep down inside. That's just the way I feel, that it actually shouldn't happen," and stated that: "I just don't feel I would be able to judge somebody feeling that way." (RT 2023.) In view of these statements, the California Supreme Court was not unreasonable in finding that during voir dire, Y.M. "stated she had strong religious beliefs against the death penalty and she could not return a death sentence." Hoyos, 41 Cal. 4th at 903. During questioning by defense counsel, Y.M. later said that she thought she could put aside her religious reservations,

stating: "I feel strong about it, but I could put them aside." (RT 2064.) When the prosecutor asked about her views, Y.M. stated: "I still feel like it's strong in me, but I feel like I could still make the decision," and when again asked about her ability to put aside her feelings, she said: "I feel like if I did sit, I am strong enough to put it aside." (RT 2069-70.)

When the trial court denied the prosecution's challenge for cause, Petitioner is correct that the trial court stated: "She wouldn't like it, but she will follow the instructions and if called upon can serve as a juror in this case." (RT 2075.) Later, during the <u>Batson</u> hearing, the trial court stated that Y.M. "indicated to the court both in her questionnaire [sic] that she, in fact, had a conscientious objection to the death penalty. She indicated orally she would be able to keep an open mind," and that "[t]he prosecution has a right to exercise preemptories [sic] as to individuals who have feelings pro or con so far as the death penalty is concerned." (RT 2789.) Thus, again, based on a review of the record, the California Supreme Court's statement that "[t]he trial court denied the prosecutor's for cause challenge of Y. M., but allowed the prosecutor to exercise a peremptory challenge against Y. M. after finding that Y. M. had strong feelings against the death penalty," (<u>Hoyos</u>, 41 Cal. 4th at 903), was not unreasonable.

With respect to prospective juror M.A., Petitioner contends that the state supreme court "made no reference to the facts in the record that under the applicable case law belied the bona fides of the reason attributed to the prosecutor," and argues that the prosecutor's failure to question M.A. about her English skills and the California Supreme Court's failure to note the trial court's misstatements about the prospective juror's language skills impeding her ability to serve as a juror, each undermined that ground as a reason for the peremptory challenge under <u>Miller-El</u>. (Reply at 12-13.) Petitioner's reliance on <u>Miller-El</u> is misplaced in this regard. In <u>Miller-El</u>, when the prosecutor was confronted with the fact that his stated reason for a peremptory strike was based on a misrepresentation of the prospective juror's position, the prosecutor "suddenly came up with" a separate reason for the strike. <u>Miller-El</u>, 545 U.S. at 245. The Supreme Court declined to accept this new

reason for the challenge, stating it "reeks of afterthought" and noting as significant that the prosecutor failed to question the juror in any detail on that matter and finding that a review of the juror's entire voir dire revealed that he "should have been an ideal juror in the eyes of a prosecutor seeking a death sentence, and the prosecutors' explanation for the strike cannot reasonably be accepted." Id. at 245-47.

Here, a review of the record reveals that each small group of prospective jurors were questioned in turn by the trial court, each defense counsel and the prosecutor. When the group containing M.A. was questioned, the trial court went first and asked M.A. numerous questions about her English proficiency, given the concerns she noted in the written questionnaire. For instance, M.A. wrote on her questionnaire that she had "por [sic] English" and checked a box indicating that she had trouble speaking or understanding English. (CT 5666.) She also indicated that she would not like to serve as a juror on the case, writing "Not Enough English." (CT 5677.) M.A. also failed to date or sign her written questionnaire. (Id.) When the trial court asked about her concerns, she stated: "I don't speak English that well and I don't understand a lot of words that you are saying. So that's what I think." (RT 1932.) M.A. agreed that she was able to understand the written questionnaire, could interrupt and ask if she did not understand something during the proceedings, and could follow the court's instructions. (RT 1933.) Petitioner's counsel questioned the jurors after the trial judge, and asked M.A. numerous questions about her language abilities. M.A. agreed that she recalled the court's instructions included the word aggravating, and when asked to define it, stating "I know what it means, but I don't know how to describe it," and similarly stated "I can't" when asked to describe what mitigating meant. (RT 1953-54.) Co-defendant's counsel questioned the jurors next and stated that he would "skip some of you," citing the questionnaires and prior voir dire, stating: "There are a lot of questions both written and oral, and as we get to me I have fewer than were asked before." (RT 1970.) He did not question M.A. (RT 1970-78.) The prosecutor asked questions last, and upon addressing the group, stated that: "As [defense counsel] said, the questions dwindle and dwindle and dwindle," similarly noting that he would be "skipping

some" jurors in his questioning. (RT 1978-79.) The prosecutor did not question M.A. (RT 1979-89.) The trial court then asked M.A. a few additional questions, asking again if she could interrupt trial proceedings if she did not understand, to which she stated: "I don't know. I get real nervous when I come to English. I think I be very nervous then. I try to speak." (RT 1991.) When asked if she might just "let it kind of pass" instead of speaking up when she did not understand, M.A. responded that: "I probably will, yes." (Id.)

When the trial court asked if counsel had any challenges for cause, Petitioner's counsel immediately challenged M.A., referencing her mention of "por English" and her lack of written response throughout the majority of the questionnaire. (RT 1999-2000.) Counsel acknowledged that M.A. appeared to "understand[] more than she can describe," but argued that "no matter what she understands, she couldn't communicate that to other jurors in deliberations and would be likely to be intimidated or a-non [sic] entity in deliberations." (RT 2000.) The prosecutor joined in the challenge for cause, agreeing with the reasons stated by defense counsel and additionally referencing the numerous spelling mistakes throughout M.A.'s written questionnaire and pointing out her failure to sign or date it. (RT 2001-02.) The trial court responded: "The questionnaire is filled with spelling errors, but that's not a challenge for cause. She was unable to define certain legal terms; that doesn't constitute a challenge for cause, frankly. She seemed to be relatively articulate in response to questions. She said she would be hesitant or reluctant to interrupt if she didn't understand something," but noted that many jurors would be similarly hesitant, which was the reason the court had a procedure allowing the jurors to ask questions via notes. (RT 2002-03.) The trial court denied the challenge, stating: "You will have to deal with that on your preemptories [sic]." (RT 2003.) The Court is not persuaded that the prosecutor's failure to specifically question M.A. about her language abilities undermines this reason as a basis for the challenge. Contrary to the situation presented in Miller-El, it is obvious that both Petitioner's defense counsel and the prosecutor were concerned about this juror's English skills and ability to understand the proceedings and communicate with the other jury members. Moreover, the trial court, in denying the challenge for cause,

stated that in order to excuse the juror, counsel would need to use a peremptory challenge. Petitioner has not demonstrated that the California Supreme Court's decision was based on an unreasonable determination of the facts, as the record reflects that M.A. repeatedly expressed concerns, in both her written questionnaire and during voir dire, that her English skills would hinder her ability to serve as a juror.  (See e.g. CT 5666, 5677; RT 1932-33.)

Finally, Petitioner asserts that the California Supreme Court erred in failing to conduct a comparative juror analysis, and asserts that: "If the CSC [California Supreme Court] had undertaken that form of review, it would have revealed that three of the seated jurors articulated reservations about the death penalty equivalent to those of struck jurors L.H. and Y.M." (Reply at 27.)  A comparative juror analysis involves "an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group." Boyd v. Newland, 467 F.3d 1139, 1145 (9th Cir. 2004).

Petitioner points to the questionnaire and voir dire responses of jurors J.C., K.T., D.R. and B.E., asserting that these four jurors expressed reservations about the death penalty similar to those articulated by L.H. and Y.M., and the California Supreme Court's failure to engage in this analysis demonstrates "another procedural failing under the clearly established federal law of Miller-El, supra."  (Reply at 27; see also SAP at 16.)  To the extent Petitioner asserts that the California Supreme Court's failure to conduct a comparative juror analysis warrants de novo review of his claim, the Ninth Circuit has rejected such a contention.  See Jamerson v. Runnels, 713 F.3d 1218, 1224 n.1 (9th Cir. 2013) (stating that the Ninth Circuit "has already addressed and rejected" the petitioner's argument that the reviewing court "should review his claim de novo because the state courts unreasonably applied clearly established federal law when they declined to conduct a comparative juror analysis."), citing Cook v. LaMarque, 593 F.3d 810, 816 & n.2 (9th Cir. 2010).

The Ninth Circuit has held that "[c]omparative juror analysis is an established tool at step three of the Batson analysis for determining whether facially race-neutral reasons

46

are a pretext for discrimination.  In addition, comparative juror analysis may be employed at step one to determine whether the petitioner has established a prima facie case of discrimination." Crittenden, 624 F.3d at 956 (internal and external citations omitted); see also Boyd, 467 F.3d at 1149 ("[B]ecause comparative juror analysis assists a court in determining whether the totality of the circumstances gives rise to an inference of discrimination, we believe that this analysis is called for on appeal even when the trial court ruled that the defendant failed to make a prima facie showing at the first step of the Batson analysis.")

Based on a review of the record, a comparative juror analysis does nothing to undermine the reasonableness of the California Supreme Court's findings and conclusions, as the voir dire and questionnaire responses of the jurors Petitioner cites do not reveal that those jurors possessed reservations about the death penalty similar to those held by prospective jurors L.H. or Y.M.[10]

For instance, Petitioner asserts that juror J.C. voiced reservations about capital punishment and "stated that the death penalty should be imposed only in 'very serious cases,' such as 'killing a president.'"  (Reply at 27.)  Petitioner stated that despite these views, the prosecutor's questions of that juror were "cursory."  (Id.)  A review of the record reveals that Petitioner's characterization that J.C. stated he would "only" impose death penalty in serious cases such as killing a president misstates both his questionnaire answers and his voir dire responses.  To a question posed in the written questionnaire asking: "Are there any circumstances where a person convicted of murder should automatically receive

_____

[10] Petitioner does not offer a comparative analysis argument with respect to prospective juror M.A., and the record fails to reveal any individual similar to M.A. who served on Petitioner's jury.  Again, as both the prosecutor and Petitioner's defense counsel expressed concerns about M.A.'s English proficiency and unsuccessfully challenged her for cause, to which the trial court stated that they would have to "deal with that" though use of a peremptory challenge, the record clearly reflects this was the obvious reason M.A. was excused from the venire.

the death penalty?" J.C. wrote: "In the case of a crime againts [sic] the United States such as the Rosenburgs [sic] spy trial or the killing of a president." (CT 3701.) As this question clearly asked whether the individual felt any crimes <u>automatically</u> warranted death penalty, a contention that those were the "only" circumstances where he would consider the death penalty is not supported by the record.

The record also reflects that the prosecutor's questions were more than "cursory," as the prosecutor asked J.C. several questions about his views, including an inquiry into his questionnaire response about when the death penalty was appropriate, and about the juror's ability to consider and follow the court's instructions. (RT 1912-14.) During part of the voir dire between the prosecutor and J.C., the juror reviewed his questionnaire at the prosecutor's behest and explained: "What I meant was I would weigh the evidence and give the death penalty only in the case of a very serious crime. In other words, I wouldn't do it if some man just robbed a bank; I wouldn't give him the death penalty unless he might have killed someone in the process. Then I would weigh the evidence and decide what I felt would be - - you know, what I think right for the crime." (RT 1914.) Given that this juror expressed a written belief that conviction of certain crimes warranted the automatic imposition of the death penalty, that he clarified during voir dire that the death penalty was indeed warranted for serious crimes, and explained that he would not give the death penalty for a bank robbery "unless he might have killed someone in the process," the Court finds that J.C. did not express "reservations" about the death penalty similar to those raised by L.H. or Y.M.

With respect to juror K.T., Petitioner states that she "wrote and affirmed that the decision to impose death is an 'enormous one' that causes her 'trepidation,' but that the prosecutor again only engaged in 'cursory' voir dire of her." (Reply at 27.) K.T. indicated in her written questionnaire that the decision to impose death was enormous, and wrote: "Unfortunately for me, I'd be a good juror I think, but the idea fills me with trepidation." (CT 3742.) K.T. also noted that she used to believe the death penalty was unwarranted in any instance, but now believed it was warranted in "certain instances." (CT 3737-38.)

While the prosecutor's questioning of K.T. was brief, it was not "cursory," as he asked if the penalty decision was one she could make, to which she answered affirmatively, and asked if she could decide someone's fate and live with that decision, to which she also answered yes and stated: "I could live with that." (RT 2485.) The Court fails to see similarities between K.T. and either Y.M. or L.H., as K.T. clearly stated that she could impose the death penalty and did not indicate, as L.H. had, that she would have to be "really convinced" to vote for it, nor did she indicate, like Y.M., that she would tend to vote for the "other" rather than the death penalty. While it is apparent that K.T. was reasonably concerned with the gravity of the penalty decision, the Court is not persuaded that she expressed reservations about capital punishment similar to those mentioned by Y.M. or L.H.

Petitioner also argues that juror D.R. "stated that the death penalty should be reserved for 'the worst of the worst,'" yet the prosecutor did not conduct any voir dire of that juror. (Reply at 27.) A review of the record reflects that D.R., too, failed to express reservations about the death penalty similar to those voiced by Y.M. or L.H. When D.R. was asked about her views of the death penalty, she stated: "What I really believe is that we have the death penalty, it's parts of our law so it's reserved for certain punishments and it's there and that's what makes our system work. [] So yes, I feel very strongly in that way. I feel very strongly that way; that it's there to be used if the situation warrants the use of the death penalty." (RT 2613.) When asked if the death penalty was used too infrequently, D.R. answered no, and the actual exchange with the court that Petitioner appears to refer to was as follows:

> Q:     Do you think it should be reserved for the very worst of the worst, so to speak?
>
> A:     It's the worst penalty so I guess, you know, I would feel that way because that's as bad as it can get as a penalty.

(Id.) Thus, the record does not support a conclusion that D.R. articulated reservations about imposing the death penalty. Indeed, D.R.'s questionnaire responses reveal that her views

were actually opposite to those of Y.M. While Y.M. indicated that her reservations about capital punishment stemmed from her deeply held religious beliefs, D.R. wrote in her questionnaire that: "Being a practicing Catholic for the first half of my life I believed that the taking of any life for any reason was wrong. I now feel that for certain crimes there are some who do not deserve to live." (CT 3643.) The Court fails to find similarities between the views of D.R. and the excused jurors.

Finally, juror B.E. stated that the penalty decision "would be an extremely difficult decision to make. But I feel that it's a decision that would have to be made if the proceedings got to that stage." (RT 2526.) When B.E. was asked if he could be objective in choosing between the penalty alternatives, he stated: "Yes, I do feel I could be." (RT 2526-27.) A review of the record reflects that B.E., unlike Y.M. or L.H., did not express reluctance or reservations about the possibility of voting for the death penalty. A comparison of Y.M. and L.H. with the non-Hispanic jurors who served do not demonstrate similarity in either answers or views about their ability to vote for the death penalty. As such, Petitioner's assertion that a comparative analysis demonstrates that the prosecutor treated non-Hispanic jurors with similar reservations about capital punishment differently fails to find support in the record and does not support an inference of discrimination.

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." Schriro, 550 U.S. at 473, citing Williams, 529 U.S. at 410. Ultimately, as thoroughly discussed above, Petitioner fails to demonstrate that the California Supreme Court's adjudication of Claim 1 was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Accordingly, Petitioner is not entitled to habeas relief on Claim 1.

///

///

///

2.     **Claim 2**

In this claim, Petitioner asserts that the "trial court erred in refusing to excuse for cause Jurors [R.L., P.G., M.N., S.K., and D.V.] based on the evidence in the trial record that they were so strongly biased in favor of the death penalty that their ability to follow the law was substantially impaired within the meaning of <u>Wainright</u> v. <u>Witt</u>, 469 U.S. 412 (1985)." (SAP at 18.)   Petitioner also contends that the trial court erred in excusing prospective jurors R.J. and R.A. for cause based on their feelings against the death penalty. (<u>Id.</u> at 18-19.)

The California Supreme Court considered and rejected this claim on direct appeal in a reasoned opinion, as follows:

> Defendant contends the trial court erred in not excusing for cause five prospective jurors who were biased in favor of the death penalty, and in excusing for cause two prospective jurors he asserts were not biased, in violation of *Wainwright v. Witt* (1985) 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 and *Witherspoon v. Illinois* (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. Defendant claims the trial court's rulings violated his right to trial by a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution. For the reasons discussed below, we conclude that the trial court did not err in its rulings concerning the for-cause challenges of prospective jurors, and that defendant's constitutional rights were not violated.
>
> *1. Denial of Defense's For-cause Challenges*
>
> The defense unsuccessfully challenged for cause the following five prospective jurors: R. L., P. G., S. K., M. N., and D. V.[FN16] The defense later removed Prospective Juror R.L. using a peremptory challenge. Prospective Jurors P. G. and S. K. were chosen to sit as jurors.
>
> > FN16. For R. L., S. K., M. N. and D. V., both defendant's trial counsel and Alvarado's trial counsel joined in the for-cause challenges. For P. G., Alvarado's trial counsel made a challenge for cause, but defendant's trial counsel stated he was not challenging P. G. for cause. We do not consider the claim as to P. G. forfeited, however, because failure to object does not forfeit a *Witt/Witherspoon* claim on appeal. (*People v. Schmeck* (2005)

37 Cal.4th 240, 262, 33 Cal.Rptr.3d 397, 118 P.3d 451 (*Schmeck*); *People v. Velasquez* (1980) 26 Cal.3d 425, 443, 162 Cal.Rptr. 306, 606 P.2d 341.) In addition, codefense counsel's challenge for cause alerted the trial judge to the possibility of *Witt/ Witherspoon* error as to P. G. (See *People v. Velasquez*, *supra*, 26 Cal.3d at 444, 162 Cal.Rptr. 306, 606 P.2d 341.)

Preliminarily, the People contend that defendant has forfeited these claims because his trial counsel did not exhaust his peremptory challenges.[FN17] "'To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so.'" (*Guerra*, *supra*, 37 Cal.4th at p. 1099, 40 Cal.Rptr.3d 118, 129 P.3d 321, quoting *People v. Williams* (1997) 16 Cal.4th 635, 667, 66 Cal.Rptr.2d 573, 941 P.2d 752.) Defendant does not dispute the fact that his trial counsel neither exhausted his peremptory challenges nor expressed dissatisfaction with the jury ultimately selected. Rather, he asserts that our discussion in *People v. Johnson*, *supra*, 47 Cal.3d at pages 1220–1221, 255 Cal.Rptr. 569, 767 P.2d 1047, concerning the dynamic nature of the process of exercising peremptory challenges, somehow undermines the exhaustion requirement. Defendant is mistaken. Our discussion in *Johnson* addresses how a party with fewer remaining peremptory challenges might exercise them more sparingly, but this does not relieve defendant of the exhaustion requirement in order to preserve his claim. Alternatively, defendant seeks to justify trial counsel's failure to exhaust all peremptory challenges by arguing that when counsel accepted the 12 jurors in the box, the venire contained several prospective jurors who may well have been worse than those in the box. Even assuming this argument could justify a failure to exhaust his peremptory challenges, it is mere speculation on this record. Defendant's contentions of erroneous jury inclusion are therefore forfeited.

> FN17. The defense exercised five of 20 available joint peremptory challenges only, and defendant did not exercise any of his five individual peremptory challenges.

Even if he did not forfeit his claims, defendant can show no error with respect to the three prospective jurors who did not sit on the jury, that is, R. L., M. N., and D. V.[FN18] As to the two jurors who did sit on the jury, P. G. and S. K., as discussed below, the trial court properly denied each of defendant's challenges for cause.

FN18. "To establish that the erroneous inclusion of a juror violated a defendant's right to a fair and impartial jury, the defendant must show either that a biased juror actually sat on the jury that imposed the death sentence, or that the defendant was deprived of a peremptory challenge that he or she would have used to excuse a juror who in the end participated in deciding the case." (*People v. Blair* (2005) 36 Cal.4th 686, 742, 31 Cal.Rptr.3d 485, 115 P.3d 1145 (*Blair*), italics omitted.) The defense removed R.L. with a peremptory challenge, but defendant makes no argument that exercising a peremptory challenge on R.L. deprived him of one that he would have used to excuse a juror who participated in deciding the case (and indeed he cannot make such an argument, given the number of his remaining unused peremptory challenges). M.N. and D.V. never even made it into the jury box.

The same analysis applies to claims involving erroneous juror exclusion or inclusion. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 975, 108 Cal.Rptr.2d 291, 25 P.3d 519.) "'Applying *Wainwright v. Witt*, *supra*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 ..., we have stated that "'[i]n a capital case, a prospective juror may be excluded if the juror's views on capital punishment would "prevent or substantially impair" the performance of the juror's duties.' [Citations.] 'A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" In addition, "'[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]""'" (*Blair*, *supra*, 36 Cal.4th at p. 743, 31 Cal.Rptr.3d 485, 115 P.3d 1145, quoting *People v. Jenkins* (2000) 22 Cal.4th, 900, 987, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)

*a. Juror P. G.*

During the trial court's voir dire, P. G. stated he would be able to follow the law and procedures in capital cases. He did not believe his feelings either for or against the death penalty would affect his judgment. P. G. told defense counsel he thought the state should reserve the death penalty for the most brutal and severe crimes, but he did not have a specific list of such crimes in mind. P. G. stated that if he found the torture allegation in the conspiracy count

to be true, he could impose the death penalty and he would place the burden on the defense in the penalty phase to produce evidence to get him to lean the other way. But in response to the prosecutor's questions, P. G. said he would consider the factors the trial court read when making his determination about the appropriate punishment, and he was not predisposed in the death penalty's favor based on the charges filed against the defendants. The record supports the trial court's conclusion that P. G. did not hold views that would prevent or substantially impair the performance of his duties as a juror. (*Blair*, *supra*, 36 Cal.4th at p. 743, 31 Cal.Rptr.3d 485, 115 P.3d 1145.)

*b. Juror S. K.*

In his responses to the written questionnaire, S. K. indicated he thought there were circumstances, such as a planned murder, where a defendant should receive the death penalty automatically. During voir dire, S. K. confirmed his responses to the questionnaire but acknowledged he made them before the court instructed him about the two options in the penalty phase. S. K. noted that he could separate his personal beliefs and his ability to consider both sentencing options. He stated he would follow the court's penalty instructions, and that he would consider the alternative penalty of life without the possibility of parole. S. K. responded to defense counsel that he understood the trial court's instruction that the law did not have a preference for the death penalty and that its imposition was not automatic. He also stated he would make his decision on penalty after listening to both sides.

Although the trial court concluded that S. K. gave equivocal answers, the court was satisfied that S. K. was capable of fulfilling his juror responsibilities. The record supports the trial court's conclusion that S. K. did not hold views that would prevent or substantially impair the performance of his duties as a juror. (*Blair*, *supra*, 36 Cal.4th at p. 743, 31 Cal.Rptr.3d 485, 115 P.3d 1145.)

*2. Granting of Prosecution's For-cause Challenges*

Defendant asserts the trial court erred in excusing two prospective jurors, R. J., and R. A. for their alleged bias against the death penalty. We discuss each claim below.

*a. Prospective Juror R. J.*

In his written questionnaire, R. J. noted that he was ambivalent about

the death penalty, but denied having conscientious or other objections to it, and indicated he would not automatically vote for life imprisonment. In his voir dire examination, however, R. J. stated he was biased against the death penalty and would not be able to listen to all the evidence in the penalty phase with an open mind and return a verdict of death. The trial court granted the prosecutor's for-cause challenge to R. J., concluding his ability to sit as a fair and impartial juror was substantially impaired due to his strong beliefs in opposition to the death penalty. The record supports the trial court's conclusion that R. J. held views that would prevent or substantially impair the performance of his duties as a juror. (*People v. Schmeck*, *supra*, 37 Cal.4th at p. 262, 33 Cal.Rptr.3d 397, 118 P.3d 451.) Even if his statements are considered conflicting or equivocal, the trial court's determination of each juror's true state of mind is binding on us. (*Ibid.*)

*b. Prospective Juror R. A.*

In his written questionnaire, R. A. expressed equivocal views about the death penalty. During the trial court's voir dire, R. A. stated that his feelings in opposition to capital punishment would not affect his judgment, and that he was capable of keeping an open mind in order to impose a just punishment. But during defense counsel's questioning, R. A. observed that he did not think he was ready to pass judgment in a capital case. In response to the prosecutor's voir dire, R. A. stated he would not impose the death penalty on a first time murderer with special circumstances. He did observe that if a murderer were to kill again after having been given a chance to rehabilitate, the death penalty might be appropriate.

The prosecutor challenged R. A. for cause because he apparently would not impose death on first-time murderers. The court granted the prosecutor's challenge. We find that the record supports the court's conclusion that R. A.'s views would prevent or substantially impair his ability to perform his juror duties. (*Schmeck*, *supra*, 37 Cal.4th at p. 262, 33 Cal.Rptr.3d 397, 118 P.3d 451.)

Hoyos, 41 Cal. 4th at 903-07 (brackets in original).

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). "[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or

substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985), quoting Adams v. Texas, 448 U.S. 38, 45 (1980).

The Supreme Court has stated that "whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind. We also noted that such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations were entitled to deference even on direct review; '[t]he respect paid such findings in habeas proceeding certainly should be no less.'" Witt, 469 U.S. at 428, quoting Patton v. Yount, 467 U.S. 1025, 1038 (1984) (footnote omitted) (bracket in original); see also Uttecht v. Brown, 551 U.S. 1, 9 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitudes and qualifications of potential jurors.")

Even if the Court assumes, without deciding, that Petitioner preserved this claim despite his failure to either exhaust his allotment of peremptory challenges or object to the ultimate composition of the jury, it is clear, for the following reasons, that the California Supreme Court's rejection of this claim was reasonable and the trial court's conclusions find ample support in the state record. See Witt, 469 U.S. at 434 ("[T]he question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record."), citing Marshall v. Lonberger, 459 U.S. 422, 432 (1983).

## A. Jurors P.G. and S.K.

Of the five venire members at issue in this aspect of the claim, only P.G. and S.K. sat on Petitioner's jury. (CT 3516.) Petitioner explains that he "cites the trial court's error as to R.L., M.N., and D.V. to show that the trial court had an incorrect standard for determining defense challenges for cause, and made multiple errors in accordance with that erroneous standard," and asserts that "[t]he prejudice comes from the fact that P.G. and

56

S.K. who were removable for cause did sit on the jury 'as finally composed.'" (Pet. Brief at 7.) The Court's review will center on the impartiality or bias of P.G. and S.K., the two individuals who actually sat on Petitioner's jury. See Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc) ("The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors. The bias or prejudice of even a single juror would violate [Petitioner's] right to a fair trial."); see also Ross v. Oklahoma, 487 U.S. 81, 86 (1988) ("Any claim that the jury was not impartial, . . . must focus . . . on the jurors who ultimately sat.")

Petitioner argues that Juror P.G. was biased because he indicated that if he found Petitioner guilty of murder and torture, he would lean towards the death penalty and place the burden on the defense to show that life in prison was warranted instead of the death penalty. (SAP at 20-21; Reply at 33.) Defense counsel challenged P.G. for cause "based on after finding a defendant guilty of murder, he would lean towards the death penalty," and argued that "he's the type of juror that would put the burden on the defense." (RT 1919.) The trial court indicated that he would review the transcript before deciding on the challenge to P.G. (RT 1920.) The trial court later denied defense counsel's challenge for cause, finding P.G. was one of a group of jurors who "in many cases gave equivocal answers, but I am satisfied and comfortable that each of these jurors is capable of fulfilling they're [sic] responsibility as far as being fair and impartial, notwithstanding any feelings they have concerning the topics covered orally or in writing." (RT 2006, 2645.) P.G. served on Petitioner's jury. (RT 2645; CT 3516.)

A review of the trial record reveals that while P.G. agreed he would "lean" towards the death penalty if he found Petitioner guilty and found a torture allegation to be true, counsel's questioning also resulted in the following exchange in which P.G. clearly indicated that he would evaluate the case on the evidence presented:

> Q.     If that were your leaning, do you think there would be anything I could say or do that would get you to lean the other way or lean straight up?

///

A.   Well, I would have to judge it on the evidence presented which way I would be leaning.

(RT 1909.)  Meanwhile, earlier questioning by the trial court confirmed P.G.'s ability and willingness to follow the law regardless of his own personal feelings:

Q.   Now you have heard me go over, at least on two occasions, some of the rules of law that apply to capital cases.  Do you feel capable of following the law and the procedures that I have outlined for you?

A.   Yes, your Honor.

Q.   Would your feelings either for or against the death penalty in any way affect your judgment in this case?

A.   I do not believe so.

(RT 1878.)

Based on a review of the entirety of the voir dire and giving deference to the judge as required, it is clear that the trial court's conclusion, that P.G. was able to be fair and impartial despite his personal views, is "fairly supported" by the record.  As such, the California Supreme Court was not unreasonable in similarly concluding that: "The record supports the trial court's conclusion that P.G. did not hold views that would prevent or substantially impair the performance of his duties as a juror."  Hoyos, 41 Cal. 4th at 905-06.

With respect to Juror S.K., Petitioner relies largely on the written responses in the juror questionnaire, in which S.K. answered yes to a question asking if every person who committed a first-degree murder should automatically receive the death penalty, and wrote that he viewed the death penalty as a punishment rather than a deterrent.  (SAP at 21, citing CT 3756, 3758.)  Petitioner contends that S.K. restated those same beliefs during voir dire.  (SAP at 21; Reply at 32.)  When defense counsel challenged S.K. for cause, the trial court stated: "If one were simply looking at the questionnaire, there wouldn't be any question about whether he is substantially impaired.  But my notes cause me to think that that was clarified by oral testimony."  (RT 2006.)  The trial court held a decision about S.K. in

abeyance pending a review of the transcript.  (<u>Id.</u>)  After that review, the trial court declined to excuse S.K., recognizing that juror, like P.G., was part of a group who "in many cases gave equivocal answers, but I am satisfied and comfortable that each of these jurors is capable of fulfilling they're [sic] responsibility as far as being fair and impartial, notwithstanding any feelings they have concerning the topics covered orally or in writing."  (RT 2645.)  S.K. was seated on Petitioner's jury.  (CT 3516.)

Upon review of the voir dire exchanges, it is apparent that the trial court's decision was supported by the record, as S.K. clearly stated that he could be objective and would listen to both sides before making a decision, as well as indicated that his questionnaire answers were made prior to the trial court's instructions on the penalty decision, as follows:

> Q. According to your answers there were a couple of questions I wanted to follow-up on.
>
> Looking at question 70, the question is: "Do you feel that every person who commits first degree murder should automatically receive the death penalty?
>
> And your response was: "If you take someone's life, then they have" - - I can't read it exactly, but they have a right to expect justice, something along those lines.
> Would that be your present state of mind?
>
> A. I was trying to, without the instructions of the two ways to go - - yeah, that is how I believe.
>
> Q. Okay.
>
> A. But I also tried to make it clear that I do think I can be objective also.

(RT 1940.)  Upon additional query about his questionnaire response concerning automatic death penalty for planned murders, S.K. clarified that: "I tried to make a distinction and my personal beliefs are that the death penalty is something that needs to be implemented. But I also tried to take that if I was instructed that there are now two choices and you have to take the aggravating and mitigating circumstances, that I would also be able to do that."

59

(RT 1963.) When asked if he believed the death penalty should be a punishment option, S.K. replied, "Absolutely." (Id.) When asked if he could consider an alternative sentence of life without parole, he also stated: "Yes, Absolutely." (Id.) Counsel and S.K. then had the following exchange:

> Q.    And do you accept what the judge has told you so far, that the law has no preference for the death penalty, that it is not automatic, no matter what?
>
> A.    I understand that completely.

(RT 1964.) After additional questions, S.K. again affirmed that: "I'm going to listen to both sides, make a decision from there." (RT 1975.)

Here too, based on the Court's review of the whole record, it is evident that the trial court's decision, made after acknowledging and considering both S.K.'s questionnaire responses as well as his answers during voir dire, is "fairly supported" by the record. Accordingly, the California Supreme Court reasonably concluded that: "Although the trial court concluded that S. K. gave equivocal answers, the court was satisfied that S. K. was capable of fulfilling his juror responsibilities. The record supports the trial court's conclusion that S. K. did not hold views that would prevent or substantially impair the performance of his duties as a juror." Hoyos, 41 Cal. 4th at 906.

## B.    Prospective Jurors R.J. and R.A.

Petitioner also contends that he was deprived of his right to a fair and impartial jury when the trial court erroneously excused prospective jurors R.J. and R.A. based on their views concerning the death penalty. (SAP at 18-19.) Petitioner states "that conclusion is refuted by the record," argues that the state court unreasonably applied Witt, and asserts that "[t]he erroneous excusal of otherwise qualified jurors is prejudicial error requiring reversal of the judgment." (Id., citing Gray v. Mississippi, 481 U.S. 648 (1987).)

"[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 522 (1968). Again, "the proper standard

for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Witt, 469 U.S. at 424, quoting Adams, 448 U.S. at 45. "The nature of the jury selection process defies any attempt to establish that an erroneous Witherspoon-Witt exclusion of a juror is harmless." Gray, 481 U.S. at 665.

A review of the state record supports the trial court's decision to excuse these two individuals for cause. In his questionnaire, R.J. indicated that he felt "somewhat ambivalent," but did not hold views strongly objecting to the death penalty that would render him unable to vote for it, nor would he automatically vote for life in prison. (CT 5484.) Petitioner concedes that R.J. "somewhat contradicted" his questionnaire responses during later voir dire questioning. (SAP at 27.) When directly asked about his views, R.J. indicated that he was against the death penalty, as follows:

> Q.  Now so far as capital punishment is concerned, how do you fit into this spectrum of people who have strong feelings for or against capital punishment?
>
> A.  I have to say that I have feelings against capital punishment.
>
> Q.  All right. You describe your feelings to some extent in response to question number 63. Do you feel that your feelings are strong to the point that they may affect your judgment in the case so far as penalty is concerned?
>
> A.  I think that they are, yes. It's a very tough question. I understand, as I indicated in my answer, I understand the - - I think I understand the motivation for having the death penalty. I just don't see that it accomplishes anything.
>
>  So I would have to say that I am biased against it, and it probably would affect my judgment in the penalty phase of the trial.

(RT 1879.) Following these questions, R.J. then expressly and clearly stated his inability to vote for the death penalty:

Q.     Are you capable of listening to all evidence presented in a penalty phase with an open mind, and if, in fact, it were your belief that the evidence in aggravation so outweighed the evidence in mitigation, that death was, in fact, warranted, would you be capable under most circumstances of returning a verdict of death?

A.     I don't think that I would be.  Honestly, I don't think that I would be.

(RT 1880.)

Counsel attempted to rehabilitate R.J., noting that many people leaned one way or another on the issue of capital punishment and that they sought those individuals who could consider both penalties and keep an open mind.  When counsel asked: "Do you think your bias is so strong that that is impossible for you to do?," R.J. replied: "I believe that it - - I believe that it is.  I mean I guess it sounds like I am on some kind of crusade or something. I mean I have never really had to evaluate this death penalty question.  Now that the chips are sort of down, so to speak, looking at it honestly I just don't think that I could sentence someone to death because I just don't see that it serves a purpose beyond vengeance.  Lock them up, throw away the key, that's my attitude towards it.  And I have to state it as such, I can't --"  (RT 1893-94.)  When asked once more if he could apply the law as instructed despite his feelings on the matter, R.J. replied, "I think not."  (RT 1894-95.)

In response to the prosecutor's challenge for cause, the trial court discussed R.J. at length and in detail, stating that he found R.J. to be "a very thoughtful and candid individual," recalling that R.J. paused before his answers and clearly "gave thought" to his responses, and concluding that "based upon what he said and the way he said it, I don't have any question in my mind that he holds strong beliefs in opposition to the death penalty that would prevent him from following the law.  He said so repeatedly.  And I think his ability to sit as a fair and impartial juror is substantially impaired as a result of those beliefs."  (RT 1921.)

As the trial court's conclusions were "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province," they are entitled to deference. Witt, 469 U.S. at 428.  The California Supreme Court affirmed this decision accordingly,

holding that the record supported the juror's exclusion and reasonably concluding that "[e]ven if his statements are considered conflicting or equivocal, the trial court's determination of each juror's true state of mind is binding on us." <u>Hoyos</u>, 41 Cal. 4th at 906-07.

In the questionnaire, R.A. wrote that "death penalty is sometimes is good, sometimes it is a bad idea to punish a person who committed a serious crime. I say it's bad because killing people is a sin. We should give them a chance to live and hope that they will change. [¶] But if they won't change and start killing people again I believe death penalty is the best penalty they should get." (CT 4592.) R.A. explicitly indicated in his questionnaire that he had an objection to the death penalty, referred back to his earlier written answer multiple times, and also answered "yes" to a question asking if his opinion were such that he would be "unable to impose the death penalty regardless of the facts." (CT 4593.) Voir dire exchanges only further confirmed R.A.'s views. When asked if he could return a verdict of death or whether his views would affect his judgment on the issue, R.A. stated: "I don't know, sir. I am not sure." (RT 2282.) R.A. and counsel later had the following exchange:

> Q.   What is that that you are concerned about?
>
> A.   On this case, you know, I don't think I'm ready for this to make a decision since like capital crime right now, I don't think, you know, I can give you some judgment.

(RT 2302.) R.A. later reiterated his questionnaire response that he condoned the death penalty only under very narrow circumstances, as follows:

> Q.   And when you write killing people is a sin, do you also mean that if you have to make a decision as to whether somebody lives or dies and you choose and you vote that a person should die, that that would be a sin?
>
> A.   Well, if it's appropriate to kill a murderer and to stop him from killing again, I think the death penalty should be necessary.

(RT 2334.) When counsel attempted to clarify R.A.'s views, R.A. again reiterated these beliefs:

> Q. In other words, you are going to be asked in the second trial whether or not the defendants should live or die. You are either going to vote for death or you are going to vote for life in prison without parole. [¶] Could you vote for the death penalty if there is no evidence that they have killed before?
>
> A. Well, if they are convicted for murder you should at least give them a chance to live and give them a chance to change. Maybe, you know, they will regret for what they have done. So I think it's just necessary to - -

(RT 2335.) Ultimately, R.A. clearly stated that he would not impose the death penalty unless a murderer had killed again, after being given a chance at rehabilitation:

> Q. So you don't believe or you do believe that the first time someone would be convicted of murder with special circumstances, they should automatically be given a chance to rehabilitate themselves or make something of themselves even though they may spend time in prison?
>
> A. Right.
>
> Q. And you would not at any time impose the death penalty?
>
> A. No.
>
> Q. But if they were to kill again after given a chance, then you would say, okay, I think the death penalty might be appropriate?
>
> A. Right.

(RT 2335-36.) The trial court later excused R.A. as part of a group of prospective jurors that "as far as this Court's opinion is concerned, are substantially impaired by virtue of their feelings concerning the various topics that are raised in the questionnaire and orally to the point that they would not be in a position to sit fairly and impartially and render a judgment in this case in accord with the Courts [sic] instructions on the law." (RT 2645.) In light of R.A.'s statements, both in the questionnaire and during voir dire itself, that he

09cv0388 L (NLS)

held strong objections to the death penalty that would impair his ability to impose such a punishment, and specifically that he would not impose the death penalty for murder unless the individual had killed before, the trial court reasonably found R.A. to be substantially impaired. The California Supreme Court reasonably concluded that "the record supports the court's conclusion that R. A.'s views would prevent or substantially impair his ability to perform his juror duties." Hoyos, 41 Cal. 4th at 907. In both instances, "[t]he trial court's finding of bias was made under the proper standard, was subject to § 2254(d), and was fairly supported by the record." Witt, 469 U.S. at 435.

The record amply supports the trial court's conclusions with respect to Jurors P.G. and S.K. Accordingly, Petitioner fails to demonstrate that the state supreme court's rejection of Claim 2 was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts. Relief is not warranted on Claim 2.

**3.   Claim 3**

Petitioner asserts that the trial court erred when it "refused to instruct the jurors as requested by the defense that they have a civic duty to serve as jurors and to subordinate their personal views regarding the death penalty and other matters to their duty to follow the law," as outlined in Witherspoon, 391 U.S. at 522. (SAP at 30.)

The California Supreme Court considered and rejected this claim in a reasoned opinion on direct appeal, as follows:

> Defendant contends the trial court erred when it denied his motion in limine requesting the court to admonish prospective jurors of their civic duty to serve as jurors, and to set aside their personal views as to that duty in order to follow the law. Defendant claims the trial court's denial of his motion contributed to the improper dismissal of qualified jurors, and violated his right to an impartial jury, due process, and equal protection of the laws under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He further claims the trial court erred by excusing prospective jurors for cause without first so admonishing them.[FN19] Defendant concedes that we have consistently held "a 'civic duty' admonition is not necessary," and apparently asks us to reconsider the issue. (*People v. Gordon* (1990) 50 Cal.3d 1223,

1261, 270 Cal.Rptr. 451, 792 P.2d 251.) We decline to do so and find no error under these facts.

> FN19. Defendant argues a "civic duty" admonition might have "salvaged" six prospective jurors excused for cause: R. J., L. S., N. W., P. K., A. U., and R. A. As an initial matter, we note that the goal of voir dire is not to "salvage" problematic jurors, but rather to find 12 fair-minded jurors who will impartially evaluate the case. In the previous section, defendant claimed that two of these six prospective jurors (R. J. and R. A.) were excused in violation of *Witherspoon* and *Witt*. But defendant does not appear to claim that the remaining four jurors (L. S., N. W., P. K., and A. U.) were also excused in violation of *Witherspoon* and *Witt*. In any event, we have reviewed the voir dire of these other four jurors, and we conclude the record supports the trial court's findings that these jurors held views that would prevent or substantially impair the performance of their duties.

Hoyos, 41 Cal. 4th at 907-08.

Petitioner argues that "[t]he California Supreme Court's rejection of this claim was an unreasonable application of Witherspoon and its progeny." (SAP at 31.) Respondent, meanwhile, points out that the California Supreme Court has repeatedly rejected this claim. (Ans. Mem. at 21, citing People v. Gordon, 50 Cal. 3d 1223, 1261 (1990) and People v. Hamilton, 48 Cal. 3d 1142, 1166 n.5 (1989).) Petitioner argues that "[t]here may not be settled law imposing a sua sponte duty to give a specific instruction, but there is settled law, cited by petitioner, that precludes the discharge of a prospective juror unless the juror's views regarding the death penalty substantially impaired his ability to serve within the meaning of Wainwright v. Witt, 469 U.S. 412 (1985)." (Pet. Brief at 8.) Petitioner relies on Boulden v. Holman, 394 U.S. 478 (1969), for the proposition that "[i]t is entirely possible that a person who has 'a fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law– to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case." Id. at 483-84.

///

09cv0388 L (NLS)

Petitioner's jury venire was instructed that the parties were entitled to a panel of fair jurors who could consider the case based only on the evidence presented at trial, and could fairly consider both potential penalties, as follows:

> Both the prosecution and the defendants are entitled to a jury comprised of 12 fair-minded people from our community who can decide the question about the defendants' guilt or innocence based only on the sufficiency of evidence produce [sic] only at the trial and irrespective of what the consequences of that decision might be.

> If the jury finds the defendants guilty and the second phase is reached, jurors must be willing to consider fairly both the circumstances of the crime and a defendant's background before deciding between death as a possible punishment and life without the possibility of parole as a possible punishment.

(RT 1677-78, 1716-17, 1753.)

> Now, we know that some citizen's [sic] favor the death penalty so strongly that they would automatically or almost automatically impose a death penalty for every murder or every murder with special circumstances, regardless of the facts of the crime or of a defendant's background. [¶] We also know that some citizen's [sic] are against the death penalty and have such strong feelings and opposition to the death penalty that they would automatically or almost automatically vote against the death penalty no matter what the crime or the defendant's background. [¶] Now, neither of these opinions is necessarily wrong, but I can tell you this; it would be wrong for people with these opinions to sit as a juror on a death penalty case.

(RT 1678-79, 1717-18, 1754.) It is clear that the prospective jurors were properly advised that they were expected to consider the case based only on the evidence presented at trial and that it would be improper for an individual to sit as a juror on the case who held such strong feelings either for or against the death penalty that they would impose or refuse to impose the death penalty regardless of the circumstances of the crime or the characteristics of the defendant.

While it is entirely reasonable that a person who has serious reservations about the death penalty may be able to follow a trial court's instructions and consider such a potential punishment, Petitioner has not demonstrated that a "civic duty" instruction is necessary to this end. He also fails to cite to any clearly established Federal law requiring such an

instruction. Petitioner generally argues that had the trial court given a civic duty instruction, six prospective jurors that were excused for cause "may well have responded to the court's questionings in a manner that precluded any excusal for cause." (SAP at 31.) Petitioner's speculative assertions fail to demonstrate that the trial court's decision not to specifically admonish the jurors about their civic duty to serve amounted to error of a constitutional dimension.

The state court's rejection of this claim was neither contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on Claim 3.

**4.   Claim 4**

In this claim, Petitioner contends that the "trial court erroneously denied the defense motion to conduct individual sequestered voir dire of the prospective jurors in order to effectuate a Sixth Amendment guarantee to an impartial jury, <u>Duncan</u> v. <u>Louisiana</u>, 391 U.S. 145 (1968), particularly with respect to the jurors' responses regarding the death penalty." (SAP at 32.)

Petitioner raised this claim on direct appeal, and the state supreme court denied it in a reasoned opinion, as follows:

> Defendant claims the trial court erred in denying his motion for individual and sequestered juror voir dire, and thus violated his right to trial by an impartial jury and to due process of law under the Sixth and Fourteenth Amendments to the United States Constitution. As we explain, we conclude the trial court did not err in denying his motion.

> Alvarado filed an in limine motion, in which defendant joined, seeking individual and sequestered juror voir dire. The trial court denied the motion, but left open the possibility of individual and sequestered voir dire for particular jurors on a showing of good cause. Subsequently, the court stated it intended to call 12 prospective jurors at a time for voir dire, followed by discussion of challenges for cause outside the jurors' presence. Defendant's trial counsel stated he had no objection to the court's proposed jury selection procedures.

///

As an initial matter, the People contend that counsel's acquiescence in the trial court's proposed jury selection process bars defendant's claim concerning individual and sequestered voir dire. But the parties stipulated that when the trial court made a ruling on an in limine motion, the losing party was not required to restate the objection in order to preserve it for appellate purposes (assuming that no evidence later presented changed the basis of the trial court's ruling). Defendant therefore did not forfeit his contention.

Defendant's claim fails on the merits, however, because, as defendant concedes, Code of Civil Procedure section 223, enacted as part of Proposition 115, abrogated the former individual voir dire procedure directed by *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80, 168 Cal.Rptr. 128, 616 P.2d 1301. (*People v. Waidla* (2000) 22 Cal.4th 690, 713, 94 Cal.Rptr.2d 396, 996 P.2d 46, citing *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168, 1171, 71 Cal.Rptr.2d 91.) Defendant submits that *Covarrubias* was wrongly decided, and apparently invites us to reconsider the issue. We decline to do so. (*People v. Ramos* (2004) 34 Cal.4th 494, 512, 21 Cal.Rptr.3d 575, 101 P.3d 478.)

Hoyos, 41 Cal. 4th at 898-99.

As previously discussed with respect to the Teague bar (see section III.B.1, supra), the United States Supreme Court has never held that individual, sequestered voir dire is mandated in a capital criminal trial. Instead, the Supreme Court has stated that "*[v]oir dire* 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" Morgan v. Illinois, 504 U.S. 719, 729 (1992), quoting Ristaine v. Ross, 424 U.S. 589, 594 (1976) (bracket in original); see also Mu'Min, 500 U.S. at 427 ("[O]ur own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias.") Current California state law, that was also in effect at the time of Petitioner's trial, clearly holds that "[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." Cal. Code Civ. Proc. § 223.

The Supreme Court has also acknowledged "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." Morgan,

504 U.S. at 729.  Here, Petitioner fails to show that the trial court's decision not to conduct individual, sequestered voir dire rendered the process somehow inadequate in his case.  A review of the record shows that the prospective jurors completed lengthy written questionnaires which contained and included numerous questions about their views on the criminal justice system and capital punishment in particular.  The trial court conducted follow-up questioning in "small groups" of twelve individuals.  (See CT 3467, 3479; RT 1791.)  The prospective jurors were advised that they could ask to address certain topics or matters in private if needed and counsel was also provided with an opportunity to question the prospective jurors.  After reviewing the record, it is clear that this procedure allowed the parties and the trial court to determine whether any prospective jurors held opinions so strong that they could not be fair to both sides, and would either always impose, or could never impose, a death sentence.  In light of the thorough jury selection process employed by the trial court, there is no indication that Petitioner was deprived of his right to an impartial jury.

Given that the Supreme Court has never articulated the rule Petitioner advances, and after reviewing the record of the voir dire proceedings, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts.  Habeas relief is not warranted on Claim 4.

**B.    Claims of Trial Court Error**

**1.    Claim 5**

Petitioner alleges that the trial court's refusal to sever his trial from that of co-defendant Alvarado's trial violated his constitutional rights to due process, to testify and to a fair trial.  (SAP at 35.)

The California Supreme Court considered this claim on direct appeal, denying it in a reasoned opinion as follows:

///

///

Defendant asserts that the trial court's denial of his severance motion violated his rights to due process of law, a fair trial, a reliable sentence, and the right to testify on his own behalf, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As discussed below, we conclude the trial court did not err in denying the severance motion.

*1. Statements of the Jailhouse Informants*

Several of defendant's claims on appeal, including the severance claim, relate to jailhouse informants George Jimenez and Jorge Flores and their statements. Neither Jimenez nor Flores testified at trial.

*a. George Jimenez*

Following defendant's and Alvarado's arrest after the car stop, Alvarado was incarcerated in the county jail. On May 30, 1992, Alvarado (under the alias "Ralph Varela") was in a holding cell with several other inmates, including George Jimenez. In an interview on June 23, 1992, Jimenez told police the inmates were passing around a newspaper that included a story about the Magoon murders. While looking at the newspaper, Alvarado stated, "Hey, we did this." One of the other inmates said, "You're the ones that capped that little kid?" Alvarado laughed and replied, "Yeah." Enraged by Alvarado's admission, some of the inmates assaulted Alvarado.

*b. Jorge Flores*

On the same day as Alvarado's jailhouse assault, defendant was incarcerated in a different jail, where he spoke with an acquaintance, Jorge Flores. The next day, June 1, 1992, during an interview with police detectives, Flores stated defendant told him he had taken a pistol that belonged to a shooting victim. Defendant told Flores that he and an unnamed companion were sent by their boss to the victims' house to either get back the marijuana their boss had sold to the victims or get the money the victims owed for it. Defendant stated that when they went to the victims' house the victims were not there, but when the victims arrived, the male victim saw they were waiting for him, and the victims went inside the house. Defendant and his companion knocked on the door; the door opened, or was broken down, and the male and female victims were inside holding weapons. The companion pulled his gun and shot one of the victims, and the bullet also hit one of the children in the head. The second victim tried to shoot, and defendant shot the second victim.

09cv0388 L (NLS)

*2. Aranda/Bruton Issues*

Defendant and Alvarado moved to sever the trial on the ground that the prosecution's proposed admission of the jailhouse informants' testimony would violate *People v. Aranda* (1965) 63 Cal.2d 518, 47 Cal.Rptr. 353, 407 P.2d 265 and *Bruton v. United States* (1968) 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. *Bruton* and its progeny provide that if the prosecutor in a joint trial seeks to admit a nontestifying codefendant's extrajudicial statement, either the statement must be redacted to avoid implicating the defendant or the court must sever the trials. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 43, 17 Cal.Rptr.3d 710, 96 P.3d 30.) As to the Flores statement, the prosecution resolved any potential *Aranda/Bruton* issues when it limited its evidence to defendant's admission that he had taken a gun from the victim. As to the Jimenez statement, the prosecutor offered several possible redactions to avoid violating *Aranda/Bruton*, all of which the court ultimately deemed inadequate. The prosecutor then elected to proceed with a joint trial at which he would not introduce the Jimenez statement in his case-in-chief, although the parties understood it might be used for impeachment purposes. The trial court's final order was that the prosecution would not use the Jimenez statement in its case-in-chief at the guilt or penalty phases.

Section 1098 expresses a legislative preference for joint trials. (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40, 17 Cal.Rptr.3d 710, 96 P.3d 30.) A trial court's denial of a motion for severance is reviewed for abuse of discretion, judged on the facts as they appeared at the time of the ruling. (*Id.* at p. 41, 17 Cal.Rptr.3d 710, 96 P.3d 30.) But even if the ruling on a severance motion was correct when made, the reviewing court will reverse the decision if a defendant shows that joinder actually resulted in "gross unfairness," amounting to a denial of due process. (*People v. Johnson* (1988) 47 Cal.3d at p. 576, 590, 253 Cal.Rptr. 710, 764 P.2d 1087.)

Because the trial court decided the severance motion entirely on *Aranda* and *Bruton* grounds, and because defendant does not claim the trial court erred in that ruling, he appears to concede the trial court's denial of the severance motion was correct. Defendant contends, however, that the court committed prejudicial error when it left open the possibility that if Alvarado testified, Jimenez could be called to impeach him. Defendant claims that because the trial court did not bar Jimenez's testimony altogether, the denial of severance resulted in gross unfairness amounting to a violation of due process. But defendant's claim that the trial court erred in not barring Jimenez's testimony altogether on *Aranda* and *Bruton* grounds is not viable. A codefendant's

extrajudicial statement implicating another defendant need not be excluded when the codefendant testifies and is available for cross-examination.[FN11] (*Nelson v. O'Neil* (1971) 402 U.S. 622, 629–30, 91 S.Ct. 1723, 29 L.Ed.2d 222; *People v. Boyd* (1990) 222 Cal.App.3d 541, 562–63, 271 Cal.Rptr. 738.)

> FN11. Defendant bases his claim that he suffered gross unfairness because Jimenez's testimony was not excluded altogether on his argument (discussed and rejected in pt. IV. F., *post*) that he suffered a *Brady* violation because the prosecutor made a late disclosure of evidence that undermined Jimenez's credibility. (*Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (*Brady*).) But because defendant's *Brady* claim fails, so too does his derivative claim that the trial court's denial of severance later resulted in gross unfairness in the form of the alleged *Brady* violation.

Hoyos, 41 Cal. 4th at 894-96. The state supreme court also rejected Petitioner's contention that the trial court's ruling resulted in prejudice with respect to his penalty phase proceedings. See id. at 927 fn. 38 ("Because we discern no error in any area of the guilt phase, we reject defendant's claims of any prejudicial effect in the penalty phase arising from these or any other guilt phase rulings.")

Federal habeas relief is unavailable based on alleged errors of state law unless such error violated a petitioner's federal constitutional rights. See Estelle v. McGuire, 502 U.S. 62, 68-73, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.")*; see also* Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996) ("While a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'"), quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986).

///

09cv0388 L (NLS)

"In common with other courts, the [United States Supreme] Court has long recognized that joint trials 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" United States v. Lane, 474 U.S. 438, 449 (1986), quoting Bruton v. United States, 391 U.S. 123, 134 (1968). Under California law, "[w]hen two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials." Cal. Penal Code § 1098. Under Federal law, "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." Lane, 474 U.S. at 446 n.8.

Petitioner primarily contends that the state court's ruling ignored and did not properly address his argument that the trial court's denial of the severance motion infringed his right to testify, and explains that "[t]he point of petitioner's presentation to the trial court was that Alvarado would refuse to testify if he could be impeached with the Jimenez statement, and that refusal would require petitioner as well to refrain from testifying at a joint trial." (SAP at 41; see also Pet. Brief at 10.)

In Zafiro v. United States, 506 U.S. 534 (1993), the Supreme Court stated that when co-defendants have been joined under the Federal Rules of Criminal Procedure, severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id., 506 U.S. at 539. In Rock v. Arkansas, 483 U.S. 44 (1987), the Supreme Court declared that "it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." Id., 483 U.S. at 49.

Petitioner places significant reliance on Zafiro in support of his claim. (See Reply at 39-42.) This reliance is misplaced, as the Ninth Circuit has explicitly held that "[b]y its own wording, Zafiro only applies to federal and not state court trials. It analyzes only the Federal Rules of Criminal Procedure applicable to federal district courts." Collins v.

74

Runnels, 603 F.3d 1127, 1131-32 (9th Cir. 2010) (italics in original); see also Runningeagle v. Ryan, 686 F.3d 758, 776-77 (9th Cir. 2012) ("In reaching that holding [in Collins v. Runnels], we found that the statement in Lane regarding when misjoinder rises to the level of constitutional violation was dicta and that Zafiro is not binding on the state courts because it addresses the Federal Rules of Criminal Procedure. Id. at 1131-33. Neither decision is 'clearly established Federal law' sufficient to support a habeas challenge under § 2254.")

Additionally, Petitioner's assertion that the California Supreme Court ignored his argument about the infringement of his right to testify is refuted by the record, as the state court clearly and explicitly acknowledged this contention in adjudicating the claim on direct appeal. See Hoyos, 41 Cal. 4th at 894 ("Defendant asserts that the trial court's denial of his severance motion violated his rights to due process of law, a fair trial, a reliable sentence, and the right to testify on his own behalf, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.") The state court found that the trial court's ruling was not in error, and did not in any event result in "gross unfairness" nor have a prejudicial impact on Petitioner's guilt or penalty phase proceedings. Id. at 896.

Indeed, in rejecting Petitioner's Brady claim, which is discussed in greater detail in Claim 13 below, the California Supreme Court also specifically rejected Petitioner's arguments about the effects of the joint defense agreement:

> Defendant implies the above trial considerations *necessitated* his adoption of the agreement with Alvarado and corresponding trial strategy. But this strategy was not compelled by necessity, legal or otherwise. Even assuming both codefendants wished to keep Jimenez's statements from the jury, defendant's testifying would not necessarily have caused Alvarado to testify. Alvarado's testifying in response to Jimenez's statements would have been contingent on the nature of defendant's testimony. If defendant's testimony painted Alvarado in a particularly bad light, Alvarado might have testified, in order to shift the blame to defendant.

///

It was also possible, however, that Alvarado would not have testified. Before testifying, Alvarado would have considered the consequences of his testimony: leaving defendant's testimony unrebutted, or taking the stand and risk having the jury hear Jimenez's statements. Alvarado could not make that calculation prior to hearing defendant's actual testimony. Neither could defendant know with any certainty in advance what Alvarado would do. There was no *necessary* connection between defendant's testifying and Alvarado's testifying.

Hoyos, 41 Cal. 4th at 921.

As discussed below with respect to Claim 13, Petitioner's related claims of Brady error and ineffective assistance of counsel, the trial court reasonably concluded that the prospect of Jimenez impeaching Alvarado did not directly impact Petitioner's own decision whether or not to testify, as Jimenez's testimony was not admissible against Petitioner irrespective of whether Petitioner testified at trial, and any agreement between the defendants was "not cognizable according to the constitution," as follows:

> There isn't any Sixth Amendment violation that I see as to Mr. Hoyos in this case. He could have testified in this case without any fear of impeachment by Jiminez [sic]. He chose not to do so. In fact, he chose not to do so in advance for reasons, as it seems, to be more akin to familial considerations. We sink or swim together. That's not cognizable as a constitutional violation. He made a decision and the potential impeaching information of the informant as to his co-defendant is not really of constitutional significance as to Mr. Hoyos. So in all respects, Mr. Hoyos' motion is going to be denied.

> There is no showing whatsoever that the failure of testimony of Alvarado in this case could have in some fashion exonerated Mr. Hoyos. Quite to the contrary, as I'm understanding the positions of the lawyers, but anyway, these two individuals decided themselves to act as a unit. That's their right. They can decide not to testify as a unit or to testify as a unit, but that's their decision, not cognizable according to the constitution, so that's my decision.

(RT 4729-30.)

The state supreme court acknowledged that Petitioner and Alvarado had a voluntary strategic agreement that their prospects were best if either both defendants testified at trial,

or if neither testified, but Petitioner fails to offer record support for an argument that if Alvarado declined to testify that Petitioner was <u>required</u> to decline as well.  As that court reasonably concluded: "There was no *necessary* connection between defendant's testifying and Alvarado's testifying."  <u>Hoyos</u>, 41 Cal. 4th at 921.  At most, Petitioner was faced with the prospect that if he chose to testify, Alvarado would make an independent decision to also testify, and the Jimenez statement would have then come in as impeachment against Alvarado.  The trial court, and later the state supreme court, each correctly observed that Jimenez's testimony was not admissible against Petitioner, only Alvarado, and reasonably concluded that the prospect of Jimenez's testimony did not directly impact Petitioner's own decision to testify.

As such, this Court is not persuaded that the trial court's denial of the severance motion violated Petitioner's federal constitutional rights or rendered his trial fundamentally unfair.  <u>See</u> <u>McGuire</u>, 502 U.S. at 68-73; <u>Jammal</u>, 926 F.2d at 919; <u>Ortiz-Sandoval</u>, 81 F.3d at 897.  Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on Claim 5.

**2.** <u>**Claim 6**</u>

Petitioner contends that "the trial court erred in precluding the defense from presenting evidence of Mary Magoon's drug use and violence," including "evidence of her sky-high cocaine blood content at the time of the murders; her current and prior possession of firearms; and her prior incidents of violent conduct."  (SAP at 42-43.)  Petitioner asserts that had the jury been apprised of this information, they might have voted for a life sentence.  (<u>Id.</u> at 43.)

The California Supreme Court considered and rejected this claim on direct appeal, reasoning as follows:

///

///

Defendant contends that the court abused its discretion in excluding evidence of Mary Magoon's alleged propensity for violence and use of firearms. Defendant claims the exclusion violated his rights to due process, to present a defense, and to a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As discussed below, defense counsel did not seek to admit this evidence, and, even if he had, it would not have been an abuse of discretion for the trial court to have excluded the evidence.

Before trial commenced, the court denied the prosecution's motion in limine to exclude, as irrelevant, evidence of Daniel Magoon's propensity for violence and prior firearm use. The court agreed with defense counsel that the presence of the Ingram "Mac 10" semiautomatic pistol at the entryway of the Magoon house supported the defense theory that Daniel Magoon may have brandished that weapon in a confrontation with defendants, and that his propensity for violence and prior use of firearms was therefore relevant. But the parties did not discuss the relevance of evidence pointing to *Mary Magoon's* propensity for violence or prior firearm use.

During the cross-examination of prosecution witness Jimmy Johnson, defense counsel asked Johnson about statements Johnson made to the police concerning Mary Magoon's propensity for violence and prior firearm use. The prosecution objected to the question on relevance grounds, but the court overruled the objection. Later, outside the presence of the jury, defense counsel told the court that Johnson had made a prior statement to police that Johnson believed Mary Magoon was heading to the bathroom to get a gun before she was murdered. The court did not rule that the statement was inadmissible. Instead, it observed that the evidence presented at trial thus far provided no foundation for questions concerning Mary Magoon's propensity for violence and firearm use. Continuing his cross-examination of Johnson, defense counsel asked about a statement that Johnson had made to the police that Mary Magoon "was on a runaway ... train with Dan." The court sustained the prosecution's objection on relevance grounds.

The issue of Mary Magoon's propensity for violence resurfaced later in the trial, when defense counsel asked the court to rule on defendant's pending motion in limine to admit the testimony of Detective Coleman. That testimony would discuss Daniel Magoon's 1982 arrest in order to show his propensity for being armed during drug transactions. The court was concerned that because Mary Magoon had also been present at the arrest, the testimony could confuse the issues under Evidence Code section 352, particularly because

there was no evidence establishing Mary Magoon's propensity for violence. Defense counsel made a narrower offer of proof limited to Daniel Magoon's past gun use, and stated he was willing to sacrifice any testimony about Mary Magoon in order to present the jury with the evidence concerning Daniel Magoon. In light of the narrowed offer of proof, the court admitted Detective Cole's testimony, and defendant's counsel did not object to the ruling.

Although the record shows that defense counsel failed to seek a ruling on the admissibility of evidence concerning Mary Magoon's propensity for violence and prior use of firearms, defendant contends that any further attempts by trial counsel to admit such evidence would have been futile after the court appeared to indicate that it believed such evidence to be inadmissible. Even assuming defendant's argument to be true, the trial court would not have abused its discretion in excluding such evidence under Evidence Code section 352 on the ground that it would have created a substantial danger of confusing the issues at trial. (See *People v. Wright* (1985) 39 Cal.3d 576, 587–88, 217 Cal.Rptr. 212, 703 P.2d 1106 [court may exclude under Evidence Code section 352 evidence of the aggressive and violent character of the victim.]) During the pretrial discussions of the relevance of admitting evidence of Daniel Magoon's propensity for violence and gun use, the trial court pointed out that, in order for a murder victim's propensity for violence to be relevant, there must be some evidentiary support for a self-defense-type theory that the defendant perceived the murder victim as presenting an immediate threat. As the trial court noted, even if the murder victim were the most violent person in the world, that fact would not be relevant if the evidence made it clear that the victim was taken by surprise and shot in the back of the head.

There was no evidence indicating that Mary Magoon could have presented a threat to defendant. Mary Magoon was killed in the hallway bathroom, which was a significant distance away from the living room, where investigators found the two rifles, or the entryway, where investigators found the Ingram "Mac-10" style semiautomatic pistol. The evidence indicated that she had been shot while holding three-year-old J. in her arms, beaten, and then finished off with a bullet to the back of her head. Defendant's sole basis for arguing that Mary Magoon might have been perceived as a threat to defendant is Johnson's statement to the police that Mary Magoon might have been going for a gun in the hallway bathroom, which was sheer speculation.[FN24] Given this record, it would have been within the trial court's discretion to have excluded the admission of evidence pertaining to Mary Magoon's alleged propensity for violence and prior use of firearms.

> FN24. Defendant asserts that Mary Magoon "was found on the floor near the empty box of a weapon just like the one she was known to have carried in the past." But defendant is mistaken. The empty gun box of the Helwan pistol was found in a hidden compartment in the *master bedroom bathroom*, not in the *hallway bathroom* where investigators found Mary Magoon's body.

<u>Hoyos</u>, 41 Cal. 4th at 911-13 (bracket in original). The state supreme court also rejected Petitioner's contention that the trial court's ruling resulted in prejudice with respect to his penalty phase proceedings. <u>See id.</u> at 927 fn. 38 ("Because we discern no error in any area of the guilt phase, we reject defendant's claims of any prejudicial effect in the penalty phase arising from these or any other guilt phase rulings.")

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986), quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984). Even so, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." <u>Taylor v. Illinois</u>, 484 U.S. 400, 410 (1988). "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." <u>Holmes v. South Carolina</u>, 547 U.S. 319, 326 (2006); <u>see also</u> <u>Menendez v. Terhune</u>, 422 F.3d 1012, 1033 (9th Cir. 2005) ("[A] trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate.") (citations omitted).

The state record reflects that the trial court repeatedly expressed concerns about the possibility that the defense would seek to introduce evidence concerning Mary Magoon's propensity for violence, and opined that such evidence did not appear relevant based on the

circumstances of the crime, as reflected in the crime scene photos. During a break in the trial proceedings, the trial court generally noted that "[t]here was a portion of the testimony this morning that I think ran afoul of some of our previous discussions concerning the scope of permissible examination concerning the aggressiveness of the victims in this case, the propensity towards violence, if any, of any victims in this case." (RT 3323.) The trial court stated that: "The focus has always been on Daniel Magoon, Daniel Magoon being, from the defense perspective, a violent individual, the crime scene supporting certain inferences which may lend support to the absence of premeditation." (RT 3324.) The trial court specifically referenced Jimmy Johnson's testimony, noted that the parties' earlier focus had been on propensity evidence as it related to Daniel Magoon, and stated that: "We didn't talk about Mary Magoon. Now, from the crime scene photographs that I have seen, I have a great deal of difficulty determining or finding any relevance to testimony concerning Ms. Magoon's use of weapons, her propensity, if there is such, towards violence. I haven't seen anything that would cause me to think that's relevant." (RT 3324-25.)

The trial court expressed concern about whether the defense's questions would go towards Mary Magoon, given that crime scene photos showed she was shot in the back of the head. (RT 3325.) In response, defense counsel indicated that Johnson previously indicated that Mary Magoon had prior weapon use, had previously possessed a gun, knew how to use guns, and that Johnson speculated that she might have been going for a weapon. (RT 3325-26.) The trial court responded that: "I am not saying there was any impropriety in any question, but I think your position so far as she might have been going into the bathroom for a gun is, from what I see, is an argument that you can make, of course, but I don't see evidentiary support of that from the crime scene or from the testimony as to location of weapons, that sort of thing. And I think the inquiry into that area should be carefully approached." (RT 3326-27.) The trial court then stated: "I wanted to explain to you my thinking from the evidence that I have seen of the crime scene, the discussions, and my thinking on it so that you can proceed accordingly. I'm not telling you how to ask

81

09cv0388 L (NLS)

questions or what questions to ask. But I'm aware of the issue now." (RT 3328.)

A short time later, during testimony in front of the jury, Johnson stated that he knew Daniel Magoon had a hidden compartment in the home for narcotics or drugs. (RT 3333.) Defense counsel broached the subject of Mary Magoon, and asked Johnson about a statement Johnson made to police that "She was on a runaway, runaway train with Dan," to which the trial court sustained the prosecutor's relevance objection. (RT 3333-34.) Counsel refrained from asking additional questions about Mary Magoon and returned to the subject of Daniel Magoon; Johnson acknowledged that he told police Daniel Magoon would have a gun out when people came to his home at night. (RT 3334.)

Later in the trial proceedings, the defense attempted to introduce testimony about Daniel Magoon's prior arrest, at which Mary Magoon was present, to show that he carried a gun during drug deals. The trial court repeated his reservations as far as they involved Mary Magoon, stating: "The second aspect of my concerns under [Cal. Penal Code section] 352 are the potential for the confusion of issues. When we bring forth that incident in 1984 or '85, we have Miss Fisher[11] part and parcel of that incident. And to the extent that she is, in effect, the subject of the same broad brush as Mr. Magoon, there is no true question that I see as to her propensity for violence. As I have said before, we can speculate that she might have been in that bathroom looking for a gun, but I think it's pure speculation. Everything seems to point to something other than that. So there is the question of the undue consumption of time." (RT 3501.) The defense stated they were "more than willing to narrow it, leave her out," and only introduce the evidence as it pertained to Daniel Magoon. (RT 3504, 3508.) The trial court allowed the testimony as limited by the defense. (RT 3790.)

Even if this Court were to assume, without deciding, that the trial court's articulated reservations with the introduction of evidence concerning Mary Magoon's propensity for

---

[11] Fisher was Mary Magoon's maiden name, as she was not yet married to Daniel Magoon at the time of this incident. (RT 3502.)

violence amounted to an express ruling excluding that evidence, Petitioner fails to show that the trial court's decision constituted an abuse of discretion or was "arbitrary or disproportionate." Menendez, 422 F.3d at 1033. Again, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." McGuire, 502 U.S. at 68. Petitioner fails to show that the failure to admit this evidence rendered his trial "fundamentally unfair." Jammal, 926 F.2d at 919.

As the state court reasonably concluded, there was no actual evidence that Mary Magoon presented a threat to the defendants, and thus, the trial court correctly concluded that evidence of her propensity for violence or weapon use was not relevant. Petitioner argues that the state supreme court's decision failed to specifically mention the cocaine found in Mary Magoon's system, which "was admissible to show her likely aggressive and volatile conduct," and "would have provided the type of foundation for the rest of the evidence regarding her use of firearms then and in the past, and of her immersion in the violent drug-dealing business with her husband." (SAP at 47.) However, there is no evidence in the record that Mary Magoon was aggressive or violent under the influence of cocaine.[12] Dr. Stephen Stahl, who testified at trial about the cocaine levels in Daniel

---

[12] In support of the first state habeas petition, Petitioner submitted the declaration of Cherlyne Short Majors, the director of a health services management company with over 30 years experience in the fields of "child/maternal health and substance dependence," who opines that the "cocaine and residue found in Mrs. Magoon's blood is a very substantial dose." (Lodgment No. 111, Ex. 62.) Majors opines that the condition of the Magoon home and the Magoons' youngest son "suggests that Mrs. Magoon had used cocaine [or related stimulants] for a lengthy period, and had likely developed a high tolerance." (Id.) (bracket in original.) Majors states that Mary Magoon was "neurologically impaired" at the time of her death and "[i]t is highly probable that her movements in that moment of crisis did not comport to her own norms, much less the norms of the larger society." (Id.) However, as the instant claim was only raised on direct appeal, Majors' declaration cannot be considered in support of this claim, as it was not presented to the California Supreme Court until the state habeas petition. See Pinholster, 563 U.S. at 181 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.") Even were the Court able to consider this declaration, it does not support

Magoon's system, stated that cocaine use results in feelings of euphoria and pleasure, and that higher doses could cause a person to act suspicious, paranoid, hostile, or even delusional. (RT 3756.) However, Dr. Stahl also stated that the effects of cocaine use was impacted by several factors, including a person's age, weight, prior use, and that the drug affected people differently; he could not state what impact it would have on a particular person, such as Daniel Magoon. (RT 3757-58.) As such, the record evidence fails to support a conclusion that Mary Magoon's cocaine use, on its own, would have provided a foundation for the introduction of the desired propensity evidence.

More importantly, in ruling that evidence of Daniel Magoon's weapon possession and propensity for violence was admissible, the trial court heard evidence not only of the cocaine found in the victims' system, but that Daniel Magoon had a long-standing involvement in drug dealing involving large amounts of marijuana and money, sold and possessed numerous weapons, and that a large automatic weapon was found at the doorway of the house, and that he dealt drugs out of his garage and kept weapons there. (RT 2805-06, 2814, 2822-23.) With that showing, the trial court articulated that the defense was entitled to argue that the evidence would show Daniel Magoon was a "very violent individual, armed himself with weapons, was very familiar with weapons, had an automatic weapon in the garage at one point." (RT 2834-35.)

Petitioner fails to offer any similar evidence with respect to Mary Magoon. That she was in the company of Daniel Magoon when he was arrested more than ten years earlier, and had at one prior point possessed and used a gun fails to demonstrate a propensity for violence. Jimmy Johnson's statement that Mary Magoon might have been going for a gun that evening is pure speculation, and markedly abstract in comparison to Mr. Johnson's statements to the police that Daniel Magoon collected and sold drugs and weapons and that he knew Daniel Magoon to answer the door at night with a gun at his side. (See RT 3334.)

_____

Petitioner's contention, as Majors does not indicate that Mary Magoon was likely either aggressive or violent.

In the merits brief, Petitioner also faults the state supreme court for "mak[ing] no mention of the fact that an M1 rifle was found in the bathroom where she was eventually shot, strongly indicating it was a highly reasonable inference, not 'sheer speculation' she was going for a weapon at the time she was shot." (Pet. Brief at 13.) A review of the state record refutes this contention, as it clearly reflects that the M-1 rifle was located in the master bedroom bathroom, not the hallway bathroom where Mary Magoon was found. (See RT 3040-43) (testimony that M-1 rifle, pills, ammunition, and box to pistol were found in storage area hidden behind a cabinet in master bedroom bathroom). Indeed, the California Supreme Court earlier refuted the similar mistaken argument concerning Mary Magoon's location, observing that: "Defendant asserts that Mary Magoon 'was found on the floor near the empty box of a weapon just like the one she was known to have carried in the past.' But defendant is mistaken. The empty gun box of the Helwan pistol was found in a hidden compartment in the *master bedroom bathroom*, not in the *hallway bathroom* where investigators found Mary Magoon's body." Hoyos, 41 Cal. 4th at 913 n. 24. In the reply brief, Petitioner retracts the earlier assertion about the M-1 rifle and acknowledges that no weapons were found in the hallway bathroom where Mary Magoon was shot, but nonetheless argues that "the record does indicate that the Magoons had weapons stashed all over the house, and she may have been going to get them when she was shot from behind." (Reply at 49 n. 3.) This contention, like Johnson's statement, is pure conjecture.

Meanwhile, as the trial court reasonably determined, the crime scene evidence fails to support a conclusion that Mary Magoon presented any threat to the defendants. Again, Mary Magoon was found in the hallway bathroom in her pajamas, and had suffered multiple blunt force trauma to the face, body and head as well as a gunshot to the back of the head. There were no weapons within reach, as the weapons found in a bathroom were in a hidden compartment in the master bathroom, several rooms away, not the bathroom where Mary was found. The other guns noted were a rifle and an air rifle in the living room and a pistol in the entryway to the home, each also a significant distance from Mary Magoon's location. Contrary to showing that Mary ever used the air rifle, the evidence

instead reflected that the weapon was used against her, as blood on the barrel was consistent with her blood type and injuries to her head and back could have been caused by the rifle. Finally, any possibility that Mary sought to use the weapons found near the front of the home would have been further complicated by their location, given the defense theory that Daniel Magoon likely answered the door with a weapon brandished.

More significantly, there was ample evidence that the violence inflicted on Mary Magoon was likely done in close proximity to her youngest son. Hair found in Mary Magoon's left hand was consistent with that of her three-year-old son J. (RT 3354-59.) Her son's pacifier was found clutched in Mary's hand and a baby blanket was lying between her legs. (RT 2890-93, 3033.) Dr. Arthur Koehler, a pathologist who reviewed the records concerning the wounds suffered by both Mary Magoon and her son, testified that the wound to J. was tangential rather than direct, "[a]nd in reviewing the wound of the decedent, Mary Magoon, it's very likely that this missile passed through the arm without slowing down and was very capable of causing a tangential wound" in her son J. (RT 3765, 3768.) Dr. Irving Root, another pathologist who reviewed the autopsy reports and photographs, stated that assuming a bullet struck Mary and then hit her son J., it was likely the "graze wound on the base of thumb" rather than the wound to the forearm. (RT 3807.)

In sum, the evidence in the record simply fails to support a defense theory that Mary Magoon presented a threat to the defendants, much less the imminent threat necessary to justify the introduction of propensity type evidence. As a result, the Court cannot conclude that the trial court's decision was in error, much less that it rendered Petitioner's trial "fundamentally unfair." Jammal, 926 F.2d at 919.

Finally, even were Petitioner able to demonstrate that the trial court's ruling amounted to error of a constitutional dimension, he fails to demonstrate prejudice at either phase of trial. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (trial error warrants habeas relief only if it "had substantial and injurious effect or influence in determining the jury's verdict.") Petitioner fails to demonstrate any possible guilt phase prejudice, as the jury was presented with concrete evidence about Daniel Magoon's propensity for violence,

including his lengthy involvement in drug and gun trafficking, prior arrest, the cocaine in his system and the potential effects, and that he was often armed when answering the door at night. Nonetheless, the jury rejected the defense's self-defense and manslaughter arguments and found Petitioner guilty of first-degree murder in the death of Daniel Magoon. Given that verdict and the comparatively thin evidence concerning Mary Magoon's propensity for violence, there is no reasonable likelihood that the jury would have been persuaded that a lesser degree of murder was appropriate in her case.

With respect to the penalty phase, even had the trial court allowed counsel to present similar evidence about Mary Magoon, such as her prior weapon possession and the speculation that she might have been going for a gun, the Court remains similarly unpersuaded that this evidence would have resulted in a verdict of life in prison rather than the death penalty for her murder. Again, Mary Magoon was found rooms away from a weapon, and while there is evidence indicating she was beaten with the air rifle, there is no indication that she wielded a weapon at any point during the murders. Instead, she was murdered in her pajamas, with a pacifier in her hand and a baby blanket at her feet, near enough to her three year old son that the bullet that struck his head was possibly aimed at, and first hit, her hand or arm. Based on a review of the record, Court finds no possibility that the omission of the evidence at issue "had substantial and injurious effect or influence in determining the jury's verdict" at the penalty phase. Brecht, 507 U.S. at 637.

After reviewing the record, it is clear that the California Supreme Court's rejection of Claim 6 was not contrary to, or an unreasonable application of, clearly established federal law, nor has Petitioner shown that it was based on an unreasonable determination of the facts. In addition, any error is clearly harmless. Petitioner does not merit relief on Claim 6.

### 3. **Claim 7**

Petitioner contends that the trial court erred in refusing to instruct the jury on voluntary manslaughter with respect to the death of Mary Magoon, or allow the presentation of evidence supporting that theory, and asserts that these actions "prevented

petitioner from having his theory of the case considered by the jury with respect to reasonable doubt as to the first-degree murder charge."  (SAP at 48.)

The California Supreme Court considered and rejected this claim on direct appeal, reasoning as follows:

> Defendant contends the trial court erred in refusing to instruct the jury on the voluntary manslaughter of Mary Magoon as a lesser included offense of murder, on the theory that her killing was committed either in sudden quarrel/heat of passion or in unreasonable self-defense. Defendant claims the court's failure to so instruct deprived him of his due process right to have the jury determine every material issue the evidence presented. Defendant again points to Mary Magoon's alleged propensity for violence and claims that her alleged role in the family business may have led defendant to believe she was "going for a weapon in the bathroom when killed." Defendant asserts that this evidence "supports a voluntary manslaughter instruction because it was sufficient to deserve consideration by the jury, and a reasonable jury could find it sufficiently persuasive to warrant a verdict of voluntary manslaughter."

> We disagree. "'Manslaughter is "the unlawful killing of a human being without malice.'" [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 102, 24 Cal.Rptr.3d 507, 105 P.3d 1099, quoting § 192.) Even though a court must instruct on general principles of law relevant to the issues the evidence raises, "[a] court is not obligated to instruct sua sponte on voluntary manslaughter as a lesser included offense in the absence of substantial evidence that the defendant acted in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or that the defendant killed in ""unreasonable self-defense."" [Citation.]" (*Benavides*, at p. 102, 24 Cal.Rptr.3d 507, 105 P.3d 1099.) There was no evidence that the killing of Mary Magoon involved sudden quarrel/heat of passion or unreasonable self-defense, and therefore no support for a voluntary manslaughter instruction.

Hoyos, 41 Cal. 4th at 913-14.

"It is well-settled that a criminal defendant is entitled to a jury instruction 'on any defense which provides a legal defense to the charge against him and which has some foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility.'"  United States v. Sotelo-Murilo, 887 F.2d 176, 178 (9th Cir. 1989), quoting United States v. Yarbrough, 852 F.2d 1522, 1541 (9th Cir. 1988); see also Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 1999), citing United States v.

Mason, 902 F.3d 1434, 1438 (9th Cir. 1990). In Beck v. Alabama, 447 U.S. 625 (1980), the Supreme Court held that failing to instruct a capital jury on a lesser-included charge supported by the evidence violates the Constitution, stating that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense- but leaves some doubt with respect to an element that would justify conviction of a capital offense- the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." Id. at 637.

At trial, defense counsel requested instructions on both second-degree murder and manslaughter with respect to Mary Magoon, arguing that "the entire sequence of events took place within a relatively short period of time, so that the violence suffered by Mary Magoon was in close proximity to the violence suffered by Daniel Magoon by most arguable theories of the case. And that were he to be killed in the heat of passion, it's not completely impossible or implausible that that heat of passion continued over to her as a co-partner and ultimately co-victim." (RT 3922.) Counsel specifically cited James Johnson's statement that Mary Magoon had previously used a Beretta-type gun, which was similar to the Helwan connected to the crimes. (RT 3923.) The trial court rejected the request, stating that "whether she had a gun in the past or didn't have a gun in the past is absolutely irrelevant to her credit," and concluding that "there is just no evidence that would support a voluntary manslaughter instruction or conviction." (RT 3924.)

Petitioner argues that there was actually "ample" evidence to support a manslaughter instruction, considering her involvement in her husband's drug-dealing activities, the weapons in their home, and the cocaine in her system. (See Pet. Brief at 15[13], Reply at 50-

---

[13] In the merits brief, Petitioner also supports his contention that there was "ample" evidence of a potential threat from Mary Magoon by erroneously arguing, as was done in support of Claim 6, that Mary "was shot in the immediate proximity of a M1 rifle concealed in the bathroom where she was found." (Pet. Brief at 15.) Again, the record reflects that

52.)  As discussed above in Claim 6, however, the presence of cocaine in her system does not support the defense theory, given that there is no indication she acted violent or aggressive when under the influence.  Nor does Petitioner offer any actual evidence of her direct involvement in her husband's drug dealing activities - the fact that she lived in the home and was likely aware of the drugs and weapons does not establish that she was a participant, as the trial testimony on the matter only went to Daniel Magoon's involvement.

Finally, the crime scene evidence offers no support for, and actually undermines, a manslaughter theory.  Under California law, "[a] court is not obligated to instruct sua sponte on voluntary manslaughter as a lesser included offense in the absence of substantial evidence that the defendant acted in a 'sudden quarrel or heat of passion', or that the defendant killed in 'unreasonable self-defense,'" People v. Benavides, 35 Cal. 4th 69, 102 (2005) (internal and external citations omitted).  As discussed in greater detail above, Mary Magoon died in her pajamas in the hallway bathroom of her home, several rooms away from any weapons, having been beaten numerous times on the skull and body and shot in the back of the head.  There is also no indication that Mary Magoon used or wielded any weapon that evening, even as Petitioner points to her prior possession of a gun years before the murder and Johnson's speculation that she could have been going for a gun.  Yet, instead of any such evidence, Mary was found holding her three-year-old son's pacifier in her hand, with strands of hair similar to her son's also found clutched in her hand, and a baby blanket between her legs.  The evidence also reflected that her son may have been near her when he was shot, as the bullet which hit him was consistent with having passed through her hand or arm before striking his head.  Petitioner fails to demonstrate that this theory of the crime had any support, much less "some foundation in the evidence" so as to warrant instruction.  See Sotelo-Murilo, 887 F.2d at 178.  Considering this record, it is clear that the California Supreme Court was not unreasonable in concluding that: "There

the M-1 rifle was located in the master bedroom bathroom, not the hallway bathroom where Mary Magoon was found, and does not support Petitioner's argument.  (See RT 3040-43.)

was no evidence that the killing of Mary Magoon involved sudden quarrel/heat of passion or unreasonable self-defense, and therefore no support for a voluntary manslaughter instruction." Hoyos, 41 Cal. 4th at 914.

Nor has Petitioner demonstrated that the trial court's ruling violated Beck, as Petitioner's jury was instructed to consider the lesser-included offense of second-degree murder in the death of Mary Magoon. (RT 4258, 4283-88.) In this case, unlike in Beck, the jury was provided with the options of first-degree murder and acquittal, as well as a "third option" of convicting Petitioner of the non-capital charge of second-degree murder. Id., 447 U.S. at 637. Petitioner fails to demonstrate that this procedure runs afoul of Beck or constitutes a due process violation. Indeed, the Ninth Circuit has plainly stated that "jury instructions are not required as to all possible lesser-included offenses." Beardslee v. Woodford, 358 F.3d 560, 576 (9th Cir. 2003) (trial court did not err in declining to instruct on manslaughter where jury could consider both second-degree murder or first degree-murder without special circumstances as lesser included offenses to capital murder, as "the jury had more than the simple all-or-nothing choice at issue in Beck."), citing Murtishaw v. Woodford, 255 F.3d 926, 955 (9th Cir. 2001) (trial court's failure to instruct on imperfect self-defense, where jury was instructed on both second-degree murder and manslaughter, did not force the jury into an "all or nothing" choice in violation of Beck).

Not only does Petitioner fail to show that the evidence warranted a manslaughter instruction, he also fails to demonstrate that such an instruction was dictated by Beck, given that the jury was given the lesser-included option of second-degree murder. The claim is without merit. Accordingly, the Court cannot conclude that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Habeas relief is not warranted on Claim 7.

///

///

///

## 4. **Claim 8**

Petitioner contends that the prosecutor repeatedly referenced torture with respect to the death of Mary Magoon, despite the fact that the jury was not instructed on torture nor was required to find that it had occurred, and that Petitioner "was substantially prejudiced by the prosecutor's emphasis with the trial court's consent that the case involved torture," violating his rights under the Fifth, Sixth, and Fourteenth Amendments. (SAP at 50-51.)

On direct appeal, the California Supreme Court rejected this claim with the following reasoned opinion:

> Defendant contends the court violated his rights to due process, a fair trial, and a reliable sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the prosecution misused the law related to conspiracy, and effectively charged defendant with murder by torture, when it listed the torture of Mary Magoon as one of 10 overt acts in the conspiracy to commit robbery count (a noncapital offense for which defendant and Alvarado were charged and found guilty). Defendant further contends that the prosecutor's references to torture during the trial had the effect of trying defendant for murder by torture, even though neither codefendant was so charged, and the trial court did not instruct the jury in any definition of torture. Defendant does not specify whether the asserted error is based on prosecutorial misconduct in using the word "torture" or the trial court's failure to instruct the jury in the legal elements of torture, but we discern no error under either theory. Defense counsel never objected to the prosecution's use of the word "torture" in the information or at trial. For this reason, we consider any claim based on the prosecution's use of the word "torture" forfeited. (*Jenkins*, *supra*, 22 Cal.4th at p. 1000, 95 Cal.Rptr.2d 377, 997 P.2d 1044.) In addition, as we explain, even if defendant did not forfeit the issue, he fails to show prejudice.
>
> *1. Torture as an Overt Act*
>
> Count 1 of the information charged both codefendants with conspiracy to commit robbery. It listed 10 overt acts: (1) arming themselves with nine-millimeter pistols; (2, 3) driving to Daniel Magoon's residence and entering it; (4) shooting and murdering Daniel Magoon; (5) torturing Mary Magoon; (6) shooting and murdering Mary Magoon; (7) shooting and wounding J.; (8–10) stealing Daniel Magoon's marijuana, nine-millimeter Helwan pistol, and money. The information charged murder generally, and did not specify first

degree murder by torture under section 189. Defendants were not charged with the crime of torture under section 206, nor was torture alleged as a special circumstance under section 190.2, subdivision (a)(18). The prosecution submitted but, on defense counsel's objection, withdrew a first degree murder by torture instruction. The court did not instruct the jury on any torture definition.

For the conspiracy count, defendant cites no authority holding the trial court was required to instruct the jury on the meaning of the word "torture," as an overt act. "A court has no sua sponte duty to define terms that are commonly understood by those familiar with the English language, but it does have a duty to define terms that have a technical meaning peculiar to the law." (*People v. Bland* (2002) 28 Cal.4th 313, 334, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) In the information, the word "torture" was used in its commonly understood sense to describe an overt act, not as part of a legal definition of conspiracy. Overt acts are not required to be crimes. (*People v. Marquez* (1994) 28 Cal.App.4th 1315, 1325–26, 33 Cal.Rptr.2d 821.) Because there is no indication the word "torture" was being used in a technical legal sense, the trial court had no sua sponte duty to define the term in the conspiracy count.

Even assuming the trial court erred in not instructing on the meaning of the word "torture" as an overt act, any error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 [federal constitutional error assessed under harmless beyond a reasonable doubt standard]; *People v. Watson* (1956) 46 Cal.2d 818, 836–837, 299 P.2d 243 [state law error assessed under reasonable probability standard]; *People v. Flood* (1998) 18 Cal.4th 470, 490, 502–504, 76 Cal.Rptr.2d 180, 957 P.2d 869 [instructional error subject to harmless error review].) Substantial evidence supported the other nine overt acts, any one of which also supported the jury's guilty verdict on the conspiracy count. (*People v. Russo* (2001) 25 Cal.4th 1124, 1128, 108 Cal.Rptr.2d 436, 25 P.3d 641 [jury need not unanimously agree on the same overt act to convict for conspiracy].)

*2. First Degree Murder by Torture*

Defendant contends the court should have instructed the jury on the legal elements of torture. But because defendant was not charged with the separate crime of torture under section 206, or torture as a special circumstance under section 190.2, subdivision (a)(18), the trial court had no duty to instruct on either. Murder by torture is a specified statutory basis for first degree murder. (§ 189.) The information charging defendant with murder

did not specify first degree murder by torture, but the accusatory pleading need not specify the theory of first degree murder on which the prosecution intends to rely. (See *People v. Diaz* (1992) 3 Cal.4th 495, 556–57, 11 Cal.Rptr.2d 353, 834 P.2d 1171 [information need not specify first degree murder by poison].) Of course, even though the prosecutor did not charge first degree murder by torture, he still might have presented the elements of murder by torture to the jury in the course of presenting his case. But even assuming the prosecutor, in effect, developed a murder by torture theory at trial and even assuming the trial court had a duty to instruct on first degree murder by torture, defendant can show no possible prejudice from the absence of the instruction. The jury was instructed on two theories supporting a guilty verdict for first degree murder: premeditation and felony murder. The jury found defendant guilty of first degree murder as to Mary Magoon based on either or both of those theories. There was no possible prejudice to defendant by the trial court's failure to provide the jury with a *third* theory for returning a verdict of first degree murder. Whether the jury accepted or rejected this third theory would not have changed the verdict of first degree murder it returned based on the other two theories.

Hoyos, 41 Cal. 4th at 914-16. The state supreme court also rejected Petitioner's contention that the trial court's ruling resulted in prejudice with respect to his penalty phase proceedings. See id. at 927 fn. 38 ("Because we discern no error in any area of the guilt phase, we reject defendant's claims of any prejudicial effect in the penalty phase arising from these or any other guilt phase rulings.")

Habeas relief may be warranted on a claim of state instructional error if the error in question "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72, quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973). "[I]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147. Even if constitutional error is found to have occurred, relief remains unavailable unless that error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

Petitioner asserts that trial court's failure to define torture violated his constitutional rights because the jury could have used an "ad hoc" definition to find the overt act true at

94

the guilt phase, and could have relied on that same definition as a basis for their penalty phase verdict. In the merits brief, Petitioner clarifies that he is not advocating that torture should have been offered as a third theory of first degree murder, but that the absence of an instruction defining torture precluded the jury from concluding torture was <u>not</u> applicable to his case. (Pet. Brief at 16-17.) In the Reply, Petitioner outlines differences between the dictionary definition of torture and the definition of torture under section 206 of the California Penal Code, and asserts that because torture was alleged as an overt act, and one overt act must be found true in order to convict Petitioner of the conspiracy charge, torture should have been defined for the jury. (Reply at 54.)

Petitioner fails to cite to any clearly established authority supporting his claim of constitutional error. He generally cites to and quotes from <u>Lanzetta v. New Jersey</u>, 306 U.S. 451, 453 (1939), to argue that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." (Reply at 53.) Yet, again, that is not the situation presented here. Petitioner was not charged with torture as either a special circumstance or as a theory of murder, as torture was instead alleged as one of ten overt acts comprising the conspiracy charge, along with other overt acts comprised of similarly common terms, including that the defendants "armed themselves with 9mm semiautomatic pistols," that they "drove over to" and "entered" the victims' residence, that they "shot and murdered" each of the two adult victims, that they "shot and wounded" the child victim, and that they "stole" Daniel Magoon's Helwan, marijuana, and money. (CT 28.)

The California Supreme Court concluded that the trial court did not err in failing to define torture, given that torture was not charged as a theory of murder, but instead "was used in its commonly understood sense to describe an overt act, not as part of a legal definition of conspiracy." <u>Hoyos</u>, 41 Cal. 4th at 915. Ninth Circuit authority is in accord with the state court's conclusion. "Whether a term in a jury instruction requires definition normally turns on whether it expresses a concept within the jury's ordinary experience." <u>United States v. Tirouda</u>, 394 F.3d 683, 688 (9th Cir. 2005). In <u>Tirouda</u>, the Ninth Circuit

rejected an allegation of error arising from the trial court's failure to define term "accomplice." Id. at 689; see also United States v. Lloyd, 807 F.3d 1128, 1165 (9th Cir. 2015) (rejecting claim of trial court error in failing to define "reckless disregard," reasoning that "[r]ecklessness in this context is 'within the comprehension of the average juror' and needs no special definition."), quoting Tirouda, 394 F.3d at 688-89. Here, torture was alleged as one of ten overt acts, and the use of the term in the overt act "torturing Mary," did not require a definition, because, similar to the terms used in the other overt acts such as "stole" or "drove over to," it was capable of being understood without additional definition and "express[ed] a concept within the jury's ordinary experience." Id. at 689. Moreover, reviewing Petitioner's contention in light of the instructions as a whole, as required, there is no support for a conclusion that the trial court's failure to specifically define torture for the jury "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.

In any event, even were Petitioner able to demonstrate error, he fails to show prejudice. First, there is no support for Petitioner's speculative argument that the jury formulated their own erroneous definition of torture and relied on that definition in arriving at the guilt and penalty phase verdicts. Petitioner argues that "[t]he question is not whether Count One conspiracy was adequately proved, but rather whether the jury likely found the perpetrator had tortured Mary under a broad definition that exceeded the scope of the criminal law definition, and relied on that 'circumstance of the offense,' Penal Code section 190.3(a), as the basis to return a death verdict as to the Mary Magoon murder." (Reply at 56.) There is nothing in the record to support a conclusion that the jury was confused or that, if confusion arose, the jurors created their own definition of torture rather than inquire with the trial court as to the definition. Indeed, just prior to guilt phase deliberations, the trial court instructed the jurors that "if in going through these instructions in deliberations you have any questions about how one instruction perhaps relates to another instruction or anything at all, don't be at all reluctant to write out your question. Give it to the bailiff. He'll give it to the court. I'll make the lawyers see it as well. Then we'll do what we can

1  to answer the question. Any deliberating juror has the right to ask any questions." (RT
2  4259.) A jury is presumed to understand and follow the trial court's instructions. <u>Weeks</u>
3  <u>v. Angelone</u>, 528 U.S. 225, 234 (2000); <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1989).

4       Petitioner nonetheless asserts that the failure to define torture "likely explains the
5  jury's death verdict as to Mary Magoon but not as to Dan Magoon." (Reply at 53; <u>see</u> <u>also</u>
6  Pet. Brief at 17.) This contention is purely speculative and is belied by the record. As
7  discussed above in Claim 6, the evidence also showed that while Mary was killed in close
8  proximity to her child, in her nightclothes, several rooms away from any weapon, there
9  was evidence that Daniel Magoon had a long-standing and direct involvement in drug
10 dealing and selling weapons, past interactions with Petitioner at his home, a propensity for
11 violence, and that he was known to answer the door armed. Petitioner is correct that the
12 prosecutor repeatedly asserted that Mary had been tortured in his penalty phase arguments
13 to the jury, but the jury was entitled to consider the circumstances of the crime itself in
14 making their penalty phase decision. The plain facts were that the crimes were extremely
15 brutal and amounted to significant evidence in aggravation even in the absence of a specific
16 definition of torture, as Mary suffered numerous blunt force injuries to her head and back
17 prior to her death, as well as several gunshot wounds, including one to the back of the head.
18 Her 3 year old son was shot and was likely nearby at the time of his wounding and her
19 death. Her husband had also been shot and killed. In light of the substantial evidence in
20 aggravation from the crimes alone, Petitioner fails to carry the "heavy burden" of
21 demonstrating that the absence of specific instruction on torture resulted in prejudice. <u>See</u>
22 <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th Cir. 1997) ("'An omission, or an incomplete
23 instruction, is less likely to be prejudicial than a misstatement of the law' and, thus, a
24 habeas petitioner whose claim involves a failure to give a particular instruction bears an
25 'especially heavy burden.'"), quoting <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977). In
26 the absence of any record indication that the instructions were confusing, or any showing
27 aside from Petitioner's own speculation that the jurors relied on an inaccurate
28 understanding of the term torture in rendering their verdict, the Court cannot conclude that

09cv0388 L (NLS)

the asserted error resulted in prejudice. Petitioner fails to demonstrate that the trial court's failure to define torture "had substantial and injurious effect or influence in determining the jury's verdict" at either the guilt or penalty phases. <u>Brecht</u>, 507 U.S. at 637.

Because Petitioner fails to show that the state court adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, and because any error is harmless, habeas relief is unavailable as to Claim 8.

**5.    <u>Claim 9</u>**

Petitioner asserts that the trial court violated his due process rights by erroneously instructing the jury regarding the special circumstance allegations, which reduced the mental state required for aiding and abetting liability, in violation of ex post facto laws. (SAP at 52-53.)

The California Supreme Court considered and rejected this claim on direct appeal, as follows:

> Defendant filed a pretrial motion seeking dismissal of the special circumstance allegations on the ground they were an ex post facto application of the laws and therefore a violation of his state and federal rights to due process. The trial court denied the motion. On appeal, defendant contends the trial court erred in denying the motion and as a consequence violated his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution. For the reasons discussed below, we discern no error and no violation of defendant's due process rights.[FN8]

> > FN8. Regarding this claim and most other claims raised on appeal, defendant contends that the asserted error or misconduct violated several constitutional rights. In many instances in which defendant raised issues at trial, however, he failed explicitly to make some or all of the constitutional arguments he now asserts on appeal. Unless otherwise indicated, his appellate claims either required no action by defendant to preserve them, or involved application of the same facts or legal standards defendant asked the trial court to apply, accompanied by a new argument that the trial error or misconduct had the additional *legal consequence* of violating the federal Constitution. To that extent, defendant has

not forfeited his new constitutional claims on appeal. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1084, fn. 4, 40 Cal.Rptr.3d 118, 129 P.3d 321.) On the merits, no separate constitutional discussion is required, or provided, where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17, 42 Cal.Rptr.3d 677, 133 P.3d 581.)

Defendant was charged with robbery and burglary special circumstances under section 190.2, as amended in 1990 by Proposition 115. Defendant contends that because this court decided the constitutionality of Proposition 115's amendments to section 190.2 *after* the commission of his crimes, charging the special circumstances violated the ex post facto clauses of the state and federal Constitutions. He also contends the special circumstances charges denied him due process because he lacked notice that he could be charged with the special circumstances.

Addressing defendant's claim requires a brief review of the history of Proposition 115. In June 1990, the electorate passed both Propositions 114 and 115, which contained different versions of section 190.2. (*People v. Superior Court (Clark)* (1994) 22 Cal.App.4th 1541, 1545, 28 Cal.Rptr.2d 46 (*Clark*).) Under the Proposition 114 version of section 190.2, the Legislature required a finding of intent to kill before the trier of fact could impose the death penalty on one who was not the actual killer. (*Clark*, *supra*, 22 Cal.App.4th at pp. 1544–1545, 28 Cal.Rptr.2d 46.) Under the Proposition 115 version of section 190.2, however, the felony-murder rule applied, with no required finding that a defendant had an intent to kill. (*Ibid.*) The passage of Propositions 114 and 115 spawned litigation that challenged whether Proposition 115's amendments to section 190.2 were effective. (*Clark*, at p. 1546, 28 Cal.Rptr.2d 46.) On June 25, 1992, we settled this issue in *Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 992, 9 Cal.Rptr.2d 102, 831 P.2d 327. *Yoshisato* held that Proposition 115's amendments to section 190.2 were operative, and went into effect the day of Proposition 115's passage in June 1990. The crimes in the present case were committed on May 26–27, 1992.

Defendant contends that the law was "unsettled" for the two-year period between the passage of Proposition 115 in June 1990, and our decision in *Yoshisato* on June 25, 1992, and that he lacked notice that a death judgment was proper in light of the actions constituting the two special circumstances charged. Defendant concedes that his argument fails under *Clark*, *supra*, 22

Cal.App.4th at page 1541, 28 Cal.Rptr.2d 46. He apparently asks us to disapprove that case.

We decline to do so. As *Clark* observed, both the United States and California Constitutions forbid only "'the retroactive application of an "unexpected" or "unforeseeable" judicial enlargement of a criminal statute.'" (*Clark*, *supra*, 22 Cal.App.4th at p. 1550, 28 Cal.Rptr.2d 46.) Our decision in *Yoshisato* was neither "unexpected" nor "unforeseeable"; all that can be said of the state of the law during the two-year period was that it was "unsettled." (*Clark*, *supra*, 22 Cal.App.4th at p. 1550, 28 Cal.Rptr.2d 46.) Defendant therefore was on notice that this court might find (as indeed we did) that the provisions of Proposition 115 were controlling. Consequently, the trial court did not err in denying defendant's motion to dismiss the special circumstances.

<u>Hoyos</u>, 41 Cal. 4th at 889-90

"'[A]ny statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.'" <u>Collins v. Youngblood</u>, 497 U.S. 37, 42 (1990), quoting <u>Beazell v. Ohio</u>, 269 U.S. 167, 169-70 (1925); <u>see</u> <u>also</u> <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 353 (1964) ("An ex post facto law has been defined by this Court as one that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action, or that aggravates a crime, or makes it greater than it was, when committed.") (internal quotations omitted).

Of particular relevance to the instant claim, the Supreme Court has also stated that "[i]f a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, [the construction] must not be given retroactive effect." <u>Rogers v. Tennessee</u>, 532 U.S. 451, 457 (2001), quoting <u>Bouie</u>, 378 U.S. at 354 (internal quotations omitted) (brackets in original).

///

1    As the state supreme court noted above, Propositions 114 and 115 each proposed

2    revisions to California Penal Code section 190.2, and both passed in the June 1990 election,

3    with Proposition 114 receiving a larger percentage of favorable votes.  Petitioner asserts

4    that: "At the time of the homicides on May 26-27, 1992, it was reasonable to believe that

5    the special circumstance elements contained in Proposition 114 were the law of the state,

6    because that proposition received more votes.  However, on June 25, 1992, <u>after</u> the

7    homicides in this case, the California Supreme Court held in <u>Yoshisato</u> v. <u>Superior Court</u>,

8    2 Cal.4th 978 (1992) that Proposition 115, 'reckless disregard' mens rea was the law of the

9    state, notwithstanding that Proposition 115 had received fewer votes."  (SAP at 52.)

10   Petitioner argues that he was prejudiced "because his convictions for first-degree murder

11   could have been predicated on conspiracy liability without any determination of his actual

12   mental state.  Subsequently, the jury could have found the special circumstances allegations

13   true based solely on the mental state that he acted in reckless disregard of human life," and

14   argues that the jurors "would <u>not</u> likely have found the special circumstances allegations

15   true if they had been instruct [sic] that the prosecution had to prove that he harbored express

16   malice."  (<u>Id.</u> at 53.)

17       After reviewing the law in existence at the time of the crimes in this case, it is evident

18   that the California Supreme Court's decision in <u>Yoshisato</u> was neither "unexpected" nor

19   "indefensible."  Proposition 115 had been subject to multiple challenges before <u>Yoshisato</u>,

20   and had been twice upheld by the state supreme court.  In <u>Raven v. Deukmejian</u>, 52 Cal.

21   3d 336 (1990), the California Supreme Court rejected a contention that Proposition 115

22   violated the single subject rule and upheld the majority of the proposition, including the

23   provisions relevant to this claim.  <u>See id.</u> at 349, 356.  Meanwhile, in <u>Tapia v. Superior</u>

24   <u>Court (People)</u>, 53 Cal. 3d 282 (1991), the California Supreme Court held that only "certain

25   provisions addressing the conduct of trials, and certain other provisions changing the law

26   to the benefit of defendants" were applicable retrospectively to crimes committed prior to

27   the effective date of the proposition, while "[t]he remainder of the measure's provisions

28   may not."  <u>Id.</u> at 286.

"The critical question is whether the law changes the legal consequences of acts completed before its effective date." Weaver v. Graham, 450 U.S. 24, 31 (1981). At the outset of the Tapia decision, the state supreme court indicated that "Proposition 115 took effect on June 6, 1990, the day after the voters approved the measure." Id. at 286. In holding that the provisions which increased the punishment of certain criminal behavior could only apply prospectively, explicitly citing the relevant portion of section 190.2 which "provides that an accomplice, for a felony-murder special circumstance to be found true, must have been a major participant and have acted with reckless indifference to human life," the state court reasoned that "[a]pplication of these provisions to crimes committed before the measure's effective date would be 'retrospective' because each would change the legal consequences of the defendant's past conduct." Tapia, 53 Cal.3d at 298, quoting Weaver, 450 U.S. at 31. The California Supreme Court specifically noted that "these provisions may only be applied to prosecutions of crimes committed on or after June 6, 1990." Tapia, 53 Cal. 3d at 299. Again, the crimes at issue in this case took place on May 26-27, 1992, nearly two years after the passage of Proposition 115 and over a year after Tapia.

To the extent Petitioner relies on the state appellate court's August 5, 1991 Yoshisato decision, which concluded that Proposition 115 never became effective, that argument is unavailing. In 1991, the California Court of Appeal heard a challenge to Proposition 115 similar to the argument advanced here - that Proposition 114, having received more votes, was the effective law. As the appellate court acknowledged, the superior court rejected that contention, concluding that: "'Neither Proposition 114 nor the relevant provisions of Proposition 115 purported to create a comprehensive regulatory scheme,'" and reasoning that: "'The will of the voters who approved both measures can be given effect.'" Yoshisato v. Superior Court (People), 284 Cal.Rptr. 182, 184 (Cal. Ct. App. 1991). The state appellate court disagreed with the superior court and held that: "Since Proposition 114 received more votes, Proposition 115's rendition of section 190.2 never became operative." Id. at 183. But on October 24, 1991, over six months prior to the crimes at issue here, the

California Supreme Court granted review of the appellate court's decision. See Yoshisato v. Superior Court (People), 818 P.2d 63 (1991). Thus, given the clear existence of conflicting opinions on this very matter, coupled with two prior California Supreme Court decisions upholding Proposition 115 and the pending review of the appellate court's ruling, it was not only foreseeable, but likely, that the state supreme court would again uphold Proposition 115. See e.g. United States v. Rodgers, 466 U.S. 475, 484 (1984) ("And any argument by respondent against retroactive application to him of our present decision, even if he could establish reliance upon the earlier . . . decision, would be unavailing since the existence of conflicting cases from other Courts of Appeals made review of that issue by this Court and decision against the position of the respondent reasonably foreseeable.") Indeed, the California Supreme Court upheld Proposition 115, rejecting the argument that 114 and 115 were in conflict, and reasoning that the two propositions "sought to amend section 190.2 in complementary or supplementary fashion." Yoshisato, 2 Cal. 4th at 990.

Ultimately, Petitioner fails to demonstrate that the California Supreme Court's Yoshisato ruling was either "unexpected" or "indefensible" in light of Tapia and the other cases discussed above. See Rogers, 532 U.S. at 457, quoting Bouie, 378 U.S. at 354. Accordingly, the California Supreme Court reasonably found that the Yoshisato decision was "neither 'unexpected' nor 'unforeseeable'" and that the application of Proposition 115 to Petitioner's case did not run afoul of the ex post facto prohibition. Because Petitioner fails to show that the state court adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, habeas relief is not warranted on Claim 9.

**6.  Claim 10**

Petitioner contends the trial court erred in allowing the testimony of Brian Kennedy about blood spatter in the victims' home and trace blood evidence, arguing that the "unreliability of Kennedy's testimony and his bias in favor of the prosecution were of such magnitude that its admission rendered the trial fundamentally unfair." (SAP at 54-55.)

///

The state supreme court considered and rejected this claim on direct appeal, as follows:

Defendant contends that prosecution blood spatter expert witness, Deputy Sheriff Brian Kennedy, was biased and lacked proper qualification as an expert. He claims Kennedy's testimony (on crime reconstruction using blood spatter analysis) violated defendant's constitutional rights to a fair trial, due process of law, and a reliable penalty determination. The testimony described the blood spatter patterns the killings caused, other transfers of blood (including "castoffs," "wipes," and drip trails), and blood pooling in Daniel Magoon's body. Defendant further contends the court violated Evidence Code section 402 and his federal due process rights when it deferred, until midtrial, any rulings on the admissibility of Kennedy's testimony. For the reasons discussed below, we conclude no error occurred.

The parties discussed the admissibility of Kennedy's testimony during in limine motions. Defense counsel made an oral objection to the testimony under *People v. Kelly* (1976) 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 and *Frye v. United States* (D.C.Cir.1923) 293 F. 1013, raising the issue of whether Kennedy had used correct procedures.[FN20] The court ruled that *Kelly* was inapplicable to Kennedy's testimony. After reviewing Kennedy's resume, the trial court stated that there was no need to have an Evidence Code section 402 hearing on Kennedy's qualifications, because Kennedy appeared qualified. The trial court noted that the defense would have the opportunity to voir dire Kennedy at trial to confirm his qualifications. At trial, defense counsel did not object to Kennedy's testimony.

> FN20. Because the United States Supreme Court abrogated the *Frye* formulation in federal trials in 1993, this rule should more accurately be referred to now as the *Kelly* rule. (See *People v. Leahy* (1994) 8 Cal.4th 587, 591, 34 Cal.Rptr.2d 663, 882 P.2d 321.)

As a preliminary matter, the People assert that defendant forfeited his claims because he failed to object to Kennedy's testimony either on the ground that he was biased or that he lacked proper qualifications as an expert. Defendant replies that trial counsel's objection on *Kelly* and *Frye* grounds to the scientific validity of the procedures followed by Kennedy is sufficient to preserve the issue on appeal.[FN21] But because the objection below neither explicitly nor implicitly raised the issues of Kennedy's bias or lack of qualification, we conclude that defendant did forfeit the claims. (*People v.*

09cv0388 L (NLS)

*Jenkins* (2000) 22 Cal.4th 900, 1000, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)

FN21. Defendant appears to refer to the *Kelly/Frye* objection below to support his contention that Kennedy lacked proper expert qualification and was biased in the prosecution's favor. He does not raise a *Kelly* rule issue on appeal. A *Kelly* rule claim would be unavailing in any case, as we have held that *Kelly* is inapplicable to blood spatter testing. (*People v. Clark* (1993) 5 Cal.4th 950, 1018, 22 Cal.Rptr.2d 689, 857 P.2d 1099.)

Even assuming that defendant's claims were not forfeited, we find them without merit. A claim that expert opinion evidence has been improperly admitted is reviewed under the deferential abuse of discretion standard. (*People v. Panah* (2005) 35 Cal.4th 395, 478, 25 Cal.Rptr.3d 672, 107 P.3d 790.) "Error regarding a witness's qualifications as an expert will be found only if the evidence shows the witness ""*clearly lacks* qualification as an expert."" [Citation.]" (*People v. Farnam*, *supra*, 28 Cal.4th at p. 162, 121 Cal.Rptr.2d 106, 47 P.3d 988.) The record does not show that Kennedy lacked expert qualifications. Kennedy received a bachelor's degree in Police Science and Management and after becoming a police officer took supplemental courses in crime scene reconstruction and bloodstain patterns. He lectured on blood spatter evidence at an in-service school for criminal investigators and prosecutors at San Jose State University. He had testified regarding blood spatter evidence in superior courts throughout the state on numerous occasions. He conducted blood spatter analysis for the Sacramento Sheriff's Department and went to homicide scenes. Kennedy's educational background and work experience fully qualified him to testify as an expert on blood spatter evidence. (See *People v. Combs* (2004) 34 Cal.4th 821, 849, 22 Cal.Rptr.3d 61, 101 P.3d 1007.)

Defendant contends that Kennedy was biased because his report included a section called "The Bludgeoning," in which he opined that the eight cast-off bloodstains in the hallway were likely caused by repeated blows to Mary Magoon's head by an instrument consistent with a nine-millimeter handgun. The serology reports, however, showed that the blood at issue was not Mary Magoon's; it was D.'s.[FN22] Defendant implies this discrepancy shows Kennedy's bias against the defendant in the face of scientific evidence to the contrary. But the explanation for the apparent conflict, as Kennedy testified at trial, was that his deadline for submitting the findings to the district attorney's office required him to write his report before the serology tests had been completed, and he was asked to outline as many possibilities as he could,

including the possibility that the blood in the hallway was Mary Magoon's. After the serology tests were returned, and prior to trial, Kennedy sought to redact the pages of the report that dealt with the bludgeoning in the hallway, but the trial court ruled that Kennedy's entire report was the fair subject of defense examination. Nothing in this record suggests Kennedy was biased in any regard.

> FN22. D. was not injured during the murders. His cast-off bloodstains in the hallway apparently predated the murders.

In addition, we find no merit in defendant's contention that the trial court violated Evidence Code section 402 and defendant's due process rights when it deferred until midtrial any rulings on the admissibility of Kennedy's testimony. The trial court did not defer its Evidence Code section 402 rulings until midtrial; it made pretrial rulings on the two preliminary facts raised, which were the scientific reliability of blood spatter testing (the *Kelly* rule objection), and Kennedy's qualifications to testify as an expert witness.[FN23]

> FN23. Evidence Code section 400, et seq. set forth rules for determining the existence or nonexistence of a preliminary fact "when the existence of a preliminary fact is disputed." (Evid.Code, § 402, subd. (a).) A "'preliminary fact' means a fact upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence." (Evid.Code, § 400.)

Defendant contends the court should have held an evidentiary hearing before Kennedy was allowed to testify. The claim has no merit. Kennedy's resume sufficiently established his qualifications. In addition, the court correctly concluded that blood spatter testing does not require *Kelly* scrutiny. (*People v. Clark*, *supra*, 5 Cal.4th at p. 1018, 22 Cal.Rptr.2d 689, 857 P.2d 1099.) We therefore conclude no error occurred when the court admitted Kennedy's expert testimony.

Hoyos, 41 Cal. 4th at 909-11 (brackets in original). The state supreme court also rejected Petitioner's contention that the trial court's ruling resulted in prejudice with respect to his penalty phase proceedings. See id. at 927 fn. 38 ("Because we discern no error in any area of the guilt phase, we reject defendant's claims of any prejudicial effect in the penalty phase arising from these or any other guilt phase rulings.")

09cv0388 L (NLS)

As noted above, a claim of state law error arising from the erroneous admission of evidence may warrant habeas relief only if "the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair." Jammal, 926 F.2d at 919; see also McGuire, 502 U.S. at 68-73.

The California Supreme Court was not unreasonable in rejecting this claim on the basis that, even assuming Petitioner did not forfeit the claim by failing to object to Kennedy's alleged bias or lack of qualifications to testify as an expert, the trial court did not err in allowing Kennedy to testify.

With respect to the area of anticipated expert testimony, the trial court noted that Kelly/Frye did not appear to apply to blood spatter evidence, as the proposed testimony "seem[s] to be based on expertise of an experienced detective, a number of seminars and training sessions concerning blood spatter and physics, and the law of physics have been around for an awful long time." (RT 1201.) With respect to Kennedy in particular, the trial court reasoned that: "From the standpoint of qualifications, taken at face value, Mr. Kennedy seems to be a person of some substantial experience in law enforcement. He has taken a number of courses concerning this topic and seems to be qualified to express opinions in this area." (RT 1201-02.) Thus, the trial court thoroughly reviewed Kennedy's qualifications, as well as his report and notes, prior to allowing his testimony.

The second component of Petitioner's claim is that Kennedy was biased in favor of the prosecution, further undermining the reliability of his testimony when coupled with his lack of qualifications, and that the trial court erred in admitting the expert testimony. As an initial matter, Petitioner fails to cite to any clearly established law supporting his contention that an expert's purported bias constitutes grounds for excluding such testimony. See e.g. United States v. Abonce-Barrera, 257 F.3d 959, 965 (9th Cir. 2001) ("Generally, evidence of bias goes toward the credibility of a witness, not his competency to testify, and credibility is an issue for the jury."); United States v. Preciado-Gomez, 529 F.2d 935, 942 (9th Cir. 1976) ("The existence of bias or prejudice of one who has expressed an expert opinion can always be examined into on the cross-examination of such expert; as

well as the facts upon which his expert opinion was based.")  In any event, Petitioner also fails to demonstrate that Kennedy was biased in favor of the prosecution.  Petitioner points to a portion of Kennedy's report entitled "The Bludgeoning," in which Kennedy offers analysis indicating that cast-off bloodstains found on a wall and door to the master bedroom were created when Mary Magoon sustained blunt force injuries from an instrument consistent with a handgun.  Because testing later revealed the bloodstains in question were not from victim Mary Magoon, Petitioner asserts that the report confirms Kennedy's bias against the defense and the falsity of his testimony.

However, as the trial court and the California Supreme Court each thoroughly discussed, Kennedy clearly stated that he submitted his report prior to the completion of serology tests and in fact sought to redact that portion of his report once the results showed the blood did not belong to Mary Magoon.  (See RT 3543-44); Hoyos, 41 Cal. 4th at 910-11.  The trial court indicated that "this type of opinion is one that an expert is a [sic] entitled to express in [sic] the basis of a hypothetical.  And that's essentially what he has done.  He's said assuming all the blood on the premises belong to one person, why, these would be my opinions.  And that is what he said.  He conditioned his opinions on the hypothetical.  He underlines it in his report."  (RT 3544.)  Indeed, Kennedy's report includes an underlined section, prior to the discussion of the blood in the hallway area, stating that: "Due to the time constraints of the Court, the following assessment of bloodstain patterns is being made prior to the return of all the presumptive and serological tests requested of stains suspected to be blood.  The following is based on the assumption that all stains addressed are blood, and the person to whom a pattern is attributed is based upon the consistency of the type of pattern and the injuries suffered.  Upon receipt of completed serological tests the opinions expressed may be subject to modification."  (Lodgment No. 112, Ex. 76 at 8.)  In admitting the testimony and report, the trial court ruled that Kennedy could be subject to questions concerning the entire report, including "The Bludgeoning" section, noting that "everything contained within this report is fair game."  (RT 3546.)  In fact, both Petitioner's defense counsel and co-defendant's counsel cross-examined

Kennedy extensively on the matter.  (See RT 3639-48, 3648-55, 3659-62.)

For instance, counsel elicited that the blood Kennedy ascribed in his report as being cast-off stains from head injuries sustained by Mary Magoon, instead actually "doesn't belong to anybody who died in this house."  (RT 3645.)  Kennedy stated that he had no way of knowing the age of the bloodstains and had to assume it was part of the crime scene, and explained that while the crime occurred in 1992, "I was on the scene in '93, a year later; and this was a very dark hallway, and the people that were living in the house didn't even know the stains were there because it was so dark.  For me to assume the age of that stain in a crime scene that's over a year old would have been very irresponsible on my part not to assess it as part of the crime scene until proved otherwise."  (RT 3647.)

As for the portion of his report titled "The Bludgeoning," Kennedy testified that "all I had was stain on a wall and head injuries to a person who was mobile in the crime scene at one time.  So I had to put two and two together.  I preface the entire report with the fact that I did not have serology results back that I had requested, and that I was required by the Court to author this report prior to the results of the serology."  (RT 3647-48.)  On cross-examination, Kennedy admitted the title of that section "was probably a poor choice of words.  I just used that as a break in the report to assess that as possibly part of the bludgeoning."  (RT 3648.)  During redirect, Kennedy explained that "I was told that due to time constraints set by the Court that I was to give as much of an assessment as I possibly could and outline as many possibilities as were indicated."  (RT 3655.)  On recross, Kennedy was again questioned about the title of the section and stated simply that: "I labeled it as a bludgeoning because I had a victim who has been bludgeoned."  (RT 3661.)  When counsel inquired further, asking if Kennedy made a "great big mistake in that conclusion," Kennedy again indicated that:  "In maybe terming - - putting that term as a topic for that group of paragraphs, maybe I made a mistake in choice of words."  (RT 3661.)

The trial court clearly considered Kennedy's qualifications and the substance of his testimony, and did not abuse its discretion in admitting the evidence.  Petitioner fails to

09cv0388 L (NLS)

offer any authority supporting his contention that an expert's alleged bias constitutes grounds for excluding such testimony. The record also reflects that the defense had, and utilized, the opportunity to cross-examine Kennedy on the basis of his opinions and specifically on the contested section of his report concerning the blunt force injuries suffered by Mary Magoon.

Based on a review of this record, the California Supreme Court reasonably concluded that Kennedy was qualified to testify and that "no error occurred" in admitting his testimony. Hoyos, 41 Cal. 4th at 911. Petitioner fails to demonstrate that the admission of Kennedy's testimony deprived Petitioner of his due process rights to a fair trial or rendered his trial "fundamentally unfair." Jammal, 926 F.2d at 919. The California Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established law, nor was it based on an unreasonable determination of the facts. Habeas relief is not warranted on Claim 10.

**7.** **Claim 11**

Petitioner asserts that the admission of numerous graphic photos, which "depicted close-ups of bloody wounds from the crime scene, and also included autopsy photos," rendered his trial unfair and violated his right to due process. (SAP at 56.)

On direct appeal, the California Supreme Court considered and rejected this claim as follows:

> Defendant contends that the trial court erred when it admitted crime scene and autopsy photographs, and in so doing violated his constitutional rights to a fair trial, due process of law, and a reliable sentence. Having viewed the photographs, and for the reasons discussed below, we conclude the court neither abused its discretion nor violated defendant's constitutional rights in admitting the photographs.

> Alvarado filed in limine motions, in which defendant joined, to exclude crime scene and victim autopsy photographs as irrelevant, cumulative, and more prejudicial than probative. At a pretrial hearing, the trial court examined the photographs, and admitted some while excluding others. Defendant apparently challenges all of the photographs admitted over defense objection, and claims they were not relevant or, in the alternative, that they were

110

cumulative and inflammatory. (Evid.Code, § 352.)

In determining whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant under Evidence Code section 210, and (2) if they were relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. (*People v. Carter* (2005) 36 Cal.4th 1114, 1166, 32 Cal.Rptr.3d 759, 117 P.3d 476.) Defendant presents no credible argument that the photographs were irrelevant. The photos were clearly relevant to the determination of many disputed facts in this case including how the victims were killed and what happened prior to the killings. (Evid.Code, § 210.)

Nor did the trial court abuse its discretion in determining that the probative value of each photograph was not substantially outweighed by its prejudicial effect. "'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]'" (*People v. Ramirez* (2006) 39 Cal.4th 398, 453–454, 46 Cal.Rptr.3d 677, 139 P.3d 64, quoting *Crittenden*, *supra*, 9 Cal.4th 83 at pp. 133–134, 36 Cal.Rptr.2d 474, 885 P.2d 887.) We have examined the photographs and conclude they are not of such a nature as to overcome the jury's rationality. (*People v. Gurule* (2002) 28 Cal.4th 557, 625, 123 Cal.Rptr.2d 345, 51 P.3d 224.) The trial court did not err in admitting the challenged photographs of the victims, nor did their admission violate defendant's constitutional rights.

*Hoyos*, 41 Cal. 4th at 908-09 (brackets in original).  The state supreme court also rejected Petitioner's contention that the trial court's ruling resulted in prejudice with respect to his penalty phase proceedings.  See *id.* at 927 fn. 38 ("Because we discern no error in any area of the guilt phase, we reject defendant's claims of any prejudicial effect in the penalty phase arising from these or any other guilt phase rulings.")

Again, a claim of state law error arising from the erroneous admission of evidence may warrant federal habeas relief only if "the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair."  *Jammal*, 926 F.2d at 919; see also *McGuire*, 502 U.S. at 68-73.

111

In the SAP, Petitioner advanced a general challenge to the admission of crime scene and autopsy photos at trial, which he asserts was prejudicial in conjunction with the testimony of Brian Kennedy. (SAP at 56.) In the merits and evidentiary hearing briefing, Petitioner states specifically that "[t]rial counsel emphasized photographs 8A and 11C as particularly irrelevant, offensive, and inflammatory, but the trial court found that each was necessary to illustrate the testimony of Kennedy, as noted above." (Pet. Brief at 19.) Petitioner argues that because "most of the inflammatory crime scene photos were admitted in conjunction and as support for Brian Kennedy's tainted testimony," the photos themselves "were similarly tainted." (Id.)

Yet, as discussed above, Petitioner fails to demonstrate that the trial court erred in admitting the expert testimony of Detective Kennedy or that the admission of his testimony deprived Petitioner of a fair trial. Accordingly, this claim must be viewed on its own merits, given the lack of demonstrated error in admitting Kennedy's testimony.

Counsel for Petitioner's co-defendant filed a pre-trial motion to exclude photos of the victims, joined by Petitioner. (CT 516-31, 814-15.) In the motion, the defense argued that "the introduction of any and all such photographs is irrelevant," and "is more prejudicial than probative," specifying that the motion was directed at "[p]hotographs of the alleged victims taken while they were alive," "photographs showing the victims' injuries, which were taken at the scene of the investigation, or during any additional investigation," and "certain photographs taken at and during the autopsy of the alleged victims, Dan and Mary Magoon." (CT 517-18, 523-24.)

The trial court and counsel engaged in extended discussions on the admissibility of a number of photos, with the trial court excluding or redacting portions of several photos. For instance, the trial court redacted a portion of one photo that displayed a family photo in the living room and excluded several photos as cumulative to those already admitted into evidence. (RT 1117-19, 1143, 1148-49, 1163.) With respect to the specific photos mentioned by Petitioner, the defense objected to photo 8A which depicted the "victim's wallet, which has been opened up and contents removed" but also showed a large pool of

blood. (RT 1120-21.) In response, the prosecutor cited to Kennedy's expected testimony about "the relevance of the pool of blood" as well as "the way the blood dried and the smear pattern" which showed how long the victim was laying on his side prior to being rolled, which allowed the perpetrators access to the entryway to the garage containing the marijuana taken from the premises. (RT 1121-22.) With respect to photo 11C, the defense contended the photo was "so graphic that it is going to be inherently offensive and overwhelming to jurors" while the prosecutor countered that in that photo "you can see how the blood dried and how there was various swipe marks caused by the opening of the door and the rolling back of the body." (RT 1122-23.) The prosecutor indicated that "Brian Kennedy, this is one of the photos he needs to accurately show that to the jury." (RT 1123.)

The trial court admitted the photos, reasoning that: "It seems to me that these two photographs taken together with the offer of proof of the prosecution are highly probative, and the probative value of these photographs would far outweigh any undo [sic] prejudice as that term is defined in law. The photographs seem to me to be part and parcel and essential to the testimony of the witness Kennedy, and for those reasons, the prosecution will be permitted to show these to the jury." (RT 1124.) Kennedy referred to the photos in his testimony about the blood pooling and transfer patterns. (RT 3558-59.) Medical examiner Dr. Mark Super, who viewed the victims at the scene and conducted the autopsies of both victims, also relied on several photos, including 11C, in his testimony. (RT 3573-74.) The record reflects that the photos in question, which depicted not only blood pooling and spatter but also a victim's wallet and indicated that one of the victims was moved after death, arguably in order to gain access to the garage and the marijuana kept there, were relevant to not only the murders, robbery, burglary, drug charges and other charged crimes, but were also relevant to the jury's consideration of the special circumstances of multiple murder and murder in the course of a robbery and burglary. See Jammal, 926 F.2d at 920 ("Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.")

///

113

Ultimately, Petitioner fails to show that the admission of the crime scene photos, whether considered independently or in conjunction with the admission of Kennedy's testimony, "so fatally infected the proceedings as to render them fundamentally unfair." Jammal, 926 F.2d at 919; Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005) ("A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision.") The trial court reasonably determined that the photos were probative and that their value was not outweighed by any potential prejudicial impact and this decision did not violate Petitioner's constitutional right to due process. See Gerlaugh v. Stewart, 129 F.3d 1027, 1032 (9th Cir. 1997) (admission of "admittedly gruesome photos of the decedent" was not cognizable on federal habeas review and did not "raise[] the spectre of fundamental fairness such as to violate federal due process of law."), citing McGuire, 502 U.S. at 67-68; see also Villafuerte, 111 F.3d at 627 (photos depicting the victim's body and blood at the crime scene were relevant and their admission did not violate due process).

The California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts. Habeas relief is unavailable on Claim 11.

**8.  Claim 12**

Petitioner contends that he was never informed of his right to consular assistance under the Vienna Convention, alleging that "[t]he prejudice is readily apparent in this case because he would have immediately contacted the Mexican Consulate if apprised of his right to do so, and with their assistance would have been much more proactive with respect to developing guilt phase defense and penalty phase mitigation with the Mexican Consulate acting in their salutary role as a cultural bridge between Mexican defendants and the United States criminal justice system." (SAP at 57-58.) He maintains that while law enforcement knew at the time of his May 27, 1992 arrest that he was a Mexican national, he was not informed of, or provided, the right to consular assistance, and his first contact with the Mexican Consulate was in September 1993 and was self-initiated. (Id. at 56-57.)

///

114

1    Petitioner presented this claim to the California Supreme Court as Claim X of his

2    first state habeas petition, where it was denied on the merits without a statement of

3    reasoning.  (Lodgment Nos. 106, 118.)

4        As discussed in the <u>Teague</u> section above (<u>see</u> section III.B.2, <u>supra</u>), the Supreme

5    Court has never held that the provisions of the Vienna Convention created individually

6    enforceable rights, much less that such rights could provide a basis for relief on federal

7    habeas review.  <u>See</u> <u>e.g.</u>, <u>Breard</u>, 523 U.S. at 378 (suggesting generally that "[a]ny rights

8    that the Consul General might have by virtue of the Vienna Convention exist for the benefit

9    of [the foreign country], not for him as an individual."); <u>Medellin</u>, 544 U.S. at 664 ("[E]ven

10   accepting, *arguendo*, the ICJ's construction of the Vienna Convention's consular access

11   provisions [determining, among other issues, that it guaranteed individually enforceable

12   rights], a violation of those provisions may not be cognizable in a federal habeas

13   proceeding.")

14       As also discussed above, both parties acknowledge the Supreme Court's decision in

15   <u>Garcia</u>, in which the Court reasserted <u>Medellin</u>'s holding that "[n]either the <u>Avena</u> decision

16   nor the President's Memorandum purporting to implement that decision constituted

17   directly enforceable federal law." <u>Garcia</u>, 564 U.S. at 941 (<u>See</u> Pet. Brief at 20; Resp. Opp.

18   at 33.)  While Petitioner explicitly acknowledges the absence of any enabling legislation

19   allowing for the enforcement of the provisions contained in the Vienna Convention, he

20   nonetheless argues that "given the continuing political activity in this area, counsel for

21   petitioner maintains his right to relief under this claim in the event that Congress does pass

22   [sic] implementing such legislation," asserting "the very real possibility that

23   implementation may occur during the course of this litigation."  (Pet. Brief at 20.)

24       Regardless of this possibility, the fact remains that this provision is not individually

25   enforceable at the present time, nor is it even clear that such a claim is cognizable on federal

26   habeas review.  <u>See</u> <u>Breard</u>, 523 U.S. at 378; <u>Medellin</u>, 544 U.S. at 664.  Given the lack of

27   any compelling authority supporting Petitioner's claim of error, the Court cannot conclude

28   that the state supreme court's rejection of this claim was either contrary to, or an

115

1   unreasonable application of, clearly established federal law or that it was based on an

2   unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on Claim

3   12.

4   **C.    Claims of Due Process/Brady Violations, IAC Claims, and Related Claims**

5        **1.    Claim 13**

6            In this claim, Petitioner argues that he was deprived of due process, his right to

7   testify, and his right to the effective assistance of counsel as a result of the prosecution's

8   failure to disclose the recantation of jailhouse informant George Jimenez in a timely

9   manner.  (SAP at 58.)  Petitioner requests an evidentiary hearing on this claim.  (<u>Id.</u> at 55.)

10           On direct appeal, the state supreme court discussed this claim at length and rejected

11  it, as discussed below:

12           The jury returned its verdicts in the guilt phase on March 7, 1994. The
         next day, the prosecutor sent defense counsel a copy of a one-page report
13       dated March 7, 1994 prepared by the prosecutor's investigator, David Weil,
         which described statements Jimenez had made to Weil on September 22,
14       1993, when Weil served a subpoena on Jimenez. Weil's report appeared to
         undermine the credibility of Jimenez as a potential witness because it noted
15       that Jimenez said his statements to the police about Alvarado's admissions in
         jail could have been untrue because of drugs Jimenez was taking at the
16       time.[FN25] As discussed above in part II.C., the trial court had excluded
         Jimenez's statements from the prosecution's case-in-chief on *Aranda* and
17       *Bruton* grounds, but Jimenez's statements were held admissible for
18       impeachment if Alvarado testified. Neither Alvarado nor Jimenez testified at
         trial.
19

20

21           FN25. Weil's report stated in relevant part: "Jimenez said
22       that he did not want to testify in this matter because he was afraid.
         He went on to say that he does not remember most of what he
23       told the officers and that he (Jimenez) was taking strong
         medication at the time he talked to the authorities. Jimenez made
24       it known to me that his statement that was recorded earlier could
25       be misleading or contain falsehoods because of the drugs he was
         taking at the time." Jimenez also said "he was concerned for his
26       safety and the safety of his family if he was compelled to testify."
27

28       Both defendant and Alvarado filed written motions seeking a new trial

116

and other relief. They complained that the prosecutor's failure to disclose information affecting Jimenez's credibility violated *Brady v. Maryland*, *supra*, 373 U.S. at page 87, 83 S.Ct. 1194. Defendant's motion included the declaration of his cocounsel, Arturo Herrera, stating that defendant had consistently expressed a desire to testify in his own defense, and that Attorney Herrera had advised defendant against testifying because Alvarado was not going to testify.

The trial court granted Alvarado's motion for a new trial, reasoning that Jimenez's statements to Weil constituted *Brady* material that the prosecution was obligated to disclose to Alvarado, and that the prosecutor's failure to provide this information at a critical stage in the proceedings prevented Alvarado's counsel from providing effective representation on the question of whether to testify.[FN26] (*Brady*, *supra*, 373 U.S. at p. 87, 83 S.Ct. 1194.) The trial court denied defendant's motion in all respects.

> FN26. In granting Alvarado's motion, the trial judge also mentioned that Alvarado's counsel had subpoenaed the sheriff's office for Jimenez's psychiatric and medical record, but had not received them even though Alvarado's counsel had a right to receive that information.

Defendant contends the trial court erred in denying his motion for a new trial because the late disclosure of the Weil report violated his right to due process under *Brady* and his right to the effective assistance of counsel. Defendant claims these constitutional violations rendered his trial fundamentally unfair and require the court to set aside his verdicts. For the reasons discussed below, we conclude defendant's constitutional rights were not violated, and the trial court did not err in denying defendant's motion for a new trial.[FN27]

> FN27. Defendant's motion for a new trial was based on the constitutional grounds of an asserted *Brady* violation or violation of the right to the effective assistance of counsel. On appeal, a trial court's ruling on a motion for new trial is reviewed under a deferential abuse of discretion standard. (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 127, 17 Cal.Rptr.3d 710, 96 P.3d 30.) Its ruling will not be disturbed unless defendant establishes "'a manifest and unmistakable abuse of discretion.'" (*Ibid.*, quoting *People v. Delgado* (1993) 5 Cal.4th 312, 328, 19 Cal.Rptr.2d 529, 851 P.2d 811.) Here, the asserted abuse of

discretion is the asserted failure of the trial court to recognize violations of defendant's constitutional rights. Our constitutional analysis below therefore also addresses the abuse of discretion issue.

*(1) Brady v. Maryland*

*a. The Brady Standard*

In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87, 83 S.Ct. 1194.) The high court has extended the prosecutor's duty to encompass the disclosure of material evidence, even if the defense made no request concerning the evidence. (*United States v. Agurs* (1976) 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342.) The duty encompasses impeachment evidence as well as exculpatory evidence. (*United States v. Bagley* (1985) 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481.) Such evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 682, 105 S.Ct. 3375.) "'[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond may have had on the preparation or presentation of the defendant's case.'" (*In re Brown* (1998) 17 Cal.4th 873, 887, 72 Cal.Rptr.2d 698, 952 P.2d 715, quoting *Bagley*, *supra*, 473 U.S. at 683, 105 S.Ct. 3375.) Defendant has the burden of showing materiality. (*In re Sassounian* (1995) 9 Cal.4th 535, 545, 37 Cal.Rptr.2d 446, 887 P.2d 527.)

*b. Defendant's Brady Claim*

Defendant essentially asserts the *Brady* violation that led the court to grant Alvarado's new trial motion had a spillover effect as to him because he and Alvarado had a strategic understanding that if one defendant testified, the other defendant would also have to testify. Defendant contends the timely disclosure of the Weil report would have led him to testify due to a change in this joint defense strategy.

As the trial court acknowledged during the hearing on the new trial motions, *Brady* claims typically require showing the different result of the proceeding

in terms of the *verdict*, rather than in terms of an intermediate event such as a defendant's testifying. Defendant essentially ignores the issue of how his testimony would have changed the verdict. If, however, defendant cannot establish the materiality of the Weil report even as to the intermediate event of his decision whether to testify, then he has failed to establish the verdict would have been different. As discussed below, we conclude defendant has failed to establish materiality even as to his decision whether to testify.

### c. Inadmissibility of the Jimenez Statements

Assuming defendant's claim is cognizable under *Brady*, the People pose a further threshold issue in observing that evidence inadmissible at trial is immaterial under *Brady* and, therefore, the failure to disclose such inadmissible evidence is not a *Brady* violation. Defendant concedes that, at the joint trial, Alvarado's purported admissions would have been admissible against Alvarado but inadmissible as hearsay against defendant, and that if defendant's motion for severance had been granted, the Jimenez testimony could not have been admitted at his single trial for any purpose. Defendant claims, however, that even though the Jimenez testimony was not admissible against defendant individually, his due process claim must survive.

The United States Supreme Court has never announced a bright line rule that only admissible evidence is "material" for purposes of a *Brady* violation.[FN28] Some federal and state courts, however, have held that unless the undisclosed evidence would have been admissible at trial, it need not have been disclosed under *Brady*.[FN29] Other courts have rejected admissibility as a prerequisite for determining *Brady's* applicability, as long as the information would have led to admissible evidence or been useful to the defense in structuring its case.[FN30] This court has not directly addressed the issue, although we have implied in dicta that admissibility might be a prerequisite to materiality.[FN31] In addition, this case presents the additional question of what *aspect* of admissibility is a prerequisite to *Brady* materiality in a joint trial: admissibility at trial generally, or admissibility as to the individual defendant making the *Brady* claim?

FN28. In *Wood v. Bartholomew* (1995) 516 U.S. 1, 6–7, 116 S.Ct. 7, 133 L.Ed.2d 1, the United State[s] Supreme Court ultimately found inadmissible polygraph evidence not material under *Brady*. However, *Wood* was not based on a per se rejection of inadmissible evidence as a basis for a *Brady* claim. *Wood* found the evidence not material because, even based on the

assumption that this inadmissible evidence might have led respondent's counsel to conduct additional discovery leading to admissible evidence, the evidence's influence on the outcome of the case was speculative. (*Wood v. Bartholomew*, *supra*, 516 U.S. at p. 6, 116 S.Ct. 7.); see also *Paradis v. Arave* (9th Cir.2001) 240 F.3d 1169, 1178 (["In *Bartholomew*, the Court did not categorically reject the suggestion that inadmissible evidence can be material under *Brady*, if it could have led to the discovery of admissible evidence."] )

FN29. See, e.g., *Madsen v. Dormire* (8th Cir.1998) 137 F.3d 602, 604 ([inadmissible evidence of forensic chemist's incompetence not material under *Brady*]); see also Gershman, Prosecutorial Misconduct (2d ed.2005) § 5:8, and cases collected therein.

FN30. See, e.g., *Paradis v. Arave*, *supra*, 240 F.3d at page 1179 ([prosecutor's notes, although not admissible, could have been used to contradict a key medical witness and nondisclosure was *Brady* violation]); see also Gershman, Prosecutorial Misconduct, supra, § 5:8, and cases collected therein.

FN31. "Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043, 29 Cal.Rptr.3d 16, 112 P.3d 14, cf. *Wood v. Bartholomew*, *supra*, 516 U.S. at p. 2, 116 S.Ct. 7.)

Because the evidence on which defendant bases his *Brady* claim was admissible at the joint trial, for the reasons that follow, we conclude defendant may assert a *Brady* claim, even though the evidence was not admissible against him.[FN32] The *Brady* standard for materiality states the undisclosed evidence is to be evaluated in terms of how "the result of the proceeding would have been different." (*United States v. Bagley*, *supra*, 473 U.S. at p. 682, 105 S.Ct. 3375.) In addition, the evidence's materiality "'must be evaluated in the context of the entire record.'" (*In re Brown*, *supra*, 17 Cal.4th at p. 887, 72 Cal.Rptr.2d 698, 952 P.2d 715, quoting *United States v. Agurs*, *supra*, 427 U.S. at p. 112, 96 S.Ct. 2392.) In deciding whether asserted *Brady* evidence is material to defendant's case, it is therefore appropriate to examine the effect of the evidence on the actual joint proceeding in which defendant was tried.

09cv0388 L (NLS)

FN32. Thus, we need not and do not reach the issue of whether a *Brady* claim is precluded when the basis of the *Brady* claim is evidence not admissible at trial.

### d. The Joint Defense Strategy

Even though defendant's *Brady* claim is not per se precluded because the undisclosed evidence was inadmissible against him individually, its inadmissibility highlights the weaknesses in his *Brady* contention. As defendant concedes, Jimenez's statements were admissible only as impeachment evidence against Alvarado, if Alvarado testified. For defendant, unlike Alvarado, there was no direct causal connection between Jimenez's statements and the decision whether or not to testify. If Alvarado testified, Jimenez's statements could have impeached him. But the prosecution could not have impeached defendant with Jimenez's statements, even if Jimenez testified.

Defendant contends Jimenez's statements did affect his decision whether to testify because the potential prejudicial impact of the statements on the jury caused him to adopt a joint defense strategy with Alvarado, to the effect that either both or neither of them would testify. During the hearings on the motions for a new trial, defense counsel extensively discussed the reasoning behind this joint defense strategy, which defendant summarizes and adopts on appeal. If the jury heard Jimenez's statements, their impact would be prejudicial not merely on Alvarado but on defendant as well. Defendant was free to testify without causing Jimenez's statements to be admitted, but if he testified, he presumably would say something exculpatory about his participation in the crime. Then more blame might be placed on Alvarado, so Alvarado would feel compelled to testify. Defendant's and Alvarado's defense counsel believed there was no fair way to have only one story presented. Thus, the codefendants had agreed on a both-or-neither approach to testifying.

### e. Impact of the Joint Defense Strategy

Defendant alternatively refers to his understanding with Alvarado on testifying at trial as an agreement and as a trial strategy. To the extent that the defendant implies the existence of a binding agreement, the argument fails. He fails to establish that he formed a binding agreement with Alvarado either by contract or detrimental reliance.[FN33] The trial court made no findings establishing the existence of a joint defense agreement. To the extent

121

defendant's argument for materiality depends on the existence of a binding agreement, defendant has therefore failed to establish one.

> FN33. The only factual evidence presented during the new trial motions was the declaration of defendant's trial attorney, Arturo Herrera. His declaration describes defendant's desire to testify and counsel's advice to defendant that, because Alvarado was not going to testify, then neither should he. But this declaration does not assert (let alone establish) the existence of a binding agreement.

In the alternative, defendant describes his agreement with Alvarado as a trial strategy that each codefendant adopted, based on their shared interest in keeping Jimenez's statements away from the jury.[FN34] Defendant claims that if the prosecution had timely disclosed the Weil report, it would have changed the joint defense strategy because the information revealed in the report would have undercut Jimenez's credibility. He reasons, therefore, that neither he nor Alvarado would have been deterred from testifying because they feared the effect of Jimenez's statements on the jury.

> FN34. Defendant also briefly mentions his trial counsel's argument that because defendant and Alvarado are brothers-in-law, the codefendants adopted the "both or neither" testifying strategy, at least in part, out of their sense of familial loyalty. Assuming defendant also raises this argument on appeal, he presents no authority that familial loyalty can establish materiality under *Brady*.

Defendant implies the above trial considerations *necessitated* his adoption of the agreement with Alvarado and corresponding trial strategy. But this strategy was not compelled by necessity, legal or otherwise. Even assuming both codefendants wished to keep Jimenez's statements from the jury, defendant's testifying would not necessarily have caused Alvarado to testify. Alvarado's testifying in response to Jimenez's statements would have been contingent on the nature of defendant's testimony. If defendant's testimony painted Alvarado in a particularly bad light, Alvarado might have testified, in order to shift the blame to defendant.

It was also possible, however, that Alvarado would not have testified. Before testifying, Alvarado would have considered the consequences of his testimony: leaving defendant's testimony unrebutted, or taking the stand and

risk having the jury hear Jimenez's statements. Alvarado could not make that calculation prior to hearing defendant's actual testimony. Neither could defendant know with any certainty in advance what Alvarado would do. There was no *necessary* connection between defendant's testifying and Alvarado's testifying.

In observing that defendant has not shown the legal necessity of the purported joint defense strategy, we do not hold defendant is required to show legal necessity in order to establish his *Brady* claim.[FN35] Nor do we deny defendant presents reasonable strategic considerations that may *possibly* have been factors in his decision whether or not to testify. But codefendants in many joint trials face difficult tactical choices in deciding how to proceed where multiple considerations are involved. Defendant has shown only the *possibility* that his decision not to testify was a result of strategic considerations made in connection with Jimenez's statements. In other words, defendant has shown only the *possibility* that he would have testified had the Weil report been timely produced. To establish materiality under *Brady*, defendant must do more than establish a *possible* relationship between the Weil report and a different result; he must establish a *reasonable probability* of a different result. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (*United States v. Agurs*, *supra*, 427 U.S. at pp. 109–110, 96 S.Ct. 2392.) Ultimately, defendant's contention that the timely disclosure of the Weil report would have resulted in his testifying is based on speculation and fails to establish materiality under *Brady*. (*Brady*, *supra*, 373 U.S. at p. 87, 83 S.Ct. 1194; *Wood v. Bartholomew*, *supra*, 516 U.S. at p. 6, 116 S.Ct. 7.)

> FN35. Alternatively, we need not and do not reach the issue of whether a showing of legal necessity would be sufficient to establish a *Brady* claim under these circumstances.

The People raise the related point that considerations entirely independent of Jimenez's statements caused defendant not to testify, regardless of whether the prosecution had disclosed the Weil report. The People point out that if defendant testified, he could have been subject to impeachment by his own prior statements to the police, and his admissions to jailhouse informant Jorge Flores.

In response, defendant attempts to discredit the possible influence of these other impeachment sources. Defendant claims his statements to the

police were not preceded by any *Miranda* warning, were far from a confession, and might have been excluded in any case as being involuntary. It is true that the People have not shown conclusively that these other impeachment factors independently determined defendant's decision not to testify. But neither has defendant conclusively shown these factors could not have done so. The highly speculative nature of any analysis here further supports our conclusion that defendant has failed to establish materiality under *Brady*.

### 2. Asserted Violation of Right to Effective Assistance of Counsel

In the alternative, defendant asserts that regardless of whether the timely disclosure of the Weil report would have caused him to testify, its late disclosure was prejudicial because it violated his right to receive meaningful guidance from his counsel on whether or not to testify on his own behalf. Defendant relies on cases based on the deficient performance of counsel, such as *Wiggins v. Smith* (2003) 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471, which appear inapplicable to the facts of this case. *Wiggins* addressed whether counsel fulfilled his duty to "'make reasonable investigations'" into defendant's background so that counsel could make a reasonable decision as to what to offer in mitigation at the penalty phase. (*Id.* at p. 522, 123 S.Ct. 2527.) Defendant does not argue that his trial counsel was deficient because he failed to uncover the Jimenez impeachment evidence. Thus, in contrast to *Wiggins*, there is no issue of trial counsel's not becoming aware of relevant evidence through counsel's failure to conduct a reasonable investigation.

Defendant also contends he was in the same situation as Alvarado in regard to the untimely disclosure of the Weil report and consequently he suffered the same interference with his right to receive meaningful guidance from counsel on the issue of whether to testify. But defendant was not in the same situation as Alvarado in relation to the Weil report. As discussed above, Alvarado and defendant stood in different relationships to the Jimenez statements. If Alvarado testified, he faced impeachment with Jimenez's statements. Defendant, in contrast, could testify without being subject to impeachment. Defendant attempts to negate this fundamental difference by claiming that a joint defense strategy committed both codefendants to the same course of action in testifying—that is, either both would testify, or neither would. But, as discussed above, defendant has failed to establish a material connection between Jimenez's statements and defendant's decision to testify. Because there was no material connection, we find no interference with defendant's right to counsel based on the late disclosure of the Weil

124

report.

*3. Alleged Prosecutorial Misconduct*

Defendant contends his convictions and sentence should be set aside because the prosecutor engaged in misconduct when he deliberately withheld Weil's report, which rendered the trial fundamentally unfair under the Fourteenth Amendment to the United States Constitution. In addition, defendant contends the trial court erred in finding the prosecutor did not intentionally keep the Weil report secret until after the jury returned the guilty verdict.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44, 104 Cal.Rptr.2d 582, 18 P.3d 11.) As discussed above, because there was no material connection between the Weil report and defendant's decision whether or not to testify, we rejected his claims that the late disclosure of the Weil report violated his constitutional right to due process under *Brady* or his right to the effective assistance of counsel. This same lack of material connection likewise causes us to reject his claim that the late disclosure of the Weil report made his trial fundamentally unfair. As to whether the prosecutor violated state law by using deceptive or reprehensible methods, we reject that claim based on the trial court's finding, not contradicted in the record, that the prosecutor's failure to disclose was unintentional.[FN36]

> FN36. Prosecutorial misconduct does not require a showing of bad faith. (*People v. Hill* (1998) 17 Cal.4th 800, 822, 829, 72 Cal.Rptr.2d 656, 952 P.2d 673.) Thus, in a typical claim of prosecutorial misconduct involving a prosecutor's presentation to the court or jury, there is no need to address the prosecutor's intent. But in the context of the prosecutorial misconduct claimed here, the only way the actions of the prosecutor can be shown to be deceptive or reprehensible is if the prosecutor had intentionally withheld the Weil report for strategic advantage. In the absence of claims for intentional misconduct, defendant would merely be repeating his *Brady*

claim, since nondisclosure under *Brady* does not require a showing of the moral culpability or the willfulness of the prosecutor. (*United States v. Agurs*, *supra*, 427 U.S. at p. 110, 96 S.Ct. 2392.)

In describing the circumstances surrounding the late disclosed Weil report, the prosecutor stated that, in September of 1993, after serving the subpoena on Jimenez, Weil told him the following: Jimenez did not want to be a witness; he was scared of what might happen to him or his family; and he might forget what he said or didn't really remember what was said. The prosecutor could not recall if he directed Weil to prepare a report in September of 1993, but he believed a report would be prepared. When the prosecutor was reviewing documents in preparation for the penalty phase, he became aware that no such report had been prepared. The prosecutor then directed Weil to prepare a report and had it delivered to defense counsel. The court made findings in connection with the codefendants' motions for a new trial. It concluded the prosecutor clearly had been negligent in failing to produce the information in the Weil report in a timely manner, but also found the prosecutor had not intentionally kept the Weil report secret until after the jury returned the verdicts.

Defendant contends the court was unreasonable in concluding that the untimely disclosure was not intentional because there were several motions filed and hearings held regarding Jimenez's statements after the time in which the prosecutor became aware of the statements. Defendant claims the prosecutor could not have believed defense counsel was already aware of Jimenez's statements to Weil. Defendant contends it was inconceivable that defense counsel would not have mentioned a "recantation" by Jimenez because such a recantation would have rendered the *Aranda/Bruton* hearings on Jimenez's testimony unnecessary.[FN37]

> FN37. Defendant also claims that the prosecutor must surely have also been aware of the Los Angeles Grand Jury investigation concerning jail house informants, which had surfaced with much publicity not long before this trial, and that, consequently, the prosecutor should have been on notice that the testimony of a jailhouse informant like Jimenez was likely false. This argument is based on facts not contained in the record. But even assuming the prosecutor was aware of the grand jury investigation, this would add little to defendant's main argument, which is that the prosecutor had *actual knowledge* of the

unreliability of Jimenez because the prosecutor knew that Jimenez had admitted it to Weil in September of 1993.

The record does not support defendant's claim. It appears the trial court's conclusion was consistent with the prosecutor's statement that when the prosecutor heard Weil's account of Weil's conversation with Jimenez in September of 1993, he understood Jimenez's comments to Weil to be an attempt to get out of testifying because he was unwilling or scared to testify. The prosecutor stated that it was not until after he read the version of the conversation in Weil's March 1994 report, that he was aware of Jimenez's comments that his prior statement to police might be misleading or contain falsehoods due to the drugs he was taking at that time. The prosecutor's understanding of Jimenez's comments to Weil as an attempt to get out of testifying, rather than as a "recantation," is consistent with the prosecutor's apparent lack of surprise that Jimenez's comments to Weil were not mentioned during the *Aranda/Bruton* hearings addressing Jimenez's statements.

Hoyos, 41 Cal. 4th at 916-25 (brackets in original).

### A.    **Brady contention**

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985).

Petitioner asserts that the California Supreme Court's decision to reject this claim was based on an unreasonable determination of the facts under section 2254(d)(2), arguing that "[w]hile the Supreme Court contends that petitioner established only a 'possible' relationship between the Weil report and his decision not to testify, the record demonstrates that both defense counsel were unequivocal that they had decided at the time of the trial that neither defendant would testify at trial, because of Alvarado's direct vulnerability to impeachment by the Jimenez statements; and were equally unequivocal that both

defendants <u>would have testified</u> at the trial if the Weil report had been timely disclosed, because the fear of impeachment would have been neutralized. The record could not be clearer, and the Supreme Court was unreasonable in not recognizing that." (SAP at 68) (emphasis in original.)

First, it is evident that the California Supreme Court was careful to clarify that any conclusions about the impact of the joint defense agreement did not compel its rejection of his <u>Brady</u> claim, noting that: "In observing that defendant has not shown the legal necessity of the purported joint defense strategy, we do not hold defendant is required to show legal necessity in order to establish his *Brady* claim." <u>Hoyos</u>, 41 Cal. 4th at 921. Instead, it is clear from the California Supreme Court's own words that the state court decision was based on Petitioner's failure to demonstrate materiality. At the outset of the discussion, the California Supreme Court remarked that Petitioner failed to even allege or argue materiality with respect to the outcome of the proceedings, as <u>Brady</u> requires, and noted that Petitioner in fact "essentially ignores the issue of how his testimony would have changed the verdict." <u>Hoyos</u>, 41 Cal. 4th at 918. The state supreme court concluded that Petitioner failed to even show the statement was material to his *decision to testify*, much less demonstrate a connection between the statement and the *outcome of the trial proceedings*,[14] as required to sustain a <u>Brady</u> claim:

---

[14] While Petitioner submitted two declarations to the state supreme court in support of his first state habeas petition (<u>see</u> Lodgment No. 115, Ex. 84A; Lodgment No. 117, Ex. 115), in neither does he address his desire to testify at trial or the substance of his prospective testimony. During the sentencing proceedings, Petitioner stated that he wanted to testify but that his attorney convinced him not to, and that "[m]y attorney argued something different than what I had told him," but again, did not address the substance of his prospective testimony. (RT 4953, 4954-58.) In the Reply brief, with respect to Claim 22, Petitioner now specifies that at the outset of the case, he told trial counsel that "he and Alvarado arrived at the Magoon residence to find the bloody scene and the victims, after which they left with marijuana from the garage." (Reply at 97.) However, there is an absence of record or other documentary support for this contention.

Defendant has shown only the *possibility* that his decision not to testify was a result of strategic considerations made in connection with Jimenez's statements. In other words, defendant has shown only the *possibility* that he would have testified had the Weil report been timely produced. To establish materiality under *Brady*, defendant must do more than establish a *possible* relationship between the Weil report and a different result; he must establish a *reasonable probability* of a different result. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (*United States v. Agurs*, *supra*, 427 U.S. at pp. 109–110, 96 S.Ct. 2392.) Ultimately, defendant's contention that the timely disclosure of the Weil report would have resulted in his testifying is based on speculation and fails to establish materiality under *Brady*. (*Brady*, *supra*, 373 U.S. at p. 87, 83 S.Ct. 1194; *Wood v. Bartholomew*, *supra*, 516 U.S. at p. 6, 116 S.Ct. 7.)

---

In response to the Court's post-oral argument request for any citations to the record concerning Petitioner's prospective trial testimony (see ECF No. 120), Petitioner filed a response stating that "[t]he state habeas investigation and interviews with Petitioner Hoyos revealed that Petitioner had no involvement in the killings of Mary and Daniel Magoon. Counsel, while aware of Petitioner's statement that when he arrived at the Magoon residence, Mary and Daniel Magoon were dead, did not file an offer of proof as to petitioner's anticipated testimony in the course of the state habeas proceedings in the California Supreme Court. Petitioner consistently maintained that he did not kill the Magoons and that he wanted to testify at trial." (ECF No. 135.) Petitioner also attached the declaration of state habeas counsel, dated April 21, 2017. (ECF No. 135-1.) Respondent asserts that this submission "is non-responsive to the request for citations to the record" and the Court cannot consider declaration of state habeas counsel in reviewing this claim, noting that "[t]he United States Supreme Court has clarified 'that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.'" (ECF No. 141 at 5, quoting Pinholster, 563 U.S. at 181.)

Given the dictates of Pinholster, as well as the fact that this declaration was executed in 2017 and this claim was raised on *direct appeal* rather than *state habeas* and denied in a reasoned decision in 2007, the Court agrees that it cannot consider the declaration of state habeas counsel in reviewing this claim under section 2254(d)(1). See Pinholster, 563 U.S. at 185 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.")

09cv0388 L (NLS)

Hoyos, 41 Cal. 4th at 922.

A review of the record does not compel a conclusion that the state supreme court's decision was based on an unreasonable determination of the facts. At a post-trial hearing concerning the late disclosure of the Weil report, defense counsel stated that Petitioner had been "adamant about testifying in court," that at the last minute, counsel "talked him out of it," and that Petitioner "made up his mind in court here that morning of the defense case, changed his mind and said he wouldn't testify." (RT 4544.) At the same time, trial counsel acknowledged that the prospect of Jimenez impeaching Alvarado was not the sole consideration given that there were multiple informants, stating that: "The reason why I'm bringing this up is because the reasons that I was talking him out of testifying was because obviously the impeachment of, of him through statements by the jail house informants." (RT 4544-45.) Counsel also conceded that the Weil report only "possibly" would have changed the calculus, and stated that had they known of Jimenez's recantation, "possibly Mr. Alvarado would have testified, and Mr. Hoyos would have testified." (RT 4545.) While counsel noted that Flores' informant statement may not have impacted their strategy "because in a lot of that statement there is a lot of exculpatory stuff," counsel continued to equivocate on the impact of the Jimenez recantation, again stating that with an earlier disclosure of the Jimenez statement "we would have probably counseled them differently because the worst part of the impeachment comes from Jiminez [sic]." (RT 4546-47) (emphasis added.) Counsel reiterated that Petitioner had been "adamant about testifying" and that "[i]t was based on advice of counsel concerning impeachment is the reason why he changed his mind." (RT 4547.) Counsel acknowledged the difficulty of re-evaluating the strategic decisions they would have made in hindsight, as follows: "It's by every logical evidentiary perspective reasonable to think that both wouldn't testify, as in fact has happened, or that both might have testified. Who knows exactly if they would have. It's hard to go back in time, re-live that, make those retroactive strategic decisions, but they very well might have." (RT 4549.)

///

1    Even as the record reflects that Petitioner himself expressed a strong desire to testify
2  and that his ultimate decision not to testify was undoubtedly influenced, at least in part, by
3  the prospect of Jimenez's testimony, trial counsel acknowledged there were other factors
4  at play, including the prospect of impeachment by Flores.  Here, the record supports the
5  reasonableness of the state supreme court's factual determination, as even trial counsel
6  themselves repeatedly conceded that, given knowledge of the recantation, "possibly" the
7  defendants would have testified and that counsel "probably would have counseled them
8  differently."   Thus, contrary to Petitioner's assertion, the record reflects that defense
9  counsel was not "unequivocal" that both defendants would have testified had the Weil
10 report been disclosed earlier, and the California Supreme Court was not unreasonable in
11 concluding that Petitioner failed to show more than a "possible" relationship between the
12 Weil report and his decision not to testify.  Given the record support for the California
13 Supreme Court's determination, Petitioner fails to demonstrate that the state court decision
14 involved an unreasonable determination of the facts under section 2254(d)(2).

15    Petitioner similarly fails to satisfy section 2254(d)(1).  It is apparent from a review
16 of the record that Petitioner's argument about materiality is directed to the impact of the
17 Jimenez statement on his decision to testify, rather than on the outcome of the trial.  Again,
18 the Supreme Court has held that "evidence is material only if there is a reasonable
19 probability that, had the evidence been disclosed to the defense, the result of the proceeding
20 would have been different."  <u>Bagley</u>, 473 U.S. at 682.  In this case, the California Supreme
21 Court correctly and reasonably noted that while Petitioner argued that the Weil report was
22 material to his decision not to testify, Petitioner "essentially ignores the issue of how his
23 testimony would have changed the verdict."  <u>Hoyos</u>, 41 Cal. 4th at 918.  Because Petitioner
24 failed to argue, much less demonstrate, that the Weil report was material to the outcome of
25 Petitioner's trial proceedings, he did not establish that <u>Brady</u> error occurred in his case.  As
26 such, the California Supreme Court's rejection of this contention was neither contrary to,
27 nor an unreasonable application of, clearly established federal law.
28 ///

131

09cv0388 L (NLS)

1                 **B.**     **Ineffective Assistance of Counsel and Right to Testify**

2          Petitioner contends that in addition to the <u>Brady</u> violation, "defense counsel were

3 also deficient in their efforts to affirmatively investigate and impeach informant Jimenez

4 particularly and informant Lopez[15] as well." (SAP at 69.)

5          In the Answer, Respondent contends that this aspect of Claim 13 is not exhausted.

6 (Ans. Mem. at 61.) On direct appeal, the California Supreme Court addressed Petitioner's

7 claim that the untimely disclosure of the Weil report "violated his right to receive

8 meaningful guidance from his counsel on whether or not to testify on his own behalf."

9 <u>Hoyos</u>, 41 Cal. 4th at 922. In doing so, the California Supreme Court noted that:

10 "Defendant does not argue that his trial counsel was deficient because he failed to uncover

11 the Jimenez impeachment evidence." <u>Hoyos</u>, 41 Cal. 4th at 922-23. Petitioner appears to

12 now offer that very argument. Thus, to the extent Petitioner asserts trial counsel was

13 ineffective for failing to investigate possible impeachment evidence concerning Jimenez,

14 the contention appears unexhausted.

15          Petitioner maintains that Respondent waived exhaustion by failing to raise it in an

16 earlier motion to dismiss for failure to exhaust. (Pet. Brief at 24-25.) Pursuant to AEDPA:

17 "A State shall not be deemed to have waived the exhaustion requirement or be estopped

18 from reliance upon the requirement unless the State, through counsel, expressly waives the

19 requirement." 28 U.S.C. § 2254(b)(3). Moreover, the Ninth Circuit has indicated that

---

[15] The Court's review of the record reveals the existence of two informants, Jimenez and Flores, neither of whom ended up testifying at trial. <u>See</u> e.g. <u>Hoyos</u>, 41 Cal. 4th at 894. One witness at trial, an acquaintance of Petitioner's, was named Marbell or Maria Lopez, while James Johnson testified that he thought Petitioner and Lopez were married and that Petitioner's name was Jaime Lopez. <u>See</u> <u>id.</u> at 886-87, 887 fn. 6. The failure to identify an informant named Lopez does not appear to impact the Court's consideration of this claim, as the substance of Petitioner's argument centers on counsel's alleged failure to obtain the same Jimenez impeachment evidence at issue in the <u>Brady</u> claim. Petitioner offers no details about the identity of an informant named Lopez nor does Petitioner provide any specific allegations about counsel's purported deficiencies in investigating impeachment information concerning any informant named Lopez.

09cv0388 L (NLS)

under the Federal Rules of Civil Procedure 7(a), 8(c), and 12(b), a motion or stipulation may not constitute a "responsive pleading" sufficient to waive an affirmative procedural defense such as exhaustion.  See Randle v. Crawford, 604 F.3d 1047, 1053 (9th Cir. 2010) (rejecting contention that the State waived a procedural defense by failing to raise it in a prior motion to dismiss, stipulation to stay proceedings, or opposition to motion to reopen federal case.)

Ultimately, the Court need not resolve the exhaustion status of this contention because the claim is without merit; the Court may exercise discretion to deny a claim on the merits despite a petitioner's failure to fully exhaust state judicial remedies.  See 28 U.S.C. § 2254(b)(2); Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999).

In this instance, Petitioner cannot establish that trial counsel's performance fell below constitutional guarantees.  As the trial court and the state supreme court each appropriately recognized, even had Petitioner chosen to testify, the prosecutor could not have called Jimenez to testify against him.  (See RT 4729-30) ("There isn't any Sixth Amendment violation that I see as to Mr. Hoyos in this case.  He could have testified in this case without any fear of impeachment by Jiminez [sic].  He chose not to do so.  In fact, he chose not to do so in advance for reasons, as it seems, to be more akin to familial considerations.  We sink or swim together, this sort of approach.  That's not cognizable as a constitutional violation.  He made a decision and the potential impeaching information of the informant as to his co-defendant is not really of constitutional significance as to Mr. Hoyos."); see also Hoyos, 41 Cal. 4th at 920 ("As defendant concedes, Jimenez's statements were admissible only as impeachment evidence against Alvarado, if Alvarado testified. For defendant, unlike Alvarado, there was no direct causal connection between Jimenez's statements and the decision whether or not to testify. If Alvarado testified, Jimenez's statements could have impeached him. But the prosecution could not have impeached defendant with Jimenez's statements, even if Jimenez testified.")  Only if Alvarado chose to testify could Jimenez have been called as an impeachment witness.  As such, Petitioner fails to persuasively explain why counsel had a duty to independently

investigate potential impeachment evidence concerning an individual that could not have been called to testify as a witness against him, much less demonstrate that the failure to do so "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88.

Even if Petitioner were able to show that trial counsel was somehow deficient for failing to independently investigate and possibly obtain evidence impeaching a potential witness against his co-defendant, his claim of ineffective assistance nonetheless fails because he cannot demonstrate prejudice. Petitioner has not shown how his testimony would have made a difference to the outcome of the trial, much less demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. At the time of the defense motion for a new trial, Petitioner told the trial court that he "wanted to take the stand and testify" but that he did not do so because counsel told him not to testify. (RT 4954-55.) Again, Petitioner submitted two separate declarations in support of his state habeas petition, but in neither does Petitioner even state that he wanted to testify at trial, much less provide any indication about what he would have testified to at trial. (See Lodgment No. 115, Ex. 84A; Lodgment No. 117, Ex. 115.) In any event, this claim was raised and adjudicated by the California Supreme Court on *direct appeal*, and Petitioner fails to point to evidence in the record before the state court at the time of that decision which supports his contention. (See fn. 14, supra; see also Pinholster, 563 U.S. at 181, 185.) In the absence of any attempt to show, much less actual evidence demonstrating, that Petitioner's testimony would have made a difference in the jury's verdict, the Court cannot conclude that Petitioner was prejudiced by trial counsel's alleged deficiencies. See Richter, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.") Therefore, even were Petitioner able to establish that counsel's performance was constitutionally inadequate, the claim fails for lack of prejudice. See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") The California Supreme Court's rejection of this contention was neither contrary to, nor an unreasonable

application of, <u>Strickland</u>.

**C.**   **Prosecutorial Misconduct and Right to Testify**

Finally, Petitioner asserts that his "right to testify on his own behalf, which is a personal and fundamental constitutional right, was violated in this case as a result of prosecutorial misconduct on the <u>Brady</u> front and ineffective assistance of counsel regarding both impeachment evidence of prosecution witnesses and the affirmative development of defense evidence." (SAP at 70.)

To sustain a claim of prosecutorial misconduct on federal habeas review, a petitioner must demonstrate that the misconduct at issue "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986), quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974). Alleged instances of misconduct must be reviewed "in the context of the entire trial." <u>Donnelly</u>, 416 U.S. at 639; <u>see also</u> <u>Greer v. Miller</u>, 483 U.S. 756, 765-66 (1987), citing <u>Darden</u>, 477 U.S. at 179 and <u>Donnelly</u>, 416 U.S. at 639. This is because "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982). Habeas relief is warranted only if the error "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.

On the showing offered by Petitioner, the Court is unable to conclude that the prosecution's failure to turn over the Jimenez material in a timely manner, even assuming it constituted misconduct, "so infected" his trial as to deprive him of due process. As discussed above, despite Petitioner's lengthy and detailed arguments to the contrary, he was not directly impacted by the Jimenez impeachment materials, which could not have been used against him had he chosen to testify at trial. Moreover, for the reasons discussed above in the discussion of the <u>Brady</u> and ineffective assistance of counsel contentions, even if Petitioner could establish the existence of constitutional error, he fails to show that the error had any impact on the outcome of his trial proceedings, much less a "substantial and injurious effect or influence" on the verdict. <u>Brecht</u>, 507 U.S. at 637.

Because Petitioner fails to demonstrate that the California Supreme Court's rejection of Claim 13 was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, he is not entitled to habeas relief.  An evidentiary hearing is not warranted on Claim 13.  See Sully, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.")

### 2.  Claim 14

Petitioner asserts that: (1) the prosecution's failure to provide information about a third party that was potentially responsible for the murders violated Brady and Petitioner's right to due process, (2) defense counsels' failure to independently investigate and develop a third party culpability defense deprived him of the effective assistance of counsel, and (3) the combination of these violations infringed on his right to testify.  (SAP at 70-81.) Petitioner requests an evidentiary hearing on this claim.  (Id. at 55.)

This claim, aside from the allegations of ineffective assistance of counsel at trial and on appeal, were raised in the first state habeas petition and summarily denied on the merits by the California Supreme Court.  (See Lodgment Nos. 106, 118.)  The aspect of this claim alleging ineffective assistance of counsel was raised in the second state habeas petition, which the California Supreme Court rejected on the merits in addition to holding it was procedurally barred.  (See Lodgment Nos. 120, 124.)  For the reasons discussed above in section III.A., the Court will reach the merits of this claim.

### A.  Brady

As stated above in the discussion of Claim 13, in Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id., 373 U.S. at 87.  "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must

136

have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

Under <u>Brady</u>, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995). Yet, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." <u>Bagley</u>, 473 U.S. at 675 (footnote omitted). "Under <u>Brady</u>'s suppression prong, if 'the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence,' the government's failure to bring the evidence to the direct attention of the defense does not constitute 'suppression.'" <u>Cunningham v. Wong</u>, 704 F.3d 1143, 1154 (9th Cir. 2013), quoting <u>Raley v. Ylst</u>, 470 F.3d 792, 804 (9th Cir. 2006).

During the investigation of the murders, several reports were turned over to the defense concerning an individual named David Luna. Investigator Oliver's May 18, 1993, report stated that in a January 25, 1993, conversation, James Johnson told investigators Weil and Oliver that: "David Luna's brother, Chris, told him the Magoon's [sic] were killed at the direction of David." (Lodgment No. 109, Ex. 32.) Oliver's report also stated that "[a]ttempts to identify David and Chris Luna based on the information provided by Mr. Johnson were subsequently made by Detective Weil and I with negative results." (<u>Id.</u>)

Investigator Weil completed a report of this same interview of James Johnson, dated June 24, 1993, which was also turned over to the defense. In the report, Weil stated that: "During the course of the interview with Mr. Johnson, he related that it came to his attention from an unnamed source that the murders of Daniel and May [sic] Magoon were planned by members of the Luna family. Johnson would not name his source but said that the source identified the brothers David and Chris Luna as being involved in the murders. Johnson went on to say that his source informed him that Chris Luna was currently in the Metropolitan Correction Center in downtown San Diego on some unrelated drug charges. Johnson went on to say that his source stated that during the time that the Magoons were murdered, the Luna brothers were living in the Jamul area of San Diego county. Johnson

09cv0388 L (NLS)

said his source did not know any other information other than whet [sic] he had just told us about the Lunas and their possible whereabouts." (Id., Ex. 33 at 1.) Weil's report further stated that he and Oliver unsuccessfully attempted to identify David and Chris Luna "through federal, state and local computer inquiries," similarly failed to locate Chris Luna at the MCC in San Diego, and that "[n]o Christopher or David Luna being brothers could be identified, and no dates of birth were discovered." (Id.) Both parties agree that these documents were turned over to defense counsel, and that the defense was aware that James Johnson had named David Luna as an individual that may have been involved in the commission of the Magoon murders. (SAP at 70-71, Ans. Mem. at 72.) A discovery receipt reflects that the Weil and Oliver reports were turned over to the defense in July 1993. (Lodgment No. 109, Ex. 33 at 2.)

However, in February 1993 the prosecution also obtained David Luna's identifying details, which were not disclosed, including Luna's fingerprints, date of birth, social security number, and information about prior arrests. (Id., Exs. 34, 35.) Petitioner argues that the information was material and that the failure to disclose these details about Luna violated Brady, as follows: "These documents were never turned over to the defense, notwithstanding the fact that they contained identifying information that would have made it significantly easier for defense counsel to locate David Luna, as well as additional information regarding his history of violence to use in building a third party culpability defense." (Reply at 72) (emphasis in original). Petitioner asserts that "[t]he undisclosed information confirmed that David Luna was a real person with a specific physical description and a history of arrests for violent assaultive conduct that made him a very strong contender as the actual third party perpetrator of the Magoon murders." (Pet. Brief at 29.)

The California Supreme Court's rejection of Petitioner's Brady claim was reasonable because Petitioner fails to demonstrate that David Luna's identifying information was itself either exculpatory or material. In United States v. Agurs, 427 U.S. 97 (1976), the Supreme Court clearly stated that "there is 'no constitutional requirement

that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case,'" and held that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Id., 427 U.S. at 109-11 (footnote omitted), quoting Moore v. Illinois, 408 U.S. 786, 795 (1972). Here, Petitioner was apprised of the favorable evidence in this case, that a man named David Luna, who lived in the Jamul area and had a brother in jail named Chris, may have ordered the Magoon murders. Defense investigator Paul Pickering acknowledged that the defense was aware of the reports about Johnson and Luna, and Pickering stated that he asked several witnesses about David Luna. (Lodgment No. 107, Ex. 8 at 3-4.) The prosecution provided the defense with the "essential facts," including Luna's name, general location, and possible involvement, that would allow the defense to pursue a third party culpability defense. See Cunningham, 704 F.3d at 1154, quoting Raley, 470 F.3d at 804. That Luna's date of birth and other information may have made it easier to locate him does not suffice to state a Brady violation. The California Supreme Court could have reasonably rejected this claim for failure to establish a Brady violation on this basis.

Additionally, as discussed in detail below with respect to Petitioner's related claim of ineffective assistance of counsel, even were Petitioner able to show that the prosecution's failure to turn over this information amounted to a Brady violation, the California Supreme Court could also have reasonably denied the claim for failure to demonstrate prejudice.

///
///
///
///
///
///
///

## B.  Ineffective Assistance of Counsel

Petitioner separately contends trial counsel was ineffective for failing to conduct an adequate investigation of the third party culpability defense and for failing to present the defense at trial.  (SAP at 72-80.)  He also asserts that state appellate counsel was ineffective for failing to raise this claim in the first state habeas petition.[16]  (Id.)

As noted above, "a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel."  Mirzayance, 556 U.S. at 122, citing Strickland, 466 U.S. at 687.

Pursuant to Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Id. at 691. With respect to performance, Petitioner asserts that "trial counsel was put on notice of a third party culpability defense, but made initial and ineffectual efforts to pursue it, as documented in the declarations of investigator Paul Pickering and case manager Bunny Amendola."  (Pet. Brief at 33-34.)  Yet the record reflects that defense counsel made numerous efforts, unsuccessful as they were, to investigate alternate suspects and theories

_____

[16] Petitioner appears to raise this contention as both an independent claim of ineffective assistance of counsel and as cause to excuse the procedural default of his ineffective assistance of trial counsel claim, as he asserts that he "is entitled to a ruling on the merits of this IAC claim as well as a ruling on the merits of the IAC claim as to trial counsel." (SAP at 80.)  For reasons discussed previously in this Order, the Court will reach the merits of the ineffective assistance of trial counsel claim regardless of the California Supreme Court's imposition of state procedural bars.

With respect to Petitioner's independent claim of ineffective assistance of state habeas counsel, such an argument fails to find support in clearly established law.  See Coleman, 501 U.S. at 752 ("There is no constitutional right to an attorney in state post-conviction proceedings."), citing Pennsylvania v. Finley, 481 U.S. 551 (1987) and Murray v. Giarratano, 492 U.S. 1 (1989).  "Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings."  Coleman, 501 U.S. at 752, citing Wainwright v. Torna, 455 U.S. 586 (1982) (per curiam); see also 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.")

of the crime. Pickering states that after reading the reports about Johnson and Luna, he "thought there was a good chance Johnson was telling the truth," but while Pickering asked several witnesses about David Luna, "they claimed they didn't know the name; we didn't have anything but a name to go on." (Lodgment No. 107, Ex. 8 at 3.) Amendola states that the defense "believed Dan Magoon was running drugs with Conrado Mejia" and that they "were hoping to find another organization that wanted Magoon dead." (Lodgment No. 110, Ex. 48 at 2.) Amendola mentions that the defense obtained the names of several individuals with the Arellano Felix cartel through the federal case against Mejia, but "we had nothing else that was really substantial." (Id.) In a 2011 declaration submitted in support of the second state habeas petition, Pickering states that "[w]e followed every lead which turned up during our investigation, including, trying to identify third parties who had motive to harm the Magoons. There was never a tactical decision made by the defense team to abandon the investigation into third party culpability in the killings of the Magoons." (Lodgment No. 123, Ex. 9 at 2.) In a 2011 declaration in support of the second state petition, Amendola similarly states that "[w]e followed every lead, including trying to identify the many third parties who had motive to harm the Magoons. The trial team entertained every possible defense theory, particularly the notion that some third party was guilty of killing the Magoons. In my mind, the case was always a 'who done it' type of case. I remain convinced to this day that other, third parties were involved in the Magoon killings. To my knowledge, there was never a tactical decision made by the defense team to abandon the investigation into third party culpability in the killings of the Magoons." (Id., Ex. 10 at 2.)

Petitioner contends that much more information has since been unearthed and could have been presented had the trial defense team properly investigated a third party theory of the murders. Kevin Gordon, an investigator who worked with Petitioner's state habeas attorneys, outlines his conversations with James Johnson, who declined to provide a declaration in support of those proceedings. (Lodgment No. 109, Ex. 36 at 1.) Gordon relates that Johnson and Daniel Magoon smuggled drugs in the 1970's and 1980's with a

man they called Conrad or the "Old Man," left the work for a time and then returned in early 1990's when both needed money.  (Id.)  Gordon states that: "Conrad agreed to work with them again and put them in touch with a relative in the Jamul/Spring Valley area who was basically doing what they had been doing before - providing safe transport for Conrad's drugs after they crossed the border to places further north."  (Id.)  Johnson also told him that: "A few months before the crime, Dan also started dealing with several Mexicans named Jaime, Oscar, Armando, and Gabrielle.  They had nothing to do with Conrad."  (Id.)  Johnson stated that Daniel Magoon sold these individuals weapons in exchange for money and marijuana, and that at some point, these individuals started to owe Daniel money which Daniel went to lengths to collect, including going to Mexico.  (Id. at 2.)  Johnson told Gordon that: "The days before the murder, he and Dan were preparing to move a load for Conrad," that "[t]he marijuana was going to be brought across the border in a car" and that Johnson was expected to monitor a police scanner and follow the car to a safe house where "he and Dan would then move the drugs to another car with a special compartment and then move that car north towards Los Angeles."  (Id.)  On the evening prior to the expected activity, Daniel Magoon seemed nervous about the run and did some cocaine at Johnson's home, and then "Dan had to go home to meet this relative of Conrad who was dropping off the car that they would use to move the load north," who always came by around 10 or 11 p.m.  (Id. at 3.)

Johnson also reiterated and elaborated on the information concerning David Luna as a potential suspect.  After the murders, Johnson stated that: "A friend of his called him up and said there might be someone that he should talk to.  He met with this other person who told him that Dan and Mary's murders were a hit ordered by David Luna."  (Id.)  Johnson told Gordon he obtained this information from a person who knew someone who had been in the MCC jail with David's brother Chris, and that "[t]he person in jail who heard this information passed it along to relatives so they would know to stay away from David Luna."  (Id.)  According to Johnson, "David Luna was the relative of Conrad who he (Johnson) and Dan had been working with for the last few months," and Luna lived on a

ranch just a few miles from Steele Canyon Road, the road the Magoon home was located on. (Id.) Johnson told Gordon that "Dan had trusted Luna because Luna was somehow related to Conrad." (Id. at 3-4.) Johnson also stated that in the weeks or months before the murders, Daniel asked Luna for help with the Mexicans that owed him money and "asked Luna to go down to Ensenada and pressure these guys to pay up what they owed." (Id. at 4.) Johnson added that: "He was also the person who was supposed to bring by the transport car the night of the crime. The day after the murder, he (Johnson) drove to the Luna residence to inform him what had happened but was told by Luna's father that Luna had left town for several days." (Id.) Based on the name David Luna and fingerprint records, Gordon located the 1992 home address of a man named David Luna, which was located in the area described by Johnson. (Id.)

Federal habeas investigator Apolinar Echeverria, who previously worked in various capacities in law enforcement and investigation for both the prosecution and defense for the past thirty years, states that had he worked on this case, he would have actively investigated David Luna, Conrad Mejia and other drug and weapons traffickers in the Jamul and Tecate areas. (Lodgment No. 120, Ex. 6 at 1-4.) Echeverria also states that co-defendant Alvarado's investigator "previously worked for, or associated with" individuals involved in trafficking and that that investigator's brother "was actively working for the cartel at the time of the killings." (Id. at 4.) Echeverria states that "[i]t was well known in 1992 that the Alvarado family were very active smugglers in the Tecate area," that the family remains involved in trafficking and their "reputation for violence is well known in that area." (Id. at 4-5.) Echeverria states that Oscar Tirado, whose identification was found in a vehicle on the Magoon property, and Gabriel Villavicencio, among others, "were known drug traffickers," were tied to Daniel Magoon and were seen on the Magoon property during the month prior to the murders. (Id. at 5.) Echeverria also detailed the smuggling activities and violence employed by individuals involved in the Tijuana Cartel around this time and states that Efrain Perez, who was "responsible for organizing the receipt and importation into the United States of the Tijuana Cartel's shipments of illegal

drugs, including marijuana," was, along with other individuals involved in these activities "seen at the Magoon residence on several occasions in the week prior to the killings on May 26, 1992. The Tijuana Cartel and its associates should have been investigated in connection with the Magoon killings." (Id. at 5-6.) Echeverria also states that: "I have learned that just prior to the Magoon killings, the Magoons lost a large load of marijuana either while in transit or in the State of Washington. Due to the temporal proximity of the loss of this load and the known propensity for violence of drug trafficking organizations likely responsible for the marijuana, this lead should have been actively followed up." (Id. at 7.)

Again, it is apparent from the record that the defense possessed Johnson's initial statement pointing to David Luna as a possible suspect in the murders and conducted inquiry into that information. Defense investigator Pickering recalled asking witnesses about Luna, but failed to obtain information on him. Similarly, defense counsel Herrera states that "Pickering wanted to develop the larger picture, & explore connections with *narcotraficantes* who might have had problems with Daniel Magoon. We allowed him to investigate this issue, while reminding him to be careful, and not let himself get killed." (Lodgment No. 110, Ex. 44 at 5) (emphasis in original.) Herrera states that his co-counsel "became frustrated at what he thought was a 'fishing expedition,' and delegated that line of investigation to me." (Id. at 5.) Herrera states that Pickering "came up with suggestive leads, but nothing sufficiently concrete to present as evidence." (Id. at 6.) The record also reflects that the defense was aware of Oscar Tirado's connection to the case, as the defense subpoenaed Tirado as a potential trial witness and later decided against calling him to testify. (RT 3668.) Thus, at a minimum, it is evident that the defense conducted an investigation into potential alternate suspects. Herrera's statement that the investigation resulted in "nothing sufficiently concrete to present as evidence," reflects a considered choice, and is entitled to at least some deference. See Strickland, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on

investigation."); <u>Siripongs v. Calderon</u>, 133 F.3d 732, 736 (9th Cir. 1998) ("[T]he relevant inquiry under <u>Strickland</u> is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."); <u>Richter</u>, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.")

Even were the Court to assume, without deciding, that counsel acted deficiently in failing to adequately investigate the third party culpability defense and obtain the information set forth above, the California Supreme Court's rejection of this claim was not contrary to, nor an unreasonable application of <u>Strickland</u> because the California Supreme Court could have reasonably rejected the claim for lack of prejudice. <u>See</u> <u>Strickland</u>, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.")

With respect to the admission of evidence of third party culpability, the Ninth Circuit has noted that:

> Under California law, [a defendant] has a right to present evidence of third party culpability if it is capable of raising a reasonable doubt about his own guilt. <u>See</u> <u>People v. Hall</u>, 41 Cal. 3d 826, 833, 226 Cal.Rptr. 112, 116, 718 P.2d 99 (1986). In order for evidence of another suspect to be admissible, however, "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." <u>Id.</u> Motive or opportunity is not enough." <u>Id.</u>

<u>Spivey v. Rocha</u>, 194 F.3d 971, 978 (9th Cir. 1999). The Ninth Circuit has also stated that "[e]vidence of third party culpability is not admissible 'if it simply affords a possible ground of suspicion against such person; rather, *it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense*.'" <u>People of Territory of Guam v. Ignacio</u>, 10 F.3d 608, 615 (9th Cir. 1993), quoting <u>Perry v. Rushen</u>, 713 F.2d 1447, 1449 (9th Cir. 1983) (emphasis in original).

Petitioner contends that "the declaration of private investigator Apolinar Echeverria summarizes the strong showing as to the likely involvement of David Luna and his drug-smuggling cohorts in the Magoon murders." (Pet. Brief at 34.) But Petitioner merely shows that David Luna, or other individuals, had a potential motive or opportunity to commit the murders independent of Petitioner, and this showing fails to "directly connect" any of these individuals to the murders. That David Luna owned property in the vicinity of the victims and was likely involved in drug dealing activities with Daniel Magoon offers, at most, that Luna may have had a motive to kill Daniel Magoon. Setting aside the fact that investigator Gordon's declaration relays second-hand information from his conversations with James Johnson, Johnson's statements that he and Daniel Magoon worked with Luna and that Luna was expected at the Magoon home on the evening of the murders in the course of their mutual drug smuggling activities demonstrates only that David Luna may have also had the opportunity to commit the murders. Petitioner fails to offer evidence that David Luna was actually at the Magoon home that evening, nor any evidence to substantiate his assertion that Luna committed, ordered, or was at all involved in, the murders. Even were the Court to assume as true that the Magoons were responsible for a missing or stolen drug shipment shortly before the murders, despite Petitioner's failure to substantiate the basis for this assertion, this does not actually link David Luna to the commission of the murders. Evidence of a missing drug shipment only provides another possible motive, which is still inadmissible unless accompanied by actual evidence connecting Luna to the crimes. See Spivey, 194 F.3d at 978.

Indeed, Petitioner's argument, premised on the unsupported assertion that the murders were motivated by an intercepted or lost drug shipment, is not even limited to David Luna. Petitioner instead posits that missing drugs "would have put the Magoons in deep trouble with the Mexican suppliers of the shipment, triggering a violent response likely engineered by David Luna at the behest of Conrado Mejia, or at the behest of a different cartel whose shipment of contraband was lost on the Magoons' watch." (Pet. Brief at 34.) As with the allegations concerning Luna, Petitioner's assertions are

speculative and are not supported by evidence.

"The pivotal question is whether the state court's application of the Strickland standard was unreasonable." Richter, 562 U.S. at 101. Here, because the evidence Petitioner presents "simply affords a possible ground of suspicion against" David Luna, Conrad Mejia, and other individuals linked to cartel and drug smuggling activities, it is not admissible under California law, given the lack of any evidence connecting those individuals to the murders or the crime scene. Ignacio, 10 F.3d at 615. Counsel cannot be faulted to failing to obtain and attempt to present a third party theory in this manner, as the evidence he advances is not "capable of raising a reasonable doubt about his own guilt." Spivey, 194 F.3d at 978, quoting Hall, 41 Cal. 3d at 833. Meanwhile, the evidence at trial clearly connected Petitioner and Alvarado to both the crime scene and the murders, including but not limited to Alvarado's fingerprint at the crime scene, blood evidence, nine millimeter bullets found both at the crime scene and in Alvarado's car, the Helwan box at the Magoon home, the Helwan pistol found in the car, and the large amount of frozen marijuana in the car's trunk wrapped with tape containing Daniel Magoon's fingerprint.

Based on a review of the record and the materials proffered by Petitioner in support of a prospective third party culpability defense, the Court is not persuaded that there is "a reasonable probability that, but for counsel's unprofessional errors" in failing to adequately pursue and present this defense at trial, "the result of the proceeding would have been different." See Strickland, 466 U.S. at 694, see also Richter, 526 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.") The California Supreme Court could have reasonably denied this claim for failure to demonstrate prejudice, and the rejection of this claim was neither contrary to, nor involved an unreasonable application of, Strickland.

## C.  **Right to Testify**

Petitioner argues that "[t]he combination of prosecutorial suppression of exculpatory evidence regarding third party culpability and defense counsel's failure to investigate based on what information was available combined to infringe petitioner's right to testify." (SAP

at 80.) Specifically, Petitioner asserts that "[h]ad defense counsel adequately investigated the third party culpability defense to the effect that the Magoons were killed as part of a falling out between drug traffickers unrelated to petitioner, counsel would likely have agreed to petitioner's adamant assertions that he wanted to testify that he was not involved in the Magoon murders, which would have been consistent with and corroborated by the third party culpability defense." (Id. at 80-81.)

"At this point in the development of our adversary system, it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." Rock, 483 U.S. at 49. Here, however, because both his Brady and claim of ineffective assistance of counsel with respect to the third party culpability defense are without merit, Petitioner cannot demonstrate that these alleged errors impacted or infringed his right to testify. That is because the evidence presented in support of the prospective third party culpability defense is not "capable of raising a reasonable doubt about his own guilt." Spivey, 194 F.3d at 978, quoting Hall, 41 Cal. 3d at 833. As this evidence is not admissible under California law, Petitioner cannot demonstrate a violation of his constitutional rights in this regard.

Petitioner fails to show that the California Supreme Court's rejection of Claim 14 was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Petitioner is not entitled to an evidentiary hearing on Claim 14. See Sully, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.")

### 3. Claim 15

Petitioner asserts that the prosecutor made a number of misleading statements in opening argument about the blood evidence, which were "substantial exaggerations if not entirely fabrications of what the forensic evidence could actually support," and defense counsel failed to object to the statements, violating his rights to due process and the effective assistance of counsel. (SAP at 81.) Petitioner requests an evidentiary hearing on this claim. (Id. at 55.)

148

Petitioner raised this claim as Claim 5 in the first state habeas petition. (Lodgment No. 106.) The California Supreme Court summarily denied the claim on the merits and alternately held that aside from the allegation of ineffective assistance of counsel, the claim was barred because it could have been but was not raised on appeal, citing to <u>Dixon</u>. (Lodgment No. 118.) For the reasons discussed above in section III.A., the Court will address the merits of this claim.

As stated above, to warrant habeas relief, prosecutorial misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden</u>, 477 U.S. at 181, quoting <u>Donnelly</u>, 416 U.S. at 643. "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" <u>Darden</u>, 477 U.S. at 181, quoting <u>Darden v. Wainwright</u>, 699 F.2d 1031, 1036 (11th Cir. 1983). Again, this is because "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." <u>Smith</u>, 455 U.S. at 219. Alleged instances of misconduct must be reviewed "in the context of the entire trial." <u>Donnelly</u>, 416 U.S. at 639; <u>see</u> <u>also</u> <u>Greer</u>, 483 U.S. at 765-66, citing <u>Darden</u>, 477 U.S. at 179 and <u>Donnelly</u>, 416 U.S. at 639. Habeas relief is warranted only if the error "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.

During opening arguments at the guilt phase proceedings, the prosecutor previewed anticipated expert witness testimony about the blood and DNA evidence, in part as follows:

> There is going to be numerous people to come in to try and help put things together for you. They are called expert witnesses. One of the expert witnesses you are going to hear from is a man by the name of Gary Harmor. Gary Harmor does serology; Gary Harmor tests blood. He does a technique involving what's called PCR/DNA to determine where blood - - what the blood source is. And what they do is either include people or exclude people as being the source of the blood.

> In this case the pants that Mr. Hoyos was wearing when he was arrested a little over an hour after the killings were examined and the pants had blood on them. Not only did the pants contain the blood of Mr. Hoyos, but they had

09cv0388 L (NLS)

small what are called high velocity spatters belonging to Mary Magoon and [J.] Magoon. The air rifle that I showed you had some blood removed or some samples removed from the barrel and from the trigger guard. The blood sample from the barrel came back to Mary Magoon, from the trigger guard Mr. Hoyos. There is a Ruger in there. On the trigger guard that has the blood of Mr. Hoyos on it.

(RT 2862-63.)

First, the record does not support a conclusion that the prosecutor's opening argument contained "substantial exaggerations if not entirely fabrications" about the blood evidence. The expert testimony offered was consistent with the prosecutor's argument that the blood evidence "came back" to the named individuals. The prosecutor succinctly prefaced the contested comments about the blood evidence by accurately stating that the job of a serologist such as Harmor was to "either include people or exclude people as being the source of the blood." (RT 2862.)

At trial, Gary Harmor testified that six individuals were tested against the blood evidence - the four Magoon family members and the two co-defendants. With respect to the blood found on the trigger guard of the Ruger, Harmor stated that all of the individuals were excluded except for Petitioner, as follows: "If we look at the 6 different knowns that were submitted, Jaime Hoyos is the only one that's a 1.1, 1.2. So he could be the donor of that." (RT 3696.) Harmor testified that the results of testing the blood on the air rifle trigger guard "are consistent with Jaime Hoyos but excludes the other people listed on this chart." (RT 3698.) With respect to the blood on the barrel of that air rifle, Harmor stated that: "Mary Magoon would be included as a potential donor for this stain, but the other 5 individuals would be eliminated." (RT 3699.)

Harmor also testified about blood stains found on several different areas of Petitioner's pants, stating that "only Jaime Hoyos could be the donors of the samples 1 through 8." (RT 3701.) Concerning another stain found on the lower pant leg, Harmor testified that: "Mary Magoon would be the potential donor of that type. She's in the group that could have donated it, and the other 5 people are excluded." (RT 3702.) Harmor stated

09cv0388 L (NLS)

that yet another stain had two potential donors, including Daniel Magoon and the Magoons' youngest son J., while the other four individuals were excluded. (RT 3703.) On cross-examination, defense counsel elicited that with respect to the samples that came back to Hoyos, Harmor could not definitively state that the blood belonged to Petitioner, explaining that: "I can say it's consistent with people like him, but I can't say it's from him only." (RT 3718.)

Petitioner argues that the prosecutor's remarks about the blood on Petitioner's pants and on the Ruger originating from Petitioner constituted prejudicial misconduct because: "Neither statement was supported by the actual evidence, but the jury had no reason to know that, and therefore would have been biased against Petitioner even before the beginning of evidence." (Pet. Brief at 37.) First, consistent with the prosecutor's argument, Harmor testified that several blood stains on Petitioner's pants and those on the Ruger excluded those tested, but included Petitioner. More importantly to the claim presented here, Petitioner fails to offer any evidence to support his assertion that the prosecutor's argument biased the jury against him. A review of the entire record supports the opposite conclusion, as prior to opening arguments, the trial court specifically directed the jurors to keep an open mind throughout the proceedings and to refrain from making any decision until the conclusion of the evidence, instructing:

> So don't decide this case based upon the opening statements of the lawyers. Don't decide this case based upon the first witness that's called on direct examination or cross examination, or the second or the third or whatever witnesses may be called. Wait until all evidence is presented by all parties, both in the sense of prosecution evidence, defense evidence, rebuttal evidence, whatever evidence is offered by anybody. Wait till all the evidence is in, and reserve judgment until everything is in and then I give you the instructions on the law.
>
> So we all have a tendency to, potentially anyway, rush to judgment. Don't do that. Keep an open mind until this matter is entirely concluded.

(RT 2776.) Immediately prior to opening statements, the trial court also explicitly instructed the jurors that the arguments of counsel were not evidence, as follows:

151

> The opening statements of the lawyers in any case, of course, do not constitute evidence. The evidence that you will be hearing comes from the witness stand. The evidence is comprised of the sworn testimony of witnesses, documents that may be introduced, diaphragms [sic], photographs and so forth. The lawyers' statements to you, while not evidence, could best be characterized, I suppose, as a description of what the lawyers feel will, in fact, be forthcoming during the evidentiary portion of the trial.

(RT 2851.) The trial court repeated this admonition at the end of the guilt phase, reminding the jurors that: "Statements made by the attorneys during the trial are not evidence." (RT 4261.)

A jury is presumed to understand and follow the trial court's instructions. <u>Weeks</u>, 528 U.S. at 234; <u>Marsh</u>, 481 U.S. at 211; <u>see also</u> <u>Miller</u>, 483 U.S. at 766 n.8 ("We normally presume a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, . . . .") As the record is absent any indication that the jurors exhibited any confusion about these instructions, this Court must therefore presume the jurors comprehended and followed the trial court's direction. Petitioner fails to show that the prosecutor's argument was improper, much less that it "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden</u>, 477 U.S. at 181, quoting <u>Donnelly</u>, 416 U.S. at 643.

Even if Petitioner could demonstrate misconduct, in light of the trial court's clear instructions to the jury that the statements of counsel were not evidence and cautioning them to refrain from making any judgment until the close of evidence, the Court cannot conclude that these comments had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637; <u>see also</u> <u>Wood v. Ryan</u>, 693 F.3d 1104, 1113 (9th Cir. 2012) ("On habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'"), quoting <u>Brecht</u>, 507 U.S. at 637-38.

As the comments at issue here did not constitute misconduct, the Court cannot fault trial counsel for failing to object. Indeed, the Ninth Circuit has recognized that "[b]ecause

152

many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." Cunningham, 704 F.3d at 1159, quoting United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993) (bracket in original).

In any event, the claim is without merit because Petitioner fails to demonstrate prejudice. See Mirzayance, 556 U.S. at 122 ("[A] defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel."), citing Strickland, 466 U.S. at 687. In view of the fact that the jury was repeatedly instructed that the arguments of counsel were not evidence, and were further cautioned to keep an open mind until the presentation of evidence was concluded, the Court finds no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Based on a review of the remarks in the context of the entire record, the Court cannot conclude that the California Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief or an evidentiary hearing on Claim 15. See Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is *not* required on issues that can be resolved by reference to the state court record.")

### 4. Claim 16

Petitioner contends that the prosecutor also committed misconduct during guilt phase closing arguments when he "argued to the jury that the forensic methodology used to analyze the spot of blood found on petitioner's pants was invented by a Nobel Prize winner, thus vouching for its reliability, and that this prize winning methodology established there was a 93 to 94 percent chance that the blood was that of Mary Magoon," which violated Petitioner's due process rights. (SAP at 82.) Petitioner also alleges that trial counsel's failure to object constituted ineffective assistance of counsel. (Id.)

Petitioner requests an evidentiary hearing on this claim. (Id. at 55.)

Petitioner raised this claim as Claim 8 in the first state habeas petition. (Lodgment No. 106.) The California Supreme Court summarily denied the claim on the merits and alternately held that aside from the allegation of ineffective assistance of counsel, the claim was barred because it was not preserved in the trial court. (Lodgment No. 118.) For the reasons discussed above in the section III.A., the Court will address the merits of this claim.

At trial, serologist Gary Harmor testified about DNA testing, and in particular, the PCR method for copying and testing small samples of genetic material. Harmor testified that the developer of the method, Kary Mullis, had recently received a Nobel prize. (RT 3682.) Discussing the potential usefulness of the method in comparing samples, Harmor was asked if the test was used as an "excluder" or an "includer," and testified that:

> Its main purpose is as an excluder because the power of the test is about 93 percent to 94 percent. In other words, what that means is that if you were to take my blood and the court reporter's blood and test it, 94 percent of the time we would be able to tell the difference between the two of us. 6 percent of the time we would match by chance. [¶] So it's basically most useful as an excluder. That's the most definitive statement we can say.

(RT 3682-83.)

During closing arguments, defense counsel referenced the blood testing and Harmor's testimony on the matter, and argued the following:

> Now, Mr. Harmor gave his own example of the unreliability of the PCR testing. If you recall he gave the example of if, for example, a test was made of his blood and the court reporter's blood, he said that if you did it a hundred times, 6 percent of the time or 6 times it will come back a match. So out of a hundred times - - and you can check the transcript - - he said that 6 percent of the time there is a mistake. So you have a 6 percent error ratio in this, in the PCR testing. [¶] Now to reverse that, if you took two samples of his own blood, then, of course, tested it a hundred times, then 6 times it will come back not his blood and 94 times his blood, if you took the same samples and tested them.

(RT 4097-98.) Defense counsel then went on to challenge the numbers and percentages Harmor discussed during his testimony. (RT 4098-4107.)

154

During rebuttal argument, the prosecutor addressed defense counsel's closing and discussion of Harmor's testimony, as follows:

> Mr. Herrera talked to you about D.N.A., the D.N.A. evidence with respect to Gary Harmor. He told you that there was a six percent error in D.N.A. evidence, a six percent error. So out of every hundred times you test it and use the court reporter and Mr. Harmor as an example, every hundred times you test it, six percent of the time there could be an error.
>
> Let's hear what Mr. Harmor said because it wasn't read to you.
>
> Question, "Is this method used - - I think you mentioned it, but just to reiterate, is it an excluder or includer?"
>
> The Court: Please read slowly for the benefit of our court reporter.
>
> Mr. Greenberg: I will. I'm sorry.
>
> Answer, "Its main purpose is as an excluder because the power of the test is about 93 percent to 94 percent. In other words, what that means is that if you were to take my blood and the court reporter's blood and test it, 94 percent of the time we would be able to tell the difference between the two of us. Six percent of the time we would match by chance."
>
> Not error, by chance. There is no error. A man won a Nobel prize for this technique. There is no error.

(RT 4197-98.) After a brief discussion of the blood sample statistics and population studies, the prosecutor again referenced the testing method, stating: "There was a Nobel prize. It's used to detect genetic disease, sickle cell anemia, anthropologists use it. This is a reliable technique, no doubt about it." (RT 4198.)

The Court finds no error in this argument. The prosecutor quoted directly from the trial transcript in referencing Harmor's testimony about the PCR method, and again referenced Harmor's testimony that the scientist who formulated that procedure won a Nobel prize. Moreover, a review of the record clearly reflects that the remarks here were made in direct response to the closing arguments of defense counsel, who argued that there was a "6 percent error ratio" in the testing method. Thus, even were the Court to conclude

that the remarks are improper, it is clear that the rebuttal comments were an "invited response" to the defense's closing argument, and in context, did not constitute misconduct. See United States v. Young, 470 U.S. 1, 5, 12-14 (1985) (improper prosecutorial remarks on rebuttal did not rise "to the level of 'plain error' when he responded to defense counsel" by expressing his belief in the defendant's guilt because defense counsel's closing argument asserted "that the Government did not believe in its own case.")  The Supreme Court has emphasized that:

> In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo.  Thus the import of the evaluation has been that if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction.

Id. at 12-13.  Here, the remarks were obviously made as a direct response to defense counsel's assertion that the 6 percent figure represented an "error ratio" and that Harmor had discussed the unreliability of the testing method.  The prosecutor quoted from and referenced Harmor's trial testimony in clear rebuttal to the defense's allegations.  If there was any error, it was invited by defense counsel's own arguments, and in any event did not "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden, 477 U.S. at 181, quoting Donnelly, 416 U.S. at 643.  Finally, as noted above with respect to Claim 15, at the conclusion of counsels' guilt phase arguments, the trial court again reminded the jurors that: "Statements made by the attorneys during the trial are not evidence."  (RT 4261.)  Again, the jury is presumed to understand and follow the trial court's instructions.  Weeks, 528 U.S. at 234; Richardson, 481 U.S. at 211; see also Greer, 483 U.S. at 766 n.8.

Accordingly, considering the remarks in the context of the trial as a whole, because the comments were a direct and equivalent response to defense counsel's own argument, consisted of direct citations and references to trial testimony, and the trial court repeatedly reminded the jurors that the arguments of counsel were not evidence, Petitioner cannot

demonstrate that the prosecutor's rebuttal argument had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.

With respect to Petitioner's claim of ineffective assistance of counsel for failing to object to the rebuttal argument, as noted above, a counsel's failure to object to argument is generally considered to be within the "'wide range' of permissible professional legal conduct." <u>Cunningham</u>, 704 F.3d at 1159, quoting <u>Necoechea</u>, 986 F.2d at 1281. Considering that the comments at issue were a response to defense counsel's own argument and consisted, in large part, of direct quotations to trial testimony, the Court does not find that the argument contained any such "egregious misstatements" that should have reasonably engendered an objection from defense counsel. At any rate, the contention also fails for lack of prejudice, because the remarks did not rise to the level of constitutional error and the Court finds no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

Based on a review of the rebuttal argument in the context of the entire record, Petitioner has not demonstrated that the California Supreme Court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Neither habeas relief nor an evidentiary hearing is warranted on Claim 16. <u>See</u> <u>Totten</u>, 137 F.3d at 1176 ("[A]n evidentiary hearing is *not* required on issues that can be resolved by reference to the state court record.")

**D.    Additional Claims of Ineffective Assistance of Counsel**

**1.    Claim 17**

Petitioner alleges that trial counsel rendered ineffective assistance in failing to pursue a ruling on the admissibility of Petitioner's custodial statements to police, asserting that the statements were involuntary because Petitioner had requested an attorney during an interrogation that took place two days earlier. (SAP at 85-87.) Petitioner requests an evidentiary hearing on this claim. (<u>Id.</u> at 55.)

157

Petitioner raised this claim as Claim II in the first state habeas petition, and the California Supreme Court rejected it on the merits without a statement of reasoning. (See Lodgment Nos. 106, 118.)

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held in part that after a person held for interrogation is provided with the required warnings, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474. Later, in Edwards v. Arizona, 451 U.S. 477 (1981), the Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85 (footnote omitted); see also Arizona v. Roberson, 486 U.S. 675, 683 (1988) ("As a matter of law, the presumption raised by a suspect's request for counsel - that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance - does not disappear suddenly because the police have approached the suspect, still in custody, still without counsel, about a separate investigation."); see also Maryland v. Shatzer, 559 U.S. 98, 109-11 (2010) (affirming that "the [Edwards] prohibition applies, of course, when the subsequent interrogation pertains to a different crime, when it is conducted by a different law enforcement authority, and even when the suspect has met with an attorney after the first interrogation," but holding that it does not apply when there has been a break in custody longer than fourteen days) (internal citations omitted).

Petitioner and his co-defendant Alvarado were arrested in the early morning hours of May 27, 1992, on drug and weapons charges. (Lodgment No. 107, Exs. 9, 12.) At the El Cajon Police Department, Petitioner was separated from Alvarado and interviewed, with a border patrol agent acting as a Spanish language interpreter. (Id., Ex. 12.) Petitioner was

09cv0388 L (NLS)

advised of his rights in Spanish, stated that he understood those rights and "requested to speak with an attorney prior to any questioning. Subsequently so, no statements were obtained of him." (Id.) At 9 p.m. on May 29, 1992, two detectives with the Sheriff's Homicide Detail interviewed Petitioner at the San Diego central jail. (Id., Ex. 11.) The detectives stated that they wanted to talk to Petitioner about the homicides in Jamul, indicated that the interview would be conducted in Spanish and read Petitioner his Miranda rights, to which Petitioner stated he understood his rights. (Id. at 1-2.) The officers asked what Petitioner knew about the murders and Petitioner stated that "I didn't have anything to do with that." (Id. at 3.) Petitioner stated that he was with his wife and children that evening in El Cajon, and discussed his whereabouts and activities that day and evening. (Id. at 3-12.) Petitioner denied knowing anything about the homicides, where the gun or marijuana found in the car came from, and denied that he killed the victims. (Id. at 11-13.) Petitioner denied ever being in the home, denied knowing the Magoons, but acknowledged knowing the area where the house was located. (Id. at 13-17.) Petitioner also repeatedly denied knowing where the marijuana found in the car came from, and denied knowing about the gun or rifles in the home or car. (Id. at 18-20.) He denied knowing anything about the shooting of the Magoons' young son. (Id. at 22-23.) After Petitioner was asked, "Or are you so cold hearted that you don't care. How would you like it if someone did that to your family?" Petitioner replied, "Until, I'm not going to speak until my attorney is present." (Id. at 24.) The interview transcript reflects that tape was then shut off and the transcript ended. (Id.) Petitioner was arraigned on June 2, 1992 and requested appointed counsel; the request for counsel was granted and the public defender was appointed. (CT 10-11.)

The record reflects that with respect to the motion to exclude any admissions by Alvarado on the basis of voluntariness, the trial court stated that "[t]he prosecution in this case has advised that no admissions/confessions to law enforcement will be offered in this case. Accordingly, the court will grant the motion in limine and order no statements to be provided absent some further hearing." (RT 1215; see also CT 3475.) The prosecutor also

159

advised that: "I'm not giving up my right to introduce evidence either to impeach the defendant if he were to testify or rebuttal depending on what evidence might come out." (RT 1216.)  Both the prosecutor and counsel for Alvarado agreed that they could postpone any discussion on the matter.  (Id.)  With respect to Petitioner's own motion to exclude admissions, the prosecutor similarly stated that: "In our case in chief there will be no statements to law enforcement made by Mr. Hoyos," and that: "I think the only time it would be in issue is if Mr. Hoyos were to testify."  (RT 1226.)  In response, the trial court stated: "I suppose the best way to do it is to grant the motion in that the prosecution will not be offering statements, and to the extent they are going to be offered, that it will be necessary to have a hearing out of the presence of the jury."  (Id.)  Defense counsel made no objection to the trial court's ruling on the matter.

Petitioner argues that "[c]ounsel was ineffective for failing to point out to the court that the statements were not merely extracted in violation of Miranda, but were involuntary under Edwards, and thus not admissible for impeachment.  Petitioner was substantially prejudiced because the trial court relied on those statements to cure the prejudice from the prosecutor's failure to disclose the Jiminez [sic] recantation."  (Pet. Brief at 41.)

However, even if the Court were to assume, without deciding, that counsel acted deficiently in failing to pursue a motion to exclude Petitioner's statement on the basis of voluntariness, the claim fails for lack of prejudice, as Petitioner fails to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  Petitioner's statements to police were not introduced at trial.  Instead, Petitioner's assertion of prejudice hinges on a rather tenuous chain of logic.  During the post-guilt phase hearing on the defense motion for a new trial based on the belatedly disclosed Jimenez statements, Petitioner and Alvarado each contended that had they known of Jimenez's credibility problems, they would have testified at trial.  The prosecutor, in turn, argued that Jimenez's prospective testimony would not have impeached Petitioner, only his co-defendant Alvarado, and thus would have had no direct impact on Petitioner's decision to testify.  The

prosecutor added that Petitioner had his own reasons to decline to testify and alluded to Petitioner's statements to authorities. Petitioner presently asserts that trial counsel was ineffective in failing to contest the voluntariness of those statements to police, as successfully excluding those statements would have negated them as a factor in Petitioner's decision to testify and removed them from the trial court's consideration of the <u>Brady</u> issue. Petitioner asserts that "[t]he prejudice thus accrues in counsel's failure to obtain a ruling as to the involuntariness of the statements, and demonstrates that fear of impeachment was not a reason that petitioner declined to testify, but rather because a [sic] of the joint defense agreement with Alvarado." (Reply at 82-83.) Petitioner specifically contends that "[t]he prosecutor argued, *and the trial court accepted*, that even if petitioner was unconstitutionally deterred from testifying at the guilt trial because of fear of the admission of Jimenez's statement attributed to Alvarado, petitioner's testimony would have been impeached by his own custodial statements and, therefore, it was unlikely that he would have attained a more favorable result." (SAP at 86) (emphasis added.)

While the prosecutor argued the custodial statements were another potential reason that Petitioner declined to testify, the record does not reflect that the trial court considered those statements, much less relied on them, in rejecting Petitioner's motion for a new trial. In fact, when the prosecutor referenced Petitioner's statements to the authorities in arguing that Petitioner's decision not to testify was impacted by factors other than the prospect of Jimenez's testimony, the trial court professed ignorance as to the substance of those statements. (<u>See</u> RT 4639-40, 4695.) The trial court acknowledged the existence of the statements, but clearly articulated that the basis for the denial of the motion for a new trial was that Petitioner, unlike Alvarado, was not directly impacted by Jimenez's prospective testimony, reasoning that: "I'm really having difficulty in seeing how your representation, you gentlemen's representation of Hoyos, was affected adversely when he could testify if he wanted to. Of course, if he would testify, he's got to face any statements he may have made to the law enforcement - - he being Hoyos - - and I'm not privy to all those statements, but he could testify." (RT 4695.)

Indeed, a review of the record shows that the trial court's ultimate conclusion was clearly based on the lack of a constitutional violation given that Jimenez's statements only impeached Petitioner's co-defendant, and does not reflect that the decision was impacted by, or based in any measure on, the contested custodial statements, as follows: "I find there is no cognizable constitutional violation of Mr. Hoyos' rights by virtue of the prosecutor in this case failing to disclose information about a co-defendant that could be used to impeach a witness called against a co-defendant, if in fact that co-defendant chose to testify." (RT 4727-28.) The trial court discussed Alvarado's statement to Jimenez, and noted that it had been excluded under <u>Aranda</u> and <u>Bruton</u> because Alvarado used the word "we," which implicated both himself and Petitioner. (RT 4728.) The trial court reasoned that "[t]hat statement, however, was made by Alvarado, not in the presence of Hoyos who was in a completely different area. It had application to Alvarado, not to Hoyos, who wasn't even there. It cannot be imputed to Hoyos." (RT 4729.) The trial court reasoned that: "Each of these individuals had different degrees and levels of culpability. Hoyos was not subject to impeachment in any respect by Jiminez [sic]. It's frankly just too speculative to say that a failure to provide information to Alvarado which could truly be used against Alvarado if Alvarado testified, if the jail house informant testified - - it's just too speculative. [¶] There isn't any Sixth Amendment violation that I see as to Mr. Hoyos in this case. He could have testified in this case without any fear of impeachment by Jiminez [sic]. He chose not to do so. In fact, he chose not to do so in advance for reasons, as it seems, to be more akin to familial considerations. We sink or swim together, this sort of approach. That's not cognizable as a constitutional violation. He made a decision and the potential impeaching information of the informant as to his co-defendant is not really of constitutional significance as to Mr. Hoyos. So in all respects, Mr. Hoyos' motion is going to be denied." (RT 4729-30.)

Thus, regardless of whether trial counsel acted deficiently in failing to seek, and perhaps obtain, a ruling excluding the use of Petitioner's custodial statements at trial for any purpose, the fact remains that those statements were never introduced at trial and the

record fails to support a finding of prejudice. Accordingly, the claim of ineffective assistance of counsel fails on the merits. See <u>Strickland</u>, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

Because Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, he is not entitled to habeas relief. Nor is an evidentiary hearing warranted on Claim 17. See <u>Sully</u>, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.")

## 2. <u>Claim 18</u>

Petitioner contends that trial counsel rendered ineffective assistance of counsel for failing to move to exclude Petitioner's statements to police on the basis of delay in arraignment and appointment of counsel, pursuant to <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44 (1991). (SAP at 89-90.) Petitioner requests an evidentiary hearing on this claim. (<u>Id.</u> at 55.)

Petitioner raised this claim as Claim III in the first state habeas petition, and the California Supreme Court rejected it on the merits without a statement of reasoning. (<u>See</u> Lodgment Nos. 106, 118.)

Petitioner and Alvarado were arrested in the early morning hours of May 27, 1992, on drug and weapons charges. (Lodgment No. 107, Exs. 9, 12.) After <u>Miranda</u> warnings were administered, Petitioner requested to speak to an attorney prior to questioning. (<u>Id.</u>, Ex. 12.) At 9 p.m. on May 29, 1992, just after Petitioner and Alvarado were arrested on murder and attempted murder charges, two detectives with the Sheriff's Homicide Detail interviewed Petitioner at the San Diego central jail. (<u>Id.</u>, Exs. 9, 12.) Those detectives administered <u>Miranda</u> warnings and Petitioner spoke to them and made numerous statements denying any knowledge of the victims and crimes before again stating: "I'm not going to speak until my attorney is present." (Lodgment No. 107, Ex. 11 at 24.) Petitioner

was arraigned on June 2, 1992 at 2 p.m. on murder, attempted murder, robbery, burglary, and drug and weapons charges, and requested appointed counsel; the request for counsel was granted and the public defender was appointed.  (CT 10-11.)

In Gerstein v. Pugh, 420 U.S. 103 (1975), the Supreme Court held that "[w]hatever procedure a State may adopt, it must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest."  Id., 420 U.S. at 124-25 (footnotes omitted).  In County of Riverside, the Supreme Court articulated that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein."  Id., 500 U.S. at 56.  The Supreme Court further held that "[w]here an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes.  In such a case, the arrested individual does not bear the burden of proving an unreasonable delay.  Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance."  Id. at 57.

In this case, Petitioner faults counsel for failing to pursue a motion to exclude Petitioner's statements based on the delay in arraignment and appointment of counsel, arguing that "[c]ounsel could not have had a tactical reason for failing to pursue this meritorious argument, because counsel did file a separate motion to exclude the custodial statements on the basis of Miranda violations and involuntariness.  Given counsel's manifest intent to seek the exclusion of petitioner's custodial statements, counsel's performance was deficient in failing to invoke a remedy that was equally or more meritorious than the one he did pursue."  (SAP at 90.)

"[A] defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel."  Mirzayance, 556 U.S. at 122, citing Strickland, 466 U.S. at 687.  Relevant to this contention, the Ninth Circuit has held that: "When the Sixth Amendment ineffective assistance of counsel claim is rooted in defense counsel's failure to litigate a Fourth Amendment issue, as it is here, petitioner must

show that (1) the overlooked motion to suppress would have been meritorious and (2) there is a reasonable probability that the jury would have reached a different verdict absent the introduction of the unlawful evidence." Ortiz-Sandoval v. Clarke, 323 F.3d 1165, 1170 (9th Cir. 2003), citing Kimmelman v. Morrison, 477 U.S. 365, 375 (1986) and Strickland, 466 U.S. at 687-88, 691-92, 694.

Even if the Court were to assume, without deciding, that any such motion to exclude Petitioner's statements based on delay was meritorious and would have been successful, as with the prior argument raised in Claim 17, this claim too fails for lack of prejudice. First, Petitioner cannot show any "reasonable probability" of a different result in the absence of Petitioner's statements, as those statements were never introduced at trial. Ortiz-Sandoval, 323 F.3d at 1170. Similar to Claim 17, Petitioner instead argues that he was prejudiced "because the fruits of the unlawfully extracted statements were relied on by the prosecutor and the trial court to deny his motion for mistrial." (SAP at 91.) Yet, as discussed in detail above, a review of the record shows that the trial court's ruling was explicitly based on the lack of a constitutional violation given that Jimenez's statements impeached Alvarado and did not directly impact Petitioner's decision whether or not to testify. The record further reflects that the trial court's decision made scant mention of the custodial statements, other than when the trial court noted that he remained unaware of the substance of any such statements. The record fails to support Petitioner's argument that the court "relied on" the statements in denying the motion for a new trial, and in fact supports a conclusion that the trial court's decision was instead based on the fact that Petitioner failed to demonstrate that his decision to testify was directly influenced by the potential impeachment of his co-defendant. As such, Petitioner cannot show "a reasonable probability that, but for counsel's" failure to pursue a motion to exclude the custodial statements based on unreasonable delay in arraignment, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. As with the prior claim, this contention fails for lack of prejudice. See id. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course

09cv0388 L (NLS)

should be followed.")

Because Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the fact, habeas relief is unavailable. Petitioner is not entitled to an evidentiary hearing on Claim 18. See Sully, 725 F.3d at 1075.

### 3. Claims 19, 20 and 21

In Claim 19, Petitioner contends that counsel was ineffective for failing to "investigate and present evidence impeaching the prosecution's forensic DNA evidence," noting that the defense retained an expert to counter the prosecution's evidence, but failed to call him to testify at the Kelly/Frye[17] hearing or at trial, leaving the prosecution's evidence unchallenged. (SAP at 91-93.) In Claim 20, Petitioner contends that trial counsel "was aware of the incriminating content of Gary Harmor's testimony for the prosecution, not only regarding DNA evidence, but also regarding blood-typing tests and results," yet was ineffective in failing to prepare and present available evidence to counter his testimony, particularly with respect to Harmor's errors and use of statistics, at the Kelly/Frye hearing or trial. (Id. at 104-05.) In Claim 21, Petitioner contends that counsel "failed to investigate and present expert testimony that Harmor's methodology was scientifically flawed and entirely unreliable," contending that Harmor testified that test results showed Petitioner's blood was found on a firearm in the victims' home, despite the actual lack of a match. (Id. at 110-11.) Petitioner requests an evidentiary hearing on each of these three claims. (Id. at 55.)

---

[17] Kelly /Frye was a California state law test concerning the admissibility of expert testimony based on new types of scientific evidence or techniques. See People v. Kelly, 17 Cal.3d 24 (1976); Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). It is currently known as the Kelly test, as Frye's application in federal court has since been superceded by the Federal Rules of Evidence and the test announced in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

166

Petitioner raised these claims as Claims VI, VII, and IX, respectively, in the first state habeas petition, and the California Supreme Court rejected all three claims on the merits without a statement of reasoning. (See Lodgment Nos. 106, 118.)

As discussed above, "a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel." Mirzayance, 556 U.S. at 122, citing Strickland, 466 U.S. at 687. Moreover, on habeas review, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Richter, 562 U.S. at 101.

## A. **Kelly/Frye Standard and Hearing**

"Under Kelly/Frye, 'the proponent of evidence derived from a new scientific methodology must satisfy three prongs, by showing, first, that the reliability of the new technique has gained general acceptance in the relevant scientific community, second, that the expert testifying to that effect is qualified to do so, and, third, that correct scientific procedures were used in the particular case.'" Cooper v. Brown, 510 F.3d 870, 944 n. 28 (9th Cir. 2007), quoting People v. Roybal, 19 Cal. 4th 481, 505 (1998).

Prior to trial, the court held a Kelly/Frye hearing on the admissibility of the DNA evidence, specifically concerning the PCR technique used to analyze the blood evidence. The trial court took judicial notice of numerous transcripts in other judicial proceedings and treatises on the matter. (RT 1348-51, 1368-78.) The parties offered argument and the prosecution cited to a number of prior judicial proceedings that had been noticed. (RT 1351-66.) The prosecution also presented the testimony of Gary Harmor, a senior forensic serologist and case work analyst at the Serological Research Institute ["SERI"], who conducted the DNA analysis in this case.

Harmor, who had been employed by SERI for 15 years and currently held the title of Senior Forensic Serologist, performed the case work analysis on Petitioner's case. (RT 1379-80.) Harmor discussed his background, training, as well as the development of DNA analysis. (RT 1380-86.) In particular, Harmor discussed the PCR/DQ-Alpha technique, his experience with it, and his prior testimony in 170 cases, including his prior

qualifications as an expert and testimony in 18-20 cases in the past three years. (RT 1386-88.) Harmor discussed testing protocols and addressed differences between amplification methods and procedures between laboratories; he acknowledged that sometimes it became necessary to add more enzyme, dilute the sample with water, or add bovine serum albumin ["BSA"] to overcome inhibition, a "process that stops the copying of the particular target site of DNA." (RT 1388-92.) Harmor testified that the methods used to overcome inhibition did not run a risk or producing unreliable or inaccurate results and stated that "[i]t is important to the analyst to get results in a case. So even if the phenomenon of inhibition [sic] observed when you know there is sufficient DNA, human DNA to arrive at a result, it's better to try to get an answer for the case. Because possibly potentially it could be exculpatory to a defendant." (RT 1392.) Harmor also discussed the various laboratories that used PCR testing, and stated that such testing was widespread across the United States, as well as throughout other countries and continents. (RT 1393-95.)

On cross-examination by defense counsel, Harmor addressed the ways in which his work deviated from the written user guide, such as his use of ammonia and saline instead of water for some samples, and his addition of BSA to overcome inhibition. (RT 1396-97.) Harmor acknowledged that the addition of BSA was not in the protocol, and obtained information about its use through peers, seminars, and published papers. (RT 1397-98.) Harmor added BSA in this case because there was inhibition, in that the sample did not amplify without it. (RT 1399.) Harmor also acknowledged there was contamination in one result, from the jeans, but explained that it was in one result on the reagent blanks, and stated that "[t]here is no evidence that the contaminant was throughout the whole test. If it had been I would not have called the results." (RT 1400-01.) Harmor and counsel had a brief exchange about population statistics, and Harmor stated that he compiled his statistics using published data and arrived at figures for California and the San Diego area. (RT 1402-03.) SERI performed both internal and external quality control, and often exchanged samples with other labs. (RT 1403-05.) Harmor reiterated that he had testified over one hundred times as a forensic serologist in the past 14 years, in 18 states and 20

California counties, and had testified approximately "20 times as a PCR expert in 8 different states." (RT 1406.)

After hearing argument from counsel, the trial court issued a written ruling on the admissibility of the DNA evidence, denying the motion to exclude that evidence and concluding that "the voluminous materials reviewed by this court, as well as the witnesses proffered by the People cause this court to believe that PCR-DNA is a relatively new scientific technology which is generally accepted as reliable in the relevant scientific community, that the sources furnishing evidence of this are properly qualified experts and the use of proper scientific procedures was present in this particular case." (CT 2929.)

### B.    Harmor's Trial Testimony

At trial, Harmor first discussed his training and background, similar to his testimony at the <u>Kelly/Frye</u> hearing, and testified generally about DNA evidence, ABO blood typing, and PCR testing in particular. (RT 3763-82.) With respect to PCR evidence, Harmor stated that: "Its main purpose is as an excluder," and stated that the same was true about ABO blood type testing. (RT 3682-83.) Harmor also generally discussed the use of statistics and population studies in determining the frequency of markers, as well as noted other "conventional" testing methods, such as Gm and Km markers, both using ABO typing. (RT 3683-85.)

Harmor testified that he received samples from six individuals concerning this case, including Daniel and Mary Magoon, the two Magoon children, and both defendants, as well as the crime scene samples. (RT 3685-86.) Harmor first detailed the markers found in each individuals' samples and those found in the crime scene blood samples. (RT 3687-90.) Harmor concluded that Petitioner "could be" the donor of the blood found on the Ruger's trigger guard, and that the other individuals were excluded as potential donors. (RT 3696.) With respect to the gun's stock, Harmor stated that the sample, which came back as 1, 3, 11, was "probably an incomplete Gm type" and reasoned that because "generally we see the 21 factor with this" type, he concluded that sample was "consistent" with Petitioner, whose Gm type was 1, 3, 11, 21, and Harmor stated that the results

09cv0388 L (NLS)

excluded the other five individuals tested.  (RT 3697-98.)  Harmor further testified that Mary Magoon was included as a possible donor of blood found on the air rifle barrel, while the other individuals were eliminated.  (RT 3698-99.)  Harmor stated that the blood on the hallway bathroom door was also consistent with Mary Magoon, and again, the other five individuals were excluded.  (RT 3699.)

Harmor testified that Petitioner was the only one of the six individuals tested that could be the donor of eight samples found on Petitioner's jeans.  (RT 3701.)  He also testified that Mary Magoon was a potential donor of another sample found on the jeans, with the others excluded, and that both Daniel Magoon and J. Magoon were potential donors of two other samples, with the others excluded.  (RT 3702-03.)  Harmor also testified at length about the population frequency of the markers, for instance, that the type found on the Ruger trigger guard was found in 5.2% of the population in San Diego and 5.3% in California, or 1 in 19 individuals.  (RT 3705-08.)

On cross-examination, Harmor acknowledged that there was a user guide, which contained the instructions for conducting PCR analysis and outlined the reagents and materials to be used in the analysis.  (RT 3708-09.)  Harmor also acknowledged that in this case, there was some contamination found in one of the three control samples, the reagent control sample, which was not supposed to contain DNA, but did.  (RT 3710-12.)  Harmor testified that: "I believe that I inadvertently got some stray DNA into the blank control on one test while I was processing the DNA."  (RT 3712.)  When asked if he followed the user guide, Harmor first stated that there are other recommendations in literature on ways to overcome inhibition, including throwing out the sample, adding more TAQ enzyme, and adding BSA.  (RT 3714.)  After counsel again asked if Harmor followed the user guide, Harmor replied that: "It's not strictly followed as a user guide was given to us.  We use it as a basis for developing our procedure," and stated that: "I followed it as far as it went, as far as the instructions were concerned on how to process the DNA and how to amplify the DNA with a few minor modifications that aren't strictly in the protocol."  (RT 3715.)  Harmor used a substance called BSA, which he had previously discussed with his peers

09cv0388 L (NLS)

and read about in literature, to amplify the material in this case.  (RT 3715-16.)

Harmor again discussed the results of his testing and his reports, including a typographical error about Petitioner being included and excluded as a donor of several samples; Harmor issued a correction of that page in his report.  (RT 3717-18.)  Harmor acknowledged that he could not conclude that the blood on the jeans came from Petitioner himself, stating that: "I can say it's consistent with people like him, but I can't say it's from him only."  (RT 3718.)  Harmor agreed that according to a population frequency of 1 in 625, it meant that out of 62,500 people, 100 could have contributed one of the samples, and agreed that for another sample, the ratio was 1 in 15.  (RT 3719-20.)  Harmor also agreed that some results were incomplete, and explained that he added two types together to come up with a frequency, which eliminated three Magoons, stating that: "It was enough of a sample to come to a partial result.  It wasn't sufficient, in my opinion, to give a result for all the Gm markers."  (RT 3723.)  Harmor agreed that most stains on Petitioner's jeans were too small to test and he did not even attempt the basic Gm analysis.  (Id.)  Harmor also conceded that it was possible to have inconsistent Gm and DQ Alpha results.  (RT 3724.)  After additional discussion on population frequencies, Harmor also acknowledged that a death row inmate brought civil charges against SERI and his supervisor Wraxall; while Harmor worked at SERI at the time, he was not named in the suit.  (RT 3726-27.)  Upon inquiry, Harmor also acknowledged that no one at the SERI lab received a Nobel prize.  (RT 3727.)  On cross-examination by Alvarado's counsel, Harmor agreed that none of the blood results "implicate or suggest" Alvarado.  (RT 3728.)

On redirect, Harmor noted that other individuals, including defense personnel, were present to observe some of the testing in this case; he provided copies of results and reports to all involved entities.  (RT 3729.)  Several samples were too small for certain tests and Harmor again addressed the testing performed on Petitioner's jeans.  (RT 3729-30.)  With respect to the results of 1, 3, 11 accompanied by an asterisk, Harmor explained that: "I didn't say but some of the samples did show a faint 21, but not enough to make a positive determination."  (RT 3730.)  He reaffirmed that Petitioner was not excluded as a donor of

09cv0388 L (NLS)

the blood on the air rifle stock and trigger guard, as follows: "Based on my results I have no way to say that that blood is different from Hoyos. There could be other people in the population that could have that set of type as well, but he's certainly not excluded." (RT 3730-31.) Harmor testified that he used BSA in the amplification of several items, including stains on a shirt and a number of small stains on the jeans, stated that his lab as a whole used BSA in their "quality control cocktail," and he had no doubts about the results obtained. (RT 3731-32.) On recross, defense counsel and Harmor had the following exchange:

> Q:     Mr. Harmor, you may not have any doubts of your results, but would it be fair to say there is some doubt whether or not Mr. Hoyos is the person who contributed the unknown samples that are attributed to him?
>
> A:     Yes. Again, he's consistent with - - the stains that were his types that are similar to him show up. But I cannot say it's definitely him in the group that could have donated it. And we have talked about the percentage.

(RT 3732-33.) Harmor also stated that while defense personnel were present for earlier tests, they were not present for later tests discussed in his final report. (RT 3733.)

## C.     Evidence Presented in Post-Conviction Proceedings

In addition to submitting the reports generated by Gary Harmor in advance of trial (Lodgment No. 110, Exs. 39 and 47), Petitioner submits a copy of the FBI Laboratory's DQ Alpha Typing Protocol (id., Ex. 41), which was also discussed at trial.

Petitioner presents a letter and later declaration from Marc Taylor, a consultant who worked with the defense at the time of trial concerning the DNA evidence. In a letter dated November 11, 1993, prior to trial, Taylor wrote to Richard Fox, the defense's consulting criminalist, after reviewing the DNA testing performed by SERI. (Id., Ex. 40.) Taylor stated that the "general appearance of the data is well organized and appears to give valid justification for the conclusions outlined in the reports of 12 July 1993 and 22 September 1993." (Id.) Taylor indicated that the "data is fairly complete with regard to the processing of the DNA after extraction, however there are no details of how the evidence was handled or the DNA extracted from the individual items." (Id.) Taylor stated that because

09cv0388 L (NLS)

extraction "is one of the most critical steps in DNA typing and extraction is where the most severe mistakes, that I am aware of, have occurred," information about those procedures is important to obtain. (Id.) While Taylor indicated that "SERI has utilized appropriate controls during the extraction and amplification steps and the results of these controls generally indicated that adequate procedures were followed," but that "the results of the controls alone, without the specifics of the protocol followed, are not sufficient to fully evaluate the procedures utilized." (Id.) Taylor also specifically noted that one extraction blank was contaminated, as it should not have contained any DNA, yet "it did contain DNA, having at least four of the DQ-Alpha alleles present." (Id. at 1-2.) Taylor stated that this occurred in the jeans sample and that "[w]hile the level of contamination in this control is low, it is significant, and when a control such as this is contaminated test results of any items extracted with this control specimen must be interpreted with extreme caution or not interpreted at all." (Id. at 2.) After identifying that item, Taylor concluded by stating that "[b]ased on the data I reviewed, I see no other areas in which I would disagree with the conclusions outlined in the two reports noted above." (Id.)

Taylor later submitted a 2006 declaration in support of the state habeas petition, in which he elaborates on his training, education and experience and discusses his work on Petitioner's case in 1993 and Harmor's test results and trial testimony. (Id., Ex. 42.) Taylor repeats his earlier statement that one of the control samples for the testing on the jeans in Petitioner's case was contaminated and "[t]hat when a control such as this is contaminated, test results of any items extracted with this control sample must be interpreted with extreme caution or, as with many laboratory protocols, not interpreted at all." (Id. at 3.) Taylor states that Harmor "negates the significance of the contamination of a reagent blank in his testimony" and states that "reagent blanks are controls that are utilized to evaluate the integrity of the testing process, and their contamination indicates that there are problems with the testing process itself. Such contamination events can lead to false inclusions or exclusions in certain circumstances." (Id. at 4.) Taylor further states that not only did the reagent blank contain DNA, so did the substrate controls, and "therefore, Mr. Harmor's

173

explanation that this contamination was not of concern because his substrate controls did not type, is not accurate." (Id. at 5-6.) Taylor states that "in most laboratories, the procedure followed when contamination of a reagent blank is encountered, is to retest the samples if possible. This retesting requires starting over with the original stained material and proceeding with clean reagents and component procedures to assure no contamination will take place. Results from this testing can then be relied upon." (Id. at 6.)

Petitioner also submits a 2006 declaration from forensic scientist Keith Inman, who also reviewed Harmor's work and states that with respect to the testing and analysis of the bloodstains found on Petitioner's jeans, the air rifle trigger guard and the air rifle barrel "significant departure from correct scientific procedure exists." (Id., Ex. 50 at 1.) Inman criticizes Harmor's conclusion that the Gm type on the jeans was likely 1, 3, 11, 21, consistent with Hoyos and reasoning that the 1, 3, 11 result was possibly due to the 21 being weak. (Id. at 2.) Inman states that "[n]o scientific support exists for this explanation of the data," and explains that Harmor's "analytical notes clearly indicate that the sample types as a 1, 3 ; ; 11. No indication exists in his notes that the stain is weak." (Id.) Inman first states that "[i]t is unusual in my experience for one G3m marker to be detected and another to go undetected," and then asserts that "Harmor's logic is clearly flawed. While it may be true that it is possible (under unusual circumstances) for the 21 marker to go undetected, it does not follow logically that the sample *therefore is* 21 positive." (Id.) (emphasis in original.) Inman further states that Harmor's analysis that the sample in question is "consistent with the majority of the other stains on this item" is not objective, but instead "injects a subjective bias into the interpretation of the data. This is an example of poor scientific reasoning, and is not supported by the analytical data for this sample." (Id.)

With respect to the bloodstains on the stock and trigger guard of the air rifle, Inman states that Harmor "makes an assertion not contained in his report" during his trial testimony, that "some of the samples showed a faint 21, but not enough to make a positive determination." (Id.) Inman states that Harmor's notes "reveal that the controls for the 21

174

did not work properly" and that "[t]he only acceptable scientific remedy for a failed control is to repeat the test, or to consider the test results inconclusive (proceed as if the test had not been run). It is incorrect scientific procedure to call any sample positive - e.g. in the extant case to call a '21' - when the controls have failed, and it is flawed scientific logic to opine that the likely type is something not supported by the data." (<u>Id.</u> at 2-3.) Inman concludes that the results for the bloodstains on those parts of the air rifle "are not supported by the analytical data, correct scientific procedures were not followed when questionable data was obtained, and Mr. Harmor employed flawed scientific reasoning when interpreting and reporting his results." (<u>Id.</u> at 3.)

Petitioner also submits a 2006 declaration from William Thompson, a California bar member and college professor whose academic focus is DNA evidence and its role in criminal trials. Thompson states that "[i]n my opinion, Mr. Harmor's testimony was misleading and inappropriate. It greatly exaggerated the value of this biological evidence for incriminating Mr. Hoyos." (Lodgment No. 113, Ex. 113 at 1.) Similar to Inman's conclusions, Thompson criticizes Harmor's scientific reasoning that the samples on the two areas of the air rifle could have come from Petitioner as "stunningly illogical and unscientific," and states that "Mr. Harmor's analysis twisted a putatively scientific test into an exercise in speculation and (perhaps) wishful thinking." (<u>Id.</u> at 2.) Thompson states that "Mr. Harmor then made matters worse by presenting irrelevant and misleading statistical estimates that greatly exaggerated the value of the evidence for linking Mr. Hoyos to the rifle," because Petitioner did not "exactly" match the markers on the rifle yet Harmor testified about the frequency in the population of those that would match the markers exactly. (<u>Id.</u> at 2-3.) Similar to both Taylor's and Inman's statements, Thompson criticizes Harmor's failure to repeat the test on Petitioner's jeans after positive DNA results were found in a control that was not supposed to contain any DNA, stating that "[i]n my view, Mr. Harmor failed to follow proper and accepted scientific procedures with respect to this test and his results (with respect to the jeans) should therefore be viewed with suspicion." (<u>Id.</u> at 4.)

Finally, Petitioner submits a declaration from Arturo Herrera, one of his two trial attorneys, who offers a statement with respect to the DNA and blood evidence:

> 5. The DNA and blood analyses were a critical part of the prosecution's case. In the spring of 1993, the prosecutor retested Mr. Hoyos's blue jeans, and informed us that Mr. Hoyo's [sic] pants contained blood spatter, or very small dots of blood that originated from within two feet of the source, that belonged to Mary Magoon, and to either Daniel or J[] Magoon. In the late Summer of 1993, we were informed that blood had been found on the trigger guards of two rifles found in the Magoon house, and that blood from Mr. Hoyos was identified as being on each one, including one that also had Mary Magoon's blood on it. The trial judge refused to give us a continuance to prepare for this new evidence, but the court of appeal granted our writ of mandate. We contacted Richard Fox; but Mr. Fox, although familiar with blood-typing, was not familiar with the DNA typing done in our case. He referred us to Marc Taylor of Technical Associates.
>
> 6. Mr. Taylor reviewed our discovery, and provided us with materials from other cases challenging the new procedures used in our case. I went to Mr. Taylor's office in Pasadena to become educated on the technical aspects of this testing, and got my first introduction to polymerase chain reaction, or PCR, a technique for amplifying small amounts of DNA. He sent us materials that we attached to our motion to exclude the testimony based on DNA testing. I remember talking about the issue of contamination with him.
>
> 7. I have been shown a copy of Mr. Taylor's November 1993 letter to Mr. Fox about this case. Regarding the issue of contamination, he stated that one particular part of the testing - that part concerning Mr. Hoyos's jeans - was contaminated, and should "be interpreted with extreme caution, or not at all." At the *Kelly-Frye* hearing, and at trial, I brought out the fact that there was contamination somewhere in the tests run by Mr. Gary Harmor, the prosecution's witness as part of my cross-examination. I did not, however, and could not, reply to Mr. Harmor's assertion that it didn't matter. It would have been very helpful to have an expert say what Mr. Taylor's report says, both to the trial court and, if necessary, to the jury, and talk about why the contamination might have made a difference in the identification of a particular individual. I found Mr. Taylor to be knowledgeable and clear. I cannot explain why we did not call him as a witness. I cannot remember talking with Mr. Fox about any aspect of the blood evidence.

(Lodgment No. 110, Ex. 44 at 2-3.)

### D.    Discussion

Petitioner first challenges trial counsel's performance at the <u>Kelly/Frye</u> hearing, faulting both counsel's failure to call an expert witness with respect to the third prong of the test concerning whether "correct scientific procedures" had been followed and for failing to challenge the reliability of Harmor's statistical analysis.   In a declaration submitted during post-conviction proceedings, trial counsel Herrera acknowledges that the defense retained Marc Taylor as an expert consultant on the DNA evidence and that he met with Taylor to discuss the evidence and contamination, but states that he "cannot explain" why Taylor was not called to testify.

However, the record reflects that just prior to the <u>Kelly/Frye</u> hearing, the trial court and both parties discussed the anticipated length of that hearing, and during that discussion Herrera stated: "I don't expect to present testimony.  My expert is going to be here to see if any problems develop that he needs to advise us on.  If he needs to testify, it will be short."  (RT 1311.)  <u>Strickland</u> dictates that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."   <u>Id.</u>, 466 U.S. at 690.  In light of the clear showing from both the declaration and trial record that counsel retained and consulted with an expert prior to the <u>Kelly/Frye</u> hearing and relied on that expert in conducting the hearing itself, Petitioner fails to overcome the presumption that counsel's decisions were within the bounds of constitutionally acceptable conduct.  <u>See</u> <u>Strickland</u>, 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.")

In any event, Respondent accurately points out that the third prong of <u>Kelly/Frye</u> requires the trial court to determine whether correct scientific procedures were employed in the case, and under California law, errors or mistakes by an individual analyst impacts the "weight" rather than the "admissibility" of the evidence in question and does not

177

implicate <u>Kelly/Frye</u>, as follows:

> The *Kelly* test's third prong does not, of course, cover all derelictions in following the prescribed scientific procedures. Shortcomings such as mislabeling, mixing the wrong ingredients, or failing to follow routine precautions against contamination may well be amenable to evaluation by jurors without the assistance of expert testimony. Such readily apparent missteps involve "the degree of professionalism" with which otherwise scientifically accepted methodologies are applied in a given case, and so amount only to "[c]areless testing affect[ing] the weight of the evidence and not its admissibility" (*Farmer*, *supra*, 47 Cal.3d at p. 913, *Cooper*, *supra*, 53 Cal.3d at p. 814).

<u>People v.Venegas</u>, 18 Cal. 4th 47, 81 (1998) (brackets in original); <u>see</u> <u>also</u> <u>Daubert</u>, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") Therefore, even were Petitioner able to demonstrate deficient performance, despite the record evidence supporting a conclusion that counsel made a reasoned and tactical decision not to call an expert at the hearing, any alleged deficiencies in counsel's performance at the <u>Kelly/Frye</u> hearing could not have resulted in prejudice. This is because the hearing was limited to the admissibility of DNA evidence resulting from use of the PCR technique, rather than the adequacy of Harmor's analysis, and Petitioner fails to demonstrate that Taylor's testimony could have changed the outcome of the <u>Kelly/Frye</u> hearing. <u>See</u> <u>Strickland</u>, 466 U.S. at 694 (in order to demonstrate prejudice, "[t]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") The California Supreme Court's rejection of his claim of ineffective assistance of counsel at the <u>Kelly/Frye</u> hearing was neither contrary to, nor an unreasonable application of, <u>Strickland</u>.

Petitioner also challenges counsel's performance at trial, asserting that counsel rendered ineffective assistance in failing to present evidence to challenge the reliability of the blood and DNA evidence and regarding flaws in Harmor's analysis through the testimony of Taylor and Inman, and in failing to present evidence about the lack of

reliability in Harmor's statistical analysis, as discussed by both Inman and Thompson.

While Petitioner contends that counsel failed to present expert testimony to challenge Harmor's analysis, he fails to show that this alleged error did not result from a tactical decision. Trial counsel now states in his declaration that even though he cross-examined Harmor, he "could not [] reply to Mr. Harmor's assertion that [the contamination] didn't matter," that "[i]t would have been very helpful to have an expert say what Mr. Taylor's report says, both to the trial court and, if necessary, to the jury, and talk about why the contamination might have made a difference in the identification of a particular individual," and that he "cannot explain why we did not call him as a witness." (Lodgment No. 110, Ex. 44 at 3.) Yet in Strickland, the Supreme Court specifically cautioned against reviewing a claim of ineffective assistance in this manner, reasoning that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689. The Court stated that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. Indeed, "the relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." Siripongs, 133 F.3d at 736.

The record reflects trial counsels' repeated attempts to retain DNA and blood experts. Counsel moved to continue the trial, which was scheduled to begin on October 1, 1993, after receiving Harmor's revised report in late September 1993, stating in a declaration that they had contacted and attempted to retain experts such as Fox, Taylor, Dr. Simon Ford, and Ed Blake, and that: "All of the expert consultants, spoken to by the defense, have told us that they do not take cases which are in progress. Dr. Fox and Dr. Taylor, our first choices as consultants simply will not agree to be retained if our case, in

179

fact, begins trial on October 1, 1993." (CT 308.) At a motion hearing, counsel stated that they had also contacted Professor Thompson, who "would not take on the case as a consultant if the case proceeds to trial today," and had spoken with personnel at a DNA lab in North Carolina, who "could not guarantee that they could do the work while the case is pending." (RT 117.) The trial court denied the motion for a continuance. However, after action by the appellate court on October 6, 1993, staying the case, the trial court continued the trial date to January 7, 1994. (CT 3456.)

The record reflects that trial counsel retained, at a minimum, Richard Fox and Marc Taylor to consult with on the blood and DNA evidence. (See Lodgment No. 110, Exs. 42, 44.) It is evident that counsel also was specifically aware of the contamination issue, as he recalled discussing that matter with Taylor. (See id., Ex. 44.) As noted above, counsel cross-examined Harmor about the contamination at the Kelly/Frye hearing. It is also clear that counsel stated on the record, prior to the Kelly/Frye hearing, that he did not expect to call Taylor to testify at that hearing. Counsel also extensively cross-examined Harmor on the issues raised by Inman, Thompson and Taylor, including the contamination issue, procedures Harmor employed, results of testing, and the statistical analysis. For instance, on cross-examination by counsel, Harmor acknowledged there was contamination in the control samples, stating that: "I believe that I inadvertently got some stray DNA into the blank control on one test while I was processing the DNA." (RT 3712.) Harmor also admitted that he deviated from the user guide in his attempts to overcome inhibition, explaining that: "I followed [the user guide] as far as it went, as far as the instructions were concerned on how to process the DNA and how to amplify the DNA with a few minor modifications that aren't strictly in the protocol." (RT 3715.) Harmor also conceded that he could not conclusively identify the samples that included Petitioner as actually attributable to Petitioner, stating that: "I can say it's consistent with people like him, but I can't say it's from him only." (RT 3718.) Defense counsel also challenged the value of Harmor's statistical analysis, and Harmor conceded that depending on the population size, the samples in question could match a large number of people. (RT 3718-22.) Indeed,

counsel and Harmor also had the following exchange, in which Harmor agreed that there was room for doubt that Petitioner contributed the evidence recovered from the crime scene:

> Q:     Mr. Harmor, you may not have any doubts of your results, but would it be fair to say there is some doubt whether or not Mr. Hoyos is the person who contributed the unknown samples that are attributed to him?
>
> A:     Yes.  Again, he's consistent with - - the stains that were his types that are similar to him show up.  But I cannot say it's definitely him in the group that could have donated it.  And we have talked about the percentage.

(RT 3732-33.)

"[T]he presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense." Bonin v. Calderon, 59 F.3d 815, 834 (9th Cir. 1995); see also Richter, 562 U.S. at 111 ("Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert and equal and opposition expert from the defense.  In many instances cross-examination will be sufficient to expose defects in an expert's presentation.")  Regardless of Herrera's declaration, in which he states he "cannot explain" why Taylor was not called to testify, it is apparent from the record that trial counsel extensively investigated the DNA and blood match evidence, by consulting with and retaining appropriately qualified experts, and challenging Harmor on numerous issues, including contamination, Harmor's procedures, statistics and results, through cross-examination.  These actions were reasonable and are entitled to deference. See Siripongs, 133 F.3d at 736 ("[T]he relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable.")

Even if Petitioner was able to demonstrate that counsel erred in not calling expert witnesses to refute Harmor's analysis and conclusions, the claim also fails for lack of prejudice.  See Strickland, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.") Again, counsel's cross-examination of Harmor

effectively challenged his analysis and conclusions, by pointing out his deviations from the user's guide and contamination, bringing to light the fact that the statistics allowed for hundreds or even thousands of individuals to be included as potential donors of the samples, and pointing out that Harmor could only state that Petitioner was not excluded as a potential source of the samples in question and could not, in fact, state that it was actually Petitioner's blood found on the air rifle or jeans.

Even had counsel presented expert testimony to further undermine and challenge Harmor's analysis and testimony, there remained significant and weighty evidence connecting Petitioner to the murders and other offenses apart from the blood and DNA evidence.  Shortly after midnight on the evening of the murder, Petitioner and Alvarado were stopped by police for a broken tail light at a location that was about a fifteen minute drive from the Magoon home.  (RT 3071.)  An hour or two prior to that stop, several neighbors heard a succession or firecrackers or gunshots from the vicinity of the Magoon home.  (RT 2919-24, 3517-21.)  The police stated that Alvarado, who was driving, was sweaty and shaking, and the weather was neither particularly hot nor cold; upon searching the vehicle, the police found a 9mm magazine containing 12 rounds, several large caliber bullets and a loaded Helwan pistol in the car.  (RT 2939-45.)  The trunk of their car contained a large quantity of marijuana; police noted some of it was in brick form and some was ice cold "like it had been in a freezer."  (RT 2947-48.)  Upon a later search, police found a shell casing in Alvarado's pocket, while Petitioner had over $1,000 in cash in his pants pockets.  (RT 2949-54.)  Meanwhile, there was marijuana debris both inside and outside the freezer at the Magoon home, while James Johnson, Daniel Magoon's friend and collaborator in drug dealing, stated that Daniel Magoon kept marijuana, in often large amounts, in the freezer.  (RT 3014-22, 3277-79.)  The police also found 9mm shell casings at the crime scene and an empty box for a Helwan pistol was found in a bathroom cabinet in the Magoon home.  (RT 3027-35, 3040-43.)  Alvarado's fingerprints were matched to prints on a 7-11 Big Gulp cup in the Magoons' kitchen.  (RT 3191-92, 3367; CT 3338.) Daniel Magoon's prints were lifted from tape used to package the marijuana.  (RT 3193-

09cv0388 L (NLS)

94, 3206-08, 3257, 3369-70; CT 3339.)   Johnson recognized Petitioner as one of the individuals who visited the Magoon home in the months prior to the murder and interacted with Daniel Magoon.  (RT 3279-81.)  Meanwhile, Petitioner's friend Maribel Lopez stated that she accompanied Petitioner to the Magoon home on multiple occasions.  (RT 3402-09.)

In light of counsel's extensive cross-examination of Harmor, as well as the strength of the other evidence against him, Petitioner has not demonstrated a "reasonable probability that, but for counsel's unprofessional errors" in failing to call expert witnesses to counter Harmor's testimony, "the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  Given that Claims 19-21 fail on the merits, the Court is unable to conclude that the California Supreme Court's rejection of these claims was objectively unreasonable.  See Richter, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the Strickland standard was unreasonable.")  Petitioner is not entitled to habeas relief on Claims 19, 20 or 21.  Nor is an evidentiary hearing warranted on these claims.  See Sully, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.")

### 4.    Claim 22

Petitioner asserts that the defense counsel presented at trial was prejudicially ineffective because it was "inconsistent with the version of the events of March [sic] 26-27 that petitioner had told him" and "was predicated entirely on the putative existence of a sudden quarrel and shootout with Dan Magoon, without any comparable or complementary defense as to the murder of Mary Magoon."  (SAP at 112.)  Specifically, Petitioner alleges that "[c]ounsel failed to investigate and present substantial evidence of petitioner's lack of involvement in the homicides, the likelihood of third party culpability, and the numerous defects in the prosecution's forensic evidence," and "counsel failed to investigate and present significant amounts of corroborating evidence to support the unsuccessful defense that counsel did present."  (SAP at 113-14) (emphasis in original.)  Petitioner requests an evidentiary hearing on this claim.  (Id. at 55.)

183

Petitioner raised this claim as Claims XI and XII in the first state habeas petition, and the California Supreme Court rejected the contentions on the merits without a statement of reasoning.  (See Lodgment Nos. 106, 118.)

As stated above, "a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel." Mirzayance, 556 U.S. at 122, citing Strickland, 466 U.S. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689.  Because this Court is reviewing the California Supreme Court's adjudication of Petitioner's claims of ineffective assistance of trial counsel, the Court must not only apply Strickland, but AEDPA as well.  "The standards created by Strickland and § 2254(d) are both 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105, quoting Strickland, 466 U.S. at 689, Lindh, 521 U.S. at 333 n.7, Mirzayance, 556 U.S. at 123.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

Petitioner's first argument, that trial counsel was ineffective for failing to investigate and present a defense of third party culpability and Petitioner's lack of involvement in the murders, was soundly rejected in Claim 14.  It is apparent from the record that co-counsel Herrera supported and supervised the investigation into alternate suspects, and case manager Amendola as well as investigator Pickering made a concerted effort to identify other individuals who could have been responsible for the murders.  Petitioner told the trial court after the verdicts that he had wanted to testify and that "[m]y attorney argued something different than what I had told him." (RT 4953.)  Even were the Court to construe this unspecific statement as supporting Petitioner's contention that he wanted to testify in order to deny any involvement in the murders, that defense counsel chose to pursue another defense does not compel a finding that counsel acted deficiently.  See Raley, 470 F.3d at 799 ("A disagreement with counsel's tactical decisions does not provide the basis for declaring that the representation was constitutionally deficient."), citing United States v.

Mayo, 646 F.2d 369, 375 (9th Cir. 1981) (per curiam).

Petitioner's next contention, that the defense advanced at trial was infirm because it lacked an adequate defense to the Mary Magoon murder in comparison to the defense asserted for the Daniel Magoon murder, is refuted by the record. The state record plainly reflects that the primary defense strategy, as set out in detail during closing arguments to the jury, was to assert self-defense or manslaughter for the murder of Daniel Magoon and second degree murder for Mary Magoon, thereby attempting to avoid a penalty phase and a potential death sentence for the two deaths. (See RT 4057-58, 4062-63, 4065, 4079, 4084-87.) This strategy was clearly tactical, based on the evidence, and falls well within the scope of "reasonable professional assistance." Strickland, 466 U.S. at 689.

Petitioner relatedly contends that trial counsel should have defended against the Mary Magoon murder charge by presenting evidence that she was a partner in her husband's drug business, was familiar with the use of weapons, was also high on cocaine that evening, and probably used her son as a human shield. (SAP at 114.) The record shows that trial counsel unsuccessfully attempted to introduce evidence about Mary Magoon's prior use of, and familiarity with, weapons, as well as her presence at Daniel Magoon's arrest ten years earlier, and decided to present propensity evidence only with respect to Daniel Magoon. Because the evidence of Daniel Magoon's propensity for violence was substantial, including his long-standing involvement in drug smuggling, prior arrests, and that Jimmy Johnson knew him to answer the door armed, and the evidence concerning Mary was largely based on Johnson's speculative statement that she might have been going for a gun that evening, this was a reasonable decision entitled to deference. Strickland, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"), quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955). As discussed in Claim 6, the evidence in the record fails to support a defense theory that Mary Magoon presented a threat to the defendants, much less the

imminent threat necessary to justify the introduction of propensity type evidence.

Petitioner's remaining contentions about Mary Magoon's purported involvement in her husband's drug activities and her actions on the evening of the murders are speculative and similarly fail to support a claim of ineffective assistance of counsel. For instance, federal habeas investigator Echeverria states that "[a]t the time of his death, Dan Magoon was a drug and weapons trafficker and his wife, Mary Magoon, was involved with him in that business," but fails to articulate a basis for this assertion. (Lodgment No. 120, Ex. 6 at 4.) The record lacks evidence that Mary Magoon had a direct involvement in her husband's activities. Both James Johnson, who was involved with Daniel Magoon's drug dealings, and his wife Oresta, only offered indications that Mary had some knowledge of her husband's drug and weapon selling activities; neither stated that Mary had any involvement. (See Lodgment No. 109, Exs. 29, 30.) In any event, trial counsel touched on this matter in closing, noting that: "She was a partner, as I pointed out in opening, in marriage. She was at least a silent partner as to the drug dealing." (RT 4053.)

Mary's drug use on the night of the murder was noted at trial, both during the testimony of medical examiner Super, who noted the cocaine content in her blood, and in defense counsel's arguments to the jury that both Daniel and Mary Magoon had drugs in their system on the evening of the murders. (RT 3620, 4053.) However, Petitioner's contention that counsel should have investigated and presented evidence about Mary Magoon's "pervasive derelictions of her maternal duties with respect to her children, presumably due to her chronic drug use" are speculative and conclusory. (See SAP at 114.) In the state habeas petition, incorporated by reference, Petitioner argues that the condition of the Magoon home was "slovenly," that J. in particular was experiencing developmental delays, and "[h]ad social services learned of the conditions in which J[] was living in 1992, regulations would have mandated immediate removal from that home." (Lodgment No. 106 at 126-27.) Petitioner further states that "[t]he house's deterioration suggests that Mary had used cocaine for an extended period of time, and had probably developed a tolerance," and posits that "[h]ighly intoxicated people have used their own children as hostages, or

09cv0388 L (NLS)

shields, in order to avoid seizures by the police, or to exploit another cocaine dealer," and includes several newspaper articles concerning such instances. (Id. at 127-28; Lodgment No. 111, Ex. 63.) This argument appears to be based at least in part on the declaration of health services management director Cherlyne Short Majors, who states she has over 30 years of experience in the fields of "child/maternal health and substance dependence." (Lodgment No. 111, Ex. 62.) Majors states that a "very substantial dose" of cocaine was in Mary Magoon's system at the time of her death, and opines that her review of materials concerning the condition of the Magoon home, the family relationships, and autopsy reports "suggests that Mrs. Magoon had used cocaine [or related stimulant] for a lengthy period, and had likely developed a high tolerance." (Id.) Majors opines that Mary Magoon was "neurologically impaired" at the time of her death and that "[i]t is highly probable that her movements in that moment of crisis did not comport to her own norms, much less the norms of the larger society." (Id.) Even were the Court to credit Majors' opinion that Mary was impaired at the time of her death, an assertion that Mary used her son as a shield is without record support and cannot sustain a claim of ineffective assistance. James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.")

The remainder and bulk of this claim concerns allegations that trial counsel inadequately challenged the prosecution's case, primarily with respect to the forensic evidence, and that counsel failed to present other available evidence in support of the defense that was advanced at trial.

Petitioner focuses much of his argument on trial counsel's alleged failures in challenging the DNA, blood spatter and ballistics evidence, and characterizes "the failure to retain a blood spatter expert to testify as to the unlikelihood that petitioner killed Mary Magoon" as "the most significant and prejudicial aspect of counsel's deficient performance." (Reply at 95) (emphasis in original.)

As an initial matter, the Court must address the declaration of George N. Crawford, which was submitted as an exhibit to the federal petition in support of this claim, and on

which Petitioner significantly relies in support of his argument that trial counsel acted deficiently in investigating his case and challenging the forensic evidence introduced at trial. (See SAP at 115-17.) As noted previously, the instant claim was previously raised as Claims XI and XII in the first state habeas petition, which was adjudicated in February 2009. (See Lodgment Nos. 106, 118.) Meanwhile, Crawford's declaration, federal habeas Exhibit B, was signed in August 2010. (See ECF No. 54-4.) In Pinholster, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Id., 563 U.S. at 181. Pursuant to Pinholster, this Court cannot consider the Crawford declaration in deciding whether the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts, because this exhibit was not part of the state record at the time the issues were adjudicated by the California Supreme Court. See id. at 182-83 ("It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.") Only if Petitioner first satisfies section 2254(d) on the record which was before the state supreme court can the Court consider this declaration.[18]

---

[18] In an Order dated January 4, 2011, three months before the Pinholster decision, this Court denied Respondent's motion to dismiss Claim 22 for failing to exhaust state remedies. (ECF No. 72 at 7-10.) This Court reasoned that the addition of the Crawford declaration did not render Petitioner's claim unexhausted, stating that "[h]ere, in state court, as in federal court, Petitioner claims that trial counsel was ineffective in failing to investigate and present evidence in defense against the prosecution's case, specifically concerning the physical and forensic evidence and Petitioner's alleged lack of involvement in the crime." (Id. at 9-10.) This Court noted that the Crawford declaration, which discussed several items of evidence previously addressed in the state habeas petition, also "does appear to offer several new facts in support of Petitioner's claim." (Id. at 9.) While the addition of those facts did not render the claim unexhausted, because the declaration itself was not presented to the California Supreme Court, and clearly includes facts not before that court, it would indeed be "strange" to consider those facts in deciding whether

The record reflects that trial counsel obtained expert assistance, by retaining criminalist Parker Bell to assist the defense, and case manager Amendola recalled visiting the crime scene with Bell, as follows:

> Parker walked through the Magoons' house with us.  He pointed out that the ceilings were too low for anyone to have lifted the rifles to strike Mary with them.  There would have been marks or holes in the ceiling, but we didn't see anything, nor any patching of marks or holes.  When Parker Bell came for a meeting, I remember laying on the floor and trying to be Mary and trying to figure out where she was shot.  I don't remember a decision not to use Parker at trial, or being part of any discussion about it - - but I was gone months before trial began.

(Lodgment No. 110, Ex. 48 at 3.)  Yet, a declaration from state habeas counsel Michael Snedeker indicates that Bell's last invoice was from February 1993, and notes that at that time less than 40% of discovery was in, and was before the defense received the blood analysis reports.  (Lodgment No. 123, Ex. 7 at 1.)  Snedeker states: "There is no record of any other criminologist being hired by counsel for petitioner."  (Id.)  Assuming that another criminologist was not retained, Petitioner fails to persuasively explain how this renders trial counsel's performance deficient.  The state record is bereft of any evidence reflecting the work Bell performed, any reports generated, and what, if anything, additional investigation could have produced.  Available records reflect that counsel also contacted and retained at least two other experts to consult on the forensic evidence, including criminalist Richard Fox and Marc Taylor, an expert in criminalistics and DNA analysis.

---

the state supreme court's decision was unreasonable under section 2254(d).  See Pinholster, 562 U.S. at 182-83.

At oral arguments, Petitioner responded to the Court's inquiry on this point in apparent agreement that the exhibit could only be considered if Petitioner first satisfied section 2254 on the record before the state court, stating that: "And Your Honor's question about the impact of *Pinholster* case, our view is that if the Court concludes the California Supreme Court was unreasonable in its decisions or its failure to conduct evidentiary hearings, then the Crawford declaration, Exhibit B, can be used in weighing the prejudice to Mr. Hoyos."  (ECF No. 142 at 61.)

(Lodgment No. 110, Exs. 40, 44.)  As discussed above, the record reflects that trial counsel, after consulting with experts including Taylor and Fox, engaged in an extensive cross-examination of prosecution witnesses Kennedy and Harmor about the blood spatter and DNA evidence, which was a viable and reasonable tactical choice.  See e.g. Bonin, 59 F.3d at 834 ("[T]he presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense."); Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.")  As discussed below, even assuming counsel acted deficiently in failing to adequately investigate and challenge the prosecution's forensic evidence, Petitioner fails to demonstrate prejudice.

In the first state habeas petition, and incorporated by reference in the instant Petition, Petitioner lists a number of points aimed at criticizing the adequacy of the defense presented at trial in an apparent attempt to buttress the contention that a different defense theory, that of third party culpability, would have proven more successful.  Among the points Petitioner raises are the following: Petitioner states that the arresting officer did not note any significant injuries to Petitioner's person and questions how Petitioner's blood was found on one of the weapons at the scene, argues that the timing testimony provided by witness Mary Lange does not match the prosecution's theory nor the blood evidence, questions why hair matching J. Magoon was found in both Daniel and Mary Magoon's hands, notes Alvarado's print on the cup in the Magoon kitchen and questions why the Magoons would have let them into the house given Johnson's statements that Petitioner and his companions showed up at all hours and made the Magoons nervous and scared, and asserts that D. Magoon knew Petitioner as a friend of the family and told authorities that Petitioner had not been to their home that evening.  (Lodgment No. 106 at 135-46.) With respect to Mary Magoon, Petitioner argues that her murder and the asserted torture did not take place as the prosecution asserted, given the likelihood that Mary Magoon knew the combination to the bedroom gun safe, the lack of blood in the bedroom and hall and that she likely had a cigarette in her mouth.  Petitioner argues that these facts refute the contention that Mary Magoon was attacked in the bedroom and that they confirm that the

final shots were fired close in time and could not have constituted torture. (Id.)

As Strickland instructs, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id., 466 U.S. at 689. Petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id., quoting Michel, 350 U.S. at 101. Instead of adhering to this standard, Petitioner implores the Court to retrospectively evaluate counsel's performance in a manner explicitly discouraged by Strickland. The Court declines to do so, as the matters Petitioner raises here could have been the result of trial counsel's strategic decisions- Petitioner provides no evidence to the contrary. See Burt v. Titlow, 571 U.S. ___, 134 S.Ct. 10, 17 (2013) ("It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'") (bracket in original), quoting Strickland, 466 U.S. at 689.

For instance, Petitioner asserts that trial counsel was deficient in the "failure to elicit from D[] that he knew petitioner as a friend of his father, and that petitioner had not gone to his house that night, before, during, or after the shootings." (SAP at 114) (emphasis in original.) Petitioner relies on videotaped interviews with seven year old D., conducted after the crimes, and contended in the state habeas petition that the reports summarizing those interviews were "misleading" with respect to Petitioner. (Lodgment No. 106 at 145.) While the record submitted to the Court does not contain copies of those videotaped interviews, the Court will assume the truth of Petitioner's account, that D. indicated in prior interviews that Petitioner was a friend of his father's and was not at the Magoon home that evening. Yet, the record also reflects that D. also stated during prior interviews, and testified at trial, that he was asleep during the murders and woke in the morning to find his parents dead. (See e.g. RT 2894-97.) Absent any information or evidence to the contrary, the Court must presume that the failure to question D. about this apparent inconsistency,

particularly in light of his young age and the traumatic experience he went through in discovering his parents' bodies and then testifying about it at trial, "might be considered sound trial strategy." Strickland, 466 U.S. at 689.

In addition, several of the inconsistencies in the prosecution's case Petitioner now highlights were in fact brought out at trial and specifically discussed in defense counsel's arguments to the jury to attack the prosecution's case as well as in support of the defense theory that the murders were the result of an unexpected altercation rather than any planned or premeditated crime. For instance, during closing arguments, trial counsel repeatedly raised the fact that the arresting officer did not note any injuries to Petitioner and questioned the test results and testimony that Petitioner's blood was found on both his pants and a weapon recovered from the scene given his lack of injury. (See RT 4093-97, 4105-07.) Defense counsel clearly attacked the prosecution's timeline and theory of the crimes, asserting that the crimes were not planned nor were the events prolonged, but instead "was five minutes to ten minutes of chaos." (RT 4055-62.) Defense counsel speculated in closing that Mary Magoon went into the bedroom knowing the location of the secret compartment and the Helwan, and addressed the lack of blood in the bedroom and argued that it showed no torture took place in that room, which undermined the prosecution's theory of the crime. (RT 4059-61.) Because counsel addressed these points at trial, either through the introduction of evidence or arguments to the jury, they do not support this claim of ineffective assistance.

Thus, for the reasons stated above, the California Supreme Court could have reasonably rejected these contentions based on Petitioner's failure to satisfy Strickland's performance prong, as Petitioner has not established that counsel's actions were unreasonable, or that they fell outside the admittedly "wide range of reasonable professional assistance." Strickland, 466 U.S. at 689; see also Siripongs, 133 F.3d at 736 ("[T]he relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable.")

///

09cv0388 L (NLS)

On this record, the California Supreme Court could also have reasonably rejected this claim based on Petitioner's failure to demonstrate prejudice. Petitioner's primary contentions are that trial counsel erred in attempting to avoid conviction on first degree murder charges and a subsequent penalty phase proceeding rather than competently investigating and presenting a different defense and that counsel failed to investigate and adequately challenge the forensic evidence against Petitioner. "In a case in which counsel's error was a failure adequately to investigate, demonstrating <u>Strickland</u> prejudice requires showing both a reasonable probability that counsel would have made a different decision had he investigated, and a reasonable probability that the different decision would have altered the outcome." <u>Bemore v. Chappell</u>, 788 F.3d 1151, 1169 (9th Cir. 2015), citing <u>Wiggins</u>, 539 U.S. at 535-36. Here, Petitioner fails to establish a reasonable probability of either a different decision by counsel or a different outcome at trial. Again, the evidence of third party culpability Petitioner offers goes only to motive and opportunity, and is inadmissible under California law, while Petitioner's arguments about Mary Magoon's involvement in her husband's drug smuggling activities and her participation that evening are based on speculation. Even if trial counsel had obtained of all of the information presented here, Petitioner fails to demonstrate any reasonable probability that counsel would have chosen another defense over the one presented at trial, nor any reasonable probability that the outcome of the trial would have differed.

Petitioner also fails to show prejudice stemming from the absence of expert testimony challenging the physical evidence. Petitioner argues that:

> It is highly relevant to prejudice that trial counsel failed to investigate the defense that petitioner had laid out for them at the beginning of the case, and to which he adhered throughout the course of the trial, i.e., that he and Alvarado arrived at the Magoon residence to find the bloody scene and the victims, after which they left with marijuana from the garage. The testimony of a blood spatter expert would have provided very strong corroboration of petitioner's defense, and would have undermined what the prosecutor claimed as highly inculpatory evidence.

///

(Reply at 97.)  Petitioner criticizes the collection and analysis of the ballistics evidence, hair samples, and blood evidence, noting the presence of numerous bullet casings in the home that were not matched to any weapons recovered from the scene or the car, questioning how both Daniel Magoon and Mary Magoon had hair in their hands matching J. Magoon, and positing that the lack of significant injury to Petitioner coupled with the delayed discovery of blood matching Petitioner on the weapons at the scene raised a possibility that the stains were the result of contamination.  However, the state record is bereft of evidence outlining the contents of prospective testimony by a blood spatter expert, ballistics expert, or other relevant expert[19] on these matters, or detailing how any such testimony could have made a difference at Petitioner's trial.  These contentions, on their own, are insufficient to demonstrate prejudice.  See Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice.")

Petitioner's prejudice argument also remains unpersuasive given the substantial evidence supporting the first degree murder verdict, particularly with respect to Mary

---

[19] In support of the first state habeas petition, Petitioner offers a declaration by forensic scientist Laurie Kaminsky, who reviewed the prosecution's hair examination report. (Lodgment No. 117, Ex. 118.) Kaminsky's declaration is limited to the analyst's discussion of hairs found in Mary Magoon's right hand, labeled #44, that were similar in hue, but different in pigmentation size and distribution, to that of Daniel Magoon, and criticizes the analyst's opinion that the evidence "leads to no conclusion" as to whether the hairs originated from Daniel Magoon. (Id.) Kaminsky states that given the differences noted, "I would exclude the hair standard from Daniel Magoon, Sr. as a possible source for the evidence hair." (Id.) However, Kaminsky qualifies her conclusion by noting that: "It should be noted that I have not personally examined the hairs referenced in this declaration nor have I examined [the analyst's] examination bench notes." (Id.) Upon reviewing the trial record, the analyst testified that with respect to #44, "I could not determine from whom this particular strand of hair originated." (RT 3359.) Given the lack of any trial testimony including Daniel Magoon as a possible source of this hair, Petitioner fails to demonstrate that this expert's prospective testimony was contrary to the trial testimony, much less show that it would have made any difference to the outcome of the trial.

09cv0388 L (NLS)

Magoon, as well as the special circumstances. Mary Magoon was found several rooms away from any weapon and was murdered in her pajamas, a pacifier in her hand and a baby blanket at her feet, and the evidence supported a conclusion that her three year old son was likely near her at the time of his wounding and possibly her death. Blood consistent with Petitioner and Mary Magoon was found on different areas of weapons connected to the crimes, and blood consistent with the victims' blood were found on Petitioner's pants. Petitioner and Alvarado were stopped by police about an hour or two after the murders at a location 15 minutes away from the Magoon home, with frozen marijuana in their trunk, a Helwan pistol in the car, and 9mm magazine and other bullets in the car. Meanwhile, 9mm casings were found at the crime scene, in addition to an empty box for a Helwan, remnants of frozen marijuana inside and outside the freezer, and Alvarado's fingerprints on a cup in the kitchen, while Daniel Magoon's prints were found on tape used to package the marijuana. On this record, Petitioner fails to demonstrate any reasonable probability that the outcome of the trial proceedings would have differed if not for counsels' alleged errors in investigating and presenting the defense at trial. See Strickland, 466 U.S. at 694; Richter, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.") Petitioner is not entitled to habeas relief on Claim 22. Because Petitioner fails to satisfy section 2254, an evidentiary hearing is not warranted on Claim 22. See Sully, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.")

## 5. **Claim 23**

Petitioner contends that he was deprived of the effective assistance of counsel at the penalty phase, as the defense "presented extremely cursory testimony at the penalty trial, consisting of relatives who testified that they loved petitioner and would be saddened if he were executed," yet failed to investigate or present information about Petitioner's background, upbringing, and social history, including his difficulties and accomplishments, as evidence in mitigation. (SAP at 117.) Specifically, Petitioner contends that trial counsel failed to investigate and present evidence that: (1) Petitioner

had undergone torture at the hands of Mexican police; (2) although Petitioner had spent time in Mexican prisons for involvement in drug related activities, there was a lack of violence; (3) Petitioner had a long-standing struggle with drug abuse, and counsel failed to procure a mental health expert to investigate the reasons for his drug use; and (4) Petitioner's childhood was difficult and marked by physical abuse and indications of childhood disabilities. (Id. at 118.) Petitioner requests an evidentiary hearing on this claim. (Id. at 55.)

Petitioner raised this claim as Claim XIII in the first state habeas petition, and the California Supreme Court rejected it on the merits without a statement of reasoning. (See Lodgment Nos. 106, 118.)

## A.   Penalty Phase Presentation

Prior to the commencement of the penalty phase presentation to the jury, counsel litigated the prosecutor's attempt to introduce a prior conviction in Mexico as evidence in aggravation under Cal. Penal Code section 190.3(c); after hearing testimony and citing concerns about the presumption of guilt, absence of jury trial, and allegations of torture to obtain confessions in that jurisdiction, the trial court excluded the conviction. (RT 4510-11.)  After this ruling, the prosecution brought up the possibility of instead introducing evidence concerning Petitioner's prior criminal activity under Cal. Penal Code section 190.3(b) and exploring the issue of prior criminal activity through cross-examination of any mental health experts or character witnesses called to testify on Petitioner's behalf. (RT 4511-12.)  In response, defense counsel stated:

> Your Honor, at this point I would like to rather clearly and candidly indicate that with the ruling the court made, that it is not our intention right now to call a psychiatrist or a psychologist, so I don't need to address what would be used there.

> And amongst other witnesses, just specifically jumping into it, were we to call other family members, for instance, it would not be as character witnesses, it would be to the limited extent, for instance, to ask would the death of your brother, father, or husband be a great loss to you?

09cv0388 L (NLS)

> Which I suggest to the court will be so definitive that it will not arguably come near opening up character -- by being a character affirmation or testimony as to good character, and it will not invite or allow cross-examination including bad character, including this prior conviction.

(RT 4512-13.)  The trial court noted that because the prior conviction was excluded, "the prosecution could not impeach the defendant via have you heard type questions framed in terms of a conviction of the defendant," if the defense called character witnesses, but acknowledged that "the underlying facts may well be the subject of a proper have you heard type of question." (RT 4513.)  The prosecution stated that if such character witnesses were called, he would seek to ask about Petitioner's involvement in a 1983 robbery, a 1992 jewelry theft, a 1989 check forgery, and trafficking in narcotics in 1977.  (RT 4518.)

Correctional consultant James Park, who worked on death row at San Quentin State Prison, testified about the four-tier prison classification system, of which Level IV was the highest security.  (RT 4782-86.)  Park stated that an individual sentenced to life without parole would be placed in a Level IV institution, of which there are five in California, and showed photos of the cells, security measures, and discussed prison conditions.  (RT 4786-98.)  Park acknowledged that even in a Level IV prison, inmates could work on maintenance or industry if offered at that institution, and that the institutions had libraries, a group TV room, exercise yards, and the inmates could have family visits.  (RT 4799-4806.)

Carrie Baker, who lived in Jamul near the Magoon home at the time of the murders, estimated she came home from work that evening at 2:00 a.m., and heard gunshots at about 2:45 a.m.[20]  (RT 4807.)  She was reading the paper with the windows open and heard a muffled gunshot, shortly thereafter heard three additional gunshots, and after another space of time, heard two more gunshots.  (RT 4808.)  Baker stated that the shots startled her dog, who barked his "people bark," and while she was able to quiet him down by 3:30 a.m. to

---

[20] As the California Supreme Court noted, the gunshots Baker heard "would have been after the time defendants had been arrested."  Hoyos, 41 Cal. 4th at 889.

go to sleep, she was continually woken until about 5:15 a.m.  (RT 4808-09.)  She was then woken by sirens at around 7:30 or 8 in the morning, and thereafter learned of the murders.  (RT 4809.)  She noted in her diary that she heard gunshots before she went to bed on May 26 to 27, 1992.  (RT 4810-11.)  Baker explained that her entry would have been made for Tuesday night May 26, even though it was actually Wednesday morning, because she gets home from work late on Tuesday nights.  (RT 4811-12.)  Baker thought, based on her dog's barking, that someone was in her yard that evening.  (RT 4815.)

Jaime Armando Hoyos Alvarado, Petitioner's son, testified that he loved his father and would feel "badly" if he could no longer see him.  (RT 4819-20.)  Petitioner's son Jesus Ivan Hoyos Alvarado also stated that he loved his father and would feel badly and miss him if he could no longer see him.  (RT 4820-21.)  Myrna Myela Hoyos Alvarado, Petitioner's daughter, testified that she loved her father.  (RT 4821.)  Myrna Myela Alvarado de Picos, Petitioner's wife, testified that the prior three witnesses were her children with Petitioner, that today was Petitioner's birthday, that she would feel extremely sad if he were put to death, and that she was currently raising the children on her own.  (RT 4822-23.)

Jesus Antonio Hoyos Jaime, Petitioner's older brother, stated that he loved his brother a lot, missed him a lot, and would feel sad to lose a loved one.  (RT 4823-24.)  Ricardo Hoyos Jaime, Petitioner's younger brother, testified that he loved and missed his brother and would be greatly affected were Petitioner put to death.  (RT 4824-25.)  Eusebio Hoyos, Petitioner's younger brother, stated that he loved his brother and it would be very painful to him if Petitioner were put to death.  (RT 4825-26.)  Eusebio stated that he lived in Tecate, as did their entire family, and explained that their mother and father could not come to court today because "they are a little bit ill, in bad health." (RT 4826.)  Maria Elena Hoyos Hernandez, Petitioner's sister, also stated that she missed her brother and would feel very sad if he were put to death.  (RT 4827-28.)

The prosecution waived opening statement and declined to present evidence at the penalty phase, offering argument only in closing.  (RT 4779, 4782, 4828, 4840-58.)

1
2

## B. Background Information Submitted During Post-Conviction Proceedings[21]

3      Petitioner submitted to the state court declarations from numerous family members,
4   including several declarations from siblings who testified at trial, as well as declarations
5   from several family members who did not testify at trial, including other siblings and his
6   mother.  Petitioner also presented school records, a declaration from his family physician
7   about his history of drug addiction, and his own declaration.  As set forth below, these
8   declarations discuss Petitioner's background, including his upbringing, family and social
9   history, and particularly physical abuse by his father, Petitioner's personality and
10  rebelliousness, his later drug addiction and accidents suffered by Petitioner in childhood
11  and as an adult.  Petitioner also presented documents and information about Mexican prison
12  conditions and torture in those institutions, and a declaration from a prison worker who
13  knew Petitioner.  Finally, Petitioner presented an evaluation from a clinical psychologist
14  who examined him prior to the trial proceedings, and a declaration from a clinical
15  psychologist specializing in neuropsychology who examined Petitioner during post-
16  conviction proceedings.

17      The Hoyos family owned and operated a ranch in Tecate, Mexico, and every family
18  member worked to run the ranch.  The Hoyos children all worked on the ranch every day
19  both before and after school, starting at a young age and leaving them with little time for
20  leisure.  (Lodgment No. 114, Ex. 80 at 1, Ex. 82 at 1, Ex. 83 at 1, Ex. 111 at 1.)  Petitioner
21  states that he started working on the ranch as "a little boy," and that: "I was the best of all
22  my siblings at working with horses so over time I became almost exclusively in charge of
23  the task of handling the horses."  (Lodgment No. 115, Ex. 84A at 1.)  Petitioner's brother

24  _____

25
26      [21] Several documents in the state record, including declarations signed by Petitioner's
    mother, siblings, girlfriend, family doctor, torture expert Alfaro, and Petitioner himself, are
27  in Spanish, and are accompanied by unsigned English translations.  (See e.g. Lodgment
    Nos. 114, 115.)  Any references or citations to the declarations are to the English versions
28  of those documents.

Adolfo adds that: "Jaime was very good at working with horses. He was the one mostly in charge of taming the wild horses because he was so skilled at this and he was better at this than the rest of us." (Lodgment No. 114, Ex. 112 at 1.) Petitioner's brothers Eusebio and Ricardo each note that Petitioner had a lot of energy and enjoyed working with the cattle and wild horses, and was thus well-suited for his work on the ranch, with Ricardo adding that: "Part of this job means getting thrown off horses and pounded around a lot." (Id., Ex. 82 at 1, Ex. 111 at 2.)

Petitioner's grandparents lived nearby and his two grandmothers treated the children very differently, with Petitioner stating that his maternal grandmother "was extremely affectionate and loving with all her grandchildren, including me," while his paternal grandmother "was a cold, angry, grumpy woman who picked favorite grandchildren." (Lodgment No. 115, Ex. 84A at 3.) Petitioner was not among his paternal grandmother favorites, and Petitioner said: "I felt she actually despised me while she just ignored" two of his brothers. (Id.) Petitioner notes that his grandmother bought presents for some grandchildren and nothing for others, that she "was friendlier and more patient" with some of the children while "she just yelled at and scolded" him and a few of his other siblings. (Id. at 4.) Petitioner's mother Leticia confirms this disparate treatment, stating that her mother-in-law "rejected" and "disliked" Petitioner and reasoning that "[m]aybe it was because Jaime was the most restless and hyper of the grandchildren." (Lodgment No. 114, Ex. 79 at 13.)

Petitioner's mother Leticia states that Jesus, her husband and father to their children, "was an alcoholic for many years" when the children were young and "drank almost everyday." (Id. at 5.) Leticia states that Jesus "was hard on the children," and "hit them just because he was angry," and that when he drank "he would act even more ill-tempered than normal." (Id. at 4-5.) Leticia explains that Jesus had a complicated relationship with his own parents, who had hit him. (Id. at 7.) Leticia describes Jesus as a "disciplinarian" who "was too strict with and hard on his children," states that she "used to cry when Jesus hit the children" and "had to sneak in fun for my children and do it behind my husband's

200

back." (Id. at 10.)

Petitioner states that: "My father and his mother had the same ill-tempered character," as they were "both demanding," and "both angered easily and seemed unhappy or grumpy." (Lodgment No. 115, Ex. 84A at 5.) Petitioner adds that: "My father's temperament was even gruffer when he drank alcohol. As a kid, I used to be afraid of my father and especially when he was drunk because this meant he might hit me for no reason. Other times, he hit me and my siblings with a belt when he got angry or to discipline us." (Id.) Petitioner describes his relationship with his father as "intense" and states that: "We communicated with each other as passionately as we butted heads with each other." (Id. at 3.) Petitioner also felt that his brothers Ricardo and Jesus were jealous over the bond he had with their father, stating that: "Even as adults, they used to say our father treated me better than them." (Id.) Maria Elena notes that: "My father hit all his children equally for what he considered misbehaving. However, Jaime was hit the most because he was the most restless and disobedient child." (Lodgment No. 114, Ex. 83 at 2.) Maria Elena adds that their father was "ill-tempered and ornery," was "unpredictable" and "would also get angry for no reason," and that he "also beat the animals when he was irritable and angry." (Id. at 2-3.)

Petitioner's family also provided additional information about Petitioner's behavior during childhood and adolescence. Leticia states that Petitioner cried more than her other children, had mood swings and "could go from being calm in one moment to becoming restless and anxious or hyper in the next moment, or vice versa, with no apparent trigger." (Id., Ex. 79 at 17-18.) Leticia states that: "As an adult, Jaime has confessed to me that he felt depression, desperation, anxiety, and restlessness throughout his childhood and adolescence." (Id. at 17.) Petitioner was hyperactive in his classes at school, became "more rebellious and temperamental" as he got older, and did not perform well in school, as he "was more focused on socializing than on his academics." (Id. at 18-20.) Leticia said that Petitioner "was a moody child and he was a temperamental teenager." (Id. at 21.) As Petitioner got older, "it was obvious his friends were drug addicts and/or drug dealers,"

and while many old friends expressed their concerns about Petitioner's drug use and new friends, Petitioner denied bad behavior.  (Id. at 22.)  After one argument with his parents about his long hair and friends, Leticia recalls that Petitioner went to his room, where a pistol was kept under the bed, slammed the door and: "The next thing I heard was Jaime firing the pistol.  I ran into the bedroom and saw that Jaime had shot himself in the arm." (Id. at 25.)  Leticia states that Petitioner "definitely overreacted" to the argument and she suspected he was trying to scare her and his father, or that drugs were a factor in his actions. (Id.)

Petitioner's oldest brother Jesus Jr., similarly states that Petitioner "was never very good in school, but none of us were very school smart except my brother Eusebio and my sister Maria Elena." (Id., Ex. 80 at 1.)  Jesus states that Petitioner was "naughtier and more hyper" than the other children and that "[i]t seemed like it was hard for Jaime to stay still." (Id.)  Jesus states that: "At first, Jaime's friends were good kids but as Jaime got older his friends started to come from a bad crowd." (Id. at 2.)  Petitioner's brother Eusebio adds that he recalled his brother was "too playful" in school and it landed him in trouble, noting that in middle school, Petitioner "punctured the tires of a teacher and got suspended and after this he stopped going to school." (Id., Ex. 82 at 2.)  Eusebio, like Jesus, notes that Petitioner had good friends when he was younger, yet "as Jaime got older, he started having friends who were bad kids and who were a bad influence on Jaime." (Id. at 3.)  His brother Ricardo recalls that: "Jaime was definitely the most hyper one out of all his siblings.  In comparison, he had more energy and it was harder for him to stay still." (Id., Ex. 111 at 2.)  He adds that: "As a kid, Jaime was more disobedient than the rest of us, but his disobedience was nothing serious," and that "Jaime got scolded more than the rest of us because of his disobedience." (Id. at 2-3.)  Petitioner's brother Adolfo also recalls that Petitioner had a number of friends, but also noted that the type of people Petitioner associated with changed as Petitioner aged, stating that: "as he got older his friends started to be the kind of people who were a bad influence on him.  I could tell by the way these friends dressed in a fancy manner and by the luxurious cars they drove that they were

probably into drug dealing." (Id., Ex. 112 at 2.)  Petitioner also includes school records from Tecate, reflecting that he failed the subjects of mathematics and Spanish in high school while achieving the minimum required grades in other subjects, was suspended from school at one point in 1973, and was the subject of a behavior report for repeatedly arriving late to school in 1979.  (Lodgment No. 115, Ex. 85A.)

Petitioner also suffered several accidents in his youth and adulthood.  Leticia recounts that Petitioner lost his right thumb in an accident at age 15.  (Lodgment No. 114, Ex. 79 at 23.)  She also states that he fell off a horse at 15 or 16 and returned home bruised and scratched after rolling down a hill on the horse and losing consciousness, stating: "Jaime told us the horse fell, he was asleep for a while on the ground, and when he woke up, the horse was dead." (Id. at 23-24.)  She states that Petitioner later got a motorcycle, then sold it after having an accident with it.  (Id.)  Leticia also recounts that Petitioner was involved in a car accident not long prior to the events in the case, when he and a cousin "were driving in a small Volkswagen bug that flipped over and fell into a ravine." (Id. at 25.)  The car they were in was totaled and his cousin broke his collarbone, while Petitioner did not sustain any visible injuries.  (Id.)

Petitioner's brothers also noted the injuries from his work with horses, with Jesus Jr. stating that: "Jaime did get injured and knocked around a lot because it was tough work trying to tame wild horses." (Id., Ex. 80 at 2.)  Meanwhile, Adolfo states that Petitioner "got thrown off horses and fell a lot," noting that especially at the beginning of training the horses, "the horses get easily spooked." (Id., Ex. 112 at 1-2.)  Adolfo states that: "Even though Jaime stopped living on the ranch, he returned and he always loved being with the horses.  I remember seeing Jaime take a few hard falls with the last horse he was taming.  This was just a few months before he was arrested in San Diego." (Id. at 2.)  Eusebio states that: "About 15 or 20 years ago Jaime needed to be hospitalized in Tecate for a week or so after being involved in an accident with a horse.  I didn't see the accident but I remember seeing Jaime in the hospital," and adds that: "Jaime was always the most daring of all his brothers. That is why he loved cars and motorcycles and horses.  He got hurt a lot but he

wasn't scared of anything." (Id., Ex. 82 at 4.)

Several family members, as well as Petitioner and the family's physician, discuss Petitioner's lengthy history of drug and alcohol use and abuse. Petitioner's mother states that: "Jaime's father and I knew Jaime was into drugs since he was a teenager," but admitted that the family did not confront the matter until he was in his early thirties, about a year prior to his arrest in this case. (Id., Ex. 79 at 29.) She states that Petitioner "probably started using drugs even earlier than I thought he did. Perhaps this accounted for some of his wild behavior as a teenager." (Id. at 21.) During treatment by their family doctor, Petitioner spent time at the family's home in Tecate and it "was the first time he had ever told us in any detail about the drug addiction we had long suspected." (Id. at 29.) Leticia states that after treatment, Petitioner started to use drugs again and then went to the United States. (Id. at 30.) Dr. Jaime Chavez Jiminez, the Hoyos' family physician, treated Petitioner for his drug addiction upon Petitioner's request, and states that: "My method of treatment was to provide a substantial intake of vitamins and healthy food, but not other drugs of any kind - no tranquilizers, or anything that would replicate in any way the effect of drugs." (Lodgment No. 115, Ex. 91A at 2.) He states that Petitioner had "severe, but typical" withdrawal symptoms, complained of pain and aches, heard and saw things that did not exist, expressed sensitivity to sound and light, experienced paranoia, and expressed wanting to commit suicide. (Id.)

Jesus Jr. states that he thought his brother started drinking at age 16 or 17, while sister Maria Elena suspected him of both dealing drugs and guns throughout his twenties. (Lodgment No. 114, Ex. 80 at 3, Ex. 83 at 4.) Ricardo recalls that his brother drank and smoked during parties and other events as a teenager, in contrast to Ricardo, who waited to drink until 18, which was approved of by their father. (Id., Ex. 111 at 3.) Petitioner states that: "I started smoking marijuana when I was about 12 or 13 years old. Over the years, my drug use escalated with the use of stronger drugs such as cocaine, heroin, and pharmaceutical drugs and I became a serious drug addict. If I was out on the street today I feel I would still have a drug addiction and substance abuse problem without serious

emotional and medical therapy." (Lodgment No. 115, Ex 84A at 5.) He states that: "I never really liked marijuana. But by the time I was 14 and 15 years old, I was smoking marijuana daily and often consuming several drinks of alcohol as well." (Id.) He recalls that: "I started using cocaine sporadically when I was about 16 years old and by the time I was 20, I used cocaine daily and was addicted. On an average day, I snorted about three or four grams and on an extreme day, I snorted up to a half an ounce of cocaine." (Id. at 6.) Petitioner enjoyed the high, as it "altered my mood and it made me forget about any anger or sadness," but acknowledged cocaine also made him "feel more aggressive" and "act hysterical and paranoid." (Id.) He states that: "I got into heroin as a way to even out the extreme highs I got from cocaine," and also used pharmaceuticals "when I realized I was using too much of the cocaine or heroin I was supposed to be selling or storing. For a time I just used pills, but then I started mixing all the drugs." (Id.) He states that: "By age 23 or 24, I was addicted to cocaine, heroin, and uppers and downers. I used one or all of these drugs every day," and notes that he first used hard drugs in La Mesa prison in Tijuana. (Id. at 6-7.) Petitioner lived a "double life" as a teenager and in his twenties due to his drug use, including multiple periods where he quit and then started using again. (Id. at 7-8.) Petitioner also states that: "My trial attorneys knew nothing about my history of drug addiction," and because he went through withdrawal at the outset of the case, "[i]t took me about three months until I was really able to concentrate on the proceedings at hand. My attorneys had no idea I was suffering so much." (Id. at 9.)

Several of Petitioner's family members also mention that his second wife's family was known to be heavily involved in drug trafficking. (See e.g. Lodgment No. 114, Ex. 79 at 28, Ex. 83 at 4.) Petitioner's brother Adolfo notes that: "When Jaime married his second wife Mayela Alvarado, Jaime lived in town with her and her family. Mayela's father and brothers had a reputation for being involved in drug dealing so I am sure the Alvarado's [sic] were another bad influence on Jaime." (Id., Ex. 112 at 3.) Maribel Lopez, who was Petitioner's girlfriend at the time of the murder, states that Petitioner's wife Mayela "was stalking me and terrorizing me" prior to trial, and states that she stopped

visiting Petitioner in jail because "Mayela was making my life too difficult." (<u>Id.</u>, Ex. 64 at 4-5.)

Petitioner also experienced several incidents of torture, including multiple instances that occurred during incarceration in Mexican jails and institutions. Petitioner states that he was first kidnapped and tortured at age 17 by coworkers who thought he stole, but that "[a]fter this, my aggressors were always federal police." (Lodgment No. 115, Ex. 84A at 9-10.) Petitioner estimates that between 1977 and 1992, he was tortured by police about ten separate times, mostly during interrogations sessions, explaining that torture by the police was "always part psychological and part physical," and that he later experienced "paranoia and fear" and "flashbacks." (<u>Id.</u> at 10-11.) Petitioner states that: "Most of the times I was beaten and tortured by federal police occurred during police detentions. The main motive of police torture was to get money or information out of me." (<u>Id.</u> at 12.) He also explains that the torture was primarily related to drug crimes, in that: "I was never tortured or beaten up when I was detained outside prison and didn't have drugs in my possession." (<u>Id.</u> at 12-13.) He details various methods of torture he experienced, including electrocution, burning, beating, vinegar in his nose, and being thrown in the ocean in a sack, among others, and noted that he sometimes blacked out from the torture. (<u>Id.</u> at 11-12, 14.) Leticia, who visited Petitioner every few weeks during his incarceration in Mexico, states that he "was severely beaten and tortured before he was arrested and sent to a Mexican jail." (Lodgment No. 114, Ex. 79 at 28.) She states that: "They did horrible things to Jaime such as pouring carbonated water into his nose and they beat him so badly, they broke his ribs." (<u>Id.</u>) Petitioner's brother Eusebio recalls that: "About 20 years ago, I saw Jaime in a prison or jail clinic in Ensenada. He had been recently arrested. The police had severely beaten him up and tortured [sic] and he was still in their custody. Police commonly beat up and torture men they arrest, but Jaime got it worse than normal because he needed to be hospitalized. It seemed like Jaime had been beaten up about a week earlier and he was in such bad shape that it seemed like he needed about three more weeks to fully recover. [¶] Jaime was bruised and swollen all over his face and body. Everything hurt and

he was unable to talk. He just moaned in pain. He was lying in a bed to which he was handcuffed and there was a police officer watching over him. We weren't able to have a conversation because he was too badly beaten up. But I was able to see that Jaime was furious at the police. I was pretty worried about Jaime." (Id., Ex. 82 at 4.) Ricardo recounts that: "I was probably about 27 years old when I visited Jaime in jail in Ensenada. Jaime told me he had been beaten up by police but he didn't give me a lot of details. I could see that his back and his bottom were all bruised and he had cigarette burns on his back." (Id., Ex. 111 at 4.) Social anthropologist Victor Clark Alfaro, who has written and published case studies on the use of torture in Baja California, and who consulted with the defense before trial but was not called to testify, states that: "I have reviewed Jaime Hoyos's account of how he was tortured, and when. Of course, I was not there, and cannot provide direct testimony as to its veracity. However, I can say with confidence that not only is what he says plausible, but it is far more likely than not to be true, because that was precisely the way those types of cases were investigated at the times and places of his arrests." (Lodgment No. 115, Ex. 86A at 4.)

Mary Antonia Brenner, who has lived in a cell in the La Mesa Prison as a religious worker since 1977, knew Petitioner during his incarceration. (Lodgment No. 113, Ex. 90 at 1-4.) Brenner states that Petitioner was "courteous" and "shy" and was not violent like some of the men in the institution. (Id. at 4.) She states that Petitioner carried a photo of his newborn baby, and found Petitioner "likeable, and even boyish, as he seemed younger than his years." (Id.) Brenner states that Petitioner was "in no sense a shot-caller" in the prison, but instead "was happy to shine the shoes, so to speak of the head honchos in the drug-trafficking world. He would have been honor-bound to follow their directives, but he did not have either the type of character or the ability to initiate something malicious and complicated when I knew him." (Id.) Brenner states that had defense counsel contacted her, she would have appeared in court on Petitioner's behalf. (Id. at 4-5.)

Dr. Jiminez, the Hoyos family physician, who first met Petitioner as a teenager, also noted several behavioral matters, and states that Petitioner "had some kind of internal

struggle," and would swing between expressing affection and fighting and yelling, or would get along with people, shortly followed by screaming and saying ugly things to his family.  (Lodgment No. 115, Ex. 91A at 1.)  He opines that Petitioner suffered from depression and "exhibited symptoms of bipolar disorder."  (Id. at 4.)  He states that: "This [post-conviction proceeding] is the first time I have talked to the defense for Mr. Hoyos.  I would have been willing to speak for Jaime Hoyos' defense at the time of his trial and his family would have contacted me."  (Id. at 4.)

Records reflect that defense counsel contacted clinical psychologist Thomas MacSpeiden, Ph.D., to evaluate Petitioner and submit a report.  (Lodgment No. 113, Ex. 93.)  Dr. MacSpeiden related background and offense information, including Petitioner's self-report that his medical history was "uneventful" aside from the accident resulting in the amputation of his thumb and that he misused heroin in his early twenties on only a few occasions.  (Id. at 4, 7.)  Dr. MacSpeiden administered a number of tests, including the WAIS-R, Rorschach, TAT, Spanish versions of the MCMI-II and MMPI-2, and the Bender Visual Motor Gestalt Test.  (Id. at 15.)  Dr. MacSpeiden concluded that Petitioner's intellectual function was in the "low average range," and that "[t]he structure of Mr. Hoyos' personality is nonpsychotic."  (Id. at 22.)  Dr. MacSpeiden's analysis discussed the crimes themselves at length as well as offering his opinions about Petitioner's participation. Indeed, Dr. MacSpeiden opined that based on the results of his psychological evaluation, it "appears probable" that Petitioner accompanied his brother-in-law to the victims' home that evening to collect a debt, carried a weapon for intimidation, and that his brother-in-law was likely the first, and possibly the only, one to fire a weapon.  (Id. at 23.)  He stated that Petitioner was reported to be tearful over the injury to J. Magoon, which "suggests a degree of empathy -- or at least sympathy -- that would make killing another person difficult," but also stated that Petitioner's "need to appear macho would preclude his stopping another person from performing such an act."  (Id.)  Dr. MacSpeiden's diagnostic impressions included: "Opioid Dependence, in Remission" as well as "Dysthymia, Primary Type, Early Onset," and "Personality Disorder Not Otherwise Specified [with dependent

and self-defeating traits].'" (Id. at 24.)  As discussed below, the defense did not call him to testify at either the guilt or penalty phases of trial.

During post-conviction proceedings, counsel retained clinical psychologist Ricardo Weinstein, Ph.D, who specializes in neuropsychology, to evaluate Petitioner's cognitive functioning.  After an evaluation, including numerous tests not administered by Dr. MacSpeiden, and reviewing the prior evaluation, Dr. Weinstein concluded that "Mr. Hoyos is functioning at the mental retardation level of intelligence." (Id., Ex. 99 at 3.)  Dr. Weinstein states that: "In reviewing Dr. MacSpeiden's report it became evident that he failed to identify the very significant brain dysfunction that Mr. Hoyos has suffered over the course of his childhood, adolescence and adulthood." (Id.)  Dr. Weinstein notes Petitioner's "history of multiple brain insults dating back to his childhood" in addition to "many instances of loss of consciousness," and "a long history of severe drug addiction." (Id.)  Dr. Weinstein faults Dr. MacSpeiden both for failing to note that history and for using an interpreter to assist in conducting the evaluation rather than having tests conducted by a Spanish-speaking neuropsychologist. (Id. at 3-4.)  Dr. Weinstein states that: "It is my opinion with a high degree of scientific certainty that Mr. Hoyos suffers from significant brain dysfunction and possibly from mental retardation.  These are definitively mitigation factors in a death penalty sentencing trial." (Id. at 4.)

### C. **Discussion**

Under Strickland, "a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel." Mirzayance, 556 U.S. at 122, citing Strickland, 466 U.S. at 687.  "Surmounting Strickland's high bar is never an easy task." Padilla, 559 U.S. at 371.  Because the Court is reviewing this claim under section 2254(d), the "state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Richter, 562 U.S. at 101.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 105.

09cv0388 L (NLS)

Emphasizing the importance of discovering and presenting a penalty phase jury with all of the "relevant" and "available" evidence in mitigation, the Ninth Circuit has stated that "'trial counsel must inquire into a defendant's social background, family abuse, mental impairment, physical health history, and substance abuse history; obtain and examine mental and physical health records, school records, and criminal records; consult with appropriate medical experts; and pursue relevant leads.'" Wharton v. Chappell, 765 F.3d 953, 970 (9th Cir. 2014), quoting Hamilton v. Ayers, 583 F.3d 1100, 1113 (9th Cir. 2009), Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1999). In Strickland, the Supreme Court instructed that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691; see also Wiggins, 539 U.S. at 523 ("In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'"), quoting Strickland, 466 U.S. at 688-89 (internal citation omitted).

Again, Petitioner faults counsel for failing to investigate and present evidence that Petitioner was tortured by the Mexican police and in jail, failing to present evidence of Petitioner's prior incarcerations, and the lack of violence on Petitioner's part, failing to investigate and present evidence, such as a mental health expert, about Petitioner's struggle with drug abuse, and failing to investigate and present testimony by Petitioner's family members about his difficult childhood, including that he had been subjected to physical discipline and potentially struggled with childhood disabilities.

After reviewing the record, it is apparent that Petitioner's argument is premised more upon a disagreement with the penalty phase strategy defense counsel pursued than on whether the defense investigation and presentation was itself deficient or unreasonable.

While trial counsel admits conducting a "less than complete" investigation into Petitioner's background, the record shows that the defense made numerous efforts to gather information about Petitioner's family history, mental health, and criminal history, including that he had been subjected to torture, prior to making a reasonable, tactical choice to employ a penalty phase strategy that focused on sympathy and avoided character testimony in order to keep evidence of Petitioner's prior criminal activity from the jury. See Strickland, 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.") That Petitioner now posits a different strategy may have been more successful does not mean that the defense presented at trial fell below constitutional guarantees. See Raley, 470 F.3d at 799 ("A disagreement with counsel's tactical decisions does not provide the basis for declaring that the representation was constitutionally deficient."), citing Mayo, 646 F.2d at 375.

Investigator Alicia Vicars, who was part of the trial defense team, characterizes the penalty phase investigation as "very thin," as well as "embarrassing and deficient," and states that it "was the sideshow in comparison to the guilt phase." (Lodgment No. 110, Ex. 49 at 1-2.) Meanwhile, attorney Herrera states that the defense "did nothing to develop Mr. Hoyos' life story, and came to believe that we had nothing to present to the jury by way of mitigating evidence." (Id., Ex. 44 at 7-8.) Yet, available records show that members of the defense team, including both investigators and attorneys, repeatedly visited and interviewed Petitioner's family members and friends in Tecate and elsewhere, in an effort to obtain information on Petitioner's background and upbringing. Herrera states that: "I can not [sic] remember any efforts to gather school records or other documents about Mr. Hoyos. I do not believe we ever did a social history about Mr. Hoyos, or any history of his drug addictions, or any record of head injuries in childhood or adolescence." (Id. at 6.) Vicars states that she attempted to go to Petitioner's school, "but it was not open." (Id., Ex. 49 at 2.) Moreover, contrary to the detailed information now provided by these same

211

family members, the information Petitioner's friends and family members provided prior to trial failed to mention that Petitioner had any history of head injuries, of any significant drug use or abuse, that he suffered any physical abuse, nor offered any indication that Petitioner may have had childhood disabilities. Nor has Petitioner presented the Court with any documentary evidence, such as medical reports or hospital records, concerning such matters.

Public defender travel records show that investigators made numerous trips to Tecate in March, May, July and September 1993 to visit and interview Petitioner's family members in preparing for the penalty phase proceedings. (See Lodgment No. 113, Ex. 98.) Investigator Vicars specifically recalls traveling to Tecate with another investigator to visit and interview Petitioner's family members, and states that they "didn't find extreme poverty, sexual or physical abuse. The family was intact. They grew up in a beautiful location near Rancho la Puerta. At the time, it seemed to me he had a childhood any of us would have loved to have had. We brought back what we had, and the lawyers basically gave up, saying that we didn't have much." (Lodgment No. 110, Ex. 49 at 2.) Case coordinator Bunny Amendola agrees, noting: "There was nothing usable for the penalty phase in his background either. The family seemed fine," and that: "This case only had drugs; Jaime seemed to just get involved in drugs." (Id., Ex. 48 at 4.) Trial counsel similarly states that "[o]ur efforts to find evidence of dire poverty, sex abuse, or serious physical abuse in Mr. Hoyos's past, led us nowhere." (Id., Ex. 44 at 7.)

Petitioner's sister Maria Elena, when interviewed in May 1993, told investigators that Petitioner had many friends who visited the ranch and loved animals; she stated that they had a "normal family growing up" and that the "family was always close." (Lodgment No. 113, Ex. 95 at 1.) She said that her family "did not comment too much about Jaime's problems" and that "she never saw Jaime being involved in drug use and said he never had an alcohol problem." (Id. at 2.) Maria Elena told investigators that her brother worked at the family ranch after his marriage, was loving towards children and would not hurt a child. (Id.) An interview with Petitioner's brother Eusebio, conducted outside the South Bay jail

in January 1993, was slightly more detailed.  (Id., Ex. 96.)  Eusebio stated that their father "was a strong disciplinarian and would scold them or spank them if they did not behave," and Petitioner "was always a little more mischievous and active" than the other siblings.  (Id. at 1.)  Eusebio stated that their father drank when they were young, but "was never an alcoholic," and like Maria Elena, Eusebio stated that Petitioner liked animals, including horses and dogs.  (Id. at 1-2.)  Eusebio told the investigators that "the first time Jaime got into difficulties he was still very young.  He had heard it was something over drugs and says that maybe his parents discussed this problem with his older brothers."  (Id. at 2.)  Eusebio recalled finding out about Petitioner's drug troubles when Petitioner was detained in Tijuana, and said that "even though there was not a lot of money to give to Jaime he never saw that he had a problem with drugs or alcohol."  (Id.)  Eusebio also stated that Petitioner was loving with his children, and he could not believe Petitioner could hurt a child.  (Id.)  Augustin Eiraut, a friend of the Hoyos family who was interviewed in May 1993 in Tecate, stated that Petitioner worked with horses when he was younger and was always willing to help out.  (Id., Ex. 97.)

Vicars recalls that the defense investigators also spoke with Petitioner's father, but did not speak with Petitioner's mother, despite the fact that she was home at the time of their visit.  (Lodgment No. 110, Ex. 49 at 2.)  Vicars also recalls speaking to Eusebio and another brother home during that visit, adding that: "I also recall seeing the sister somewhere a second time other than the day we interviewed her."  (Id.)  Attorney Herrera recalls visiting the family's ranch in Tecate with co-counsel once, visiting Petitioner's home once, and visiting the ranch on another occasion.  (Id., Ex. 44 at 6.)  Petitioner's mother Leticia recalls the visits by counsel and consular officials: "I remember Mexican consular officials spoke with my husband and I during Jaime's trial investigation and I remember than Jaime's trial attorneys came to Tecate two times, each visit lasting about three hours.  My husband was scared and distrustful of the American legal system because it was so unfamiliar to him."  (Lodgment No. 114, Ex. 79 at 34.)  Two of Petitioner's siblings state that they would have provided additional information had they been asked.

09cv0388 L (NLS)

Petitioner's brother Eusebio states: "I remember Jaime's trial attorneys and investigators only visited Tecate a couple of times and they didn't stay for that long.  If they had stayed longer and asked more questions I would have given them more information."  (Id., Ex. 82 at 4.)  Maria Elena states that: "Jaime's trial defense team only came to Tecate two times staying a few hours on each visit.  I don't have any idea what information might have been useful, but I would have given a lot more information had they really wanted to talk to me."  (Id., Ex. 83 at 5.)  Petitioner himself acknowledges that he "did not fully open up to his attorneys," explaining that he did not fully understand the proceedings or trust his counsel due to the difficulties in understanding the differences between the Mexican and American systems, the fact that he did not speak English and he was not provided with translations of some documents, and the fact that he felt his attorneys did not visit him sufficiently.  (Lodgment No. 115, Ex. 84A at 14-15.)

The record also reflects that the defense retained an expert to evaluate Petitioner's mental health.  Attorney Herrera, who asked psychologist Dr. MacSpeiden to interview and evaluate Petitioner, states that: "I did not know of any head injuries or loss of consciousness by Jaime as a child.  I did not bring to Dr. McSpeiden's [sic] attention the fact that Mr. Hoyos was tortured, or any issues related to drug use or addiction, and I did not direct his attention to any of those things.  The materials we provided him, so far as I can now recall, related only to the crimes for which Mr. Hoyos was charged."  (Lodgment No. 110, Ex. 44 at 7.)  Dr. MacSpeiden conducted an extensive interview and evaluation of Petitioner, meeting with him on five separate occasions between January and April 1993, conducting numerous psychological tests and compiling extensive background and offense information, resulting in a 24 page psychological evaluation.  (See Lodgment No. 113, Ex. 93.)  A review of the background information reveals that, similar to Petitioner's family members, Petitioner downplayed his drug use, stating that "he had misused only heroin" in his early twenties and "no more than 'several times.'"  (Id. at 7.)  Petitioner stated that his father "was okay," and noted that his father was more strict than his mother, as he would punish the children and "[s]ometimes he'd spank us."  (Id. at 3.)  Petitioner failed to

09cv0388 L (NLS)

mention any history of head injuries or loss of consciousness to the psychologist, as Petitioner "initially said he had suffered no unusual illnesses, accidents or physical abnormalities, but then pointed out he is absent the thumb on his right hand." (Id. at 4.) After detailing the events leading up to the amputation, the report stated that "[o]therwise he thought his medical history unremarkable." (Id.) Petitioner similarly told Dr. MacSpeiden that his adolescent and young adult years were rather unremarkable, that he got "regular" grades in school, was suspended on a few occasions for pranks but did not get in trouble with the law, and was truant on occasion. (Id. at 4-5.) He told the psychologist of his working life, family life and children, and legal troubles as an adult, stating that his incarceration at La Mesa prison was "uneventful." (Id. at 5.) With respect to the testing conducted, Dr. MacSpeiden reported that: "This client's MMPI-2 clinical profile is within normal limits and no clinical diagnosis is provided." (Id. at 21.) The psychologist noted that the testing raised the possibility that Petitioner suffered from addictive problems, and he recommended that: "Further evaluation of alcohol or drug usage is recommended." (Id.) Dr. MacSpeiden also indicated that: "There appears to be no pressing need for psychological treatment, and restrictive administrative management will probably not be necessary for him." (Id.) Case coordinator Bunny Amendola's recollections are consistent, as she states that: "Dr. MacSpeiden ran psychological tests on Jaime for us. He was an expert that the Public Defender's office frequently used. MacSpeiden said that Jaime tested more psychologically normal than any person he had dealt with. He was startled by how normal Jaime's psychological results were. It seemed strange to us too." (Lodgment No. 110, Ex. 48 at 4.) Herrera states that after receiving the psychological evaluation, he declined to order any additional testing, explaining that: "My thinking then was focused entirely on whether or not Mr. Hoyos suffered from psychological problems. When my own belief in his normality in this area was confirmed by Dr. MacSpeiden, I made no further consideration of using any expert to examine Mr. Hoyos's mental functioning." (Id., Ex. 44 at 7.) Public defender records show disbursements to a psychiatrist in addition to those to the psychologist, but the record does

09cv0388 L (NLS)

not provide details about the reason for the former expenditure.  (Lodgment No. 113, Ex. 98.)

Herrera also states that "Mr. Hoyos informed me that he had been tortured, but he said no more, and I did not ask him to provide me any details." (Lodgment No. 110, Ex. 44 at 7.)  Yet, the record reflects that even if counsel did not question Petitioner, the defense did investigate the matter, as counsel obtained court records on Petitioner's prior convictions and criminal activities and consulted Professor Alfaro, a social anthropologist who studied and wrote about the use of torture in Baja Mexico, stating: "We were prepared to use him as an expert witness if the judge was inclined to allow the priors into evidence as aggravating factors during the penalty phase of Mr. Hoyos' trial." (Id. at 4.)  Counsel states that the conviction records the defense obtained "made it clear that Mr. Hoyos's convictions were the result of coercion, and probably torture." (Id.)  As mentioned above, the trial record reflects that the defense's penalty phase presentation was shaped by the fact that the trial court disallowed introduction of Petitioner's prior convictions as aggravation "on grounds that they were unreliable and coerced confessions." (See id.; see also RT 4511-13.)  Herrera recalls that "the court did allow the prosecutor to ask 'have you heard'-type questions to any character witness we might present, to see if they knew about these prior convictions, or had heard about the actions Mr. Hoyos was alleged to have done." (Lodgment No. 110, Ex. 44 at 4.)  Herrera states that the defense investigation did not uncover significant evidence in mitigation, and that: "Therefore, we chose to avoid any kind of character evidence or expert testimony, in order to completely exclude any questioning of witnesses by the prosecutor along the lines of whether or not they knew about the actions Mr. Hoyos had done in order to have been convicted of a felony in Mexico." (Id. at 8; see also RT 4511-13.)  Professor Alfaro's recollection is consistent with that reflected in the trial record, as he indicates that: "I was contacted in 1994 by Mr. Hoyos' trial attorneys, as asked to testify on his behalf about the routine use of torture to obtain confessions of crimes.  I agreed to do so, and would have testified then to what I have said in this declaration.  However, trial counsel told me that the judge had agreed not

09cv0388 L (NLS)

to allow the presentation of Mr. Hoyos [sic] prior convictions and that I would not be necessary." (Lodgment No. 115, Ex. 86A at 4.)

Under Strickland, a reviewing court must give deference to trial counsel's decisions and refrain from concluding that trial counsel was ineffective based solely on a disagreement with those decisions. See Strickland, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable.")  However, because the California Supreme Court rejected this claim on the merits, this Court's review must afford deference not only to trial counsel's decisions pursuant to Strickland, but to the state court decision as well.  See Richter, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.")

Here, there is a reasonable argument that counsel acted in a constitutionally acceptable manner in the investigation and presentation of the penalty phase case, despite the omissions noted above.  The record reflects that members of the defense team, including attorneys and investigators, traveled to Tecate and other areas on numerous occasions to investigate Petitioner's family history, including speaking to a number of Petitioner's family members and friends.  Counsel also retained a mental health expert to interview and evaluate Petitioner's psychological makeup, the results of which were generally normal.  Counsel investigated the torture angle with respect to Petitioner's prior criminal activity and convictions, including obtaining his criminal records and consulting with a relevant expert, and in doing so, succeeded in excluding their introduction from the penalty phase proceedings.  It is also apparent from the record that, in light of the information obtained during the defense investigation into Petitioner's background, trial counsel made a strategic decision to focus on sympathy and avoid introducing character testimony to keep evidence of the prior criminal activity from the jury.  (See RT 4511-13; Lodgment No. 110, Ex. 44 at 7-8.)

The California Supreme Court could have reasonably concluded that trial counsel's strategic decision supported the limits on the defense investigation, including the decision not to present mental health testimony experts or offer character testimony from family members in order to avoid jeopardizing the defense's success in excluding mention of Petitioner's prior criminal activities. See Richter, 562 U.S. at 102 ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.") "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689. Petitioner fails to show that the defense investigation, and the decisions of trial counsel reflected in the record, fell below constitutional guarantees.

The California Supreme Court could have also reasonably rejected this contention based on Petitioner's failure to demonstrate prejudice under Strickland. See Mirzayance, 556 U.S. at 122 ("[A] defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel."), citing Strickland, 466 U.S. at 687. As mentioned above, the Ninth Circuit instructs that: "In a case in which counsel's error was a failure adequately to investigate, demonstrating Strickland prejudice requires showing both a reasonable probability that counsel would have made a different decision had he investigated, and a reasonable probability that the different decision would have altered the outcome." Bemore, 788 F.3d at 1169, citing Wiggins, 539 U.S. at 535-36. Herrera now states that: "I believe now that we should have investigated further than we did, in large part because we did not quickly find evidence of what we thought to be the only mitigating factors. I understand that just because Mr. Hoyos did not grow up in a typically impoverished environment, and was not badly abused as a child, did not mean that he was not acting under compulsion and with significant limitations, and was not an individual." (Lodgment No. 110, Ex. 44 at 9.) Herrera also appears to leave open the

possibility that the defense strategy could have differed depending on what could have been developed from a more complete investigation, and states that: "Mr. Hoyos's prior convictions that led to prison terms in Mexico (drug transporting, a driver for a robbery of a telegraph office) were serious, but not remotely as serious as the commitment offense." (Id. at 8.)

Yet, Petitioner ultimately fails to establish a reasonable probability that employing the strategy advanced here would have led to different penalty phase outcome, given the strength of the aggravating evidence, particularly the circumstances of the crime. See Wiggins, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."); see also Williams, 529 U.S. at 397-98, Wong, 558 U.S. at 26 ("[T]he reviewing court must consider all the evidence-the good and the bad-when evaluating prejudice."), citing Strickland, 466 U.S. at 695-96.

First, trial counsel only notes two prior crimes, while the trial prosecutor voiced an intention to ask about five separate instances of previous criminal activity, spanning well over a decade, had the defense introduced character testimony. (See RT 4511-18.) While testimony about Petitioner's childhood and upbringing, including evidence about his strict and physically abusive father, Petitioner's history of drug addiction and that he suffered multiple instances of torture at the hands of legal and correctional authorities in Mexico would have certainly been mitigating, the impact of such evidence would have been tempered by the prosecutor's stated intention to ask any character witnesses if they had heard about Petitioner's prior criminal activity. Petitioner's lengthy and varied criminal history, while not as steeped in violence as the circumstances of the instant offenses, would have at a minimum diluted the weight of such mitigating evidence, particularly considering that the prior crimes evinced Petitioner's long-standing involvement in drug trafficking activities, and the murders at issue in the instant case were clearly drug-related.

While Petitioner could have introduced family members' anecdotal accounts of his prior head injuries, he fails to offer evidence showing how such injuries, on their own, constitute mitigating evidence. The psychologist who evaluated Petitioner prior to trial

asked about previous injuries and Petitioner failed to disclose any such history, nor has Petitioner offered any indication how the expert's evaluation or conclusions may have differed had such injuries been disclosed. While Dr. Weinstein, who evaluated Petitioner during post-conviction proceedings, states that Petitioner may be intellectual disabled, he refrains from actually rendering such a diagnosis without further investigation. In any event, any failures by Dr. MacSpeiden cannot be attributed to trial counsel. See Fairbank v. Ayers, 650 F.3d 1243, 1252 (9th Cir. 2011) ("An expert's failure to diagnose a mental condition does not constitute ineffective assistance of *counsel*, and [a petitioner] has no constitutional guarantee of effective assistance of experts."), quoting Earp v. Cullen, 623 F.3d 1065, 1077 (9th Cir. 2010) (emphasis and bracket in original). Petitioner also asserts that trial counsel should have procured a mental health expert to investigate the reasons for his drug use and contends that counsel also failed to present the jury with evidence that Petitioner's childhood behavior indicated that he suffered from learning disabilities. However, Petitioner only speculates that an expert would have concluded Petitioner suffered from learning disabilities, or that exploring his history of drug use would have provided additional mental health mitigating evidence. In addition, Petitioner admits that he withheld evidence of his drug use and addiction from counsel. Without declarations or other evidence outlining the expert testimony counsel allegedly should have presented, Petitioner cannot establish prejudice. See Grisby, 130 F.3d at 373 ("Speculation about what an expert could have said is not enough to establish prejudice.")

Thus, even had trial counsel pursued the strategy Petitioner now espouses, the Court remains unpersuaded that the additional evidence in mitigation would have overcome the substantial aggravating evidence. Again, the introduction of the mitigating evidence would have allowed repeated reference to Petitioner's prior criminal activity, which, while not as serious or grave as the crimes at issue at trial, showed that Petitioner had a substantial criminal history that spanned over a decade. Moreover, wholly apart from this criminal history, the circumstances of the crimes against the Magoon family were extremely brutal and amounted to significant evidence in aggravation, as Mary Magoon suffered numerous

blunt force injuries to her head and back prior to her death, as well as several gunshot wounds, including one to the back of the head. Her three-year-old son was shot in the head and was likely near his mother at the time of his wounding and her death. Her husband was also shot and killed. Two individuals killed and a child severely wounded, for cash and drugs. Evidence of Petitioner's childhood, drug abuse and the other evidence now offered in mitigation does not offset the powerful evidence in aggravation.

Therefore, to the extent the California Supreme Court's rejection of Petitioner's claim of ineffective assistance of trial counsel at the penalty phase was due to a failure to demonstrate prejudice, Petitioner fails to show that such a resolution was either contrary to, or an unreasonable application of, Strickland or that it was based on an unreasonable determination of the facts. See Richter, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.") Claim 23 does not merit habeas relief.

Given Petitioner's failure to satisfy section 2254, an evidentiary hearing is not warranted on Claim 23. See Sully, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.")

**E.  Systemic Claims**

**1.  Claim 24**

Petitioner contends that "[t]he California capital sentencing statute contains numerous invalidities, including the over-breadth of Penal Code section 190.2; the pervasive arbitrariness and capriciousness in the imposition of death sentences; and in the absence of adequate safeguards to ensure any death sentence is reliably and fairly imposed in conformity with the demands of the Eighth Amendment," and "is equally incompatible with international law and basic standards of decency." (SAP at 167.) Petitioner does not outline or detail these challenges in the SAP itself, but instead notes that "[t]he deficiencies in the California statute are set forth in detail in Appellant's Opening Brief, Argument XV." (Id.)

Petitioner presented this claim to the California Supreme Court on direct appeal, which the state court rejected in a reasoned decision as follows:

221

Defendant attacks the constitutionality of California's death penalty statute on numerous grounds. We reaffirm the decisions that have rejected similar claims and decline to reconsider such authorities, as follows:

That certain noncapital sentencing proceedings may require jury unanimity or proof beyond a reasonable doubt does not mean the death penalty statute violates the equal protection clause of the Fourteenth Amendment. (*People v. Rogers* (2006) 39 Cal.4th 826, 893, 48 Cal.Rptr.3d 1, 141 P.3d 135 (*Rogers*); *Blair*, *supra*, 36 Cal.4th at p. 754, 31 Cal.Rptr.3d 485, 115 P.3d 1145; *People v. Davis* (2005) 36 Cal.4th 510, 571–572, 31 Cal.Rptr.3d 96, 115 P.3d 417.) "The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (*Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1066, 47 Cal.Rptr.3d 467, 140 P.3d 775, citing *People v. Brown*, (2004) 33 Cal.4th 382, 401, 15 Cal.Rptr.3d 624, 93 P.3d 244.) Indeed, the trial court need not and should not instruct the jury as to any burden of proof or persuasion at the penalty phase. (*Rogers*, *supra*, 39 Cal.4th at p. 893, 48 Cal.Rptr.3d 1, 141 P.3d 135; *Blair*, *supra*, 36 Cal.4th at p. 753, 31 Cal.Rptr.3d 485, 115 P.3d 1145.)

The Eighth and Fourteenth Amendments do not require that a jury unanimously find the existence of aggravating factors or that it make written findings regarding aggravating factors. (*Rogers*, *supra*, 39 Cal.4th at p. 893, 48 Cal.Rptr.3d 1, 141 P.3d 135; *Blair*, *supra*, 36 Cal.4th at p. 753, 31 Cal.Rptr.3d 485, 115 P.3d 1145.) In addition, the United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*United States v. Booker* (2005) 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621; *Blakely v. Washington* (2004) 542 U.S. 961, 125 S.Ct. 21, 159 L.Ed.2d 851; *Ring v. Arizona* (2002) 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435) have not changed our prior conclusions regarding burden of proof or jury unanimity at the penalty phase. (*Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1066, 47 Cal.Rptr.3d 467, 140 P.3d 775; *Rogers*, *supra*, 39 Cal.4th at 893, 48 Cal.Rptr.3d 1, 141 P.3d 135.)

Section 190.2—setting out the special circumstances that, if found true, render a defendant eligible for the death penalty—adequately narrows the category of death-eligible defendants in conformity with the requirements of the Eighth and Fourteenth Amendments. (*Rogers*, *supra*, 39 Cal.4th at pp.

892-893, 48 Cal.Rptr.3d 1, 141 P.3d 135; *Blair*, *supra*, 36 Cal.4th at p. 752, 31 Cal.Rptr.3d 485, 115 P.3d 1145; *People v. Barnett* (1998) 17 Cal.4th 1044, 1179, 74 Cal.Rptr.2d 121, 954 P.2d 384.)

Section 190.3, factor (a)—which permits consideration of the "circumstances of the crime" as an aggravating factor—is not impermissibly vague and provides adequate guidance to a jury in sentencing. (*People v. Prieto* (2003) 30 Cal.4th 226, 276, 133 Cal.Rptr.2d 18, 66 P.3d 1123 (*Prieto*); *People v. Lewis* (2001) 26 Cal.4th 334, 394, 110 Cal.Rptr.2d 272, 28 P.3d 34.)

There is no requirement under the jury trial guarantee of the Sixth Amendment, the cruel and unusual punishment clause of the Eighth Amendment, or the due process or equal protection guarantees of the Fourteenth Amendment that a jury find the existence of unadjudicated criminal activity under section 190.3, factor (b), unanimously or beyond a reasonable doubt. (*Rogers*, *supra*, 39 Cal.4th at 894, 48 Cal.Rptr.3d 1, 141 P.3d 135; *Blair*, *supra*, 36 Cal.4th at p. 753, 31 Cal.Rptr.3d 485, 115 P.3d 1145.)

The use of restrictive adjectives—i.e., "extreme" and "substantial"—in the list of mitigating factors in section 190.3 does not act unconstitutionally as a barrier to the consideration of mitigation. (*People v. Harris* (2005) 37 Cal.4th 310, 365, 33 Cal.Rptr.3d 509, 118 P.3d 545; *Brown*, *supra*, 33 Cal.4th at p. 402, 15 Cal.Rptr.3d 624, 93 P.3d 244; *Prieto*, *supra*, 30 Cal.4th at p. 276, 133 Cal.Rptr.2d 18, 66 P.3d 1123.)

Intercase proportionality review is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution. (*Rogers*, *supra*, 39 Cal.4th at p. 894, 48 Cal.Rptr.3d 1, 141 P.3d 135; *Blair*, *supra*, 36 Cal.4th at p. 753, 31 Cal.Rptr.3d 485, 115 P.3d 1145.)

Capital punishment per se does not violate the Eighth Amendment's proscription against cruel and unusual punishment. (*People v. Moon* (2005) 37 Cal.4th 1, 47, 32 Cal.Rptr.3d 894, 117 P.3d 591; *People v. Staten* (2000) 24 cal.4th 434, 462, 101 Cal.Rptr.2d 213, 11 P.3d 968.) We have recently rejected the argument that we should reconsider our position in light of the abolition of the death penalty by the nations of Western Europe, and the United States Supreme Court's ruling in *Atkins v. Virginia* (2002) 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 that the execution of mentally retarded persons constitutes cruel and unusual punishment. (*Moon*, supra, 37 Cal.4th

at pp. 47–48, 32 Cal.Rptr.3d 894, 117 P.3d 591.)

Hoyos, 41 Cal. 4th at 925-27 (footnote omitted).

### A. **Failure to Narrow**

Petitioner asserts that "California's death penalty statute does not meaningfully narrow the pool of murderers eligible for the death penalty," and that the "death penalty is imposed randomly on a small fraction of those who are death-eligible," in violation of the Eighth and Fourteenth Amendments. (SAP at 167; Lodgment No. 100 at 298.)

Petitioner fails to cite to Supreme Court authority supporting his contention that the California capital statute fails to comply with constitutional guarantees in this manner and indeed conceded in the state court that "[t]he issue presented here has not been addressed by the United States Supreme Court. (Id. at 302.) Meanwhile, the Ninth Circuit has on multiple occasions rejected arguments asserting that the California capital statute fails to perform the narrowing function, as follows:

> With regard to this claim, we reject Karis' argument that the scheme does not adequately narrow the class of persons eligible for the death penalty. The California statute satisfies the narrowing requirement set forth in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The special circumstances in California apply to a subclass of defendants convicted of murder and are not unconstitutionally vague. See id. at 972, 103 S.Ct. 2733. The selection requirement is also satisfied by an individualized determination on the basis of the character of the individual and the circumstances of the crime. *See id.* California has identified a subclass of defendants deserving of death and by doing so, it has "narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." *Arave v. Creech*, 507 U.S. 463, 476, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993).

Karis v. Calderon, 283 F.3d 1117, 1141 n. 11 (9th Cir. 2002); see also Mayfield v. Woodford, 270 F.3d 915, 924 (9th Cir. 2001) (en banc) ("A reasonable jurist could not debate, therefore, that the 1978 California statute, which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional.")

///

///

1    Given the absence of Supreme Court authority, the Court is unable to conclude that
2    the state court's rejection of this claim is contrary to, or an unreasonable application of,
3    clearly established federal law.

### B.    Section 190.3(a)

5    Petitioner contends that Cal. Penal Code section 190.3(a) "has been applied in such
6    a wanton and freakish manner that almost all features of every murder, even features
7    squarely at odds with features deemed supportive of death sentences in other cases, have
8    been characterized as 'aggravating' within the statute's meaning." (SAP at 167; Lodgment
9    No. 100 at 303.)  Specifically, Petitioner argues that the aggravating factor, which allows
10   the jury to consider the circumstances of the crime, "is being relied upon as an aggravating
11   factor in every case, by every prosecutor, without any limitation whatever [sic]."  (Id. at
12   310.)  Petitioner acknowledges that factor (a) has been upheld by the Supreme Court, yet
13   argues that its application is so arbitrary and contradictory as to violate due process and the
14   Eighth Amendment.  (Id. at 305.)

15   As Petitioner recognizes, the Supreme Court has specifically rejected challenges of
16   vagueness with respect to several California capital sentencing factors, including factor (a).
17   See Tuilaepa v. California, 512 U.S. 967, 975-78 (1994).  The Tuilaepa Court stated that
18   "vagueness review is quite deferential," and explained that "a factor is not unconstitutional
19   if it has some 'common-sense core of meaning . . . that criminal juries should be capable
20   of understanding.'"  Tuilaepa, 512 U.S. at 973, quoting Jurek, 428 U.S. at 279 (White, J.,
21   concurring).   Because the Supreme Court instructs that vagueness review is "quite
22   deferential" and has explicitly upheld the constitutionality of factor (a), Petitioner fails to
23   offer any persuasive argument demonstrating that the state supreme court's rejection of
24   this claim is either contrary to, or an unreasonable application of, clearly established federal
25   law.
26   ///
27   ///
28   ///

### C.     Lack of Safeguards

Petitioner alleges that the California capital scheme is unconstitutional due to its failure to require a burden of proof and unanimity in finding the existence of aggravating factors, failure to require written findings, failure to require that the jury find that the aggravation outweighs the mitigation beyond a reasonable doubt or a preponderance of the evidence before imposing the death penalty, allowing the introduction of unadjudicated criminal activity as evidence in aggravation, failure to require or allow proportionality review, and the use of terms that act as barriers to the consideration of mitigation.  (SAP at 167; Lodgment No. 100 at 311-52.)

### 1.     Failure to Require Unanimity

First, Petitioner argues that the Supreme Court's decisions in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) and <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), compel a conclusion that a capital penalty jury must unanimously find factors in aggravation to be true beyond a reasonable doubt, and renders the California capital statute unconstitutional. (SAP at 167; Lodgment No. 100 at 313-14.)

In <u>Apprendi</u>, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  <u>Id.</u>, 530 U.S. at 490. "<u>Ring</u> altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment," by holding that "'a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty.'" <u>Schriro v. Summerlin</u>, 542 U.S. 348, 353 (2004), quoting <u>Ring</u>, 536 U.S. at 609 (bracket in original).

However, "[a] defendant in California is eligible for the death penalty when the jury finds him guilty of first-degree murder and finds one of the § 190.2 special circumstances true."  <u>Tuilaepa</u>, 512 U.S. at 975, citing <u>California v. Ramos</u>, 463 U.S. 992, 1008 (1983); <u>see also</u> Cal. Penal Code § 190.2.  As such, a California penalty phase jury's finding that

09cv0388 L (NLS)

the aggravation significantly outweighs the evidence in mitigation does not "increase" the penalty for first-degree murder beyond the statutory maximum and Petitioner fails to persuasively show that it is implicated by either <u>Apprendi</u> or <u>Ring</u>.  Petitioner fails to demonstrate that the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.

## 2.  <u>Failure to Require Written Findings</u>

Next, Petitioner alleges that the California capital statute fails to require specific or written findings regarding aggravating factors, violating Petitioner's right to due process and meaningful appellate review.  (SAP at 167; Lodgment No. 100 at 341-45.)

The Ninth Circuit has held that California's death penalty statute "need not require written jury findings in order to be constitutional."  <u>Williams v. Calderon</u>, 52 F.3d 1465, 1484-85 (9th Cir. 1995), citing <u>Harris v. Pulley</u>, 692 F.3d 1189, 1195-96 (9th Cir. 1982), <u>reversed on other grounds by</u> <u>Pulley v. Harris</u>, 465 U.S. 37, 53-54 (1984).  Petitioner fails to cite to any clearly established law compelling a conclusion that written findings are constitutionally required.

In the absence of any such authority, Petitioner fails to show that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.

## 3.  <u>Failure to Require Burden of Proof</u>

Petitioner also insists that the California capital statute is infirm because constitutional guarantees of due process and against cruel and unusual punishment require the penalty phase jury be instructed that they can only impose a death sentence if they find beyond a reasonable doubt that the evidence in aggravation outweighs that in mitigation and the death sentence is warranted.  (SAP at 167; Lodgment No. 100 at 331.)

Petitioner's jury was instructed pursuant to California law that they were to weigh the "totality" of the evidence in aggravation against the "totality" of that in mitigation and "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it

09cv0388 L (NLS)

warrants death instead of life without parole." (RT 4839-40, 4898, CT 3311-12.) The argument lacks support, as the Supreme Court has upheld the constitutionality of the California capital statute, stating that: "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." Tuilaepa, 512 U.S. at 979 ("'Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.'"), quoting Ramos, 463 U.S. at 1008. Moreover, the Ninth Circuit has explicitly rejected this argument. See Williams, 52 F.3d at 1485 ("[T]he failure of the statute to require a specific finding that death is beyond a reasonable doubt the appropriate penalty does not render it unconstitutional.") Accordingly, Petitioner fails to show that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.

### 4. <u>Unadjudicated Criminal Activity</u>

Petitioner also asserts that the introduction and consideration of unadjudicated criminal activity at the penalty phase violates constitutional guarantees, and argued that Ring and Apprendi require that "all of the findings prerequisite to a sentence of death must be made beyond a reasonable doubt by a jury acting as a collective entity," which includes findings pertaining to prior criminal activity. (SAP at 167; Lodgment No. 100 at 350-51.)

First, Petitioner's reliance on Ring and Apprendi is misplaced for the reasons discussed above. Moreover, California law specifically provides for the introduction of prior uncharged criminal conduct at capital penalty phase proceedings. See Cal. Penal Code §190.3(b). The Supreme Court has generally noted that "[s]entencing courts have not only taken into consideration a defendant's prior convictions, but have also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior." United States v. Nichols, 511 U.S. 738, 747 (1994). The Ninth Circuit has specifically upheld the admission of unadjudicated criminal activity into evidence at penalty phase proceedings. See McDowell v. Calderon, 107 F.3d 1351, 1366 (9th Cir. 1997), <u>amended</u>

116 F.3d 364 (9th Cir. 1997), <u>vacated in part by</u> 130 F.3d 833, 835 (9th Cir. 1997) (en banc).  Petitioner fails to show that Supreme Court authority supports his contention and as such, the Court cannot conclude that state court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law.

## 5. **Lack of Proportionality Review**

Petitioner argues that the California Supreme Court has interpreted the California capital statute as forbidding inter-case proportionality review and that the state court's refusal to engage in such review violates the federal Constitution.  (SAP at 167; Lodgment No. 100 at 345-50.)

The Ninth Circuit has specifically rejected the contention that the California death penalty statute violates the federal Constitution due to a lack of proportionality review, reasoning that such an "argument is foreclosed by the Supreme Court's holding in <u>Pulley v. Harris</u>, 465 U.S. 37, 43-46, 104 S.Ct 871, 79 L.Ed.2d 29 (1984), that neither the Eighth Amendment nor due process requires proportionality review in imposing the death penalty." <u>Allen v. Woodford</u>, 395 F.3d 979, 1018 (9th Cir. 2005).  In light of the lack of clearly established authority supporting his argument, Petitioner fails to demonstrate that the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.

## 6. **Barriers to the Consideration of Mitigation**

Petitioner asserts that the use of the terms "extreme" and "substantial" in Cal. Penal Code section 190.3 factors (d) and (g) "acted as barriers to the consideration of mitigation," in violation of the Constitution.  (SAP at 167; Lodgment No. 100 at 352.)

Petitioner fails to cite to clearly established law that compels the outcome he seeks. In fact, the Supreme Court rejected a challenge to another state capital sentencing statute that employs the terms "extreme" and "substantially" in a similar manner, rejecting the argument that "these instructions impermissibly precluded the jury's consideration of lesser degrees of disturbance, impairment, or duress," and reasoning that the "judge at petitioner's trial made clear to the jury that these were merely items it could consider, and

that it was also entitled to consider 'any other mitigating matter concerning the character or record of the defendant, or the circumstances of his offense.'" Blystone v. Pennsylvania, 494 U.S. 299, 308 (1990); see also Hendricks v. Vasquez, 974 F.2d 1099, 1109 (9th Cir. 1992) (use of term "extreme" in penalty phase instructions did not impermissibly prevent jurors from considering relevant evidence in mitigation), citing Blystone, 494 U.S. at 308. Like those cases, the trial court in Petitioner's case also instructed the penalty phase jury that it, pursuant to factor (k), could consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (RT 4897, CT 3310.)

Accordingly, the California Supreme Court's rejection of this contention was neither contrary to, or an unreasonable application of, clearly established federal law.

### D. Equal Protection

Petitioner argues that "California's death penalty scheme provides significantly fewer procedural protections for persons facing a death sentence than are afforded persons charged with non-capital crimes," and that "[t]his differential treatment violates the constitutional guarantee of equal protection of the laws." (SAP at 167; Lodgment No. 100 at 352.)

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985), quoting Plyler v. Doe, 457 U.S. 202, 216 (1982). The Supreme Court has held that "the penalty of death is qualitatively different from a sentence of imprisonment, however long," and as such, "there is a corresponding difference in the need for reliability in the determination that death in an appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976). However, because capital and non-capital defendants are not "similarly

situated" to one another, Petitioner fails to persuasively demonstrate that differences in procedural rules implicate equal protection principles.  See Massie v. Hennessey, 875 F.2d 1386, 1389 (9th Cir. 1989) ("The relevant comparison for equal protection purposes is between two defendants, both of whom are sentenced to death.")

Given the lack of Supreme Court authority supporting his contention, Petitioner has not shown that the California Supreme Court's rejection of this claim on appeal was either contrary to, or an unreasonable application of, clearly established federal law.

### E.    International Norms

Finally, Petitioner argues that the state of California's use of the death penalty "falls short of international norms" and violates the Eighth and Fourteenth Amendments to the United States Constitution.  (SAP at 167; Lodgment No. 100 at 362.)   He asserts that capital punishment is "unconstitutional in this country inasmuch as international law is a part of our law."  (Id. at 365.)

This claim is similar in scope and aim to the contention raised in Claim 26.  As discussed below with respect to that claim, Petitioner fails to offer any clearly established federal law that supports his claim of constitutional error.  In the absence of controlling authority, Petitioner has not shown that the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.

### F.    Systemic Delay

In the merits brief, Petitioner adds a "supplemental citation and argument as to the failure of the California capital sentencing scheme to comply with the Eighth Amendment," citing to and relying on Jones v. Chappell, 31 F.Supp.3d 1050 (C.D. Cal. 2014), a case in which a federal district court in California vacated a capital petitioner's death sentence, holding that California's capital system was unconstitutional due to arbitrariness and delays in the post-conviction review process.  (Pet. Brief at 51.)  Petitioner argues that his case "demonstrat[es] the same systemic delay that cumulatively constituted cruel and unusual punishment in Jones," and also similar to Jones, "the state habeas corpus proceedings were inadequate to provide a reasonable determination of the habeas claims." (Id. at 52.)  Setting

aside the significant hurdle posed by Petitioner's failure to present and exhaust this contention with the California Supreme Court, even had Petitioner previously raised and exhausted an identical claim in state court, the district court's decision is not binding on this Court. Moreover, since the briefing, the Ninth Circuit reversed the district court's decision, finding that the relief sought was barred by Teague. See Jones v. Davis, 806 F.3d 538, 553 (9th Cir. 2015) ("Because Petitioner asks us to apply a novel constitutional rule, we may not assess the substantive validity of his claim."), rehearing and rehearing en banc denied (9th Cir. 2016); but see Alfaro v. Johnson, 862 F.3d 1176, 1185 n. 5 (9th Cir. 2017) (citing recent Supreme Court decisions in Welch v. United States, 578 U.S. ___, 136 S.Ct. 1257 (2016) and Montgomery v. Louisiana, 577 U.S.___, 136 S.Ct. 718 (2016), which "suggest[] that, under the Supreme Court's evolving interpretation of Teague, the rule she seeks to advance may present a substantive rule," but noting that "because Alfaro's petition can be resolved on alternative procedural grounds, we do not now decide the continued vitality of our holding to the contrary in Jones.") As it currently stands, Petitioner fails to provide any clearly established authority in support of his claim for relief, in addition to his failure to exhaust. Habeas relief is not warranted.

**2. Claim 25**

Petitioner asserts that he "suffers from serious mental disabilities of a neuropsychological nature that are the functionally [sic] equivalent of mental retardation with respect to diminishing his culpability, and that should also be deemed a bar to the imposition of capital punishment," relying on Atkins v. Virginia, 536 U.S. 304 (2002), in which the Supreme Court barred the execution of intellectually disabled offenders. (SAP at 168.) Petitioner requests an evidentiary hearing on this claim. (Id. at 55.)

Petitioner raised this claim as Claim XIV in the first state habeas petition and the California Supreme Court rejected it on the merits without a statement of reasoning. (See Lodgment Nos. 106, 118.)

"Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most

deserving of execution.'" <u>Roper v. Simmons</u>, 543 U.S. 551, 568 (2005), quoting <u>Atkins</u>, 536 U.S. at 319. In accordance with this reasoning, the Supreme Court has specifically held that certain classes of defendants, such as juveniles and the intellectually disabled, are ineligible for the death penalty. <u>See</u> <u>e.g.</u> <u>Roper</u>, 543 U.S. at 571 ("Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity."); <u>Hall v. Florida</u>, 572 U.S. ___, 134 S.Ct. 1986, 1992 (2014) ("No legitimate penological purpose is served by executing a person with intellectual disability."), citing <u>Atkins</u>, 536 U.S. at 317, 320; <u>see also</u> <u>Moore v. Texas</u>, 581 U.S. ___, 137 S.Ct. 1039, 1048 (2017) ("In <u>Atkins v. Virginia</u>, we held that the Constitution 'restrict[s] . . . the State's power to take the life of' *any* intellectually disabled individual."), quoting <u>Atkins</u>, 536 U.S. at 321 (brackets and emphasis in original).

Petitioner contends that he "suffers from serious mental disabilities of a neuropsychological nature that are the functionally [sic] equivalent of mental retardation with respect to diminishing his culpability, and that should also be deemed a bar to the imposition of capital punishment." (SAP at 168.) Yet, Petitioner fails to cite any clearly established federal law supporting his contention that <u>Atkins</u> bars the execution of individuals with an arguably "equivalent" impairment, given that <u>Atkins</u> simply and clearly holds only that "persons with intellectual disability may not be executed." <u>Hall</u>, 134 S.Ct. at 1992, citing <u>Atkins</u>, 536 U.S. at 321. As such, Petitioner fails to show that the state court's rejection of this argument was objectively unreasonable. <u>See</u> <u>Richter</u>, 562 U.S. at 101 ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."), quoting <u>Mirzayance</u>, 556 U.S. at 122 (bracket in original). However, in an abundance of caution, and to the extent Petitioner alleges that his mental disabilities and brain damage establish his intellectual disability and thus render him ineligible for the death penalty under <u>Atkins</u>/<u>Hall</u>, the Court will consider that argument on the merits.

///

09cv0388 L (NLS)

"[T]he Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability." <u>Hall</u>, 134 S.Ct. at 1990, citing <u>Atkins</u>, 536 U.S. at 321. The State of California has developed rules and procedures to adjudicate claims of intellectual disability,[22] and has defined the term as follows: "As used in this section, 'intellectual disability' means the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years of age." Cal. Penal Code § 1376(a). California's definition of intellectual disability was developed in accordance with the standards discussed by the Supreme Court in <u>Atkins</u>. <u>See In re Hawthorne</u>, 35 Cal. 4th 40, 47 (2005) (noting that "the clinical definitions referenced in <u>Atkins</u> . . . conform to section 1376."); <u>Hall</u>, 134 S.Ct. at 1994 ("As the Court noted in <u>Atkins</u>, the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period."), citing <u>Atkins</u>, 536 U.S. at 308, n. 3.

In order to state a claim of intellectual disability in state post-conviction proceedings, California sets forth the following standard:

> To state a prima facie case for relief, the petition must contain 'a declaration by a qualified expert stating his or her opinion that the (petitioner) is mentally retarded . . . .' (§1376 subd. (b)(1).) Not only must the declarant be a qualified expert, i.e., an individual with appropriate education, training, and experience, the declaration must explain the basis for the assessment of mental retardation in light of the statutory standard.

---

[22] The current version of Cal. Penal Code § 1376 replaces the term "mentally retarded," used in a previous version of the statute, with "intellectual disability." This change in terminology has been adopted by numerous entities, including the Supreme Court. <u>See</u> <u>e.g.</u> <u>Hall</u>, 134 S.Ct. at 1990 ("Previous opinions of this Court have employed the term 'mental retardation.' This opinion uses the term 'intellectual disability' to describe the identical phenomenon.") The Court will similarly use the term "intellectual disability" unless directly quoting from a source that uses the prior terminology.

<u>Hawthorne</u>, 35 Cal. 4th at 47.  Moreover, California requires that "the expert's declaration must set forth a factual basis for finding the petitioner has significantly subaverage intellectual functioning and deficiencies in adaptive behavior in the categories enumerated above.  The evidence must also establish that the intellectual and behavioral deficits manifested prior to the age of 18."  <u>Id.</u> at 48.

In the first state habeas petition, Petitioner did not assert that he was intellectually disabled.  Instead, he argued that "[w]hether or not Mr. Hoyos is mentally retarded, he suffers from moderate to severe brain damage," and that "[a]side from the question of whether or not Mr. Hoyos is retarded, the reasoning and logic of *Atkins v. Virginia* (2002) 536 U.S. 304, applies to Mr. Hoyos, whose mental disorders render him volitionally incapacitated.  When the U.S. Supreme Court concluded that mentally retarded murderers are categorically so lacking in moral blameworthiness as to be ineligible for the death penalty, its rationale for doing so compels the conclusion that the volitionally incapacitated are likewise ineligible."  (Lodgment No. 106 at 205) (footnote omitted.)

Petitioner provided the California Supreme Court with the evaluation of clinical psychologist Thomas MacSpeiden, Ph.D., who examined Petitioner in 1993 in advance of trial, as well as a declaration from clinical psychologist Ricardo Weinstein, Ph.D., who specializes in neuropsychology and examined Petitioner in 2006.  (<u>See</u> Lodgment No. 113, Exs. 93, 99.)  However, as discussed below, neither expert offers an opinion that Petitioner is intellectually disabled.  Petitioner conceded this point in his state habeas petition, acknowledging in a footnote that whether he was intellectually disabled was "an open question that can only be resolved by further investigation," citing Dr. Weinstein's declaration.  (Lodgment No. 106 at 205 n. 29.)

Dr. MacSpeiden reported that testing showed Petitioner's Verbal IQ was 79, Performance IQ was 85, and his Full Scale IQ was 79.  (Lodgment No. 113, Ex. 93 at 16.) He stated that Petitioner was verbally "borderline," his motor performance was in the "low average range," and that overall Petitioner was in the "borderline range," and that while the tests "were somewhat conservative estimates of his intellectual ability because of

cultural factors," he opined "[i]t is probable that his overall intelligence is in the low average range." (Id.) Dr. MacSpeiden concluded that: "Jaime Armando Hoyos functions intellectually in the low average range.  His verbal IQ tested in the borderline range, but his poor verbal aptitude appeared secondary to the cultural bias of the intelligence test." (Id. at 22.)  Dr. MacSpeiden's evaluation does not contain any discussion on or offer any opinion as to whether Petitioner is intellectually disabled.

Meanwhile, as a result of the 2006 testing, Dr. Weinstein concluded that "Mr. Hoyos is functioning at the mental retardation level of intelligence." (Lodgment No. 113, Ex. 99 at 3.)  Dr. Weinstein reported that Petitioner's verbal IQ was 73, Performance IQ was 75, and Full Scale IQ was 72. (Id.)  Dr. Weinstein also noted Petitioner's "history of multiple brain insults dating back to his childhood" as well as during both Petitioner's developmental ages and adulthood, in addition to "many instances of loss of consciousness," and "a long history of severe drug addiction." (Id.)  Dr. Weinstein faulted Dr. MacSpeiden for failing to note that history, as well as for using an interpreter instead of suggesting that the tests should have been conducted by an expert fluent in Spanish. (Id. at 3-4.)  Dr. Weinstein stated that: "It is my opinion with a high degree of scientific certainty that Mr. Hoyos suffers from significant brain dysfunction and possibly from mental retardation." (Id. at 4.)  However, Dr. Weinstein further qualified his conclusion that Petitioner "possibly" suffers from an intellectual disability, explaining that:

> The IQ scores obtained from the instruments utilized indicate that Mr. Hoyos falls within the range of mental retardation (approximately 2 standard deviations below the mean).  There are also significant suggestions of adaptive deficits in Mr. Hoyos's background.  Although his ability for thinking abstractly and rationally is severely limited, as is typical in mentally retarded individuals, the diagnosis of mental retardation can not be confirmed without further work and investigation, since many of the potential causes of his current low intellectual functioning may have occurred after the age of 18.  All currently operative definitions of mental retardation require that the limitations have originated and manifested prior to the age of 18 years old.

(Id.)

///

At oral arguments, Petitioner alleged that the California Supreme Court should have issued an order to show cause on the evidence presented, namely the MacSpeiden and Weinstein declarations. (ECF No. 142 ["Oral Arg. RT"] at 77-78.) Respondent maintained that all three criteria (significantly subaverage intellectual functioning, adaptive deficits, and onset prior to age 18) needed to be met to satisfy Cal. Penal Code § 1376, and Petitioner did not do so, as Dr. Weinstein stated he could not confirm Petitioner's limitations manifested prior to age 18. (Id. at 79-80.) Respondent stated that "the burden to show that he met Atkins or met California Penal Code 1376 was not met on habeas corpus in the California Supreme Court, and this Court should defer to that finding." (Id. at 80.)

Petitioner asserted that with respect to the state court proceedings, "[c]ounsel took their best shot with the resources that they had, but they exhausted the financial resources provided by the California Supreme Court, applied for additional funding to conduct more investigation, and were denied. So that - - so to the extent that counsel is saying that the Weinstein declaration and the MacSpeiden declaration don't get the ball all the way down the field into the touchdown zone of a prima facie case, that's not attributable to defective - - or inadequate performance on the part of state post-conviction counsel. That's equally attributable to the California Supreme Court not providing resources for further investigation that they - - that they requested and were denied." (Id. at 82-83.)

Petitioner's filing subsequent to oral arguments supports his contention that state habeas counsel requested such funding, which the state supreme court denied. (See ECF No. 140.) In September 2007, during state habeas proceedings, counsel for Petitioner submitted a confidential application for additional habeas corpus investigation funds, explained that the standard $25,000 permitted for investigation and expert services was "inadequate" and requested supplemental funding for additional investigation, including an additional $7,430 for investigation related to a "Potential Retardation analysis." (ECF No. 140-1 at 2-3, 12.) Counsel acknowledged the lack of a diagnosis by Dr. Weinstein and stated that: "According to Dr. Weinstein, a definitive diagnosis would require three days in and around Tecate, California, the town where petitioner grew up and where his family

remains; two days in San Quentin, to review his medical files and talk with people who have know [sic] him since his arrival at San Quentin in 1994, and one day at La Mesa, the Baja California prison in which he was incarcerated for approximately eight years," and requested funding for this purpose.  (Id. at 10-12) (footnote omitted).  In October 2007, the California Supreme Court denied the request.  (ECF No. 140-2 at 1.)

In his response to Petitioner's filing, Respondent asserted that the California Supreme Court followed its own rules in denying funding, as state habeas counsel had already exhausted the $25,000 granted for habeas investigation before requesting additional investigative funding.  (ECF No. 141 at 2.)  Respondent notes that the state court's own order denying funding cited "Supreme Ct. Policies Regarding Cases Arising from Judgments of Death, Policy 3, Compensation stds., std. 2-2.1," which states in relevant part that the court "will not authorize counsel to expend, nor will it reimburse counsel, for habeas corpus investigation exceeding $25,000 before the issuance of an order to show cause."  (Id. at 2-3, quoting Sup. Ct. Policy 3, std. 2-2.1.)  Respondent argues that Petitioner's failure to state a prima facie case and the state court's denial of an OSC "readily explains" this denial of additional funding.  (Id. at 4.)

At oral arguments, Petitioner asserted that the state court's rejection of this claim without issuing an OSC was unreasonable, and also argued that any pleading deficiencies in state court were at least partially attributable to the state court's denial of supplemental investigative funds.  (Oral Arg. RT at 77-78, 82-83.)  In light of the recent submission, it is clear that state habeas counsel sought additional funding to complete the investigation and attempt to reach a definitive diagnosis on whether Petitioner was intellectually disabled, and that the California Supreme Court denied the request for supplemental funding.

The Ninth Circuit has stated that "a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable."  Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2004).  The Ninth Circuit also cautioned that a reviewing court

"must be particularly deferential to our state court colleagues" and instructed that "before we can determine that the state-court factfinding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Taylor, 366 F.3d at 1000.

Yet, Petitioner fails to show that the state court acted unreasonably in failing to issue an OSC on his Atkins claim. The California Supreme Court has outlined the procedures for considering a habeas petition, stating in relevant part that: "An appellate court receiving such a petition evaluates it by asking whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief. If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an OSC." People v. Duvall, 9 Cal. 4th 464, 474-75 (1995) (in bank) (internal and external citations omitted). The Duvall Court also stated that: "Issuance of an OSC signifies the court's preliminary determination that the petitioner has pleaded sufficient facts that, if true, would entitle him to relief." Id. at 475.

Here, because the California Supreme Court issued a summary denial of Petitioner's Atkins claim, it is presumed that the state court concluded Petitioner's allegations failed to state a prima facie case for relief. See Duvall, 9 Cal. 4th at 474-75; see also Pinholster 563 U.S. at 188, n.12 ("Under California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that 'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.' In re Clark, 5 Cal. 4th 750, 770, 21 Cal.Rptr.2d 509, 855 P.2d 729, 741-41 (1993).")

Reviewing Petitioner's claim in light of state law concerning claims of intellectual disability and California's procedures for considering a habeas petition, the state court's conclusion was not unreasonable. Again, under California law, in order to state a claim of intellectual disability in state post-conviction proceedings, the habeas petition must be

09cv0388 L (NLS)

accompanied by "'a declaration by a qualified expert stating his or her opinion that the (petitioner) is mentally retarded . . . .'" See Hawthorne, 35 Cal. 4th at 47, quoting Cal. Penal Code § 1376(b)(1). Specifically, "the expert's declaration must set forth a factual basis for finding the petitioner has significantly subaverage intellectual functioning and deficiencies in adaptive behavior in the categories enumerated above. The evidence must also establish that the intellectual and behavioral deficits manifested prior to the age of 18." Id. at 48.

Even taking all of Petitioner's factual allegations, including those in the MacSpeiden and Weinstein declarations, to be true, it is evident that Petitioner did not state a prima facie case for relief, as neither expert stated an opinion that Petitioner was intellectually disabled. Dr. Weinstein indicated he could only state that Petitioner "possibly" met the definition. (Lodgment No. 113, Ex. 99 at 3-4.) Dr. MacSpeiden's declaration, meanwhile, did not offer an opinion that Petitioner was intellectually disabled or even any discussion of that topic. (See Lodgment No. 113, Ex. 93 at 16.) Given the clear lack of an expert declaration stating an opinion that Petitioner was intellectually disabled, particularly the lack of any showing that Petitioner's asserted deficits occurred prior to age 18, it is clear that the state court's rejection of Petitioner's Atkins claim was not erroneous, much less unreasonable.

Nor can the Court conclude that the state court fact-finding process was defective. The record reflects that the state court allocated $25,000 in investigative funds for Petitioner's habeas proceedings, and Petitioner exhausted that funding. The state supreme court's own policies specified that investigative expenses exceeding that amount were not allowed prior to the issuance of an OSC. See Supreme Court Policies Regarding Cases Arising From Judgments of Death, Policy 3, std. 2-2.1 (providing in relevant part that "The court will reimburse counsel for expenses up to $25,000 that were reasonably incurred pursuant to the duty to investigate as described in standard 1-1, but it will not authorize counsel to expend, nor will it reimburse counsel for, habeas corpus investigation expenses exceeding $25,000 before the issuance of an order to show cause.")

As Respondent correctly notes, the California Supreme Court followed, and cited to, its own policy in denying Petitioner's supplemental request. In light of California law on the requirements for stating a prima facie case for relief on a claim of intellectual disability, Petitioner's failure to satisfy that standard, and the state supreme court's own rules, the rejection of supplemental funding was reasonable and not indicative of a "deficient" or "non-existent" state court fact-finding process. See Taylor, 366 F.3d at 1000. The state court authorized investigative funds during Petitioner's habeas proceedings, which were used in part to retain Dr. Weinstein to test and evaluate Petitioner, and state habeas counsel presumably made decisions concerning the best use of those investigative funds. Petitioner has not offered any indication that had those funds been used differently, or had the state court authorized additional funding even prior to the issuance of an OSC, Petitioner could have stated a claim for relief. As such, the inability to plead a successful claim does not appear readily attributable to inadequacies in the state court process. Petitioner fails to provide evidence supporting a conclusion that he actually meets the definition of intellectual disability. Even taking his factual allegations to be true, the strongest support is Dr. Weinstein's assertion that Petitioner "suffers from significant brain dysfunction and possibly from mental retardation." (Lodgment No. 113, Ex. 99 at 4.)

Had the state court provided for further investigation and development of this claim, the Court acknowledges a possibility Petitioner could have obtained and provided evidence showing an onset prior to age 18. At the same time, however, the Court must recognize that further investigation could have instead revealed the onset of Petitioner's condition occurred after 18. Again, Petitioner himself acknowledged during state habeas proceedings that the issue of whether he was intellectually disabled was "an open question that can only be resolved by further investigation." (Lodgment No. 106 at n. 29.) Dr. Weinstein's evaluation and declaration also clearly allowed for either outcome, as he indicated only that Petitioner "possibly" suffered from intellectual disability. While Dr. Weinstein appeared to clearly find that Petitioner met the first criteria, stating that Petitioner functioned at a significantly subaverage intelligence level, the expert was much less firm

concerning the second criteria, indicating only that there were "significant <u>suggestions</u> of adaptive deficits" in Petitioner's history. (Lodgment No. 113, Ex. 99 at 4) (emphasis added.) Finally, Dr. Weinstein cited an inability to reach any conclusion on the third criteria, or to actually confirm a diagnosis, as he could not determine whether the onset was prior to 18, and indeed explicitly conceded that "many of the potential causes of his current low intellectual functioning may have occurred after the age of 18." (<u>Id.</u>) It is also notable that Dr. MacSpeiden, who examined Petitioner in 1993 prior to trial, found Petitioner's intelligence to be "low average," which is clearly contrary to Dr. Weinstein, who in 2006 found Petitioner to be "functioning at the mental retardation level of intelligence." (<u>Compare</u> Lodgment No. 113, Exs. 93 (MacSpeiden) and 99 (Weinstein).)

"<u>Atkins</u> stated in clear terms that 'we leave to the State(s) the task of developing appropriate ways to enforce the constitutional restriction upon (their) execution of sentences.'" <u>Schriro v. Smith</u>, 546 U.S. 6, 7 (2005) (per curiam), quoting <u>Atkins</u>, 536 U.S. at 317 and <u>Ford v. Wainwright</u>, 477 U.S. 399, 416-17 (1986). Petitioner failed to demonstrate, as required by California law to state a claim for relief, that he suffered from "significantly subaverage intellectual functioning and deficiencies in adaptive behavior" and "that the intellectual and behavioral deficits manifested prior to the age of 18." <u>Hawthorne</u>, 35 Cal. 4th at 47-48. Accordingly, the Court cannot conclude that the California Supreme Court's rejection of this claim without providing for additional investigation was in error, much less that it was objectively unreasonable so as to merit relief under AEDPA.

Ultimately, Petitioner fails to show that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, <u>Atkins</u>, or that the California Supreme Court's conclusion was based on an unreasonable determination of the facts. As such, neither habeas relief nor an evidentiary hearing is warranted on Petitioner's <u>Atkins</u> claim. <u>See</u> <u>Sully</u>, 725 F.3d at 1075.

///

///

### 3. **Claim 26**

Petitioner asserts that his death sentence "not only violates the Eighth Amendment of the United States Constitution as construed in <u>Atkins</u>, but also the various sources of international law bearing on this issue, including Article 53 of the Vienna Convention." (SAP at 168-69.)

Petitioner raised this claim as Claim XV in the first state habeas petition, and the California Supreme Court rejected it on the merits without a statement of reasoning. (<u>See</u> Lodgment Nos. 106, 118.)

Petitioner fails to offer any support for his contention that the international agreements and statements discussed in the state habeas petition are enforceable on federal habeas review, nor does he cite to any clearly established federal law that supports his claim of constitutional error. In the absence of any controlling authority supporting this argument, Petitioner has not shown that the state supreme court's rejection of this claim was objectively unreasonable. Habeas relief is not warranted on Claim 26.

### 4. **Claim 27**

Petitioner contends that "capital sentencing in California is overall deficient because of the disparate practices in the 58 separate counties" and that "[t]he result is akin to discrimination on the basis of geographic coincidence," in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. (SAP at 169.) He also asserts that "[t]here is substantial equal protection law that when fundamental rights are at stake, uniformity of procedures among counties within the state is essential. <u>Bush</u> v. <u>Gore</u>, 531 U.S. 98 (2000)." (<u>Id</u>.)

Petitioner raised this claim as Claim XVII in the first state habeas petition, and the California Supreme Court rejected it on the merits without a statement of reasoning. (<u>See</u> Lodgment Nos. 106, 118.)

Petitioner's reliance upon <u>Bush v. Gore</u> is misplaced, as that decision involved legal challenges arising from the 2000 presidential election, and the Supreme Court specifically stated in that case that "*[o]ur consideration is limited to the present circumstances*, for the

09cv0388 L (NLS)

problem of equal protection in *election processes* generally presents many complexities."
Id., 531 U.S. at 109 (emphasis added).

As for Petitioner's general assertion that variances among the California counties in charging, prosecution and sentencing violates constitutional principles, he fails to offer clearly established law supporting his position.  Indeed, the Supreme Court has on multiple occasions rejected the contention that prosecutorial discretion in capital charging violates constitutional principles.  See e.g. Jurek v. Texas, 428 U.S. 262, 274 (1976); Proffitt v. Florida, 428 U.S. 242, 254 (1976); Gregg v. Georgia, 428 U.S. 153, 199-200 (1976).  The California Supreme Court, citing those same holdings, has similarly rejected this argument. See e.g. People v. Williams, 16 Cal. 4th 153, 278 (Cal. 1997), quoting People v. Keenan, 46 Cal. 3d 478, 505 (Cal. 1988) ("[P]rosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment."), citing Jurek, 428 U.S. at 274, Profitt, 428 U.S. at 254, Gregg, 428 U.S. at 199-200.

In light of this authority, Petitioner fails to show that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law.  Habeas relief is unavailable on Claim 27.

**5.   Claim 28**

Petitioner alleges that he "was substantially prejudiced at both phases of the trial proceedings because of the combined errors, misconduct, and deficient performance by the trial court, the prosecutor, and defense counsel, rending this trial fundamentally  unfair under the Fifth, Sixth, Eighth, and Fourteenth Amendments."  (SAP at 170.)

Petitioner raised this claim on direct appeal, which the California Supreme Court rejected, reasoning as follows:

> Defendant requests that we consider the cumulative effect of any errors in the pretrial stage, guilt phase, or penalty phase in deciding whether to reverse defendant's convictions and death sentence. Because we conclude there were no individual errors of any kind, we reject defendant's claim that any

cumulative effect warrants reversal.

Hoyos, 41 Cal. 4th at 927. Petitioner re-raised the claim as Claim XVI of his first state habeas petition, and the California Supreme Court denied the claim on the merits without a statement of reasoning. (Lodgment No. 106, 118.)

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284, 298, 302-03 (1973). "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." Parle, 505 F.3d at 927, citing Chambers, 410 U.S. at 290 n.3. Here, Petitioner failed to demonstrate the existence of any error, much less multiple errors that could combine to sustain a claim of cumulative error.[23] See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) ("Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation.")

Petitioner fails to show that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Habeas relief is not warranted on Claim 28.

///

///

---

[23] In the merits briefing, "Counsel for petitioner request leave to provide additional briefing on the cumulative prejudice argument after this Court rules as to the existence of constitutional errors whose prejudice must be weighed cumulatively." (Pet. Brief at 54-55.) Because Petitioner fails to show the existence of any single instance of constitutional error, much less multiple instances, Petitioner fails to demonstrate a possibility of cumulative error. Accordingly, the Court finds no need for additional briefing on this matter.

245

## VI.  CERTIFICATE OF APPEALABILITY

In a habeas case, a certificate of appealability ["COA"] may be granted "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" Shoemaker v. Taylor, 730 F.3d 778, 790 (9th Cir. 2013), quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) ("Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.")  Meanwhile, the Ninth Circuit has repeatedly characterized the standard required for granting a COA as "relatively low" or "modest."  See e.g. Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002), Silva v. Woodford, 279 F.3d 825, 832 (9th Cir. 2002), quoting Lambright v. Stewart, 220 F.3d 1022, 1024 (9th Cir. 2000).  In light of this standard, the Court finds Claims 1, 5, 13, 14, 22, 23, and 25 appropriate for a COA.

## VII. CONCLUSION

For the reasons discussed above, the Court **DENIES** Respondent's request to dismiss Claims 14-16 on the basis of state procedural bars, **DENIES** Petitioner's motion for an evidentiary hearing on Claims 13-23 and 25, and **DENIES** Petitioner's request for relief on the merits of all claims in the SAP.  In the final order, the Court will **GRANT** a COA on Claims 1, 5, 13, 14, 22, 23, and 25.

**IT IS SO ORDERED.**

Dated:  October 4, 2017

Hon. M. James Lorenz
United States District Judge